FILED

2015 Mar-31  PM 01:56
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | | |
|---|---|---|
| **MARK ALLEN JENKINS,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **Case no. 4:08-00869-VEH-SGC** |
| | ) | |
| **RICHARD ALLEN, Commissioner,** | ) | |
| **Alabama Department of Corrections,** | ) | |
| | ) | |
| **Respondent.** | ) | |

_____

## MEMORANDUM OPINION

The petitioner, Mark Allen Jenkins ("Jenkins"), is an Alabama state inmate sentenced to death. Before the court is Jenkins's motion for an evidentiary hearing on the claim that he is mentally retarded under *Atkins v. Virginia*, 536 U.S. 304 (2002). (Doc. 49). For the following reasons, the petitioner's *Atkins* claim is without merit, and he is not entitled to an evidentiary hearing on this claim.

## I. PROCEDURAL HISTORY

In June 1989, Jenkins was indicted in the St. Clair County Circuit Court on two counts of capital murder for the strangling death of Tammy Ruth Hogeland. (C.R. Vol. 10, Tab 27 at 23).[1] The indictment charged that Jenkins intentionally killed Ms.

_____

[1] The court will utilize the following method of citation to the record. References to specific pages of the court record on direct appeal are designated "(C.R.__)" and references to the transcript on direct appeal are designated "(R.__)." References to the court record of the Rule 32 proceedings

Hogeland during the course of a robbery[2] and kidnapping.[3]  Jenkins was represented at trial by Douglas Scofield and Stan Downey.  The guilt phase of the trial commenced on March 12, 1991.  (C.R. Vol. 45, Tab 73 at 1).  On March 19, 1991, Jenkins was convicted as charged.  (*Id*.).  After a twenty-minute recess, the court proceeded with the penalty phase of the trial.[4]  (*Id*.).  Later that day, the jury recommended by a vote of 10-2 that Jenkins be sentenced to death.  (*Id*.; R. Vol. 9, Tab 24 at 1763).  At the April 10, 1991 sentencing hearing,[5] the trial court followed the jury's recommendation and sentenced Jenkins to death.  (R. Vol. 9, Tab 26 at 1795).

Jenkins was represented by Douglas Scofield on direct appeal.  He raised a variety of issues on appeal, including: (1) insufficiency of the evidence; (2) the

---

are designated  "(Rule 32 C.R. ___ )" and references to the transcript of the Rule 32 hearing are designated "(Rule 32 R. ___ )."  The court will strive to list any page number associated with the court records by reference to the numbers at the bottom of each page of a particular document, if said numbers are the most readily discoverable for purposes of expedient examination of that part of the record.  Otherwise, the page numbers shall correspond with those listed at the upper right hand corner of the record.  Additionally, the court has cited to any easily identifiable tab numbers close to any cited material for the reader's benefit.

[2] *See Ala. Code* § 13A-5-40(a)(2) (1975).

[3] *See Ala. Code* § 13A-5-40(a)(1) (1975).

[4] Jenkins's friend Lonnie Seal was the only witness at the penalty phase.  She testified that Jenkins was a good friend, who was helpful, generou,s and kind.  Seal further testified that he trusted Jenkins, even with his wife and baby.  (R. Vol. 9, Tab 19 at 1718-27).

[5] The transcript of the sentencing hearing is located at R. Vol. 9, Tabs 25-26.

court's failure to suppress physical evidence; (3) the admission of testimony from several prosecution witnesses; (4) the selection of the jury; (5) alleged violations of *Batson v. Kentucky*, 476 U.S. 79 (1986); (6) the court's findings on aggravating and mitigating circumstances; (7) prosecutorial misconduct during closing arguments in the guilt and sentencing phases; and (8) the court's jury instructions. (C.R. Vol. 12, Tabs 28, 30, 32). The Alabama Court of Criminal Appeals affirmed Jenkins's convictions and sentence on February 28, 1992. *Jenkins v. State*, 627 So. 2d 1034 (Ala. Crim. App. 1992). On May 28, 1993, the Alabama Supreme Court affirmed Jenkins's capital murder convictions and death sentence. *Ex parte Jenkins*, 627 So. 2d 1054 (Ala. 1993). On March 28, 1994, the United States Supreme Court denied Jenkins's petition for a writ of certiorari. *Jenkins v. Alabama*, 511 U.S. 1012 (1994).

On May 26, 1995, Jenkins, through counsel,[6] filed a Rule 32 petition in the St. Clair County Circuit Court. (Rule 32 C.R. Vol. 17, Tab. 42). Jenkins filed an amended petition on November 26, 1996. (Rule 32 C.R. Vol. 18, Tab 47). Evidentiary hearings were held on December 10, 1996, and January 20-21, 1997. (Rule 32 R. Vol. 19, Tab 48; Rule 32 R. Vol. 22). On December 31, 1997, the trial court denied the petition. (Rule 32 R. Vol. 45, Tab 77).

---

[6] Jenkins was represented by his current counsel, Joseph T. Flood, Esq.

Jenkins appealed the denial of his Rule 32 petition to the Alabama Court of Criminal Appeals, which affirmed the trial court on February 27, 2004. In affirming, the Court of Criminal Appeals specifically found that Jenkins's death sentence did not violate *Atkins*. *Jenkins v. State*, 972 So. 2d 111, 154-55 (Ala. Crim. App. 2004). The Alabama Court of Criminal Appeals denied Jenkins's application for rehearing on May 21, 2004. *Jenkins v. State*, 972 So. 2d 111 (Ala. Crim. App. 2004). On April 8, 2005, the Alabama Supreme Court affirmed the Court of Criminal Appeals' affirmance of the trial court's denial of the *Atkins* claim.[7] *Ex parte Jenkins*, 972 So. 2d 159 (Ala. 2005). The United States Supreme Court denied Jenkins's petition for a writ of certiorari on January 22, 2008. *Jenkins v. Alabama*, 552 U.S. 1167 (2008).

On August 11, 2008, Jenkins, through counsel, filed an amended § 2254 petition in this court. (Doc. 12). The respondent filed an answer to the amended petition on October 29, 2008. (Doc. 20). On November 12, 2008, the action was stayed to allow the petitioner to pursue a second state Rule 32 petition based upon *Ex Parte Burgess*, 21 So.3d 746 (Ala. 2008). (Doc. 25). On June 20, 2013, Jenkins filed an amended petition raising his newly exhausted juror misconduct claim. (Doc. 36). The respondent filed an answer to the amendment on September 3, 2013. (Doc. 40). Jenkins filed a reply brief on November 14, 2013. (Doc. 48).

---

[7] The Alabama Supreme Court reversed the judgment of the Alabama Court of Criminal Appeals on an unrelated claim and remanded the case for further proceedings on that claim. *Id*.

On November 14, 2013, Jenkins filed a Motion for an Evidentiary Hearing on his *Atkins* claim. (Doc. 49). The respondent filed an opposition to the motion on September 22, 2014. (Doc. 51). On October 8, 2014, Jenkins filed a reply to the respondent's opposition. (Doc. 52). The matter is now ripe for resolution.

## II. THE MOTION

In his motion, Jenkins requests that the court "issue a writ of habeas corpus on his *Atkins* claim" or, in the alternative, hold an evidentiary hearing allowing him "to present evidence in support of his claim that he is mentally retarded under *Atkins v. Virginia*." (Doc. 49 at 11). Jenkins argues "the evidence introduced during the Rule 32 proceedings in support of his claims of ineffective assistance of counsel conclusively establishes his mental retardation." (*Id*. at 5-6). Jenkins only requests an evidentiary hearing to the extent this court finds the record insufficient to grant relief, "as he was diligent in requesting a hearing in state court." (*Id*. at 6).

## III. PRESENTATION OF THE CLAIM IN STATE COURT

### A.  Pre-Atkins Review

Jenkins's trial took place in 1991, more than a decade prior to the *Atkins* decision in June 2002. Jenkins made no argument concerning his mental capacity at trial. However, in his amended Rule 32 petition, filed May 25, 1995, Jenkins argued trial counsel was ineffective for failing to investigate and present mitigating evidence

showing: (1) he was developmentally impaired since birth; (2) he possessed learning disabilities, low intelligence, poor comprehension, and retarded socialization skills that prevented him from achieving academically and forming normal relationships; and (3) he had a long history of mental health problems.  (Rule 32 C.R. Vol. 18, Tab 47 at 16-17).

The trial court conducted evidentiary hearings on December 10, 1996, and January 20-21, 1997.  (Rule 32 R. Vol. 19, Tab 48; Rule 32 R. Vol. 22).  Among the witnesses at the hearings were two mental health experts, Dr. David Lisak and Dr. Karl Kirkland.  On December 31, 1997, the trial court denied the petition.  (Rule 32 R. Vol. 45, Tab 77).  The mental health evidence presented to the trial court is summarized below.

### 1.  Dr. Lisak: Jenkins's Mental Health Expert

Dr. David Lisak, the clinical psychologist[8] retained by Jenkins, testified at the Rule 32 hearing that he evaluated Jenkins from August 22-23, 1996, and again on October 11, 1996, for a total of at least 12 hours.  (Rule 32 R. Vol. 21 at 432-33).  Dr. Lisak also reviewed the transcript of the witnesses who testified earlier in the evidentiary hearing.  He also interviewed: Lonnie and Sherry Seal (friends Jenkins lived with when he first moved to Alabama); Virginia Price and Bonnie Adams (the

---

[8] Dr. Lisak testified that his area of research and expertise is psychological trauma, the study of the impact of traumatic events on individuals.  (Rule 32 R. Vol. 21 at 440).

guards who watched over Jenkins while he was in the St. Clair County Jail); Betty Delavega (Jenkins's second cousin); Anna Clark (a family friend); Sharon Roberts (Jenkins's aunt); Steven Michael Jenkins (Jenkins's brother); Donna Jo Jenkins (Jenkins's mother); Steven Jenkins, Sr. (Jenkins's step-father); Jerry White (Jenkins's step-father's sister); Eva Dano (a family friend); and Dorothy Hodge (Jenkins's step-father's mother). (*Id*. at 432-34).

Dr. Lisak also reviewed various records in preparation for the hearing, including: Jenkins's birth certificate; hospital records from Jenkins's birth; Jenkins's juvenile records; records from the San Bernardino Department of Mental Health; school records for both Jenkins and his siblings; records from Jenkins's time at Taylor Hardin Secure Medical Facility; Jenkins's medical records from Holman Prison; records from the Department of Corrections; the psychiatric records of Jenkins's sister, Pammy Jo Montez; the Lunacy Commission's Report on Jenkins; the pre-sentence investigation report on Jenkins; large portions of original trial transcript; newspaper reports concerning Jenkins's crime; the District Attorney's file; the police report regarding an interview with Jenkins while in custody at the Los Angeles County Jail; and the transcript of the earlier portion of the evidentiary hearing. (*Id*. at 435-38).

Dr. Lisak did not perform any psychiatric testing.  (Rule 32 R. Vol. 21 at 467-68).  Rather, he explained that he evaluated Jenkins for the purpose of constructing a developmental history and "to evaluate the abuse he had suffered and describe and interpret for his attorneys the impact of those traumas on his development."  (Rule 32 R. Vol. 22 at 575).  Dr. Lisak determined Jenkins: (1) was a slow learner; (2) was physically, emotionally, and sexually abused; (3) was neglected both medically and in terms of nurturing and basic loving and care; and (4) suffered from pervasive adverse impacts to his cognitive development due to chronic and severe trauma suffered during childhood.  (Rule 32 R. Vol. 21 at 443-49).  Further, based upon his interviews of third-parties, review of the records, and evaluation of Jenkins, Dr. Lisak concluded Jenkins: (1) had suffered from emotional, psychiatric, and psychological disturbances all his life; (2) was severely depressed for much of his life; and (3) suffered post-traumatic stress symptoms throughout his life.  (Rule 32 R. Vol. 22 at 486-492).  Finally, Dr. Lisak testified that he did not diagnose Jenkins as suffering from any mental disease or defect because he was not asked to make a diagnosis.  (*Id.* at 571).  However, Dr. Lisak concurred with Dr. Kirkland's test results indicating Jenkins had borderline intellectual capacity.  (Rule 32 R. Vol. 21 at 467-68).

8

## 2.  Dr. Kirkland: The State's Mental Health Expert

Dr. Karl Kirkland, a licensed psychologist retained by the state to evaluate Jenkins, testified that he performed a "general post conviction appeal evaluation" of Jenkins.  (Rule 32 R. Vol. 22 at 610-11, 618).  In conjunction with the evaluation, Dr. Kirkland reviewed the Rule 32 petition, the original trial transcript, and administrative and medical records from the Department of Corrections. Dr. Kirkland also attended the earlier portion of the evidentiary hearing on the Rule 32 petition, observed Jenkins's prison cell, and spoke with Jenkins's therapist.  (*Id*. at 618).  On September 5, 1996, Dr. Kirkland met with Jenkins at Holman Prison and administered a number of psychological tests over a four or five hour period.  (*Id*. at 619).  Dr. Kirkland found that Jenkins: (1) maintained a clean and organized cell; (2) had good relationships with guards; (3) was depressed; and (4) was taking a mild tranquilizer and anti-depressant.  (*Id*. at 619-21).  Dr. Kirkland stated that, although Jenkins did not seem to trust him, he seemed to understand who he was and why he was there. (*Id*. at 620-21).

Dr. Kirkland administered a Bach Depression Inventory test, which is a questionnaire relating to symptoms of depression in numerous categories. (*Id*. at 621-22).  The results of the Bach Depression Inventory test showed severe depression. (*Id*. at 622).

Dr. Kirkland explained that the Minnesota Multiphasic Personality Inventory test is a 399-item self-reported true-false inventory. When scored, it produces a profile that can be used to evaluate the subject's validity or test-taking attitude, clinical characteristics, as well as past and current emotional functioning. (*Id*. at 622-23).[9] Dr. Kirkland testified Jenkins produced an invalid profile on this test "in that he answered the questions in a way that tended to over-emphasize psycho-pathology, much like he did on the Bach Depression Inventory." (*Id*. at 623). Dr. Kirkland indicated the results did not match Jenkins's clinical presentation. (*Id*.)

Dr. Kirkland also performed a Competency to Stand Trial Assessment on Jenkins. It is a structured interview that assesses a person's understanding of the trial process and the legal system. The results indicated that Jenkins "had an adequate understanding of the trial process and did not evidence a mental disorder that would interfere with that process." (*Id*. at 623-24).

The Wechsler Adult Intelligence Scale is an intelligence test commonly administered and accepted in the field. (*Id*. at 624). Jenkins "scored in the range of borderline intellectual functioning which is between mild mental retardation and low average intellectual functioning." (*Id*. at 624, 670). Jenkins's overall IQ score was 76. (*Id*.). Dr. Kirkland opined that Jenkins "cooperated and was not malingering or

---

[9] Because Jenkins reads at a third grade level, Dr. Kirkland had to read the test questions to him. (*Id.* at 641).

trying to throw the results a certain way," which was "consistent with his school records that Dr. Lisak testified about and consistent with other reports of his difficulties with academic functioning." (*Id*. at 624). Further, Dr. Kirkland noted in the following testimony that an IQ of 76 is two standard deviations below the norm, placing Jenkins in the bottom ten percent of the population:

Q: What is [Jenkins's] IQ?

A: Borderline range.

Q: Did you testify it was 76?

A: Yes.

Q: Is IQ a measurement of intelligence or intelligence potential that [is] fairly constant over a lifetime?

A: It tends to be, yes.

Q: Do you know how many standard deviations with an IQ of 76 is below that?

A: Two.

Q: Approximately two standard deviations – that would place [Jenkins] in what percentile of the population?

A: Under ten percent – it is getting pretty low.

Q: Do you know what the cut-off for being considered mentally retarded is?

A: Under seventy.

Q: Is that the only standards [sic] ?  Are there national standards that recognizes [sic] mental retardation at 75 and below?

A: I'm not aware of that.  The other standard would be integrating, social and adaptive behavior into that, which I did not do in this case. That is really not what I was looking for.

Q: Would it be fair to characterize [Jenkins's] performance on this testing as consistently in the bottom percentile?

A: Yes.

(*Id*. at 670-71).

The RAT-3 is a test of achieved knowledge or actual academic achievement. On this test, Dr. Kirkland found Jenkins was "functioning on a third grade level in both reading, spelling and arithmetic, which placed him at the first percentile," which is "generally consistent with the [WAIS-R] Results and generally consistent with his clinical presentation and also consistent with his history."  (*Id*. at 625; *see* 669).  Dr. Kirkland concluded Jenkins was "not technically learning disabled, as much as he is just a slow learner overall."  (*Id*.).

The Short Category Test Booklet Format is used as a neuro-psychological screening instrument.  It is a shortened version of a much longer neuro-psychological test that is part of a battery of tests.  (*Id*. at 626).  This test measures brain damage, flexibility, and problem solving ability.  (*Id*. at 669-70).  Jenkins scored at the first

percentile on this test, which is in an impaired range. (*Id*. at 626, 669). Dr. Kirkland testified that in his experience "often inmates that have been incarcerated for a while tend to have difficulty with this particular test, not necessarily because of brain damage, but because they have trouble shifting gears and get easily frustrated with the task." (*Id*. at 626).

Finally, Dr. Kirkland administered the Forensic Assessment of Criminal Responsibility Procedure on Jenkins. (*Id*.). It is "a procedure that involves or is present in any mental state at the time of offense or forensic evaluation that involves assigning some type of criminal responsibility." (*Id*.). It involves reviewing "trial transcripts or the D.A. file, taking a statement from the defendant about his feelings, actions, and behavior surrounding the time of the offense as well as post-offense behavior which would in this case include leaving the State and requesting an alibi if one assumes those facts are true." (*Id*. at 627). From his review of the D.A. file, Dr. Kirkland concluded Jenkins's behavior showed an "awareness of wrongfulness or criminality after the offense and that his behavior was not entirely consistent with what [Jenkins] told [Dr. Kirkland] about being in a black-out the entire time." (*Id*.).

Dr. Kirkland also reviewed Jenkins's records from Taylor Hardin, including the diagnosis reached by the Lunacy Commission. He summarized the findings of the Lunacy Commission as follows:

> They basically concluded that he was capable of proceeding toward trial, and they did not find the presence of a disorder that would have detracted from criminal responsibility.  At least two of the three people suggested that was their finding.[10]

(*Id*. at 634).  Dr. Kirkland noted the Lunacy Commission conducted its evaluations approximately fourteen months after the offense.  This was significant to Dr. Kirkland because it is "a lot easier to do a retrospective analysis fourteen months after an offense rather than several years after an offense."  (*Id*. at 635).

Dr. Kirkland's opinion ultimately was that Jenkins did not suffer from a mental disease or disorder at the time of the murder that would have detracted from his ability to appreciate the criminality of his acts.  (*Id*. at 636, 687).  Dr. Kirkland added that, because Jenkins's IQ and achievement scores are roughly in the same vicinity, Jenkins does not have a learning disability but is a slow learner.[11]  (*Id*. at 675-76).

## B.  Post-*Atkins* Review

---

[10] The Lunacy Commission's evaluations took place in 1990, the year after the murder was committed.  Dr. Wolfram Glaser found that Jenkins suffered no substantial cognitive impairment. Dr. Glaser further found an Axis II diagnosis of borderline intellectual functioning.  (Rule 32 C.R. Vol. 25 at 557-63).  Dr. James F. Hooper also found no evidence of any significant cognitive impairments but did not reach an Axis II diagnosis.  (*Id*. at 564-68).  The third member of the commission, Dr. Kamal A. Nagi, was unable to make an assessment of Jenkins, who announced to Dr. Nagi that he was "getting tired of talking about the same damn thing" and was not going to talk any more.  (*Id*. at 556).  Additionally, in the admission summary prepared at Taylor Hardin, staff social worker Carol Williams and Dr. Glaser noted that Jenkins displayed no obvious cognitive impairment but that he appeared to be of limited intellectual capabilities and possibly had borderline intellectual functioning.  (*Id*. at 545-55).

[11] However, Dr. Kirkland went on to state that he did not test Jenkins for dyslexia and would not refute that diagnosis if school records revealed Jenkins was dyslexic.  (*Id*. at 676).

Jenkins appealed the denial of his Rule 32 petition to the Alabama Court of Criminal Appeals.  Both sides briefed the issues raised by Jenkins and argued them before the appellate court.  On June 20, 2002, before the Alabama Court of Criminal Appeals issued an opinion, the United States Supreme Court handed down its opinion in *Atkins v. Virginia*, 536 U.S. 304 (2002).  In *Atkins,* the Court held that the execution of mentally retarded criminals violates the Eighth Amendment's prohibition of cruel and unusual punishment.  Thus, while Jenkins's collateral appeal was still pending, the Alabama Court of Criminal Appeals ordered the parties to file supplemental briefs, addressing the possible impact of *Atkins* on Jenkins's case.[12]

The parties both submitted supplemental briefs on August 15, 2002.  The State contended any claim by Jenkins that he is mentally retarded is procedurally barred and that Jenkins is not mentally retarded.  (*Appellee's Supplemental Brief*, Rule 32 C.R. Vol. 39, Tab 55).  Jenkins argued that, because his mental retardation is supported by the record and because Alabama has no procedure for adjudicating mental retardation in capital cases, the court should either: (1) stay his appeal until the Alabama Legislature enacts appropriate legislation in light of *Atkins*; or (2) vacate his death sentence and remand the case to the trial court with directions to stay the case until the legislature enacts such legislation.  (*Appellant's Supplemental Brief*,

---

[12] The *Atkins* decision announced a new rule of constitutional law made retroactive to cases on collateral review.  *See In re Holladay*, 331 F.3d 1169, 1172 (11th Cir. 2003).

Rule 32 C.R. Vol. 39, Tab 56).  The state submitted a reply brief on September 19,

2002.  (*Appellee's Supplemental Reply Brief*, Rule 32 C.R. Vol. 39, Tab 57).

Simultaneously, Jenkins submitted a supplemental reply brief, arguing: (1) his *Atkins*

claim was not procedurally barred; (2) his case should be stayed pending the

enactment of appropriate *Atkins* legislation; and (3) it would be cruel and unusual

punishment to execute Jenkins because he is mentally retarded.  (*Appellant's*

*Supplemental Reply Brief*, Rule 32 C.R. Vol. 39, Tab 58).

The Alabama Court of Criminal Appeals affirmed the trial court's denial of

Jenkins's amended Rule 32 petition on February 27, 2004.  *Jenkins v. State*, 972 So.

2d 111 (Ala. Crim. App. 2004).  With regard to Jenkins's *Atkins* claim, the court

found the following:

> Neither is there any indication that Jenkins's death sentence
> violates the United States Supreme Court's holding in *Atkins v. Virginia*,
> 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002).  The United
> States Supreme Court held in *Atkins v. Virginia*, that it was cruel and
> unusual punishment in violation of the Eighth Amendment to execute a
> mentally retarded individual.   Though Alabama has not enacted
> legislation addressing the holding in  *Atkins*, our Supreme Court in *Ex
> parte Perkins*, 808 So.2d 1143 (Ala.2001), has applied the most liberal
> view of mental retardation.  To be considered mentally retarded a
> defendant must have a significantly subaverage intellectual functioning
> (an IQ score of 70 or below), significant deficits in adaptive behavior,
> and the problems must have manifested themselves before the defendant
> reached the age of 18.  *Perkins*.

Dr. Kirkland testified that he performed psychological tests on Jenkins and that Jenkins's IQ was 76. There was evidence presented at Jenkins's trial indicating that Jenkins maintained relationships with other individuals and that he had been employed by P.S. Edwards Landscaping Company, Cotton Lowe 76 Service Station, and Paramount Painting Company. The record fails to show that Jenkins meets the most liberal view of mental retardation adopted by the Alabama Supreme Court in *Perkins*. Jenkins's death sentence does not violate *Atkins v. Virginia*.

*Id*. at 154-55.

Jenkins next raised the claim in an application for rehearing. *(Brief in Support of Petition for Writ of Certiorari*, Rule 32 C.R. Vol. 39, Tab 59 at 58). The Alabama Court of Criminal Appeals denied his application for rehearing on May 21, 2004. *Jenkins v. State*, 972 So. 2d 111 (Ala. Crim. App. 2004). Jenkins then presented the claim to the Alabama Supreme Court in a petition for writ of certiorari, arguing that because he made a prima facie showing of mental retardation, it was unreasonable for the Alabama Court of Criminal Appeals to refuse to remand his case to the trial court for an evidentiary hearing. (*Petition for Writ of Certiorari*, Rule 32 C.R. Vol. 40, Tab 60 at 57; *Brief in Support of Petition for Writ of Certiorari*, Rule 32 C.R. Vol. 40, Tab 61 at 109). On April 8, 2005, the Alabama Supreme Court affirmed the Court of Criminal Appeals' affirmance of the trial court's denial of this claim. *Ex parte Jenkins*, 972 So. 2d 159 (Ala. 2005).

17

# IV. THE HABEAS CLAIM

Jenkins contends he is mentally retarded and ineligible for execution under *Atkins*. Because this claim was denied on the merits in the state court, this court must first determine whether the state court's decision can survive review under 28 U.S.C. § 2254(d). Unless Jenkins prevails on his claim under § 2254(d), he is not entitled to present new evidence to this court and is not entitled to an evidentiary hearing on his mental retardation claim. *See Cullen v. Pinholster*, 131 S. Ct. 1388, 1398-99 (2011). The review of Jenkins's *Atkins* claim in this court is "limited to the record that was before the state court that adjudicated the claim on the merits." *Id*. at 1398. Further, the "backward-looking language" of the statute requires an examination of the state court's decision on the date it was made. *Id*.

## A.  Title 28 U.S.C. § 2244(d)

"By its terms § 2254(d) bars relitigation of any claim adjudicated on the merits in state court, subject only to the exceptions in §§ 2254(d)(1) and (d)(2)." *Harrington v. Richter*, 131 S. Ct. 770, 784 (2011)(internal quotations omitted).[13] Those sections provide that when a state court has made a decision on a petitioner's constitutional claim, habeas relief cannot be granted unless the state court's adjudication of the claim either:

---

[13] It does not matter whether the state court decision contains a lengthy analysis of the claim or is a summary ruling "unaccompanied by explanation." *Id.*

18

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The "contrary to" and "unreasonable application" clauses of § 2254(d) have been interpreted as "independent statutory modes of analysis." *Alderman v. Terry*, 468 F.3d 775, 791 (11th Cir. 2006) (citing *Williams,* 529 U.S. at 405-07).[14]  When considering a state court's adjudication of a petitioner's claim, therefore, the *habeas* court must not conflate the two modes of analysis.

### 1. The meaning of § 2254(d)(1)'s "contrary to" clause

A state-court determination can be "contrary to" clearly established Supreme Court precedent in at least two ways:

*First*, a state-court decision is contrary to this Court's precedent if the state court arrives at a conclusion opposite to that reached by this Court on a question of law.  *Second*, a state-court decision is also contrary to this Court's precedent if the state court confronts facts that are

---

[14] *See also Williams*, 529 U.S. at 404 (O'Connor, J., majority opinion) ("Section 2254(d)(1) defines two categories of cases in which a state prisoner may obtain federal *habeas* relief with respect to a claim adjudicated on the merits in state court.  Under the statute, a federal court may grant a writ of *habeas* corpus if the relevant state-court decision was either (1) '*contrary to* . . . clearly established Federal law, as determined by the Supreme Court of the United States,' or (2) '*involved an unreasonable application of* . . . clearly established Federal law, as determined by the Supreme Court of the United States.'") (emphasis supplied).

> materially indistinguishable from a relevant Supreme Court precedent
> and arrives at a result opposite to ours.

*Williams*, 529 U.S. at 405 (emphasis added); *see also*, *e.g.*, *Brown v. Payton*, 544 U.S. 133, 141 (2005) (same); *Early v. Packer*, 537 U.S. 3, 8 (2002) (*per curiam*) (same); *Putman v. Head*, 268 F.3d 1223, 1240-41 (11th Cir. 2001) (same).

The Eleventh Circuit has observed that the majority opinion in *Williams* does not limit the construction of § 2254(d)(1)'s "contrary to" clause to the two examples set forth above.[15]   Instead, the statutory language "simply implies that 'the state court's decision must be substantially different from the relevant precedent of [the

---

[15] Indeed, as one commentator has observed, the possible permutations are not just two, but at least four in number:

> The word "contrary" denotes incompatibility or logical inconsistency.  Two propositions are incompatible with one another if both cannot be true or correct.  Thus, a state court decision is contrary to federal law if that decision and the applicable federal law cannot both be true or correct.  Given this premise, there appear to be four possible combinations of state court adjudications and resulting decisions that are pertinent to this textual inquiry:
>
> •   the state court applies the correct federal standard and arrives at a correct outcome;
>
> •   the state court applies an incorrect federal standard and arrives at an incorrect outcome;
>
> •   the state court applies an incorrect federal standard and arrives at a correct outcome; and
>
> •   the state court applies the correct federal standard and arrives at an incorrect outcome.

Allan Ides, *Habeas Standards of Review Under 28 U.S.C. § 2254(d)(1):  A Commentary on Statutory Text and Supreme Court Precedent*, 60 WASH. & LEE L. REV. 677, 685 (2003) (footnotes omitted).

Supreme] Court.'" *Alderman*, 468 F.3d at 791 (quoting *Williams*, 529 U.S. at 405)

(alteration supplied).

**2.   The meaning of § 2254(d)(1)'s "unreasonable application" clause**

A state court's determination of a federal constitutional claim can result in an

"unreasonable application" of clearly established Supreme Court precedent in either

of two ways:

> *First*, a state-court decision involves an unreasonable application of this Court's precedent if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case.  *Second*, a state-court decision also involves an unreasonable application of this Court's precedent if the state court either unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.

*Williams*, 529 U.S. at 407 (emphasis added) *see also*, *e.g., Putman*, 268 F.3d at 1240-

41 (same).

It is important to note that "an *unreasonable* application of federal law is

different from an *incorrect* application."  *Williams*, 529 U.S. at 410 (emphasis in

original).  A federal *habeas* court "may not issue the writ simply because that court

concludes in its independent judgment that the relevant state-court decision applied

clearly established federal law *erroneously* or *incorrectly*.  Rather, that application

must also be *unreasonable*."  *Id*. at 411 (emphasis added).

21

In other words, the question is *not* whether the state court "correctly" applied Supreme Court precedent when deciding the federal constitutional issue but whether the state court's determination was "unreasonable."   *Id*. at 409 ("[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable."); *see also*, *e.g*., *Bell*, 535 U.S. at 694 (observing the "focus" of the inquiry into the reasonableness of a state court's determination of a federal constitutional issue "is on whether the state court's application of clearly established federal law is objectively unreasonable," and stating that "an unreasonable application is different from an incorrect one"); *Harrington v. Richter*, 131 S. Ct. 770, 785-87 (2011) (same).[16]

In order to demonstrate that a state court's application of clearly established federal law was "objectively unreasonable," the *habeas* petitioner "must show that the state court's ruling on the claim being presented in federal court was so lacking

---

[16] The Eleventh Circuit has observed that § 2254(d)(1)'s "unreasonable application" provision is the proper statutory lens for viewing the "run-of-the-mill state-court decision applying the correct legal rule." *Alderman v. Terry*, 468 F.3d 775, 791 (11th Cir. 2006).

> In other words, if the state court identified the correct legal principle but unreasonably applied it to the facts of a petitioner's case, then the federal court should look to § 2254(d)(1)'s "unreasonable application" clause for guidance. "A federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was *objectively* unreasonable."

*Id*. (quoting *Williams*, 529 U.S. at 409) (emphasis in original).

in justification that there was an error well understood and comprehended in existing law *beyond any possibility for fairminded disagreement*." *Id.* at 786-87 (emphasis added). Stated another way, if the state-court's resolution of a claim is debatable among fairminded jurists, it is not "objectively unreasonable."

"By its very language, [the phrase] 'unreasonable application' refers to mixed questions of law and fact, when a state court has 'unreasonably' applied clear Supreme Court precedent to the facts of a given case." *Neelley v. Nagle*, 138 F.3d 917, 924 (11th Cir. 1998) (citation and footnote omitted). Mixed questions of constitutional law and fact are those decisions "which require the application of a legal standard to the historical-fact determinations." *Townsend v. Sain*, 372 U.S. 293, 309 n.6 (1963).

### 3. The meaning of § 2254(d)(2)'s clause addressing an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding"

"28 U.S.C. § 2254(d)(2) imposes a 'daunting standard — one that will be satisfied in relatively few cases.'" *Cash v. Maxwell*, 132 S. Ct. 611, 612 (2012) (quoting *Maxwell v. Roe*, 628 F.3d 486, 500 (9th Cir. 2010) (internal quotation marks omitted in original)).

> As we have observed in related contexts, "[t]he term 'unreasonable' is no doubt difficult to define." *Williams v. Taylor,* 529 U.S. 362, 410, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000). It suffices to say, however, that

23

a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance. *Cf. Id.,* at 411, 120 S. Ct. 1495.

*Wood v. Allen,* 558 U.S. 290, 301 (2010).   Therefore, "even if reasonable minds reviewing the record might disagree about the finding in question, on habeas review that does not suffice to supersede the trial court's . . . determination." *Id.* (quoting *Rice v. Collins,* 546 U.S. 333, 341-42 (2006)) (punctuation omitted).   Conversely:

> when a state court's adjudication of a habeas claim results in a decision that is based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding, this Court is not bound to defer to unreasonably-found facts or to the legal conclusions that flow from them.

*Atkins v. Warden, Holman Correctional Facility*, 710 F.3d 1241, 1249-50 (11th Cir. 2013) (quoting *Jones v. Walker*, 540 F.3d 1277, 1288 n.5 (11th Cir. 2008) (*en banc*) (punctuation omitted)).

Jenkins maintains the state court's adjudication of his mental retardation claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law and was an unreasonable determination of the facts in light of the evidence presented in state court. *(Jenkins' Amended Petition*, Doc. 12 at 24; *Jenkins' Reply Brief*, Doc. 48 at 23).

## B.  The *Perkins* Standard

Alabama uses the definition of mental retardation adopted by the Alabama Supreme Court in *Ex parte Perkins*, 851 So.2d 453 (Ala. 2002). *Perkins* held that to be considered mentally retarded for purposes of the Eighth Amendment's prohibition on execution, a defendant "must have significantly subaverage intellectual functioning (an IQ of 70 or below), and significant or substantial deficits in adaptive behavior" that "manifested themselves during the developmental period (i.e., before the defendant reached age 18)." *Id.* at 456. Later, in *Smith v. State*, No. 1060427, 2007 WL 1519869 at *8 (Ala. May 25, 2007), the Alabama Supreme Court "reaffirmed the definition of mental retardation it identified in *Perkins*" and "clarified that it is implicit in that definition that the IQ and deficits in adaptive behavior exist not only prior to the age of eighteen but also both at the time of the crime and currently." *Powell v. Allen*, 602 F.3d 1263, 1272 (11th Cir. 2010) (*citing Smith*, 2007 WL 1519869 at *8).

Jenkins contends the state appellate court's use of the *Perkins* standard in rejecting his *Atkins* claim was either contrary to, or an unreasonable application of, clearly established federal law:

> In denying relief on this claim, the state applied an erroneous legal standard that violated *Atkins* and the prevailing clinical standards, and constitutes an unreasonable application of federal law. *See Id.* at 398 ("Our difference is as to the cases in which, at first blush, a state-court judgment seems entirely reasonable, but thorough analysis by a federal

25

court produces a firm conviction that that judgment is infected by constitutional error.  In our view, such an erroneous judgment is 'unreasonable' within the meaning of the Act even though that conclusion was not immediately apparent.").

Rather than apply the "broadest definition of mental retardation," as required, *see Jenkins II*, 972 So.2d at 154, the CCA erroneously used an IQ cutoff of 70, in violation of the prevailing scientific standards which were expressly relied upon by *Atkins*. 536 U.S. at 309 n. 3, 318; *see* footnote 8, *supra*, at 23.  In defining mental retardation *Atkins* did so without implementing a specific IQ cut-off and it drew extensively from clinical sources that reject such cut-offs and expressly require IQ be expressed within a "confidence interval."  *See Atkins*, 536 U.S. at 318, 309 n.3, 309 n.5 (*citing* Kaplan & Sadock's Comprehensive Textbook of Psychiatry, at 2952). Specifically, the creators of WAIS-R, the very test utilized by Dr. Kirkland, advised its instruments are not capable of giving bright line scores and instead employ a confidence interval of 95% with a Standard Error of Measurement of + or – five points. David Wechsler, WAIS-R Manual; Wechsler Adult intelligence Scale 0 Revised 31 (1981); *see* WAIS-IV Administrative and Scoring Manual Tables A.3-A.7, at 220-25. This is so because the instrument is not capable of providing a bright-line Full Scale IQ score.  *Id*. Accordingly, the WAIS technical manual provides:

> The standard error of measurement is used to calculate the confidence interval, or the band of scores, around the observed score in which the individual's true score is likely to fall. . . .  The examiner can use confidence intervals to report an individual score as an interval that is likely to contain the individual's true score.  Confidence intervals also serve as a reminder that *measurement error is inherent in all test scores and that the observed test score is only an estimate of true ability*.

Wechsler, *WAIS-R Manual*, at 31 (emphasis added).

. . .

No reasonable interpretation of *Atkins* would allow the use of a particular standardized intelligence test to assess intellectual disability divorced from the very Technical Manual created for scoring and interpreting that test. The WAIS-R, selected by the State's expert to test Mr. Jenkins, is a very precise instrument and for it to be effective and the results to be reliable, it must be administered and interpreted as designed.   The test administrator must take into account the SEM. Currently no testing instrument has been created that measures IQ with so much precision that confidence intervals can be ignored.   Thus, the Alabama courts erred in inventing out of whole cloth a bright line cutoff for determining mental retardation where no instrument exists that can measure IQ with that level of precision.   Indeed, the state courts unreasonably ignored that the instrument utilized by the State's expert expressly prohibits that practice.   The State of Alabama may not make standardized IQ results more precise than the test's creators determined is reasonable; to do so is both unscientific and unreasonable.

While the Court in *Atkins* indicated that states would be allowed leeway in crafting appropriate procedures to implement the constitutional restriction against executing the mentally retarded, *see Atkins*, 536 U.S. at 342, it did not authorize the use of definitions unmoored from sound science and accepted clinical practice.   In *Atkins* itself, the Court acknowledged a lack of precision in IQ testing and the need for confidence intervals implicitly rejecting a hard cutoff.   For instance, the Court stated that "[m]ild" mental retardation is typically used to describe people with an IQ level of 50-55 to approximately 70." *Id*. at 308 n.3 (*citing* DSM-IV, at 42-43 (2000)).   Even more significant, the Court noted "an IQ between 70 and 75 or lower . . . is typically considered the cutoff IQ score for the intellectual function prong of the mental retardation definition." *Id*. at 309 n.5.   Nowhere in *Atkins* did the Court allow states to alter the clinical definition of mental retardation by eliminating the use of the SEM and confidence intervals which the creators of the WAIS-R have consistently stated are necessary for the proper interpretation of the test.   By applying the wrong standard, one that contained a strict IQ cut-off, the state court unreasonably

determined Mr. Jenkins was not mentally retarded.  *Jenkins II*, 972 So.
2d at 155.

(*Jenkins's Reply Brief*, Doc. 48 at 35-38) (parentheticals and footnote omitted).

Jenkins further alleges that *Smith v. State*, clarifying that the IQ and deficits in

adaptive behavior must also be present at the time of the crime and at the time the

*Atkins* claim is raised, is unconstitutional and was improperly applied to his case.[17]

(*Id.* at 23, n.8).

"Although the *Atkins* Court alluded to clinical definitions propounded by the

American Association on Mental Retardation[18] ('AAMR') and the American

Psychiatric Association ('APA'), it left to the states the development of standards for

courts to employ in making a determination of whether an offender is mentally

retarded."  *Thomas v. Allen*, 607 F.3d 749, 752 (11th Cir. 2010)(*citing Atkins*, 536

U.S. at 317)(footnote added).[19]   The Eleventh Circuit has repeatedly applied the

---

[17] The court notes that *Smith v. State* was not applied to Jenkins's case since it was not decided until
2007, well after the Alabama Court of Criminal Appeals' 2004 opinion on his *Atkins* claim.

[18] The American Association on Mental Retardation is now known as the American Association on
Intellectual and Developmental Disabilities.

[19] The *Atkins* court noted:

> The American Association on Mental Retardation (AAMR) defines mental
> retardation as follows: "Mental retardation refers to substantial limitations in present
> functioning. It is characterized by significantly subaverage intellectual functioning,
> existing concurrently with related limitations in two or more of the following
> applicable adaptive skill areas: communication, self-care, home living, social skills,
> community use, self-direction, health and safety, functional academics, leisure, and
> work.  Mental retardation manifests before age 18."  Mental Retardation: Definition,

Alabama standard.  In doing so, it has never indicated that any of that standard's regarding deficits in IQ and adaptive behavior are inconsistent with *Atkins* or otherwise unconstitutional.  *See Id.* at 752, 756-57; *Burgess v. Comm'r, Ala. Dept. of Corr.*, 723 F.3d 1308, 1314, 1321 (11th Cir. 2013); *Powell v. Allen*, 602 F.3d 1263, 1272 (11th Cir. 2010); *Holladay v. Allen*, 555 F.3d 1346, 1353, 1357 (11th Cir. 2009); *Wood v. Allen*, 542 F.3d 1281, 1285-86 (2008).     Therefore, this court finds Alabama's standard for establishing mental retardation applies to Jenkins's case. Jenkins has offered nothing to show the state appellate court's use of Alabama's mental retardation standard was contrary to, or an unreasonable application of, clearly established federal law.

## C.  **Application of *Atkins* and *Perkins***

---

Classification, and Systems of Supports 5 (9th ed. 1992).  The American Psychiatric Association's definition is similar: "The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A) that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety (Criterion B).  The onset must occur before age 18 years (Criterion C).  Mental Retardation has many different etiologies and may be seen as a final common pathway of various pathological processes that affect the functioning of the central nervous system."  Diagnostic and Statistical Manual of Mental Disorders 41 (4th ed.2000).  "Mild" mental retardation is typically used to describe people with an IQ level of 50-55 to approximately 70.  *Id.*, at 42-43.

*Atkins*, 536 U.S. at 308 n.3.

Jenkins maintains the Alabama Court of Criminal Appeals' decision that he is not mentally retarded is contrary to, and involved an unreasonable application of, clearly established federal law.   Jenkins further contends this decision was an unreasonable determination of the facts in light of the evidence presented in state court.   Jenkins divides his arguments among the three criteria for determining mental retardation: (1) significantly subaverage intellectual functioning (an IQ of 70 or below); (2) significant or substantial deficits in adaptive behavior; and (3) the manifestation of those deficits before the age of eighteen.

## 1. Intellectual Functioning

Jenkins acknowledges that Dr. Karl Kirkland administered the Wechsler Adult Intelligence Scale to him in 1996, resulting in a IQ of 76.   (*Jenkins's Reply Brief*, Doc. 48 at 24).   He emphasizes that Dr. Kirkland stated Jenkins's IQ score was two standard deviations below the mean.   (*Id*.).   Jenkins argues that when "the "Flynn Effect'[20] and standard error of measurement[21] are considered, Mr. Jenkins's actual IQ

[20] The Flynn Effect is "a method that recognizes the fact that IQ scores have been increasing over time" and "acknowledges that as an intelligence test ages, or moves farther from the date on which it was standardized, or formed, the mean score of the population as a whole on that assessment instrument increases, thereby artificially inflating the IQ scores of individual test subjects." *Thomas v. Allen*, 607 F.3d 749, 753 (11th Cir. 2010).

[21] The Standard Error of Measurement ("SEM") is an index of the variability of test scores produced by persons forming the normative sample.

> In other words, the SEM is a statistical measure that allows the evaluator to know the amount of error that could be present in any test.   The AAMR acknowledges that the

is between 65 and 75 . . . and satisfies even Alabama's unconstitutionally rigorous interpretation of *Atkins's* first prong." (*Id*.).

This court finds Jenkins has failed to provide clear and convincing evidence to overcome the presumption of correctness that attaches to the state appellate court's factual findings. Jenkins also has not demonstrated that the state court unreasonably applied federal law in connection with the assessment of his intellectual functioning or that the decision was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Further, Jenkins did not raise his Flynn Effect argument in the state court.

### a. The Flynn Effect

As previously stated, when a state court has adjudicated a claim on the merits, this court must judge the decision on the record before that court. Since Jenkins did not raise the Flynn Effect as an issue during collateral review, this court cannot now consider it. However, even if Jenkins had raised the Flynn Effect as a concern on collateral review, neither *Atkins* nor Alabama law *requires* that a court take the phenomenon into account when evaluating a defendant's IQ test scores. The cases

---

SEM has been estimated to be three to five points for well-standardized measures of general intellectual functioning. Hence, the IQ standard score is bounded by a range that would be approximately three to four points above and below the obtained scores.

*Thomas*, 607 F.3d at 753.

31

cited by Jenkins in support of the Flynn Effect[22] are not binding authorities of the

Supreme Court, Eleventh Circuit, or State of Alabama, and *none* of them have held

that the Flynn Effect *must* be taken into account when examining an IQ test score.

Moreover, this court finds that, to the extent the appellate courts of the State of

Alabama have discussed the Flynn Effect, they have stated that consideration of the

phenomenon lies in the discretion of the trial judge.  For example, the Alabama Court

of Criminal Appeals observed in its 2009 opinion in the case of *Beckworth v. State*,

No. CR-07-0051, 2009 WL 1164994 (Ala. Crim. App. May 1, 2009), that it had not

previously

> addressed the "Flynn effect," see *James R. Flynn, Tethering the
> Elephant: Capital Cases, IQ, and the Flynn Effect*, 12 Psych., Pub.
> Pol'y, & L., 170-78 (2006), which posits that IQ scores increase over
> time in certain populations.  However, the Texas Court of Appeals
> recently stated:  "We have previously refrained from applying the Flynn
> effect . . . noting that it is an 'unexamined scientific concept' that does
> not provide a reliable basis for concluding that an appellant has
> significant sub-average general intellectual functioning." *Neal v. State*,
> 256 S.W.3d 264, 273 (Tex. Crim. App. 2008).

*Beckworth*, 2009 WL 1164994 at *38 n.5 (some citations omitted), *reversed on other*

*grounds*, *Ex parte Beckworth*, No. 1091780, 2013 WL 3336983 (Ala. July 3, 2013).

A more recent decision of the Alabama Court of Criminal Appeals, *Albarran*

*v. State*, 96 So. 3d 131 (Ala. Crim. App. 2011), makes it clear that consideration of

---

[22] (*Jenkins's Reply Brief*, Doc. 48 at 24-26).

the Flynn Effect is not a *requirement* when applying Alabama's criteria for

determining whether a criminal defendant suffers from mental retardation.   That

opinion states:

> First, this Court cannot, based on the record, say that the circuit court
> abused its discretion in determining that Albarran failed to meet the
> definition of mental retardation adopted by the Alabama Supreme Court
> in *Perkins* based on Albarran's IQ score.   Although Dr. Weinstein also
> testified that, when adjusted for the "Flynn effect," Albarran's IQ was
> around 68, the circuit court could have reasonably rejected the "Flynn
> effect"  and determined that Albarran's IQ was 71.   *Gray v. Epps*, 616
> F.3d 436, 446 n.9 (5th Cir. 2010) (quoting *In re Mathis*, 483 F.3d 395,
> 398 n.1 (5th Cir. 2007) ("[T]he Flynn Effect 'has not been accepted in
> this Circuit as scientifically valid.'")); *Bowling v. Commonwealth*, 163
> S.W.3d 361, 375 (Ky. 2005) (holding that "*Atkins* did not discuss
> margins of error or the 'Flynn effect' and held that the definition [of
> mental retardation] in KRS 532.130(2) 'generally conform[ed]' to the
> approved clinical definitions" so the court could not consider the Flynn
> effect); *Thomas v. Allen*, 607 F.3d 749, 758 (11th Cir. 2010) [(observing
> that:] "[T]here is no uniform consensus regarding the application of the
> Flynn effect in determining a capital offender's intellectual functioning,
> and there is no Alabama precedent specifically discounting a court's
> application of the Flynn effect . . . .").   Because the circuit court could
> have reasonably determined that Albarran's IQ was 71, a score that
> places him outside the Alabama Supreme Court's definition of mental
> retardation, this Court cannot say that the circuit court abused its
> discretion in denying Albarran's *Atkins* motion.

*Albarran*, 96 So.3d at 199-200 (second alteration supplied, all others in original,

footnote omitted).

### b.  Standard Error of Measurement

Jenkins argued to the Alabama Court of Criminal Appeals that, given the Standard Error of Measurement ("SEM") of plus or minus five points, Jenkins meets the threshold for mental retardation. (*Appellant's Supplemental Reply Brief*, Rule 32 C.R. Vol. 39, Tab 58). However, neither the appellate court nor Dr. Kirkland indicated that they took the SEM into account.

It is undisputed that Jenkins scored 76 on the IQ test administered by Dr. Kirkland. Thus, considering the SEM, Jenkins's IQ falls within a range of 71-81, which is still above the threshold established in *Perkins*. Further, the record of the Rule 32 proceedings indicates that testing performed on Jenkins in 1980, when he was twelve years old, calculated his IQ at 90 on the Peabody Picture Vocabulary Test and Raven Progressive Matrices Test, and 83 on the Wechsler Intelligence Scale for Children - Revised.[23] The record of the Rule 32 proceedings also indicates that testing performed in 1981, when Jenkins was fourteen years old, calculated his IQ at

---

[23] The preparer of the Re-Evaluation Report prepared in conjunction with the 1980 testing noted that Jenkins is dyslexic. Additionally, the preparer of the report rated Jenkins's intellectual capacity as average as opposed to below average or borderline and offered the following comments:

> Frequent moves, changes in schools and family instability have made it difficult for [Jenkins] to achieve success in academic subjects. Low ability coupled with a specific learning disability add to his problems so that, at times, behavior is reflection of inferiority feelings, rejection by peers and general lack of success in school life. Lack of responsibility for self control and poor use of time contribute to lack of learning as well as some social problems.

(Rule 32 C.R. Vol. 27 at 955-58).

81 on the Shipley Institute of Living Scale, and 86 on the Peabody Picture

Vocabulary Test.[24] (Rule 32 C.R. Vol. 27 at 845-48; 955-58).  Furthermore, Jenkins's

school records consistently indicate that his poor performance was a result of

excessive absences, late assignments, and lacking fundamental skills in math, reading

and language.  (*Id.* at 877-964).

---

[24] The psychological report prepared by the San Bernardino County, California Probation Department, in conjunction with the 1981 testing, concluded that:

> [Jenkins] is functioning in the Dull-Normal range of intelligence according to the Shipely [*sic*] Institute of Living Scale and the Peabody Picture Vocabulary Test. [Jenkins] appears to be suffering from a definite learning disability.  It is important to note that [his] scores on his testing reflect a wide discrepancy in his performance level.  He appears to have erratic comprehension in the verbal/reading skills and to be easily distracted on tasks which require sustained concentration.  A full-scale Wechsler Intelligence Test and a Nebraska Psychoneurological Battery is recommended to better define [his] specific learning disabilities.  [Jenkins] is in need of special education designed for the emotionally disturbed adolescent with definite learning disabilities.
>
> . . .
>
> Testing indicates that [Jenkins] is a very emotionally disturbed adolescent.  [He] does not appear to be psychotic but to be functioning at a marginal, borderline state of emotional adjustment.  It is important to note, that [he] is presently under psychiatric care and receiving medication for bedwetting (Elavil).  The possible benefit of medication needs to be noted in regards to testing results.  [Jenkins's] testing data indicates strong fluctuations in consistency, he performs well on some tasks and extremely poor on others.  Testing suggests an innate dull normal or lower level of average normal intelligence.  However, his difficulty with verbal comprehension and ability to concentrate suggest a learning disability, possibly a factor of emotional interference in his cognitive processes.  Therefore, in his present emotional state, he may appear to be less intelligent than is actually the case.

(Rule 32 C. R. Vol. 27 at 846-47).

None of the mental health experts who have evaluated Jenkins over the course of his life has concluded Jenkins has significant limitations in his intellectual functioning or that he is mentally retarded.  Further, none of his IQ scores, adjusted for the SEM, puts Jenkins below a 71 IQ score.  Thus, the state appellate court's finding that Jenkins's IQ does not meet the *Perkins* standard for "significantly subaverage intellectual functioning (an IQ of 70 or below)" is not unreasonable.

### c.  Two Standard Deviations Below the Mean

Jenkins also argues that Dr. Kirkland's conclusion that Jenkins's IQ is two standard deviations below the mean is enough, on its own, to establish the "sufficiently subaverage intellectual functioning" prong of the *Perkins* test. (*Jenkins's Motion for an Evidentiary Hearing*, Doc. 49 at 3).  However, it is apparent that Dr. Kirkland simply misspoke when he made this statement.  According to the AAMR, an IQ of 100 is the mean IQ score, and the standard deviation is fifteen. AAMR, Mental Retardation 36-67 (9th ed. 1992).  Thus, two deviations from the mean (30) indicates an IQ score of 70.  Dr. Kirkland clearly stated that Jenkins's IQ is 76.

### 2. Adaptive Behavior

Because Jenkins's IQ test scores fall within the SEM, he must also "be able to present additional evidence of intellectual disability, including testimony regarding

adaptive deficits." *Hall v. Florida*, 134 S. Ct. 1986, 2001 (2014). "The AAMR defines the term 'adaptive behavior' as the collection of conceptual, social, and practical skills that people learn in order to function in their everyday lives." *Thomas v. Allen*, 607 F.3d 749, 754 (11th Cir. 2010) (*citing Holladay v. Allen*, 555 F.3d 1346, 1353 (11th Cir. 2009). "[S]ignificant or substantial deficits in adaptive behavior are defined as 'concurrent deficits or impairments in present adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health and safety.'" *Holladay*, 555 F.3d at 1353. "The American Association on Mental Retardation (AAMR) defines mental retardation as follows: 'Mental retardation refers to substantial limitations in present functioning.'" *Atkins*, 536 U.S. at 308 n. 3. Therefore, in order for Jenkins to be considered mentally retarded in the *Atkins* context, he must currently (at the time the *Atkins* claim was adjudicated) exhibit deficits in adaptive behavior. Moreover, these problems must have manifested themselves before the age of eighteen.

In concluding that Jenkins did not exhibit significant or substantial deficits in his adaptive behavior, the Alabama Court of Criminal Appeals stated there was "evidence presented at Jenkins's trial indicating that Jenkins maintained relationships with other individuals and that he had been employed by P.S. Edwards Landscaping

37

Company, Cotton Lowe 76 Service Station, and Paramount Painting Company."
*Jenkins*, 972 So. 2d at 955. Jenkins argues that the state court's "focus on only two skill areas was an unreasonable application of *Atkins*." (*Jenkins's Response to the State's Opposition to Motion for Evidentiary Hearing*, Doc. 52 at 11).

Jenkins maintains that the state court record contains overwhelming evidence of his significant adaptive deficits in the areas of functional academic skills, communication skills, self-care, home living, social/interpersonal skills, use of community resources, and self-direction. (*Jenkins's Reply Brief*, Doc. 48 at 28-34).

With respect to functional academic skills, Jenkins notes the following:

Mr. Jenkins exhibited absolute failure in school, placing him consistently several grade levels behind, despite a demonstrated and concerted effort. Despite his diligence Mr. Jenkins's grades were always poor prompting his fifth grade teacher to note that he "work[s] very hard," "always tries to get his work done on time," "but most of the time finds it very difficult." (RHCC, vol. 27, p. 940.) A county health care services report observed that "[i]n spite of his academic failures," he "expressed liking for school and intends to graduate." (*Id*. at 846.) Yet, his secondary school records showed very poor grades, mostly Ds and Fs in fifth and sixth grade academic classes and noted he was below grade level in all the major subjects. (*Id*. at 883, 887, 940, 944.) His fifth grade test scores fell in the very low percentiles, including the fifth percentile in math concepts and fourth percentile in math application. His seventh grade scores on the California Test of Basic Skills (CTBS) also fell in the very low percentiles, including the fourth percentile in reading comprehension. (*Id*. at 895, 936.) One teacher sent letters home to his parents indicating Mr. Jenkins was failing for several reasons, including deficiencies in his oral work. (*Id*. at 927, 931.) In addition, Mr. Jenkins was held back multiple times and never completed the

seventh grade. (RHCC, Tab #R-48, TR. 470; vol. 27, pp. 846, 883, 886, 895, 902, 905, 915, 916, 922, 927, 931, 940, 944, 958, 962, 973.)

State expert Dr. Kirkland confirmed this bleak picture, noting that Mr. Jenkins had very poor problem solving abilities, was functioning in the bottom one percentile in the most important academic subjects, and was a very slow learner. (RHCC, Tab #R-48, TR. 624-25, 670.) Kirkland administered the Wide Range Achievement Test, a test of academic achievement, and found that at age 29, Mr. Jenkins was only functioning at the third grade level in reading, spelling, and arithmetic. (Id. at 624-25.) Kirkland's testing corroborates the observation of one of Mr. Jenkins's teachers who observed some twenty years earlier that he lacked the "fundamental skills in reading, math, and language," to be successful, was scoring in the bottom percentiles in virtually every category, that "[t]he work is too hard for" him and that "[g]rading him isn't fair." (RHCC, vol. 27, pp. 895, 905, 940, 944.)

(Id. at 28-30).[25]

With respect to communication skills, Jenkins argues the following:

Mr. Jenkins has significant cognitive deficits as well as poor reading skills. His cognitive deficits prevented him from concentrating and sitting still as a child. (RHCC, Tab #R-48, TR. 94,[26] 470; vol. 27, p. 941.) A county health care services report described his concentration and attention spans as "poor." (Id. at 846-47.) Another report noted that he was "quite concrete in his thinking." (Id.; see also vol. 25, p. 566.) Throughout his limited schooling Mr. Jenkins's teachers consistently noted that he had poor reading skills, erratic comprehension. (Id. at 895,

---

[25] However, the state court record lacks any finding that Jenkins's performance in school was below borderline and generally reflected that his poor performance was at least partially attributable to his abysmal family life, frequent moves, changes in schools, frequent absences from school, and dyslexia. (Rule 32 C.R. Vol. 27 at 877-964). Additionally, both Dr. Lisak and Dr. Kirkland concluded that Jenkins functioned at a borderline intelligence level. (Rule 32 R. Vol. 21 at 467-68; Rule 32 R. Vol. 22 at 624).

[26] This cite refers to the portion of the testimony of Michael Jenkins, Jr., Jenkins's brother, stating Jenkins could not sit still while his father was beating him because it hurt.

902, 940, 944.) One teacher made clear to his parents that Mr. Jenkins was failing in school partially due to his lack of verbal communication skills. (*Id*. at 927, 931.) Likewise, by the seventh grade, Mr. Jenkins scores on a standardized test revealed that his reading comprehension was in the bottom fourth percentile. (*Id*. at 846, 936, 895.) At the time of his evaluation in 1996, Mr. Jenkins's reading skills were so poor that Dr. Kirkland had to read aloud all of the tests he administered to insure that he understood them. (RHCC, Tab #R-48, TR. 641.) Dr. Kirkland estimated he was reading at a third grade level at the time of his evaluation, consistent with his academic records and deficits in the area of communication. (*Id*.)

(*Jenkins's Reply Brief*, Doc. 48 at 30).

With respect to self-care, Jenkins argues:

The unrebutted evidence presented in Rule 32 shows Mr. Jenkins has significant deficits in self-care skills.  For instance, as a child Mr. Jenkins was filthy, lived in a filthy room, wet the bed and regularly defecated in his underwear. His bladder and bowel control problems persisted into adulthood and created significant problems for him socially. (RHCC, Tab #R-48, TR. 86, 89, 91, 104-10, 113, 117-18, 171, 197-200, 230-231; vol. 27, pp. 859, 891, 934-35.[27]) Indeed, when he was living with Sharon and Lonnie Seal in Alabama as a nineteen year-old and it appeared that they would discover that he wet the bed, Mr. Jenkins left their trailer to avoid having his enuresis found out. This decision led to a rapid deterioration in his life and overall mental health as he began to use drugs and alcohol to the degree that it severely impaired his functioning and evidenced profound limitations in the area

---

[27] No part of the record cited here by Jenkins supports his claim that, "[h]is bladder and bowel control problems persisted into adulthood and created significant problems for him socially." Rather, all of the evidence cited pertains to Jenkins's childhood.

of self-care. (RHCC, Tab #R-48, TR. 58-59[28], 486[29]; vol. 25, p. 565[30]; vol. 26, p. 760[31]; vol. 27, pp. 859, 860.[32])

(*Jenkins's Reply Brief*, Doc. no. 48 at 30-31).

With respect to home living, Jenkins notes:

In addition to living in filth as a child, Mr. Jenkins was dependent upon others to provide shelter. As a child he fled his home, rather than

---

[28] Sherry Seal testified that while Jenkins was living with her family, she noticed that he wet the bed several times. She discussed the problem with Jenkins and offered to help if she could. The Seals had told Jenkins that when their baby was born, they wanted to switch bedrooms with him because he had the largest bedroom, which was closest to the bathroom and the front door. Jenkins moved out shortly after the Seals planned to swap bedrooms with him. When asked at the Rule 32 hearing if Jenkins moved out because he wanted to be near the bathroom, Sherry Seal replied, "That could be. I couldn't say exactly what his reasons were." *Id.* at 57-59. There is nothing in the record indicating that Jenkins moved out of the Seals' home to avoid their discovery of his enuresis. In fact, Sherry Seal testified that she knew about Jenkins's problem and discussed it with him before he moved out.

[29] This cite references the following testimony from Dr. David Lisak:

Q. Is there anything from the events following [Jenkins] leaving the Seals that supports your conclusions here today?
A. I think when he left the Seals, and that being a very positive environment for him, he moved back into a lifestyle that began to mimic more and more the kind of lifestyle he had in California. He drank more and started using drugs more. He was around people who did not have the kind of positive influence on him that Lonnie Seal had.

[30] This cite references the following portion of the June 8, 1997 Lunacy Commission report:

It is noted from prior records that the patient has a very significant history of alcohol dependence with alcoholic blackouts in the last several years prior to his arrest. In addition, he has used heroin, speed, inhalants, LSD, and PCP.

[31] This cite references a page from a probation report prepared on May 11, 1983, when Jenkins was 16 years old.

[32] This cite references a page from a probation report prepared on September 21, 1981, when Jenkins was 14 years old.

be abused, and ended up being homeless because he lacked skills to locate lodging. (RHCC, Tab #R-48, TR. 118-24, 200; vol. 25, pp. 546, 573, 574, 575; vol. 26, p. 760; vol. 27, pp. 804, 822, 844, 845, 847, 857, 860.) While living with the Seals, he contributed where he was able but had no significant home living responsibilities such as taking care of the home, paying bills, buying groceries or other chores.[33] After fleeing the safety of their trailer when he feared that they might discover he was a bed-wetter, he lived in squalor – taking up residence in a filthy mess of a[] dwelling that had been provided by an employer, thereby confirming his lack of home living skills and that his life totally deteriorated without the limited structure of the Seals['] home. (RHCC, Tab #R-48, TR. 58-59, 486.)[34]

(*Jenkins's Reply Brief*, Doc. 48 at 31).

With respect to social and interpersonal skills, Jenkins maintains that:

Mr. Jenkins suffers significant deficits in social and interpersonal skills. He was a social outcast who was rejected and exploited by his peers. (RHCC, Tab #R-48, TR. 108, 110, 124, 184, 194; vol. 27, pp. 847, 891, 935.) Mr. Jenkins had no friends during childhood. (RHCC, Tab #R-48, TR. 108, 494.) In addition, because he often urinated and defecated in his pants, Mr. Jenkins's peers ostracized and ridiculed him. (*Id.* at 110, 111.) Even his own family treated him differently. (*Id.* at 110, 192.) His parents never showed him any affection. (*Id.* at 111, 192.) During much of his early life, Mr. Jenkins's parents physically prevented him from communicating by regularly "lock[ing him] in his room" and "not allow[ing him] to be around anybody." (*Id.* at 112.)

---

[33] Jenkins offers nothing to support this statement.  However, Lonnie Seal testified at the sentencing phase of Jenkins's trial that Jenkins contributed to the rent and other household expenses such as groceries.  (R. Vol. 9, Tab 19 at 1721-22).

[34] These cites in no way support Jenkins's statements that: "After fleeing the safety of their trailer when he feared that they might discover he was a bed-wetter, he lived in squalor – taking up residence in a filthy mess of a[] dwelling that had been provided by an employer, thereby confirming his lack of home living skills and that his life totally deteriorated without the limited structure of the Seal['s home."

42

Others took advantage of him all the time. (*Id*. at 60.)[35] In response to the ostracism and exploitation, Mr. Jenkins did not stand up for himself. When beaten, he would cower, cry, and apologize, but would not fight back or run. (*Id*. at 193.) When asked to contribute on different occasions, Mr. Jenkins would "always give more than anybody else," and when others asked for help, often "he would end up doing the whole job." (*Id*. at 60.) He also did not receive fair wages at his job and was always working extended hours. (*Id.* at 61.) Mr. Jenkins was gullible and easily exploited. Mr. Jenkins's social isolation was a lifelong experience. He lacked the basic foundation for establishing peer relationships and had poor relationships with his family throughout his life. (RHCC, Tab #R-48, TR. 100-04, 112-14, 184-186, 192-96, 232, 452.) Notes from his elementary school records reveal that Mr. Jenkins was socially as well as mentally retarded with one evaluator opining that at age 12, Mr. Jenkins was five years behind the social level of his peers. (RHCC, vol. 27, pp. 879, 883, 944, 946, 955.) Indeed, the fact that Mr. Jenkins was isolated and rejected by his family of origin did not prevent the family from exploiting him. The evidence introduced in Rule 32 show that his mother extorted money from him while he was a homeless teenager, in exchange for her commitment not to report him to authorities. (RHCC, Tab #R-48, TR. 483.) According to the AAMR, "victimization of people with mental retardation, observed in social and economic exploitation, is 'a more central (and generally more subtle) problem that goes to the heart of why people with mental retardation are considered to need that label.'" AAIDD MANUAL at 84 (citing Stephen Greenspan, A Contextualist Perspective on Adaptive Behavior, in Adaptive Behavior and Its Measurement: Implications for the Field of Mental Retardation 69 (R.L. Schalock, ed., 1999)).

(*Jenkins's Reply Brief*, Doc. 48 at 31-33).

With respect to use of community resources and self-direction, Jenkins offers the following:

---

[35] The record does not supports Jenkins's assertion that people took advantage of him "all the time."

Mr. Jenkins has significant deficits in the area of use of community resources and self-direction. Specifically, Mr. Jenkins could not protect himself and failed to succeed without considerable assistance. From a very young age, Mr. Jenkins suffered "severe" abuse, which escalated throughout his childhood and included at least one instance of sexual abuse from his grandfather. (RHCC, Tab #R-48, TR. 187-88, 454, 458, 462.) When Mr. Jenkins was abused, he would "ball" up, instead of fighting back. (*Id*. at 93, 96, 193.) Mr. Jenkins also ran away from home and lived on the streets. (Id. at 122.) In response to his troubles in school and at home, a county health care services report recommended that Mr. Jenkins, who was a ward of the court, stay in a structured special education program. (RHCC, vol. 27, pp. 844, 846, 847.) The report also noted that Mr. Jenkins would "have to deal with his feelings of rejection and worthlessness that he has received from his family and work to improv[e] his self-image." (*Id*.)

As evidenced by the testimony and records presented at the Rule 32 hearing, Mr. Jenkins did not utilize community resources after becoming homeless as a child – such as a homeless shelter or juvenile facility – and instead lived in the streets. (RHCC, Tab #R-48, TR. 118-24, 200.) Likewise, although his bladder and bowel control problems and chemical dependency significantly interfered with any efforts he made at normalcy, he was unable to avail himself to resources that would have assisted with these issues. Indeed, rather than be discovered as a bedwetter, Mr. Jenkins left the Seals' home. As an adult, Mr. Jenkins's peers took advantage of him regularly, which required him to subsist in the streets or rely on others. (*Id*. at 60, 61.[36]) During one of

---

[36] This cite references the testimony of Sherry Brown Seal, who stated that after Jenkins moved out of her house, he was taken advantage of on several occasions. She elaborated:

A. On several occasions, when asked to contribute for different occasions, whether it was a meal or whatever, he would always give more than anybody else. There were times people would ask for help, and he would end up doing the whole job.
Q. In his employment, was he taken advantage of?
A. The employment in California, I don't know about. The employment while he was employed in Alabama, yes, he was.
Q. Tell me how he was taken advantage of.
A. He was not receiving fair wages. He was asked to work extended hours.

the periods in which Mr. Jenkins had no place to live, he followed a family he befriended to Alabama and depended on them for transportation and lodging. (RHCC, Tab #R-9, TR. 1726; Tab #R- 48, TR. 151.)[37] Those with mental retardation tend to be "followers," and rely on others for direction and support. *Atkins*, 536 U.S. at 318. Further indicative of lack of his self direction, Mr. Jenkins found only "odd and ends" work doing painting, landscaping, and assisting a mechanic. (RHCC, vol. 29, p. 1255.)

(*Jenkins's Reply Brief*, Doc. no. 48 at 33-34).

The respondent maintains the evidence before the state court reveals that Jenkins does not have significant limitations in adaptive functioning.  (*Respondent's Opposition to Motion for Evidentiary Hearing*, Doc. 51 at 19).  The respondent first argues that Lonnie Seal's testimony at the penalty phase of the trial supports a finding that Jenkins does not have significant limitations in adaptive functioning:

Mr. Seal testified that he met Jenkins when he started working at the garage where Jenkins was employed in California. (Vol. 9, p. 1719.) Mr. Seal described their job duties as consisting of "mostly heavy engine work," and he stated that Jenkins did whatever their boss needed him to do, from driving a wrecker to installing engines. *Id*. at 1720. He testified that they became "well acquainted" and added that Jenkins regularly stopped by his home to visit with him, his wife, and their child. *Id*.

---

Seal indicated that she did not believe Jenkins was paid enough for the hours he worked.

[37] Lonnie Seal testified at the sentencing phase of Jenkins's trial that he invited Jenkins to move to Alabama with his family and offered to let Jenkins live with him until he could obtain his own lodging, or if he did not like Alabama, he would help him "get a bus ticket back."  He testified that Jenkins helped with the move by driving the Seals' truck to Alabama while Lonnie Seal drove his car with his wife and child.  He further testified that it took him several weeks to find a job, while Jenkins found a job in two days, which allowed Jenkins to pay rent and contribute to household expenses such as groceries.  (R. Vol. 9, Tab 19 at 1721-22).

Mr. Seal testified that he and his wife decided to move to Alabama to be closer to relatives after they discovered that she was pregnant with their second child. *Id*. at 1721. Jenkins volunteered to assist them with their move. *Id*. Jenkins drove their truck and attached trailer from California to Alabama while Mr. Seal drove himself, his wife, and their child to Alabama in his wife's car. *Id*. Once they arrived in Alabama, the Seals invited Jenkins to stay with them, and he accepted their offer. *Id*. at 1722. It took Mr. Seal "several weeks" to find a job, but Jenkins obtained a job just two days after they arrived in Alabama. *Id*.

When he was asked whether Jenkins paid rent and otherwise contributed to their household, Mr. Seal responded, "Yes, sir. He paid us about thirty dollars a week rent, and then he was constantly contributing, buying groceries, do whatever he could do. He was always offering more." *Id*. at 1722-1723. Mr. Seal recalled that Jenkins lived with them for approximately three weeks and then moved out of their residence because "he got his own mobile home in Vandiver." *Id*. at 1723. When he was asked whether they had close contact with Jenkins after he left their home, Mr. Seal replied, "Yes, sir. I saw Mark about every day." *Id*. Mr. Seal explained that Jenkins stopped by their home almost every day in the evening after his work shift to visit with them. *Id*. When he was asked whether Jenkins had any contact with their eight-month-old child during those visits, Mr. Seal testified, "Yes, sir, he always did. He would go in his room and sit in the floor and play with him. Every time Mark come to the house, he would bring something, you know. If Mark ate lunch at Hardees, or something, he would get the little toy, like the little raisin man or something, and bring it home. Every time Mark come to the house he had something. If it was just a sucker or candy, he would always spend time with Lon." *Id.* at 1724.

Mr. Seal's testimony reveals that Jenkins has good adaptive functioning in the areas of communication, self-care, home living, social and personal skills, use of community resources, and self-direction. Jenkins volunteered to drive Mr. Seal's truck and attached trailer from California to Alabama and successfully completed that task. He then

wisely accepted the Seals' offer to live with them until he found a home of his own, which he did just three weeks after arriving in Alabama. Unlike Mr. Seal, who had to spend weeks searching for a job, Jenkins found a job just two days after they arrived in Alabama, and he used the money that he earned from that job to pay rent, buy groceries, and otherwise support the household that he shared with the Seals. Jenkins stayed in close contact with Mr. and Mrs. Seal after he moved into his own home, visiting them in the evenings after completing his work duties. Jenkins interacted well with their young child during these visits and remembered to bring gifts, such as the toy from Hardees, to the child. Thus, Mr. Seal's testimony reveals that Jenkins not only could but did live independently, that he provided for his own needs and the needs of others, and that he had no difficulties in the areas of self-care, self-direction, social, personal, and home living skills, communication, and use of community resources.

(*Id*. at 19-22).

The respondent further argues the facts surrounding Jenkins's crime also reveal

that he does not have significant deficits in adaptive functioning:

In the early-morning hours of April 18, 1989, Jenkins kidnapped, robbed, and murdered Tammy Hogeland. (Vol. 3, pp. 522-526; Vol. 4, pp. 672-673.) Later that morning, Jenkins approached Michael Brooks, who was working as a mechanic at the Alford Avenue Shell in Birmingham, and asked Brooks if he was willing to buy his car for $100 because, as he explained, he needed to travel to California to visit his ailing mother. (Vol. 6, pp. 1026, 1032.) After Brooks agreed to purchase the car for $80, Jenkins produced a bill of sale and signed the car over to him. *Id*. at 1026-1032. Jenkins's exchange with Brooks shows that he was able to fabricate a plausible reason for needing money and demonstrates that he understands proper sales transactions in light of the fact that he had the bill of sale with him and signed it over to the purchaser. Jenkins's encounter with Brooks also demonstrates his ability and willingness to bargain over a price to achieve what he wanted – in this case, cash that he could use to escape Alabama.

47

Jenkins next persuaded Reba Wood, who also worked at the Alford Avenue Chevron, to take him to the Greyhound Bus Station. (Vol. 6, pp. 1035-1039.) At that time, Jenkins had with him a blue suitcase, a paper sack, and a duffel bag. Id. Jenkins boarded a bus leaving Birmingham at approximately 12:00 p.m. *Id*. On the following day, Jenkins awakened in Houston, Texas, and realized that his bus ticket was at the end of its use. *Id*. at 1157-1158. So, Jenkins proceeded to hitchhike to Los Angeles, California, where he ultimately was arrested some 22 days after the offense. *Id.* at 1106.

Jenkins's flight from Alabama to California and his ability to avoid arrest for nearly three weeks after he committed the crime demonstrate that he, perhaps regrettably, has good adaptive functioning. By way of example, Jenkins's encounters with Brooks and Wood and the fact that he successfully hitchhiked from Texas to California demonstrate good adaptive functioning in the areas of communication, social and personal skills, and self-direction. And, Jenkins's use of a bus to flee Alabama demonstrates his ability to use community resources.

Because the evidence in the state-court record demonstrates that he does not have significant limitations in his adaptive functioning, Jenkins cannot satisfy his burden of showing that he is mentally retarded and, therefore, ineligible for the death penalty under *Atkins*.

(*Id*. at 22-24).

Additionally, there was testimony at the evidentiary hearing concerning Jenkins's most recent adaptive behavior while he was incarcerated. Bonnie Adams, a jailer for the St. Clair County Sheriff, testified that while Jenkins was in the county jail from 1989 through 1991, she had constant contact with him. (Rule 32 R. Vol. 19, Tab 48 at 13-17). Ms. Adams stated that Jenkins was a model inmate, the best she ever supervised, who never complained about anything or caused trouble while he

was in jail.  (*Id*. at 18-27).  Virginia Price, another jailer for the St. Clair County Sheriff, also testified that Jenkins was the model inmate, always polite and respectful. (*Id*. at 35-41).  Finally, Dr. Kirkland testified that he reviewed Jenkins's cell and met with Jenkins at Holman Prison for several hours.  (Rule 32 R. Vol. 22 at 618-19).  Dr. Kirkland testified that Jenkins's cell was organized and clean and that Jenkins had good relationships with guards.  (*Id*.).

Jenkins argues he has significant limitations in adaptive functioning in the following skill areas: academic, communication, self-care, home living, social/interpersonal, community resources, and self-direction.  Almost all of the evidence cited by Jenkins pertains to his childhood.  It is indisputable that Jenkins had a horrible childhood in which he was seriously abused, ignored, and mistreated by his parents.  However, Jenkins's school records indicate his poor academic performance was due at least in part to his family problems, including frequent moves and multiple absences from school.  (Rule 32 C.R. Vol. 27  at 877-964). Additionally, many of the behavioral deficits Jenkins now claims to possess were in no way attributable to Jenkins or his adaptive ability.  Rather, they were the result of the way Jenkins was treated by his parents since his birth.[38]

---

[38] Jenkins's brother, Michael Jenkins, Jr., testified to the following: Jenkins was regularly beaten as a child; he was often beaten for lying or messing in his bed; he was made to wear his soiled underwear to school or on his head; his father made Jenkins hang his soiled sheets on the fence for the neighbors to see; his father rubbed feces on Jenkins's face and made him eat feces; his father beat

With the exception of academic skills, the respondent provides facts to support an argument that Jenkins did not have significant limitations in adaptive functioning in other skill areas during both the time period leading up to the murder and time following the murder.  Further, as the appellate court noted in its opinion on Jenkins's collateral appeal, there was testimony at trial indicating that during the time period surrounding the murder, Jenkins maintained relationships with others and was employed by a landscaping company, service station, and painting company. *Jenkins*, 972 So. 2d at 155.

---

him more severely if he tried to run away or hide from beatings; he and Jenkins were forced to help their father work all night, holding lights for him to work in the dark; they often were too tired to go to school because of being required to stay up all night helping their father; Jenkins was never treated with affection; Jenkins was locked in his room with two dogs who were not house-trained and was required to clean up after the dogs who used his bedroom as their bathroom; Jenkins was locked in his room during meals, so he had to eat dog biscuits and other scraps that were thrown to the dogs; Jenkins and his siblings ran away regularly; he called Child Protective Services once, but his father threatened to kill him if he ever called them again; and their parents regularly used "speed or crystal methamphetamines."  (Rule 32 R. Vol. 20 at 81-172).

Jenkins's cousin, Tammy Lynn Pitts testified to the following: she is five years older than Jenkins and lived with Jenkins and his family until she was in her twenties; Jenkins was beaten and mistreated as a child; his mother hid him from the family because his father was Mexican or Puerto Rican; his mother did not change his diapers regularly, so he was forced to sit in soiled diapers for several days at a time; he suffered bad diaper rash; his mother never bathed him; while he was a baby, his mother smacked and tossed him around like he was nothing; things got worse when Jenkins's step-father was released from prison; his step-father beat him daily until he left home; Jenkins tried to hide his soiled sheets and put clean sheets on his bed to avoid beatings; Jenkins's parents called him names such as "Puerto Rican puke" and "Bastard" and gave him no affection; he was forced to attend school in his soiled clothing; Jenkins begged his father not to beat him, telling him he loved him; Jenkins was locked in his room, filthy with dog feces and dirty clothes that were never washed, and was not let out of his bedroom except to go to school or do chores; after the family ate, they threw food into his bedroom for him, or he ate out of a trash can or ate dog food; his siblings were treated better than he was; he was forced to wear diapers at age 9; his parents drank a lot and used drugs; the living conditions in the home were filthy with dirty dishes and clothes; and the dogs destroyed the house and urinated inside.  (*Id.* at 182-225).

Jenkins argues that the appellate court's "focus on only two skill areas was an unreasonable application of *Atkins*." (*Jenkins's Response to the State's Opposition to Motion for Evidentiary Hearing*, Doc. 52 at 11). However, the fact that the appellate court mentioned only two skill areas in its opinion does not necessarily mean that no other skill areas were considered. *See Harrington v. Richter*, 562 U.S. 86, 98 (2011) ("Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief. This is so whether or not the state court reveals which of the elements in a multipart claim it found insufficient, for § 2254(d) applies when a 'claim,' not a component of one, has been adjudicated.").

The state record is replete with evidence pertaining to the various skill areas. The evidence cited by Jenkins in support of his claim that he lacked skills in a number of  areas pertains mainly to his childhood, which was unquestionably terrible. However, the record shows that Jenkins's deficit in academic skills was in part a result of matters that were beyond his control, such as his poor family life, frequent moves and changes in schools, and frequent absences. Similarly, the deficits Jenkins claims existed in other behaviors were in large part the result of the way his family abused, ignored, and mistreated him. Further, the evidence pertaining to the time of the offense and adjudication of the *Atkins* claim indicates Jenkins did not have

significant or substantial deficits in adaptive behavior during that period of time. Given the evidence before the state court, Jenkins is unable to establish that the Alabama Court of Criminal Appeals' decision–that Jenkins did not possess significant or substantial deficits in adaptive behavior–resulted in: (1) a decision that was contrary to, or involved an unreasonable application of, clearly established federal law; or (2) a decision based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

3. <u>Onset Before Age Eighteen</u>

The final requirement in proving an *Atkins* claim is that the alleged mental retardation (significantly subaverage intellectual functioning and significant or substantial deficits in adaptive behavior) must have been present before the petitioner turned eighteen. *Perkins*, 851 So. 2d at 456. Jenkins argues that "all relevant evidence shows [his] mental retardation manifested before the age of eighteen and is a lifelong condition." (*Jenkins's Reply Brief*, Doc. 48 at 34). However, taking all evidence into account, Jenkins cannot demonstrate his alleged mental retardation manifested before he attained the age of eighteen.

School records clearly show Jenkins's poor performance in school was due in part to excessive absences, late assignments, and lack of fundamental skills in math, reading, and language. (Rule 32 C.R. Vol. 27 at 877-964). At age 12, officials

determined  through extensive intelligence and adaptive functioning testing that Jenkins's intellectual capacity was average and that he was dyslexic, which impaired his ability to read.  (*Id*. at 955).  Officials noted that frequent moves, changes in schools, family problems, and a learning disability (dyslexia) all contributed to Jenkins's "problems." (*Id*. at 958).  Additional testing performed when Jenkins was 14 years old concluded that he functioned in the dull-normal range of intelligence and was suffering from a "definite learning disability." (*Id*. at 846).  School and court officials clearly determined that Jenkins's intelligence scores and adaptive functioning skills were attributable to his learning disability and other circumstances in his life, rather than mental retardation.  Thus, Jenkins is unable to establish that the decision by the Alabama Court of Criminal Appeals–that his alleged mental retardation manifested itself before he was eighteen years old–was contrary to clearly established federal law.  Neither can Jenkins show the Alabama Court of Criminal Appeals' decision either unreasonably applied clearly established federal law or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

## V. CONCLUSION

Jenkins has failed to establish that the Alabama Court of Criminal Appeals' decision that he is not mentally retarded under *Atkins* was contrary to, or involved an

unreasonable application of, clearly established federal law, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  Thus, his *Atkins* claim is due to be **DENIED**.

Because he cannot prevail on his *Atkins* claim, Jenkins is not entitled to an evidentiary hearing on that claim.  *See Cullen v. Pinholster*, 131 S. Ct. at 1398-99. Thus, Jenkins's Motion for an Evidentiary Hearing on his *Atkins* claims (Doc. 49) is due to be **DENIED**.

An appropriate order will follow.

**DONE** this the 31st day of March, 2015.

**VIRGINIA EMERSON HOPKINS**
United States District Judge

54