# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### MIDDLE DIVISION

**MARK ALLEN JENKINS,**      )
      )
      **Petitioner,**      )
      )
**v.**      )      **Case no. 4:08-cv-00869-VEH**
      )
**RICHARD ALLEN, Commissioner,**      )
**Alabama Department of Corrections,**      )
      )
      **Respondent.**      )

_____

## MEMORANDUM OPINION

The petitioner, Mark Allen Jenkins ("Jenkins"), seeks habeas corpus relief from his state court capital murder conviction and death sentence. *See* 28 U.S.C. § 2254.

## Table of Contents

I.    **PROCEDURAL HISTORY**......................................1

II.    **THE OFFENSE OF CONVICTION**...........................6

III.    **THE SENTENCE**...........................................11

IV.    **THE SCOPE OF FEDERAL HABEAS REVIEW**.................15

    A.    **Exhaustion of State Court Remedies**......................16

    B.    **The Procedural Default Doctrine**.........................17

        1.    *General Principles*....................................17

        2.    *Overcoming Procedural Default*.........................22

        a.     *The "Cause and Prejudice" Standard.* . . . . . . . . . . . . 24

              i.     *"Cause".* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

              ii.    *"Prejudice".* . . . . . . . . . . . . . . . . . . . . . . . . . 26

        b.     *The "Fundamental Miscarriage of Justice" Standard*
            . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

**C.**    **The Statutory Overlay:** *The Effect of "the Antiterrorism and Effective Death Penalty Act of 1996" on* Habeas *Review* . . . . . . . . . 28

    1.    *28 U.S.C § 2254(e)(1).* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

    2.    *28 U.S.C § 2254(d).* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

        a.     *The Meaning of § 2254(d)(1)'s "Contrary To" Clause.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

        b.     *The Meaning of § 2254(d)(1)'s "Unreasonable Application" Clause.* . . . . . . . . . . . . . . . . . . . . . . . . . 35

        c.     *The Meaning of § 2254(d)(2)'s Clause Addressing an "Unreasonable Determination of the Facts in Light of the Evidence Presented in the State Court Proceeding".* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

        d.     *Evaluating State Court Factual Determinations under 28 U.S.C. §§ 2254(d)(2) and (e)(1)* . . . . . . . . . 38

**D.**    **The Burden of Proof and Heightened Pleading Requirements for Habeas Petitions**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

**E.**    **Introduction to Ineffective Assistance of Counsel Claims**. . . . . . . 43

    1.    *The Performance Prong.* . . . . . . . . . . . . . . . . . . . . . . . . . . 45

2.    *The Prejudice Prong*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

3.    *Deference Accorded State Court Findings of Historical Fact, When Evaluating Ineffective Assistance of Counsel Claims.*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

**V.    JENKINS'S CLAIMS**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

**A.    Mr. Jenkins Was Deprived of his Constitutional Right to an "Impartial, Indifferent" Jury when a Juror Repeatedly Failed To Answer Critical Questions during Voir Dire**. . . . . . . . . . . . . 52

**B.    The Eighth Amendment Prohibits Executing Mr. Jenkins because He Is Mentally Retarded**. . . . . . . . . . . . . . . . . . . . . . . . 77

**C.    Trial Counsel's Inadequate Performance Deprived Mr. Jenkins of the Effective Assistance of Counsel.**. . . . . . . . . . . . . . 77

1.    Counsel's Deficient Performance Deprived Mr. Jenkins of the Effective Assistance of Counsel during the Penalty Phase.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

a.    Evidence relating to Jenkins's childhood and background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105

b.    Jenkins's age at the time of the offense; lack of significant criminal history; and severe intoxication. . . 110

c.    Jenkins's model behavior and positive adjustment to pretrial incarceration. . . . . . . . . . . . . . . . . . . . . . . . 126

d.    Failure to request a continuance.. . . . . . . . . . . . . . . . 132

2.    Counsel's Deficient Performance Deprived Mr. Jenkins of the Effective Assistance of Counsel during the Sentencing Hearing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 134

3.      Trial Counsel Failed To Object and Take Action To Ensure Appellate Review of the Prosecutor's Discriminatory Use of Peremptory Challenges. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 138

        a.      Failure to object to the prosecutor's discriminatory use of peremptory challenges.. . . . . . . . . . . . . . . . . . 139

        b.      Failure to take action to insure appellate review of the prosecutor's discriminatory use of peremptory challenges. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 150

        c.      Prejudice. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 178

4.      Counsel's Deficient Performance Deprived Mr. Jenkins of the Effective Assistance of Counsel during the Guilt Phase. . 179

        a.      Lack of sufficient funding. . . . . . . . . . . . . . . . . . . . . 180

        b.      Failure to object to original co-counsel's conflict of interest. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 190

        c.      Failure to interview Sarah Harris. . . . . . . . . . . . . . . . 194

        d.      Failure to interview Doug Thrash. . . . . . . . . . . . . . . 200

        e.      Failure to interview Frieda Vines. . . . . . . . . . . . . . . . 205

        f.      Failure to discover that another suspect was detained and questioned in connection with the victim's murder.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 212

        g.      Failure to conduct appropriate voir dire. . . . . . . . . . . 219

        h.      Failure to make numerous objections at trial. . . . . . . 221

        i.      Failure to present a coherent and consistent theory of defense. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 225

5.    The Cumulative Effect of Counsel's Errors Deprived Mr. Jenkins of the Effective Assistance of Counsel. . . . . . . . . . 228

**D.    The State Failed to Disclose *Brady* Evidence to the Defense**. . . . 230

**E.    The Trial Court's Unconstitutional Instructional Errors**. . . . . . 239

1.    The Trial Court's Failure to Instruct the Jury on Applicable Lesser-Included Offenses. . . . . . . . . . . . . . . . . . . . . . . . . . . 239

2.    The Trial Court's Failure to Instruct the Jury on Voluntariness. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 248

3.    The Trial Court's Improper Instruction Regarding Mr. Jenkins's Failure To Testify.. . . . . . . . . . . . . . . . . . . . . . . . 257

4.    The Trial Court's Erroneous Instruction Concerning Circumstantial Evidence. . . . . . . . . . . . . . . . . . . . . . . . . . 261

5.    The Trial Court's Improper Reasonable Doubt Instructions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 266

6.    The Trial Court's Reference to the Jury's Verdict as "Merely Advisory" Was Improper and Prejudicial.. . . . . . . . 276

**F.    The Prosecutors Engaged in Misconduct throughout Mr. Jenkins's Trial**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 279

1.    Prosecutor's Prejudicial Comments in the Guilt Phase. . . . . . 282

a.    The prosecutor improperly commented on Jenkins's failure to testify, and "improperly shifted the burden" to Jenkins. . . . . . . . . . . . . . 283

b.    The prosecutor misused irrelevant and prejudicial photos to inflame the jury. . . . . . . . . 293

c. The prosecutor repeatedly expressed personal opinions and vouched for the quality of the prosecution's case and witnesses.. . . . . . . . . . 294

d. The prosecutor injected unsworn and inflammatory testimony that was not admitted into evidence, and had been excluded. . . . . . . . 297

e. The prosecutor misstated the law on reasonable doubt, improperly encouraged the jury to speculate about the existence of evidence where the State's proof was lacking, and  misstated the elements of capital murder, robbery as an aggravating circumstance, kidnapping as an aggravating circumstance, robbery as an afterthought, and the state's burden of proof. . . . . . . . . . . . . . . . . . . . . . . . 299

2. Prosecutor's Prejudicial Comments in the Penalty Phase. . . . 303

a. The prosecutor improperly argued for the existence of non-statutory aggravating circumstances. . . . . . . . . . . . . . . . . . . . . . . . 306

b. The prosecutor improperly encouraged the jury to reject mercy and improperly compared the victim's rights to Mr. Jenkins. . . . . . . . . . . . . 307

c. The prosecutor improperly encouraged the jury to vote for death to deter others. . . . . . . . . . . . 310

**G. The Evidence of Capital Murder Was Insufficient To Convict Mr. Jenkins beyond a Reasonable Doubt**. . . . . . . . . . . . . . . . . . 312

**H. The Trial Court's Sentencing Errors**. . . . . . . . . . . . . . . . . . . . . . 318

vi

I.      **Mr. Jenkins Was Deprived of a Fair Trial by the State's Racially Discriminatory Use of Peremptory Challenges**....... 324

J.      **The Trial Court's Wholesale Adoption of the State's Proposed Findings of Fact Was Unreasonable**....................... 332

K.      **The Manner of Execution Used by the State of Alabama Constitutes Cruel and Unusual Punishment**.................. 338

VI.   **CONCLUSION**.......................................... 340

# I. PROCEDURAL HISTORY

In June, 1989, Jenkins was indicted in the St. Clair County Circuit Court on two counts of capital murder for the strangling death of Tammy Ruth Hogeland. (C.R. Vol. 10, Tab 27 at 23).[1] The indictment charged that Jenkins intentionally killed Ms. Hogeland during the course of a robbery[2] and kidnapping.[3] Jenkins was represented at trial by Douglas Scofield and Stan Downey. The guilt phase of the trial began on March 12, 1991. (C.R. Vol. 45, Tab 73). On March 19, 1991, Jenkins was convicted as charged. (*Id.*). After a twenty-minute recess, the court proceeded with the penalty phase of the trial.[4] (*Id.*). Later that day, the jury recommended by a vote of 10-2 that Jenkins be sentenced to death. (*Id.*; R. Vol. 9, Tab 24 at 1763). At the April 10, 1991,

---

[1] The court will utilize the following method of citation to the record. References to specific pages of the court record on direct appeal are designated "(C.R.___)" and references to the transcript on direct appeal are designated "(R.___)." References to the court record of the first Rule 32 proceedings are designated "(Rule 32 C.R. ___)" and references to the transcript of the Rule 32 hearing are designated "(Rule 32 R. ___)." References to the court record of the second Rule 32 proceedings are designated "(Second Rule 32 C.R. ___)." The court will attempt to list any page number associated with the court records by reference to the numbers at the bottom of each page of a particular document if those numbers are the most readily discoverable for purposes of expedient examination of that part of the record. Otherwise, the page numbers correspond with those listed at the upper right hand corner of the record. Additionally, for the reader's benefit, the court has cited to any easily identifiable tab numbers close to any cited material.

[2] *See Ala. Code* § 13A-5-40(a)(2) (1975).

[3] *See Ala. Code* § 13A-5-40(a)(1) (1975).

[4] Jenkins's friend Lonnie Seal was the only witness at the penalty phase. He testified that Jenkins was a good friend, who was helpful, generous, and kind. Seal further testified that he trusted Jenkins, even with his wife and baby. (R. Vol. 9, Tab 19 at 1718-27).

sentencing hearing,[5] the trial court followed the jury's recommendation and sentenced Jenkins to death. (R. Vol. 9, Tab 26 at 1795).

Jenkins was represented by Douglas Scofield on direct appeal. He raised a variety of issues on appeal, including: (1) insufficiency of the evidence; (2) the court's failure to suppress physical evidence; (3) the admission of testimony from several prosecution witnesses; (4) the selection of the jury; (5) alleged violations of *Batson v. Kentucky*, 476 U.S. 79 (1986); (6) the court's findings on aggravating and mitigating circumstances; (7) prosecutorial misconduct during closing arguments in the guilt and sentencing phases; and (8) the court's jury instructions. (C.R. Vol. 12, Tab 28; C.R. Vol. 13, Tabs 30 and 32). The Alabama Court of Criminal Appeals affirmed Jenkins's convictions and sentence on February 28, 1992, and denied his application for rehearing on April 17, 1992. *Jenkins v. State*, 627 So. 2d 1034 (Ala. Crim. App. 1992). On May 28, 1993, the Alabama Supreme Court affirmed Jenkins's capital murder convictions and death sentence. *Ex parte Jenkins*, 627 So. 2d 1054 (Ala. 1993). On March 28, 1994, the United States Supreme Court denied Jenkins's petition for a writ of certiorari. *Jenkins v. Alabama*, 511 U.S. 1012 (1994).

On May 26, 1995, Jenkins, through counsel,[6] timely filed a Rule 32 petition in

---

[5] The transcript of the sentencing hearing is located at R. Vol. 9, Tabs 25-26.

[6] Jenkins was represented by his current counsel, Joseph T. Flood, Esq.

the St. Clair County Circuit Court. (Rule 32 C.R. Vol. 17, Tab. 42). Jenkins filed an amended petition on November 26, 1996, after the applicable two-year limitations period had expired.[7] (Rule 32 C.R. Vol. 18, Tab 47). An evidentiary hearing was held on December 10, 1996, and January 20-21, 1997. (Rule 32 R. Vol. 19, Tab 48 at 1 - Rule 32 R. Vol. 22 at 700). On December 31, 1997, the trial court denied the petition. (Rule 32 C.R. Vol. 45, Tab 77).

Jenkins appealed the denial of his Rule 32 petition to the Alabama Court of Criminal Appeals, which affirmed the trial court on February 27, 2004. *Jenkins v. State*, 972 So. 2d 111 (Ala. Crim. App. 2004). The Alabama Court of Criminal Appeals denied Jenkins's application for rehearing on May 21, 2004. *Id*.

On April 8, 2005, the Alabama Supreme Court reversed the judgment of the Alabama Court of Criminal Appeals "insofar as it held that Jenkins's claim of juror misconduct, presented for the first time in his amended petition, could not be considered because it did not relate back to his original petition," and remanded the cause for further proceedings. *Ex parte Jenkins*, 972 So. 2d 159, 165 (Ala. 2005). The Alabama Supreme Court affirmed the Court of Criminal Appeals' affirmance of the trial court's denial of the other claims raised in Jenkins's Rule 32 petition. *Id*.

---

[7] Rule 32.2(c), Ala. R. Crim. P. (This rule was amended, effective August 1, 2002, to shorten the limitations period to one year.)

On remand, the Alabama Court of Criminal Appeals affirmed the trial court's denial of the juror misconduct claim, based upon the trial court's finding that the claim was procedurally barred because it was not raised at trial or on direct appeal. *Jenkins v. State*, 972 So. 2d 165 (Ala. Crim. App. 2005). The Alabama Court of Criminal Appeals denied Jenkins's application for rehearing on April 14, 2006. *Id*. The Alabama Supreme Court denied his petition for writ of certiorari on May 18, 2007. *Id.* The United States Supreme Court denied Jenkins's petition for a writ of certiorari on January 22, 2008. *Jenkins v. Alabama*, 552 U.S. 1167 (2008).

On August 11, 2008, Jenkins, through counsel, filed an amended § 2254 petition in this court. (Doc. 12). The respondent filed an answer to the amended petition on October 29, 2008. (Doc. 20). On November 12, 2008, the action was stayed to allow the petitioner to pursue a second state Rule 32 petition based upon *Ex Parte Burgess*, 21 So.3d 746 (Ala. 2008). (Doc. 25).

On October 1, 2008, Jenkins filed a second Rule 32 petition in state court, realleging his juror misconduct claim. (Second Rule 32 C.R. Vol. 1, Tab 1). On November 25, 2008, the trial court issued an order dismissing the petition as procedurally barred and denying the petition on the merits. (Second Rule 32 C.R. Vol. 9, Tab 18). The Alabama Court of Criminal Appeals affirmed the trial court's denial of the petition on August 26, 2011. *Jenkins v. State*, 105 So. 3d 1234 (Ala. Crim. App.

4

2011). The Alabama Supreme Court granted certiorari for the limited purpose of reviewing Jenkins's claim that the trial court erroneously adopted verbatim the state's proposed order dismissing the petition. *Ex parte Jenkins*, 105 So. 3d 1250 (Ala. 2012). On September 21, 2012, the Alabama Supreme Court affirmed the appellate court's judgment upholding the trial court's adoption of the state's proposed order denying the Rule 32 petition, and denied certiorari on the remaining grounds raised by Jenkins. *Id*. The United States Supreme Court denied Jenkins's petition for a writ of certiorari on March 25, 2013. *Jenkins v. Alabama*, 133 S. Ct. 1634 (2013).    On June 20, 2013, Jenkins filed an amended petition in this court, raising his newly exhausted juror misconduct claim. (Doc. 36). The respondent filed an answer to the amendment on September 3, 2013. (Doc. 40). Jenkins filed a reply brief on November 14, 2013. (Doc. 48).

On November 14, 2013, Jenkins filed a Motion for an Evidentiary Hearing on on his claim that he is mentally retarded under *Atkins v. Virginia*, 536 U.S. 304 (2002). (Doc. 49). The respondent filed an opposition to the motion on September 22, 2014, (doc. 51), and Jenkins filed a reply to the respondent's opposition on October 8, 2014 (doc. 52). On March 31, 2015, the court denied Jenkins's *Atkins* claim and his motion for an evidentiary hearing on that claim. (Doc. 54).

## II. THE OFFENSE OF CONVICTION

The Alabama Court of Criminal Appeals set out the evidence in its opinion on

direct appeal:

> The state's evidence tended to show that in the late afternoon of April 21, 1989, the nude body of an unidentified female was found on an embankment on the side of interstate highway 59 south near Pelham, Alabama. The body was badly decomposed and was later identified by dental records as Tammy Hogeland. The cause of death was manual strangulation. The victim's hyoidal bone was fractured which is consistent with a manual strangulation as opposed to other types of strangulation.

> Several items of clothing were recovered from the scene: a ladies watch, a blue apron, a pair of ladies white tennis shoes, a brassiere, a pair of black slacks, and a hair net. Other items found at the scene were an owner's manual for a Mazda RX7 automobile, a fraternity card, photographs, a cable TV guide, a road map, a work order for repair on a Mazda automobile, and several beer and soft drink cans.

> Tammy Hogeland was last seen in the early morning hours of April 18, 1989, at the Airport Omelet Shoppe restaurant in Birmingham where she was working. She was scheduled to work that evening at the Riverchase Omelet Shoppe, but when an employee did not come to work at the Airport Omelet Shoppe, she was asked to work there. Her sister, Wendy Hogeland, and her sister's boyfriend drove the [victim] to the Airport Omelet Shoppe at around 10:00 p.m. on the evening of April 17. Wendy Hogeland testified at trial that Tammy at that time had on her jewelry, which included a Citizens brand watch, a necklace with the words "special sister," a class ring with a topaz stone, and a diamond cluster engagement ring. That evening the victim was working as a cook, and she was wearing a blue apron, black pants, a white shirt, and a pair of white shoes. Early in the morning of April 18, the victim and Sarah Harris were the only employees working at the Airport Omelet Shoppe. At about 2:00 a.m. Sarah Harris observed a red sports car being driven into the parking lot. She stated that she remembered the car because it

almost jumped the curb and came through the glass wall of the restaurant. Harris identified the appellant, Mark Allen Jenkins, as the individual driving the car and stated that he appeared to be intoxicated when he came to the Omelet Shoppe. The appellant walked over to the victim and began talking to her. Harris saw the victim and the appellant drive off in the red sports car. She could not testify at trial whether the victim went willingly or was abducted. Testimony did reveal that the victim was a heavy smoker and that she left behind her cigarettes, her lighter, her purse, and her paycheck, which had been issued that evening. Harris had also worked with the victim on several occasions and said that she had never before left the shop without telling anyone as she did that evening.

Later, at around 5:00 a.m. on the morning of April 18, Geraldine and Bobby Coe were at a Chevron gasoline service station on I-59, when they saw an individual in a red sports car. They identified the individual in the car as appellant Jenkins. They also stated that a female was in the front passenger seat of the car and that she appeared to be "passed out." They could not say whether she was alive or dead. While Bobby Coe was pumping gas, the appellant approached him and asked him for some cigarettes. Coe gave the appellant some cigarettes, and the appellant said, "looks like it's been a long night and it looks like it's going to be a long day." The appellant then told Coe, "God bless you," and as he was walking back to the red sports car he asked Coe how to get to interstate highway 459. Coe gave him directions. They both got into their respective vehicles and left the station. The Coes, each driving a different car, drove out of the gas station. Bobby Coe stated that he saw the car driven by the appellant follow him for awhile, flash his lights, slow down, and then pull to the side of the road between mile markers 151 and 152. This is the area where Tammy Hogeland's body was found approximately three days later.

By agreement, a statement made by Christine Nicholas was received into evidence. Nicholas told police that she had known the appellant for several months and that she had met him at the Omelet Shoppe where she worked. She further stated that the appellant was at her home on the evening of April 17 and that he stayed at her home until approximately 2:00 a.m. on the morning of April 18. She stated that the

appellant was very intoxicated and that he was attempting to seduce her. She resisted and the appellant got "real mad" and asked her several times what she would do if someone came up from behind her and grabbed her. At approximately 1:00 a.m., the appellant and Nicholas went to the Riverchase Omelet Shoppe. The appellant went inside the Omelet Shoppe and talked with one of the waitresses. Shortly after this, the appellant and Nicholas returned to her home, and the appellant fell asleep on the couch. Around 2:00 a.m. the appellant was asked to leave by Ms. Nicholas's mother. When he left, he fell down some steps and then rammed his car into another vehicle. Nicholas also stated that she saw the appellant later in the morning of April 18 at a Delchamps grocery store. The appellant was making a telephone call, looking at a newspaper, and attempting to sell his automobile, an old model Buick Century. At this time Nicholas loaned the appellant $4.00 so that he could get some gasoline for his car.

Douglas Thrash, a manager of the Riverchase Omelet Shoppe, saw the appellant at around 1:00 a.m. on the morning of April 18 at the Riverchase Omelet Shoppe. Thrash said that he recognized the appellant because he was a regular customer at the restaurant. The appellant spoke with Frieda Vines, one of the waitresses. Thrash heard mention of, at one point in the conversation, the Omelet Shoppe near the airport. Thrash also stated that the appellant knew all of the waitresses, including the victim, because he was a regular customer and that he talked with them all when he was in the restaurant.

Testimony also established that the appellant sold his car around 10:00 a.m. on the morning of April 18, to Michael Brooks, a mechanic at the Alford Avenue Chevron gasoline service station in Birmingham. He told Brooks that his mother was sick and that he needed money to go home to California. One of the attendants at the service station took the appellant to the bus station between 11:30 and 12:00 p.m. that day. A ticket agent for Greyhound bus lines testified that she sold two tickets that day between 12:00 and 2:00 p.m. The two destinations were Houston, Texas, and Tulsa, Oklahoma.

When the appellant was living in Birmingham, he was sharing a house with Mitchell Babb. The house was a one-bedroom bungalow with

no electricity. Evidence established that the appellant was in financial trouble. The house was owned by John Angwin. Angwin testified that the appellant lived in the house for approximately two months, that he paid no rent, and that he allowed the appellant to stay there so that the appellant could keep his job at a landscape company.

The evidence presented further established that near the appellant's residence in Birmingham was a gasoline service station, Rocky Rid[ge] Road Service Station, where the appellant did some odd jobs. This station was managed by Leon Wooten. About 10 days before the homicide, a red Mazda RX7 automobile was brought into the service station for routine maintenance work. While the car was at the service station, the appellant was working there. Approximately two days before the homicide, the appellant was at the station more frequently, and he parked his Buick automobile there. He told the manager of the station that he wanted to leave his car there because he did not want the person who sold him the car, John Angwin, to know when he was driving the car. On April 18, one of the managers of the Rocky Rid[ge] Road Service Station noticed that the ignition to the service truck had been tampered with. When the manager discovered this, the appellant was at the station putting some gasoline in his Buick. The manager asked the appellant if he knew anything about the service truck and he replied that his Buick had also been tampered with. Later in the day when the owner of the red Mazda came to pick his car up from the station, it was gone. The car was later recovered on I-459 near Leeds. While the Mazda was at the service station, the keys to it were left in the car above the visor. The manager of the station said that they always left car keys above the visors.

Steve Musser testified that he had known the appellant for approximately six months prior to the murder. On the day before the victim disappeared, the appellant approached Musser and asked him if he wanted to buy a chainsaw. At this time the appellant was dressed in jeans and a pullover shirt. After talking for several minutes, the appellant left. On the morning of April 18, the appellant again came to see Musser and was dressed in the same clothes that he had on the day before. The appellant told Musser that someone had stolen his car the night before, and he asked him if he would say that he had been with him all night.

9

Musser refused and the appellant stayed and talked for about 15 minutes and left. Musser did not see the appellant again.

The appellant was identified as a suspect by Michael Weems, a Hoover Police Officer. Weems went to the Omelet Shoppe where the victim worked every day. He knew that the appellant knew the victim and that when the appellant was in the restaurant he would talk with her and that on several occasions he had passed notes to her on napkins.

The owners of the Mazda identified the car recovered off I-459 as their vehicle. They further identified items found near the victim's body as items that were in the Mazda when they took the car in to the Rocky Rid[ge] Road Service Station for repairs. Several business cards from a golf professional at Delray Beach Municipal Golf Course in Florida were identified as those that were in the glove compartment of the Mazda.

Hair fibers collected from the victim and items of her clothing tended to establish her presence in the red Mazda automobile. Fibers from the seat of the automobile were found on her underclothing. Hair fibers consistent with those from the victim were found on the car seat and on the storage area behind the seats. A pubic hair identified as that of the victim's was found on the passenger floorboard mat. Hair fibers collected from some of the appellant's clothing connected him to the red Mazda. Forty-six car seat fibers were found on the appellant's blue jeans. Fibers from the appellant's blue jeans were also discovered on the victim's apron.

Mitchell Babb, the appellant's roommate in Birmingham, identified boots that were recovered from the appellant's uncle in California as being like boots that the appellant wore. A boot print found at the scene of the crime was identified as being consistent with the heel of the boots recovered from the appellant's uncle.

A prisoner who was a cellmate of the appellant in the St. Clair County jail, testified that the appellant approached him several times while they were in jail and talked about the murder. He said that the appellant feared that he would be transferred to Jefferson County because

the victim was married to or was going to marry a Jefferson County deputy sheriff. According to this witness, the appellant was afraid that the people from the service station, the Coes, would identify him and he was also afraid that the police would find his fingerprints on a beer can left at the scene, according to this witness. The witness also said that Jenkins told him that "he had done the crime."

*Jenkins v. State,* 627 So. 2d 1034, 1037-40 (Ala. Crim. App. 1992) (alterations added)

(footnote omitted).

## III. THE SENTENCE

The following excerpt is taken from the written order of the sentencing court:

This Court has considered all of the relative testimony relating to aggravating circumstances as set out in Title 13A-5-49, of the 1975 Code of Alabama, and also considered all mitigating circumstances as set out in Title 13A-5-51 of the 1975 Code of Alabama, together with other mitigating circumstances not set out in the above Code Section.

### AGGRAVATING CIRCUMSTANCES

At the sentence hearing before the jury and the sentence hearing before this Court, the State of Alabama stated to the Court that they were relying on the following aggravating circumstances.

1.     The capital offense was committed while the defendant was engaged [in] or was an accomplice in the commission of, or an attempt to commit, or flight after committing, or attempting to commit, robbery.

2.     The capital offense was committed while the defendant was engaged [in] or was an accomplice in the commission of, or an attempt to commit, or flight after committing, or attempting to commit kidnapping.

11

There was no statement made by the District Attorney that he was relying on any of the other aggravating circumstances as set out in Title 13A-5-49 of the Code of Alabama. No evidence was offered at any state of the proceedings that would justify a finding that:

1.    The capital offense was committed by a person under sentence of imprisonment; or

2.    The defendant was previously convicted of another capital offense or a felony involving the use or threat of violence to the person; or

3.    The defendant knowingly created a great risk of death to many persons; or

4.    The capital offense was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody; or

5.    The capital offense was committed for pecuniary gain; or

6.    The capital offense was committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of laws; or

7.    The capital offense was especially heinous, atrocious or cruel compared to other capital offenses.

This Court is convinced beyond a reasonable doubt that on April 18, 1989 at some time after 2:00 a.m. on said date, the Defendant Mark Allen Jenkins robbed the victim Tammy Ruth Hogeland and in the process of the robbery, the victim Tammy Ruth Hogeland was murdered by means of strangulation by the Defendant. The Defendant did, in fact, rob the victim by taking certain items of personal property which has been set out in the findings of facts above; or, that the Defendant Mark Allen Jenkins, at some time around 2:00 a.m. on April 15, 1989 or thereafter, kidnapped the victim Tammy Ruth Hogeland and in the process of the kidnapping, the victim was murdered by the Defendant by strangulation.

Therefore, this Court does find as an aggravating circumstance that the capital offense was committed while the defendant was engaged or was an accomplice in the commission of, or an attempt to commit, or flight after committing robbery; and, that the capital offense was committed while the defendant was engaged [in] or was an accomplice in the commission of, or an attempt to commit, or flight after committing, or attempting to commit, kidnapping.

## MITIGATING CIRCUMSTANCES

This Court has considered all of the mitigating circumstances as enumerated in Title 13A-5-51, 1975 Code of Alabama. This Court does find as a mitigating circumstance that,

1.  The defendant has no significant history of prior criminal activity. Even though the Defendant had been convicted of at least two misdemeanors, this Court would not consider that as a significant history of criminal activity as a mitigating circumstance in a capital offense.

2.  This Court has considered the mitigating circumstance that the capital offense was committed while the defendant was under the influence of extreme mental or emotional disturbance. After considering said mitigating circumstance there was no evidence introduced for this Court's consideration that would justify a finding for this mitigating circumstance.

3.  The Court, after having considered [the] mitigating circumstance that the victim was a participant in the defendant's conduct or consented to it, does not find that there was any evidence that would substantiate this mitigating circumstance.

4.  The Court, after having considered [the] mitigating circumstance that the defendant was an accomplice in the capital offense committed by another person and his participation was relatively minor, does not find that there was any evidence that would substantiate this mitigating circumstance.

13

5.      The Court, after having considered [the] mitigating circumstance that the defendant acted under extreme duress or under the substantial domination of another person, does not find that there was any evidence that would substantiate this mitigating circumstance.

6.      The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired. The Court does find that there was evidence that the defendant, at some time during the night of April 17th or morning of April 18th had consumed alcoholic beverage [sic], but the Court does not find that at the time of the commission of the capital offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired. The Defendant's conduct, at approximately 5:00 a.m. on the 18th at the service station, and his conversation with the two Coe witnesses and his later recollection of the events that occurred surrounding the commission of the offense, would indicate that the defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was not substantially impaired to the extent as required in this mitigating circumstance.

7.      Even though the Defendant was twenty one years of age at the time of the crime, this Court does find that the age of the defendant at the time of the crime was a mitigating circumstance.

This Court has further considered the pre-sentence report going into the background of the Defendant prior to the commission of the offense and also all of the mitigating circumstances as set out in the Defendant's Attorney's pre-sentence memorandum and all of the mitigating circumstances enumerated in Title 13A-5-51 of the Code of Alabama.

The Court does further consider the fact that the jury, after hearing the evidence in the case, the aggravating and mitigating circumstances at the sentence hearing, the jury made the recommendation that the death penalty be imposed.

14

After considering all of the aggravating and mitigating circumstances, this Court finds that the aggravating circumstances as considered by this Court outweigh the mitigating circumstances as considered by this Court, and that said aggravating circumstances are such to uphold the jury and this Court's finding of punishment by death.

It is therefore the judgment of this Court that the recommendation by the jury that the defendant be punished by death is accepted by this Court. This Court has heretofore, on this date, in open Court, found the defendant guilty, therefore be it ORDERED that the Defendant be and is hereby sentenced to suffer the penalty of death.

(C.R. Vol. 45, Tab 73 at 16-19) (alterations added).

## IV. THE SCOPE OF FEDERAL HABEAS REVIEW

"The habeas statute unambiguously provides that a federal court may issue the writ to a state prisoner 'only on the ground that he is in custody in violation of the Constitution or law or treaties of the United States.'" *Wilson v. Corcoran*, 562 U.S. 1, 5 (2010) (quoting 28 U.S.C. § 2254(a)). As such, this court's review of claims seeking habeas relief is limited to questions of federal constitutional and statutory law. Claims that turn solely upon state law principles fall outside the ambit of this court's authority to provide relief under § 2254. *See Alston v. Department of Corrections*, 610 F. 3d 1318, 1326 (11th Cir. 2010) (holding that a claim addressing either "an alleged defect in a collateral proceeding," or a state court's "interpretation of its own law or rules," does not provide a basis for federal habeas relief) (citations omitted).

**A.**     **Exhaustion of State Court Remedies:** *The First Condition Precedent to Federal Habeas Review*

A habeas petitioner is required to present his federal claims to the state court, and to exhaust all of the procedures available in the state court system, before seeking relief in federal court. 28 U.S.C. § 2254(b)(1); *Medellin v. Dretke*, 544 U.S. 660, 666 (2005) (holding that a petitioner "can seek federal habeas relief only on claims that have been exhausted in state court"). That requirement serves the purpose of ensuring that state courts are afforded the first opportunity to address federal questions affecting the validity of state court convictions and, if necessary, correct violations of a state prisoner's federal constitutional rights. As explained by the Eleventh Circuit:

> In general, a federal court may not grant habeas corpus relief to a state prisoner who has not exhausted his available state remedies. 28 U.S.C. § 2254(b)(1)(A) ("An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State. . . ."). "When the process of direct review . . . comes to an end, a presumption of finality and legality attaches to the conviction. . . . The role of federal habeas proceedings, while important in assuring that constitutional rights are observed, is secondary and limited. Federal courts are not forums in which to relitigate state trials." *Smith v. Newsome*, 876 F.2d 1461, 1463 (11th Cir. 1989) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 887 (1983)).

> Exhaustion of state remedies requires that the state prisoner "fairly presen[t][8] federal claims to the state courts in order to give the State the

---

[8] The phrases "fairly presented" and "properly exhausted" are synonymous. *O'Sullivan v. Boerckel,* 526 U.S. 838, 848 (1999) (observing that the question is "not only whether

opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (citing *Picard v. Connor*, 404 U.S. 270, 275-76 (1971) (internal quotation marks omitted). The Supreme Court has written these words:

> [T]hat the federal claim must be fairly presented to the state courts . . . . it is not sufficient merely that the federal habeas applicant has been through the state courts. . . . Only if the state courts have had the first opportunity to hear the claim sought to be vindicated in a federal habeas proceeding does it make sense to speak of the exhaustion of state remedies.

*Picard*, 404 U.S. at 275, 92 S. Ct. at 512. *See also Duncan*, 513 U.S. at 365, 115 S. Ct. at 888 ("Respondent did not apprise the state court of his claim that the evidentiary ruling of which he complained was not only a violation of state law, but denied him the due process of law guaranteed by the Fourteenth Amendment.").

> Thus, to exhaust state remedies fully the petitioner must make the state court aware that the claims asserted present federal constitutional issues. "It is not enough that all the facts necessary to support the federal claim were before the state courts or that a somewhat similar state-law claim was made." *Anderson v. Harless*, 459 U.S. 4, 5-6, 103 S. Ct. 276, 277, 74 L. Ed. 2d 3 (1982) (citations omitted).

*Snowden v. Singletary*, 135 F.3d 732, 735 (11th Cir. 1998) (first and third alterations

and redactions in original) (footnote added).

## B.    The Procedural Default Doctrine: *The Second Condition Precedent to Federal Habeas Review*

### 1.    *General principles*

---

a prisoner has exhausted his state remedies, but also whether he has *properly exhausted* those remedies, *i.e.*, whether he has *fairly presented* his claims to the state courts") ("properly" emphasized in original, all other emphasis added).

It is well established that, if a habeas petitioner fails to raise his federal claim in the state court system at the time and in the manner dictated by the state's procedural rules, the state court can decide the claim is not entitled to a review on the merits. Stated differently, "the petitioner will have *procedurally defaulted* on that claim." *Mason v. Allen*, 605 F.3d 1114, 1119 (11th Cir. 2009) (emphasis added). The so-called "procedural default" doctrine was explained by the Supreme Court in *Woodford v. Ngo*, 548 U.S. 81 (2006), as follows:

> In habeas, the sanction for failing to exhaust properly (preclusion of review in federal court) is given the separate name of procedural default, although the habeas doctrines of exhaustion and procedural default "are similar in purpose and design and implicate similar concerns," *Keeney v. Tamayo–Reyes*, 504 U.S. 1, 7 (1992). *See also Coleman v. Thompson*, 501 U.S. 722, 731–732, 111 S. Ct. 2546 (1991). In habeas, state-court remedies are described as having been "exhausted" when they are no longer available, regardless of the reason for their unavailability. *See Gray v. Netherland*, 518 U.S. 152, 161, 116 S. Ct. 2074, 135 L. Ed. 2d 457 (1996). Thus, if state-court remedies are no longer available because the prisoner failed to comply with the deadline for seeking state-court review or for taking an appeal, those remedies are technically exhausted, *ibid.*, but exhaustion in this sense does not automatically entitle the habeas petitioner to litigate his or her claims in federal court. Instead, if the petitioner procedurally defaulted those claims, the prisoner generally is barred from asserting those claims in a federal habeas proceeding. *Id.*, at 162, 116 S. Ct. 2074; *Coleman*, *supra*, at 744–751, 111 S. Ct. 2546.

*Woodford*, 548 U.S. at 92-93.

Generally, if the last state court to examine a claim states clearly and explicitly that the claim is barred because the petitioner failed to follow state procedural rules,

18

and that procedural bar provides an adequate and independent state ground for denying relief, then federal review of the claim also is precluded by federal procedural default principles. *See Cone v. Bell,* 556 U.S. 449, 465 (2009); *Coleman v. Thompson*, 501 U.S. 722, 731 (1991) ("When a petitioner fails to raise his federal claims in compliance with relevant state procedural rules, the state court's refusal to adjudicate the claim ordinarily qualifies as an independent and adequate state ground for denying federal review.") (alteration added).

> The federal courts' authority to review state court criminal convictions pursuant to writs of habeas corpus is severely restricted when a petitioner has failed to follow applicable state procedural rules in raising a claim, that is, where the claim is procedurally defaulted. *Federal review of a petitioner's claim is barred by the procedural default doctrine if the last state court to review the claim states clearly and expressly that its judgment rests on a procedural bar*, *Harris v. Reed*, 489 U.S. 255, 263, 109 S. Ct. 1038, 1043, 103 L. Ed. 2d 308 (1989), *and that bar provides an adequate and independent state ground for denying relief. See id.* at 262, 109 S. Ct. at 1042-43; *Johnson v. Mississippi*, 486 U.S. 578, 587, 108 S. Ct. 1981, 1987, 100 L. Ed. 2d 575 (1988). The doctrine serves to ensure petitioners will first seek relief in accordance with state procedures, *see Presnell v. Kemp*, 835 F.2d 1567, 1578-79 (11th Cir. 1988), *cert. denied*, 488 U.S. 1050, 109 S. Ct. 882, 102 L. Ed. 2d 1004 (1989), and to "lessen the injury to a State that results through reexamination of a state conviction on a ground that a State did not have the opportunity to address at a prior, appropriate time." *McCleskey v. Zant*, 499 U.S. 467, 111 S. Ct. 1454, 1470, 113 L. Ed. 2d 517 (1991).

*Johnson v. Singletary*, 938 F.2d 1166, 1173 (11th Cir. 1991) (emphasis added).[9]

---

[9] "When the last state court rendering judgment affirms without explanation, [the federal court will] presume that it rests on the reasons given in the last reasoned decision." *Mason v. Allen*, 605 F.3d

Federal deference to a state court's clear finding of procedural default under the

state court's own rules is so strong that:

> "[A] state court need not fear reaching the merits of a federal claim in an *alternative* holding. Through its very definition, the adequate and independent state ground doctrine requires the federal court to honor a state holding that is a sufficient basis for the state court's judgment, even when the state court also relies on Federal law." *Harris*, 489 U.S. at 264 n.10, 109 S. Ct. 1038 (emphasis in original). *See also Alderman v. Zant*, 22 F.3d 1541, 1549-51 (11th Cir. 1994) (where a Georgia habeas corpus court found that the petitioner's claims were procedurally barred as successive, but also noted that the claims lack merit based on the evidence, "this ruling in the alternative did not have an effect . . . of blurring the clear determination by the [Georgia habeas corpus] court that the allegation was procedurally barred"), *cert. denied*, 513 U.S. 1061, 115 S. Ct. 673, 130 L. Ed. 2d 606 (1994).

*Bailey v. Nagle*, 172 F.3d 1299, 1305 (11th Cir. 1999) (alterations and emphasis in

original).

---

at 1118 n.2 (11th Cir. 2009) (alteration added). As the Supreme Court observed in *Ylst v. Nunnemaker*, 501 U.S. 797 (1991):

> The problem we face arises, of course, because many formulary orders are not meant to convey *anything* as to the reason for the decision. Attributing a reason is therefore both difficult and artificial. We think that the attribution necessary for federal habeas purposes can be facilitated, and sound results more often assured, by applying the following presumption: *Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground*. If an earlier opinion "fairly appear[s] to rest primarily upon Federal law," we will presume that no procedural default has been invoked by a subsequent unexplained order that leaves the judgment or its consequences in place. Similarly where, as here, the last reasoned opinion on the claim explicitly imposes a procedural default, we will presume that a later decision rejecting the claim did not silently disregard that bar and consider the merits.

*Id*. at 803 (first alteration in original, second emphasis added) (citation omitted).

The Supreme Court defines an "adequate and independent" state court decision as one that "'rests on a state law ground that is *independent* of the federal question and *adequate* to support the judgment.'" *Lee v. Kemna,* 534 U.S. 362, 375 (2002) (quoting *Coleman v. Thompson,* 501 U.S. at 729) (emphasis in *Lee*)). The questions of whether a state procedural rule is "independent" of the federal question and "adequate" to support the state court's judgment, so as to have a preclusive effect on federal review of the claim, "'is itself a federal question.'" *Id.* (quoting *Douglas v. Alabama*, 380 U.S. 415, 422 (1965)).

To be considered "independent" of the federal question, "the state court's decision must rest solidly on state law grounds, and may not be 'intertwined with an interpretation of Federal law.'" *Judd v. Haley,* 250 F.3d 1308, 1313 (11th Cir. 2001) (quoting *Card v. Dugger*, 911 F.2d 1494, 1516 (11th Cir. 1990)). An example of intertwining would be when "the State has made application of the procedural bar depend on an antecedent ruling on Federal law, that is, on the determination of whether federal constitutional error has been committed." *Ake v. Oklahoma*, 470 U.S. 68, 75 (1985). Stated differently, if "the state court must rule, either explicitly or implicitly, on the merits of the constitutional question" before applying the state's procedural rule to a federal constitutional question, then the rule is *not* independent of Federal law. *Id.*

To be considered "adequate" to support the state court's judgment, the state

procedural rule must be both "'firmly established and regularly followed.'" *Lee v. Kemna,* 534 U.S. at 375 (quoting *James v. Kentucky*, 466 U.S. 341, 348 (1984)). In other words, the rule must be "clear [and] closely hewn to" by the state for a federal court to consider it as "adequate." *James*, 466 U.S. at 346 (alteration added). That does not mean that the state's procedural rule must be rigidly applied in every instance, or that occasional failure to do so will render the rule "inadequate." "To the contrary, a [state's] discretionary [procedural] rule can be 'firmly established' and 'regularly followed' — even if the appropriate exercise of discretion may permit consideration of a federal claim in some cases but not others." *Beard v. Kindler*, 558 U.S. 52, 60-61 (2009) (alterations added). Rather, the "adequacy" requirement means only that the procedural rule "must not be applied in an *arbitrary* or *unprecedented* fashion." *Judd,* 250 F.3d at 1313 (emphasis added).

In summary, if the procedural rule is not firmly established, or if it is applied in an arbitrary, unprecedented, or manifestly unfair fashion, it will not be considered "adequate," and the state court decision based upon such a rule can be reviewed by a federal court. *Card,* 911 F.2d at 1517. Conversely, if the rule is deemed "adequate," the decision will not be reviewed by this court.

**2.** *Overcoming procedural default*

There are basically three circumstances in which an otherwise valid state-law

22

ground will *not* bar a federal habeas court from considering a constitutional claim that was procedurally defaulted in state court: *i.e., (i)* where the petitioner demonstrates that he had good "cause" for not following the state procedural rule, *and*, that he was actually "prejudiced" by the alleged constitutional violation; *or (ii)* where the state procedural rule was not "firmly established and regularly followed"; *or (iii)* where failure to consider the petitioner's claims will result in a "fundamental miscarriage of justice." *See Edwards v. Carpenter*, 529 U.S. 446, 455 (2000) (Breyer, J., concurring); *see also*, *e.g.*, *Coleman*, 501 U.S. at 749-50 (holding that a state procedural default "will bar federal habeas review of the federal claim, unless the habeas petitioner can show cause for the default and prejudice attributable thereto, or demonstrate that failure to consider the federal claim will result in a fundamental miscarriage of justice") (citations and internal quotation marks omitted); *Murray v. Carrier*, 477 U.S. 478, 496 (1986) ("[W]here a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default.") (alteration added); *Smith v. Murray*, 477 U.S. 527, 537 (1986) (same); *Davis v. Terry*, 465 F.3d 1249, 1252 n.4 (11th Cir. 2006) ("It would be considered a fundamental miscarriage of justice if 'a constitutional violation has probably resulted in the conviction of one who is actually innocent.'") (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995) (in turn quoting

23

*Murray*, 477 U.S. at 496)).

> **a**.    *The "cause and prejudice" standard*

"A federal court may still address the merits of a procedurally defaulted claim if the petitioner can show cause for the default *and* actual prejudice resulting from the alleged constitutional violation." *Ward v. Hall*, 592 F.3d 1144, 1157 (11th Cir. 2010) (citing *Wainwright v. Sykes*, 433 U.S. 72, 84-85 (1977)) (emphasis added). This so-called "cause *and* prejudice" standard is clearly framed in the conjunctive; therefore, a petitioner must prove both parts.

> ***i.*    "*Cause*"**

To show "cause," a petitioner must prove that "some objective factor external to the defense impeded counsel's efforts" to raise the claim in the state courts. *Carrier*, 477 U.S. at 488; *see also Amadeo v. Zant*, 486 U.S. 214, 221-22 (1988).

> Objective factors that constitute cause include "'interference by officials'" that makes compliance with the State's procedural rule impracticable, and "a showing that the factual or legal basis for a claim was not reasonably available to counsel." In addition, constitutionally "[i]neffective assistance of counsel . . . [on direct review] is cause." Attorney error short of ineffective assistance of counsel [on direct review], however, does not constitute cause and will not excuse a procedural default.

*McCleskey v. Zant*, 499 U.S. 467, 493-94 (1991) (citations omitted) (first alteration in original, all other alterations added).

"Attorney error [on direct review] that constitutes ineffective assistance of

counsel" has long been accepted as "cause" to overcome a procedural default. *Coleman,* 501 U.S. at 754 (alteration added). However, the constitutional ineffectiveness of post-conviction counsel on collateral review generally will not support a finding of cause and prejudice to overcome a procedural default, because "[t]here is no right to counsel in state post-conviction proceedings." *Id.* at 752 (alteration added) (citing *Pennsylvania v. Finley*, 481 U.S. 551 (1987); *Murray v. Giarratano*, 492 U.S. 1 (1989)).

Even so, in two recent landmark cases, the Supreme Court extended its prior decision in *Coleman* by deciding that, as a matter of equity, and, under specific, limited circumstances, errors by counsel on post-conviction collateral review could establish the necessary "cause" to overcome a procedurally defaulted claim. In the first such case, *Maples v. Thomas*, — U.S. —, 132 S. Ct. 912 (2012), the Supreme Court found that post-conviction counsel's gross professional misconduct (*e.g.* abandonment of the petitioner) severed the agency relationship between counsel and the petitioner and, thus, established the necessary "cause" to overcome a procedural default. *Id.* at 922.

In the second case, *Martinez v. Ryan*, — U.S. —, 132 S. Ct. 1309 (2012), the Supreme Court held that post-conviction counsel's failure to raise an ineffective assistance of trial counsel claim at an initial review collateral proceeding could serve as the necessary "cause" to overcome the procedural default of that type of claim when

the state prohibits it from being raised during the direct review process. *Id.* at 1317.

### ii.     *"Prejudice"*

In addition to proving the existence of "cause" for a procedural default, a habeas petitioner must show that he was actually "prejudiced" by the alleged constitutional violation. He must show "not merely that the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and *substantial* disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis added); *see also McCoy v. Newsome*, 953 F.2d 1252, 1261 (11th Cir. 1992) (*per curiam*). If the "cause" is of the type described in the Supreme Court's 2012 decision in *Martinez v. Ryan*, then the reviewing court should consider whether the petitioner can demonstrate "that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." *Martinez*, 132 S. Ct. at 1318-19 (citing for comparison *Miller-El v. Cockrell*, 537 U.S. 322 (2003) (describing standards for certificates of appealability to issue)).

### b.     *The "fundamental miscarriage of justice" standard*

Because habeas is a creature of equity, the Supreme Court has recognized that, where procedural default would result in a "fundamental miscarriage of justice," a federal court may consider a procedurally defaulted claim even *without* a showing of

"cause" for the default. *See Schlup v. Delo*, 513 U.S. at 319 ("habeas corpus is, at its core, an equitable remedy".) Balancing societal versus individual interests, the Supreme Court has "[e]xplicitly t[ied] the miscarriage of justice exception to innocence[,] thus accommodat[ing] both the systemic interests in finality, comity, and conservation of judicial resources, and the overriding individual interest in doing justice in the 'extraordinary case.'" *Schlup*, 513 U.S. at 322 (citing *Carrier*, 477 U.S. at 496)(alterations added).

The Supreme Court has recognized two alternative standards which fall under the rubric of fundamental miscarriage of justice: the standard set out in *Carrier* and the standard set out in *Sawyer*. Which standard applies depends on whether the claim being assessed is that the petitioner is *actually innocent* of the crime of conviction (*Carrier* "probably resulted" standard applies) or is some other claimed constitutional error resulting in imposition of a death sentence (*Sawyer* "clear and convincing evidence" standard applies).

In assessing a substantial claim of actual innocence of the crime of conviction, the Supreme Court applies *Carrier's* more lenient standard: a fundamental miscarriage of justice is shown where the petitioner shows that the procedurally defaulted claim of constitutional error now raised "has *probably resulted* in the conviction of one who is actually innocent." *Carrier*, 477 U.S. at 496 (emphasis added); *See also Schlup,* 513

27

U.S. at 324. ("We conclude that *Carrier,* rather than *Sawyer,* properly strikes the balance between the societal interests and the individual interest in justice, when the claimed injustice is that constitutional error has resulted in the conviction of one who is actually innocent.").

As to all *other* procedurally defaulted claims, the petitioner is subject to the more stringent *Sawyer* standard. He must show "by *clear and convincing* evidence that[,] but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty." *Schlup*, 513 U.S. at 323 & n.38 (quoting *Sawyer v. Whitley*, 505 U.S. 333, 336 (1992)) (emphasis in *Schlup*, alteration added); *see also*, *e.g.*, *Smith*, 477 U.S. at 537-38.

## C.   The Statutory Overlay: *The Effect of "the Antiterrorism and Effective Death Penalty Act of 1996" on* Habeas *Review*

The writ of habeas corpus "has historically been regarded as an extraordinary remedy." *Brecht v. Abrahamson*, 507 U.S. 619, 633 (1993). That is especially true when federal courts are asked to engage in habeas review of a state court conviction pursuant to 28 U.S.C. § 2254.

> Direct review is the principal avenue for challenging a conviction. "When the process of direct review . . . comes to an end, a presumption of finality and legality attaches to the conviction and sentence. The role of federal habeas proceedings, while important in assuring that constitutional rights are observed, *is secondary and limited. Federal courts are not forums in which to relitigate state trials.*"

*Id.* (emphasis and redaction added) (quoting *Barefoot v. Estelle*, 463 U.S. at 887).

"Those few who are ultimately successful [in obtaining federal habeas relief] are persons whom society has grievously wronged and for whom belated liberation is little enough compensation." *Fay v. Noia*, 372 U.S. 391, 440-41 (1963) (alteration added).

"Accordingly, . . . an error that may justify reversal on direct appeal will not necessarily support a collateral attack on a final judgment." *Brecht*, 507 U.S. at 634 (citations, quotation marks, and footnote omitted). That is due to the fact that, under the federal system of governments created by the United States Constitution,

> [t]he States possess primary authority for defining and enforcing the criminal law. In criminal trials they also hold the initial responsibility for vindicating constitutional rights. Federal intrusions into state criminal trials frustrate both the States' sovereign power to punish offenders and their good-faith attempts to honor constitutional rights.

*Engle v. Isaac*, 456 U.S. 107, 128 (1982) (alteration added).[10]

These principles were reinforced by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which amended preexisting habeas law.[11] Among

---

[10] "The reason most frequently advanced in our cases for distinguishing between direct and collateral review is the State's interest in the finality of convictions that have survived direct review within the state court system." *Brecht*, 507 U.S. at 635 (citing *Wright v. West*, 505 U.S. 277, 293 (1992); *McCleskey*, 499 U.S. at 491; and *Wainwright*, 433 U.S. at 90).

[11] The Antiterrorism and Effective Death Penalty Act ("AEDPA") was signed into law by President Clinton on April 24, 1996. *See* Pub. L. No. 104-132, 110 Stat. 1214 (1996). The present petition was filed after that date. Accordingly, the habeas statutes as amended by AEDPA apply to the claims asserted in this case. *See id.* § 107(c), 110 Stat. at 1226; *McNair v. Campbell*, 416 F.3d 1291, 1297 (11th Cir. 2005) (applying AEDPA to habeas petitions filed after Act's effective date); *Hightower*

other things, several provisions of the AEDPA require federal courts to give greater

deference to state court determinations of federal constitutional claims than before.

### 1.    *28 U.S.C. § 2254(e)(1)*

Section 2254(e)(1) requires district courts to presume that a state court's factual

determinations are correct, unless the habeas petitioner rebuts the presumption of

correctness with clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *see also*,

*e.g., Fugate v. Head*, 261 F.3d 1206, 1215 (11th Cir. 2001) (observing that §

2254(e)(1) provides "a highly deferential standard of review for factual determinations

made by a state court"). Section 2254(e)(1) "modified a federal habeas court's role in

reviewing state prisoner applications in order to prevent federal habeas 'retrials' and

to ensure that state-court convictions are given effect to the extent possible under law."

*Bell v. Cone*, 535 U.S. 685, 693 (2002) (citing *Williams v. Taylor*, 529 U.S. 362,

403-04 (2000)).

The deference that attends state court findings of fact pursuant to Section

2254(e)(1) applies to all habeas claims, regardless of their procedural stance. Thus, a

presumption of correctness must be afforded to a state court's factual findings, even

---

*v. Schofield*, 365 F.3d 1008, 1013 (11th Cir. 2004) (same). *See also Martin v. Hadix*, 527 U.S. 343, 356 (1999) (discussing retroactivity of AEDPA amendments to § 2254). *Cf. Lindh v. Murphy*, 521 U.S. 320, 327 (1997) (holding that AEDPA's amendments do not apply to habeas petitions filed prior to the Act's effective date); *Johnson v. Alabama*, 256 F.3d 1156, 1169 (11th Cir. 2001) (same); *Thompson v. Haley*, 255 F.3d 1292, 1295 (11th Cir. 2001) (same).

when the habeas claim is being examined *de novo*. *See Mansfield v. Secretary, Department of Corrections*, 679 F.3d 1301, 1313 (11th Cir. 2012) (acknowledging the federal court's obligation to accept a state court's factual findings as correct, if unrebutted by clear and convincing evidence, and proceeding to conduct a *de novo* review of the habeas claim).

The presumption of correctness also applies to habeas claims that were adjudicated on the merits by the state court and, therefore, are claims subject to the standards of review set out in 28 U.S.C. § 2254(d)(1) or (d)(2) discussed in the following section.

**2.**     *28 U.S.C. § 2254(d)*

"By its terms § 2254(d) bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions in §§ 2254(d)(1) and (d)(2)." *Harrington v. Richter*, 562 U.S. 86, 98 (2011). It does not matter whether the state court decision contains a lengthy analysis of the claim, or is a summary ruling "unaccompanied by explanation." *Id.*

Further, the "backward-looking language" of the statute requires an examination of the state court decision on the date it was made. *Cullen v. Pinholster*, — U.S. —, 131 S. Ct. 1388, 1398 (2011). That is, "[s]tate court decisions are measured against [the Supreme] Court's precedents as of 'the time the state court renders its decision.'"

*Id.* at 1399 (alterations added) (quoting *Lockyer v. Andrade*, 588 U.S. 63, 71-72 (2003)).

Finally, "review under §[§] 2254(d)(1) [and (d)(2)] is limited to the record that was before the state court that adjudicated the claim on the merits." *Id.* at 1398, 1400 n.7 (alterations added). Therefore, a federal habeas court conducting 2254(d) review should not consider new evidence "in the first instance effectively *de novo.*" *Id.* at 1399.

A closer look at the separate provisions of 28 U.S.C. § 2254(d)(1) and (d)(2) reveals that, when a state court has made a decision on a petitioner's constitutional claim, habeas relief cannot be granted, unless it is determined that the state court's adjudication of the claim either:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).[12]

─────────────

[12] Section 2254(d)(1)'s reference to "clearly established Federal law, as determined by the Supreme Court of the United States" has been interpreted by the Supreme Court as referencing only "the *holdings*, as opposed to the *dicta*, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." *Williams*, 529 U.S. at 412 (O'Connor, J., majority opinion) (emphasis and alteration added); *see also, e.g., Carey v. Musladin*, 549 U.S. 70, 74 (2006) (same); *Osborne v.*

The "contrary to" and "unreasonable application" clauses of § 2254(d) have been interpreted as "independent statutory modes of analysis." *Alderman v. Terry*, 468 F.3d 775, 791 (11th Cir. 2006) (citing *Williams*, 529 U.S. at 405-07).[13] When considering a state court's adjudication of a petitioner's claim, therefore, the habeas court must not conflate the two modes of analysis.

> ### a.  *The meaning of § 2254(d)(1)'s "contrary to" clause*

A state court determination can be "contrary to" clearly established Supreme Court precedent in at least two ways:

> First, a state-court decision is contrary to this Court's precedent if the state court arrives at a conclusion opposite to that reached by this Court on a question of law. Second, a state-court decision is also contrary to this Court's precedent if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to ours.

*Williams*, 529 U.S. at 405. *See also*, *e.g.*, *Brown v. Payton*, 544 U.S. 133, 141 (2005)

---

*Terry*, 466 F.3d 1298, 1305 (11th Cir. 2006) (same); *Warren v. Kyler*, 422 F.3d 132, 138 (3rd Cir. 2005) ("[W]e do not consider those holdings as they exist today, but rather as they existed as of the time of the relevant state-court decision.") (internal quotation marks and citation omitted) (alteration added).

[13] *See also Williams*, 529 U.S. at 404 (O'Connor, J., majority opinion) ("Section 2254(d)(1) defines two categories of cases in which a state prisoner may obtain federal habeas relief with respect to a claim adjudicated on the merits in state court. Under the statute, a federal court may grant a writ of habeas corpus if the relevant state-court decision was either (1) *'contrary to* . . . clearly established Federal law, as determined by the Supreme Court of the United States,' or (2) *'involved an unreasonable application of* . . . clearly established Federal law, as determined by the Supreme Court of the United States.'") (emphasis added).

(same); *Early v. Packer*, 537 U.S. 3, 8 (2002) (*per curiam*) (same); *Putman v. Head*,

268 F.3d 1223, 1240-41 (11th Cir. 2001) (same).

The Eleventh Circuit has observed that the majority opinion in *Williams* does not

limit the construction of § 2254(d)(1)'s "contrary to" clause to the two examples set

out above.[14] Instead, the statutory language "simply implies that 'the state court's

decision must be substantially different from the relevant precedent of [the Supreme]

Court.'" *Alderman*, 468 F.3d at 791 (quoting *Williams*, 529 U.S. at 405) (alteration

added).

---

[14] Indeed, as one commentator has observed, the possible permutations are not just two, but at least four in number:

> The word "contrary" denotes incompatibility or logical inconsistency. Two propositions are incompatible with one another if both cannot be true or correct. Thus, a state court decision is contrary to Federal law if that decision and the applicable Federal law cannot both be true or correct. Given this premise, there appear to be four possible combinations of state court adjudications and resulting decisions that are pertinent to this textual inquiry:
>
> • the state court applies the correct federal standard and arrives at a correct outcome;
>
> • the state court applies an incorrect federal standard and arrives at an incorrect outcome;
>
> • the state court applies an incorrect federal standard and arrives at a correct outcome; and,
>
> • the state court applies the correct federal standard and arrives at an incorrect outcome.

Allan Ides, *Habeas Standards of Review Under 28 U.S.C. § 2254(d)(1): A Commentary on Statutory Text and Supreme Court Precedent*, 60 WASH. & LEE L. REV. 677, 685 (2003) (footnotes omitted).

**b.**     *The meaning of § 2254(d)(1)'s "unreasonable application" clause*

A state court's determination of a federal constitutional claim can result in an

"unreasonable application" of clearly established Supreme Court precedent in either of

two ways:

> First, a state-court decision involves an unreasonable application of this
> Court's precedent if the state court identifies the correct governing legal
> rule from this Court's cases but unreasonably applies it to the facts of the
> particular state prisoner's case. Second, a state-court decision also
> involves an unreasonable application of this Court's precedent if the state
> court either unreasonably extends a legal principle from our precedent to
> a new context where it should not apply or unreasonably refuses to extend
> that principle to a new context where it should apply.

*Williams*, 529 U.S. at 407. *See also*, *e.g., Putman*, 268 F.3d at 1240-41 (same).

It is important to note that "an *unreasonable* application of Federal law is

different from an *incorrect* application." *Williams*, 529 U.S. at 410. A federal habeas

court "may not issue the writ simply because that court concludes in its independent

judgment that the relevant state-court decision applied clearly established Federal law

*erroneously* or *incorrectly*. Rather, that application must also be unreasonable." *Id*. at

411.

In other words, the question that should be asked is not whether the state court

"correctly" applied Supreme Court precedent when deciding the federal constitutional

issue, but whether the state court's determination was "unreasonable." *Id*. at 409 ("[A]

35

federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established Federal law was objectively unreasonable."). *See also*, *e.g.*, *Bell*, 535 U.S. at 694 (observing that the "focus" of the inquiry into the reasonableness of a state court's determination of a federal constitutional issue "is on whether the state court's application of clearly established Federal law is objectively unreasonable," and stating that "an unreasonable application is different from an incorrect one"); *Harrington v. Richter*, 562 U.S. 86, 100-103 (2011) (same).[15]

In order to demonstrate that a state court's application of clearly established Federal law was "objectively unreasonable," the habeas petitioner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 786-87. Stated another way,

---

[15] The Eleventh Circuit has observed that § 2254(d)(1)'s "unreasonable application" provision is the proper statutory lens for viewing the "run-of-the-mill state-court decision applying the correct legal rule." *Alderman v. Terry*, 468 F.3d 775, 791 (11th Cir. 2006).

> In other words, if the state court identified the correct legal principle but unreasonably applied it to the facts of a petitioner's case, then the federal court should look to § 2254(d)(1)'s "unreasonable application" clause for guidance. "A federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established Federal law was *objectively* unreasonable."

*Id.* (quoting *Williams*, 529 U.S. at 409).

if the state-court's resolution of a claim is debatable among fairminded jurists, it is not "objectively unreasonable."

"By its very language, [the phrase] 'unreasonable application' refers to mixed questions of law and fact, when a state court has 'unreasonably' applied clear Supreme Court precedent to the facts of a given case." *Neelley v. Nagle*, 138 F.3d 917, 924 (11th Cir. 1998) (citation and footnote omitted) (alteration added). Mixed questions of constitutional law and fact are those decisions "which require the application of a legal standard to the historical-fact determinations." *Townsend v. Sain*, 372 U.S. 293, 309 n.6 (1963).

> **c.** *The meaning of § 2254(d)(2)'s clause addressing an "unreasonable determination of the facts in light of the evidence presented in the state court proceeding"*

"[Title] 28 U.S.C. § 2254(d)(2) imposes a 'daunting standard – one that will be satisfied in relatively few cases.'" *Cash v. Maxwell*, — U.S. —, 132 S. Ct. 611, 612 (2012) (alteration added) (quoting *Maxwell v. Roe*, 628 F.3d 486, 500 (9th Cir. 2010).

> As we have observed in related contexts, "[t]he term 'unreasonable' is no doubt difficult to define." *Williams v. Taylor,* 529 U.S. 362, 410, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000). It suffices to say, however, that a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance. *Cf. id.,* at 411, 120 S. Ct. 1495.

*Wood v. Allen,* 558 U.S. 290, 301 (2010). Therefore, "even if '[r]easonable minds

reviewing the record might disagree' about the finding in question, 'on habeas review

that does not suffice to supersede the trial court's . . . determination." *Id.* (quoting *Rice*

*v. Collins,* 546 U.S. 333, 341-42 (2006)) (alteration in original). Conversely,

> when a state court's adjudication of a habeas claim result[s] in a decision
> that [i]s based on an unreasonable determination of the facts in light of the
> evidence presented in the state court proceeding, this Court is not bound
> to defer to unreasonably-found facts or to the legal conclusions that flow
> from them.

*Adkins v. Warden, Holman Correctional Facility*, 710 F.3d 1241, 1249 (11th Cir.

2013) (quoting *Jones v. Walker*, 540 F.3d 1277, 1288 n.5 (11th Cir. 2008) (*en banc*)

(alteration in original) (quotation marks and citations omitted in original)).

> **d**.    *Evaluating state court factual determinations under 28 U.S.C. §§*
> *2254(d)(2) and (e)(1)*

As set out previously, 28 U.S.C. § 2254(d)(2) regulates federal court review of

state court findings of fact. That provision limits the availability of federal habeas relief

on any claims by a state prisoner that are grounded in a state court's factual findings,

unless the state court's findings were "based on an unreasonable determination of the

facts in light of the evidence presented in the State court proceeding." 28 U.S.C. §

2254(d)(2).

Moreover, it must be remembered that 28 U.S.C. § 2254(e)(1) provides that

factual determinations made by a state court are "presumed to be correct," and that the

habeas petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." *See* 28 U.S.C. § 2254(e)(1); *Ward v. Hall*, 592 F.3d at 1155 (holding that the presumption of correctness attending a state court's findings of fact can be overcome only by clear and convincing evidence).

Nevertheless, there is Eleventh Circuit case authority observing that the manner in which subsections 2254(d)(2) and (e)(1) relate to one another remains an open question. *See Cave v. Secretary for Department of Corrections*, 638 F.3d 739, 744-45 (11th Cir. 2011) ("'[N]o court has fully explored the interaction of § 2254(d)(2)'s 'unreasonableness' standard and § 2254(e)(1)'s 'clear and convincing evidence' standard.") (quoting *Gore v. Secretary for Department of Corrections*, 492 F.3d 1273, 1294 n.51 (11th Cir. 2007)).

Even so, the Eleventh Circuit's earlier opinion in *Ward v. Hall* clearly held that federal habeas courts "must presume the state court's factual findings to be correct unless the petitioner rebuts that presumption by clear and convincing evidence." *Id.* at 1177 (citing § 2254(e)(1); *Parker v. Head*, 244 F.3d 831, 835-36 (11th Cir. 2001)). That same opinion also observed that "28 U.S.C. § 2254(e)(1) commands that for a writ to issue because the state court made an 'unreasonable determination of the facts,' the petitioner must rebut 'the presumption of correctness [of a state court's factual findings] by clear and convincing evidence.'" *Ward*, 592 F.3d at 1155 (alteration in

39

original).

### D.     The Burden of Proof and Heightened Pleading Requirements for Habeas Petitions

Habeas review "exists only to review errors of constitutional dimension." *McFarland v. Scott*, 512 U.S. 849, 856 (1994); *see also* 28 U.S.C. § 2254(a).[16] Further, "[w]hen the process of direct review . . . comes to an end, a presumption of finality and legality attaches to the conviction and sentence." *Barefoot v. Estelle*, 463 U.S. at 887 (alteration and redactions added). Two consequences flow from those fundamental propositions.

First, the habeas petitioner bears the burden of overcoming the presumption of "legality" that attaches to the state court conviction and sentence, and of establishing a factual basis demonstrating that federal post-conviction relief should be granted. *See, e.g.*, 28 U.S.C. §§ 2254(d) and (e)(1);[17] *Hill v. Linahan*, 697 F.2d 1032, 1036

---

[16] 28 U.S.C. § 2254(a) provides that the "Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." It follows that claims pertaining solely to questions of state law fall outside the parameters of this court's authority to provide relief under § 2254.

[17] As discussed previously, Section 2254(d) provides that the state courts' adjudication of a habeas petitioner's claims can be overturned only if the petitioner carries the burden of demonstrating that a particular determination *either* (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law," *or* (2) that the ruling "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Further, § 2254(e)(1) provides that:

(11th Cir. 1983) ("The burden of proof in a habeas proceeding is always on the petitioner.") (citing *Henson v. Estelle*, 641 F.2d 250, 253 (5th Cir. 1981)).

Second, the habeas petitioner must meet "heightened pleading requirements." *McFarland v. Scott*, 512 U.S. 849, 856 (1994); *Borden v Allen*, 646 F.3d 785, 810 (11th Cir. 2011) (holding that Section 2254 requires "fact pleading," and not merely "notice pleading"). The mere assertion of a ground for relief, without concomitant allegation of sufficient factual detail, does not satisfy either the petitioner's burden of proof under 28 U.S.C. § 2254(e)(1), or the requirements of Rule 2(c) of the *Rules Governing Section 2254 Cases in the United States District Courts*, which requires a state prisoner to "specify all the grounds for relief available to the petitioner," and to then "state the facts supporting each ground." Rule 2(c)(1) and (2), *Rules Governing Section 2254 Cases in the United States District Courts*.[18] *See also* 28 U.S.C. § 2242 (stating that an application for writ of habeas corpus "shall allege the facts concerning the applicant's commitment or detention").

In short, a habeas petitioner must include in his statement of each claim sufficient

---

In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

[18] *Accord* Rule 2(b) of the *Rules Governing Section 2255 Proceedings for the United States District Courts*.

supporting facts to justify a decision for the petitioner if the alleged facts are proven true. *See*, *e.g.*, *Blackledge v. Allison*, 431 U.S. 63, 75 n.7 (1977) (observing that a habeas petition must "state facts that point to a 'real possibility of constitutional error'") (quoting Advisory Committee Notes to Rule 4 of the *Rules Governing Section 2254 Cases in the United States District Courts*). *Cf. Diaz v. United States*, 930 F.2d 832, 835 (11th Cir. 1991) (holding in a case premised upon 28 U.S.C. § 2255 that, despite the liberal construction due a *pro se* petitioner's allegations, dismissal was appropriate because the movant did not allege "facts that, if proven, would entitle him to relief").[19]

In addition, "[c]itation of the controlling constitutional, statutory, or other bases for relief for each claim also should be stated." 1 Randy Hertz & James S. Liebman, *Federal Habeas Corpus Practice and Procedure* § 11.6, at 654 (5th ed. 2005). As another district court has held:

> It is not the duty of federal courts to try to second guess the meanings of statements and intentions of petitioners. Rather the duty is upon the individual who asserts a denial of his constitutional rights to come forth with a statement of sufficient clarity and sufficient supporting facts to enable a court to understand his argument and to render a decision on the

---

[19] *Cf. Hill v. Lockart*, 474 U.S. 52, 60 (1986) ("Petitioner did not allege in his habeas petition that, had counsel correctly informed him about his parole eligibility date, he would have pleaded not guilty and insisted on going to trial. He alleged no special circumstances that might support the conclusion that he placed particular emphasis on his parole eligibility in deciding whether or not to plead guilty.").

matter.

*Nail v. Slayton*, 353 F. Supp. 1013, 1019 (W.D. Va. 1972).

**E.      An Introduction to Ineffective Assistance of Counsel Claims**

An introduction to ineffective assistance of counsel claims is included here because of the relationship between such claims – which are governed by a highly deferential standard of constitutional law – and 28 U.S.C. § 2254(d), which is itself an extremely deferential standard of habeas review. Ineffective assistance of counsel claims are specifically limited to the performance of attorneys who represented a state prisoner at trial, or on direct appeal from the conviction. *See* 28 U.S.C. § 2254(i) ("The ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254."). *See also Coleman v. Thompson*, 501 U.S. at 752 ("There is no constitutional right to an attorney in state post-conviction proceedings. Consequently, a petitioner cannot claim constitutionally ineffective assistance of counsel in such proceedings.") (citations omitted).

The Supreme Court's "benchmark" standard for judging any claim that a trial or appellate attorney provided representational assistance to a state prisoner that was so professionally incompetent as to create issues of federal constitutional proportions is the question of "whether counsel's conduct so undermined the proper functioning of

43

the adversarial process that the trial cannot be relied upon as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984). If an objective answer to that question is "yes," then counsel was constitutionally ineffective. Even so, *Strickland* requires that the issue be approached in two steps.

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. *First, the defendant must show that counsel's performance was deficient*. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. *Second, the defendant must show that the deficient performance prejudiced the defense*. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes *both* showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Id*. at 687 (emphasis added); *see also*, *e.g.*, *Williams*, 529 U.S. at 390 (same); *Grayson v. Thompson*, 257 F.3d 1194, 1215 (11th Cir. 2001) (same).

Both parts of the *Strickland* standard must be satisfied: that is, a habeas petitioner bears the burden of proving, by "a preponderance of competent evidence," that the performance of his trial or appellate attorney was *deficient*; and that such deficient performance *prejudiced* his defense. *Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000) (*en banc*). Thus, a federal court is not required to address both parts of the *Strickland* standard when the habeas petitioner makes an insufficient

showing on one of the prongs. *See*, *e.g.*, *Holladay v. Haley*, 209 F.3d 1243, 1248 (11th Cir. 2000) ("Because both parts of the test must be satisfied in order to show a violation of the Sixth Amendment, the court need not address the performance prong if the defendant cannot meet the prejudice prong, or vice versa.") (citation to *Strickland* omitted).

### 1.   *The performance prong*

"The burden of persuasion is on the petitioner to prove by a preponderance of the evidence that counsel's performance was unreasonable." *Stewart v. Secretary, Department of Corrections*, 476 F.3d 1193, 1209 (11th Cir. 2007) (citing *Chandler*, 218 F.3d at 1313). To satisfy the performance prong of the *Strickland* test, a defendant must prove that counsel made errors so serious that he or she was not functioning as the counsel guaranteed by the Sixth Amendment. *Strickland*, 466 U.S. at 687. The standard for gauging attorney performance is "reasonableness under prevailing professional norms." *Id*. at 688; *see also*, *e.g.*, *Williams*, 529 U.S. at 390-91 (same); *Darden v. Wainwright*, 477 U.S. 168, 184 (1986) (same); *Chandler*, 218 F.3d at 1313 (same). "The test of reasonableness is not whether counsel could have done something more or different," but whether counsel's performance "fell within the broad range of reasonable assistance at trial." *Stewart*, 476 F.3d at 1209 (citing *Chandler*, 218 F.3d at 1313). Furthermore, courts must "recognize that 'omissions are inevitable, but, the

45

issue is not what is possible or 'what is prudent or appropriate, but only what is constitutionally compelled.'" *Id.* (quoting *Burger v. Kemp*, 483 U.S. 776, 794 (1987)). The Sixth Amendment does not guarantee a defendant the very best counsel or the most skilled attorney, but only an attorney who performed reasonably well within the broad range of professional norms. "The test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial." *White v. Singletary*, 972 F.2d 1218, 1220 (11th Cir. 1992).

The reasonableness of counsel's performance is judged from the perspective of the attorney at the time of the alleged error, and in light of all the circumstances. *See, e.g.*, *Johnson v. Alabama*, 256 F.3d 1156, 1176 (11th Cir. 2001) (giving lawyers "the benefit of the doubt for 'heat of the battle' tactical decisions"); *Mills v. Singletary*, 161 F.3d 1273, 1285-86 (11th Cir. 1998) (noting that *Strickland* performance review is a "deferential review of all of the circumstances from the perspective of counsel at the time of the alleged errors").

> Under this standard, there are no "absolute rules" dictating what reasonable performance is or what line of defense must be asserted. [*Chandler*, 218 F.3d] at 1317. Indeed, as we have recognized, "[a]bsolute rules would interfere with counsel's independence — which is also constitutionally protected — and would restrict the wide latitude counsel

have in making tactical decisions." *Putman v. Head*, 268 F.3d 1223, 1244
(11th Cir. 2001).

*Michael v. Crosby*, 430 F.3d 1310, 1320 (11th Cir. 2005) (first alteration added,

second alteration in original). Judicial scrutiny of counsel's performance must be

"highly deferential," because representation is an art, and an act or omission that is

unprofessional in one case may be sound or even brilliant in another. *See Strickland*,

466 U.S. at 697. Indeed, reviewing courts are instructed that they "must indulge a

strong presumption that counsel's conduct falls within the wide range of reasonable

professional assistance." *Id*. at 689.

> It is all too tempting for a defendant to second-guess counsel's assistance
> after conviction or adverse sentence, and it is all too easy for a court,
> examining counsel's defense after it has proved unsuccessful, to conclude
> that a particular act or omission of counsel was unreasonable. A fair
> assessment of attorney performance requires that every effort be made to
> eliminate the distorting effects of hindsight, to reconstruct the
> circumstances of counsel's challenged conduct, and to evaluate the
> conduct from counsel's perspective at the time. Because of the difficulties
> inherent in making the evaluation, a court must indulge a strong
> presumption that counsel's conduct falls within the wide range of
> reasonable professional assistance; *that is, the defendant must overcome
> the presumption that, under the circumstances, the challenged action
> might be considered sound trial strategy*. There are countless ways to
> provide effective assistance in any given case. Even the best criminal
> defense attorneys would not defend a particular client in the same way.

*Strickland*, 466 U.S. at 689 (emphasis added) (citations and internal quotation marks

omitted); *see also*, *e.g.*, *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994) ("When

reviewing whether an attorney is ineffective, courts should always presume strongly that counsel's performance was reasonable and adequate.") (internal quotation marks omitted).

"Based on this strong presumption of competent assistance, the petitioner's burden of persuasion is a heavy one: '*petitioner must establish that no competent counsel would have taken the action that his counsel did take.*'" *Stewart*, 476 F.3d at 1209 (quoting *Chandler*, 218 F.3d at 1315) (emphasis added). "Even if many reasonable lawyers would not have done as defense counsel did at trial, no relief can be granted on ineffectiveness grounds *unless it is shown that no reasonable lawyer*, *in the circumstances*, *would have done so.*" *Rogers*, 13 F.3d at 386 (emphasis added).

### 2.    *The prejudice prong*

"A petitioner's burden of establishing that his lawyer's deficient performance prejudiced his case is also high." *Van Poyck v. Florida Department of Corrections*, 290 F.3d 1318, 1322 (11th Cir. 2002). *See also*, *e.g.*, *Gilreath v. Head*, 234 F.3d 547, 551 (11th Cir. 2000) (holding that a habeas petitioner "must affirmatively prove prejudice, because '[a]ttorney errors come in an infinite variety and are as likely to be utterly harmless in a particular case as they are to be prejudicial.'") (quoting *Strickland*, 466 U.S. at 693)) (alteration in original). "It is not enough for the [*habeas* petitioner] to show that the errors had some conceivable effect on the outcome of the proceeding."

*Strickland*, 466 U.S. at 693 (alteration added); *see also Harrington*, 562 U.S. at 111-112 (citing *Strickland*, 466 at 693) ("The likelihood of a different result must be *substantial*, not just conceivable.")) (emphasis added).

Instead, to prove prejudice, the habeas petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *see also Williams*, 529 U.S. at 391 (same). When that standard is applied in the context of the death sentence itself, "'the question is whether there is a reasonable probability that, absent the errors, the sentencer [*i.e.*, in Alabama, the trial court judge] . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.'" *Stewart*, 476 F.3d at 1209 (quoting *Strickland*, 466 U.S. at 695) (alteration added).

That is a high standard, and in order to satisfy it a petitioner must present competent evidence proving "that trial counsel's deficient performance deprived him of 'a trial whose result is reliable.'" *Brown v. Jones*, 255 F.3d 1272, 1278 (11th Cir. 2001) (quoting *Strickland*, 466 U.S. at 687). In other words, "[a] finding of prejudice requires proof of unprofessional errors so egregious that the trial was rendered unfair and the verdict rendered suspect." *Johnson*, 256 F.3d at 1177 (quoting *Eddmonds v.*

49

*Peters*, 93 F.3d 1307, 1313 (7th Cir. 1996) (in turn quoting *Kimmelman v. Morrison*,

477 U.S. 365, 374 (1986))) (internal quotation marks omitted) (alteration added).

**3.** *Deference accorded state court findings of historical fact, and decisions on the merits, when evaluating ineffective assistance of counsel claims*

State court findings of historical fact made in the course of evaluating a claim of

ineffective assistance of counsel are subject to a presumption of correctness under 28

U.S.C. §§ 2254(d)(2) and (e)(1). *See, e.g.*, *Thompson v. Haley*, 255 F.3d 1292, 1297

(11th Cir. 2001). To overcome a state-court finding of fact, the petitioner bears a

burden of proving contrary facts by "clear and convincing evidence."

Additionally, under the AEDPA, a federal habeas court may grant relief on a

claim of ineffective assistance of counsel *only if* the state-court determination involved

an "unreasonable application" of the *Strickland* standard to the facts of the case.

*Strickland* itself, of course, also requires an assessment of whether counsel's conduct

was professionally unreasonable. These two assessments cannot be conflated into one.

*See Harrington,* 562 U.S. at 101-02. Thus, habeas relief on a claim of ineffective

assistance of counsel can be granted with respect to a claim actually decided by the

state courts only if the habeas court determines that it was "objectively unreasonable"

for the state courts to find that counsel's conduct was not "professionally

unreasonable." The *Harrington* Court explained:

50

"Surmounting *Strickland's* high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. [356], [371-372], 130 S. Ct. 1473, 1485, 176 L. Ed. 2d 284 (2010). An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the *Strickland* standard must be applied with scrupulous care, lest "intrusive post-trial inquiry" threaten the integrity of the very adversary process the right to counsel is meant to serve. *Strickland*, 466 U.S., at 689-690, 104 S. Ct. 2052. Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is "all too tempting" to "second-guess counsel's assistance after conviction or adverse sentence." *Id.*, at 689, 104 S. Ct. 2052; *see also Bell v. Cone*, 535 U.S. 685, 702, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002); *Lockhart v. Fretwell*, 506 U.S. 364, 372, 113 S. Ct. 838, 122 L. Ed. 2d 180 (1993). The question is whether an attorney's representation amounted to incompetence under "prevailing professional norms," not whether it deviated from best practices or most common custom. *Strickland*, 466 U.S., at 690, 104 S. Ct. 2052.

Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both "highly deferential," *Id.*, at 689, 104 S. Ct. 2052; *Lindh v. Murphy*, 521 U.S. 320, 333, n.7, 117 S. Ct. 2059, 138 L. Ed. 2d 481 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles* [*v. Mirzayance*], 556 U.S., at [125], 129 S. Ct. at 1420 [(2009)]. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at [123], 129 S. Ct. at 1420. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard.

51

*Harrington*, 562 U.S. at 105 (alterations added); *see also Premo v. Moore*, 562 U.S. 115, 121-23 (2011).

## V. JENKINS'S CLAIMS

**A.**   **Mr. Jenkins Was Deprived of His Constitutional Right to an "Impartial, Indifferent" Jury when a Juror Repeatedly Failed To Answer Critical Questions during Voir Dire**

Jenkins alleges that his right to a fair and impartial jury was violated by Juror Leona Voss's failure to disclose that twenty years earlier, her nephew and his wife had been "brutally murdered, execution-style, in the 'worst case' in St. Clair County's history." (Doc. 36 at 4). He asserts that:

> During voir dire at Mr. Jenkins's trial, defense counsel asked each juror whether they or any "close relatives" had been crime victims. TR. 285. Counsel emphasized that the question referred to "any type of crime, from serious assaults on down to purse snatching," TR. 286.[20] Based on answers to these questions and follow-up responses, defense counsel removed jurors who were victims or had friends or relatives who were victims.[21]

---

[20] Defense counsel Downey asked Ms. Voss's panel:

> Does anyone know of any other of your close relatives, or a very good friend who has ever be[en] the victim of crime, any type of crime, from serious assaults on down to purse snatching?

(R. Vol. 2 at 286) (alteration added).

[21] Jenkins does not identify which jurors were removed based upon their answers to this question. However, a review of the record reveals that, of the eleven named prospective jurors who indicated they or their friends or family had been crime victims, four were removed by the defense, four were removed by the state, and three sat on the jury.

52

Juror Voss was asked several questions, including inquiries about her prior employment in the textile industry, involvement in civic and social clubs, personal hobbies, and her deceased husband's relatives. In light of her responses to the various inquiries, Ms. Voss plainly had no difficulty hearing questions.

Counsel also asked Ms. Voss and the other members of her panel if they, their relatives or friends had ever been victims of crime. Several jurors responded and were asked follow-up questions. For instance, one juror stated that her husband was hit by a car before they met, a second said her boss's restaurant had been burglarized, and another said her brother-in-law's car was "stripped" near the interstate. During a longer colloquy, a fourth juror discussed being a burglary victim. R1 at 285-89. Trial counsel asked additional follow-up questions regarding the circumstances of the crimes, including the jurors' relationships to the victims and whether the experience would impact their ability to serve.[22]

---

[22] Only three prospective jurors in Ms. Voss's panel indicated that they or their friends or relatives had been the victim of a crime:

> [Defense Counsel]: Has anyone here in this panel been the victim of a crime. I'm talking about something that you consider serious, whether it's generally thought of as a serious or not, I mean, to one person somebody stealing your hubcaps is just as bad as burglarizing your house. What I'm trying to get at is there anyone on this panel who has ever been the victim of a crime that you considered a serious criminal offense against you: house burglary, purse snatching, auto theft, anything like that? Yes, sir.

> Prospective Juror Richard Spiker: I have been broken into twice about ten years ago.

> [Defense Counsel]: Your residence?

> Prospective Juror Richard Spiker: Yes, sir.

> [Defense Counsel]: What did they take, something important to you?

> Prospective Juror Richard Spiker: My father's gun collection, stereo, things like that.

> [Defense Counsel]: You were living with your family?

> Prospective Juror Richard Spiker: Yes.

---

[Defense Counsel]: Do you think that the fact that your family was victimized by a criminal act of burglary and theft, would that have any bearing on your ability, Mr. Spiker to be completely fair in trying the case of this defendant Mark Jenkins?

Prospective Juror Richard Spiker: No.

[Defense Counsel]: Does anyone know of any other of your close relatives, or a very good friend who has ever be[en] the victim of crime, any type of crime, from serious assaults on down to purse snatching?

Prospective Juror Helen Staples: Well, my husband was, but I didn't know him when it happened to him.

[Defense Counsel]: I don't mean to put words in your mouth, really, but it sounds like that wouldn't have any bearing on your ability to be impartial now?

Prospective Juror Helen Staples: No, it wouldn't. He was hit by a drunk 22 years ago. I didn't know him then. I don't [sic] any problem with it.

[Defense Counsel]: Anyone else?

Prospective Juror Karen Whitten: My boss.

[Defense Counsel]: Who is your boss?

Prospective Juror Karen Whitten: Charles Bearden.

[Defense Counsel]: Tell me what you are referring to?

Prospective Juror Karen Whitten: Well, he was in a bunch of trouble when and [sic] I worked for him.

[Defense Counsel]: I know about that. I'm talking about the victim of a crime, that is somebody did a crime to you or to Charlie, for example, burglarized Charlie's Catfish –

[The Prosecutor]: We have a case pending right now where Charlie has made an arrest where a man burglarized his restaurant.

[Defense Counsel]: Were you working there when that happened?

Prospective Juror Karen Whitten: No.

54

[Defense Counsel]: Do you think that that fact would have any bearing on your being able to be completely fair and impartial?

Prospective Juror Karen Whitten: No.

[Defense Counsel]: Has anyone here ever been a witness in a criminal case, testified before a court before?

Prospective Juror Karen Whitten: Me. It was several – about six or seven years ago. My brother-in-law's car got stripped on the interstate and we had to go in a lineup to testify – to pick the man that did it.

[Defense Counsel]: Did you go into court with the case?

Prospective Juror Karen Whitten: I went twice.

[Defense Counsel]: Did they have a trial?

[Defense Counsel]: About like this. Didn't have no jury or nothing.

[Defense Counsel]: Did you testify?

Prospective Juror Karen Whitten: We went in a room like this. We didn't have to go in front of the judge. We had to talk to the lawyers and stuff.
. . .

[Defense Counsel]: I believe you said you helped pick somebody out of a lineup?

Prospective Juror Karen Whitten: Yes.

[Defense Counsel]: Was it a live lineup, or was it pictures?

Prospective Juror Karen Whitten: About from here to there.

[Defense Counsel]: Live people?

Prospective Juror Karen Whitten: Yes.

(R. Vol. 2 at 285-89). Both Richard Spiker and Helen Staples served on the jury. Karen Whitten was removed by the state. (R. Vol. 3 at 445-50).

55

In response to the numerous questions about victimization presented to her and the other jurors, Ms. Voss said nothing. She did not raise her hand, answer audibly, or take any action to apprise counsel and the court that two of her closest relatives had been brutally murdered.

(Doc. 36 at 4-5) (footnote omitted).

Jenkins maintains that during postconviction investigation, he discovered for the first time that Ms. Voss's nephew and his wife had been murdered. (*Id.* at 5). He points out that at the evidentiary hearing on his Rule 32 petition, "Ms. Voss testified about her family members who had been murdered, TR1,[23] and Mr. Jenkins's trial

---

[23] At the hearing, Ms. Voss testified regarding her jury service, her sister Pauline, and Pauline's son J.T.:

> [Defense Counsel]: Was he murdered in March of 1971?
>
> [Ms. Voss]: Yeah, I guess. It has been a long time. I'm not sure.
>
> [Defense Counsel]: Are you close to your sister, Pauline?
>
> [Ms. Voss]: Yes, I'm close to her. She and one more [sister] is all I have.
>
> [Defense Counsel]: Does she live close to you?
>
> [Ms. Voss]: About three miles, I guess.
>
> [Defense Counsel]: Do you have an opportunity to see her fairly often?
>
> [Ms. Voss]: I see her three times a week. She is old and I help take care of her.
>
> [Defense Counsel]: At the time her son was murdered, did you have a lot of contact with her?
>
> [Ms. Voss]: No, because I worked then. We didn't see as much of each other as we do now.

counsel testified that he 'absolutely' would have struck this juror from the panel had the juror disclosed this information. TR1 at 289."[24]

---

[Defense Counsel]: You were still close?

[Ms. Voss]: Yes, of course.

. . .

[The State]: Did you want to serve on a capital murder case?

[Ms. Voss]: No, ma'am, I certainly did not.

[The State]: When asked by the attorney during the voir dire process of the trial, you didn't intentionally withhold any information from them, did you?

[Ms. Voss]: No, ma'am.

[The State]: So if you were asked a question of whether or not you had a family member that was a victim of a crime, had you thought of it, you would have answered that in the affirmative?

[Ms. Voss]: That was the furthest thing from my mind. Judge Holladay was here then. He was dismissing the ones that wanted to be excused. If you had a good excuse, you would be excused. If that was in my mind, I would have been in that line.

[The State]: You were not trying to get on this jury?

[Ms. Voss]: No, ma'am.

[The State]: And you were not trying to withhold information from any of the parties in this case?

[Ms. Voss]: No, ma'am.

(Rule 32 R., Vol. 19, Tab 48 at 9-11).

[24] Jenkins's trial counsel, Doug Scofield, testified that:

[Defense Counsel]: If a member from the jury venire had stated during voir dire that her nephew had been murdered, would you have exercised a peremptory strike to

57

Jenkins unsuccessfully raised this claim in his original Rule 32 petition, then again in a successive Rule 32 petition. The Alabama Court of Criminal Appeals set out the procedural history of this claim in its opinion affirming the Rule 32 court's dismissal of Jenkins's successive Rule 32 petition:

> On May 26, 1995, Jenkins, through counsel, filed his first Rule 32 petition in the St. Clair Circuit Court in which he raised numerous claims for relief. On November 26, 1996, Jenkins filed an amendment to his Rule 32 petition in which he alleged, among other things, that he was entitled

---

remove her?

[Mr. Scofield]: Absolutely.

. . .

[Defense Counsel]: During the jury selection process, was it important to you to remove jurors who had been victims of crimes?

[Mr. Scofield]: Yes, it was.

[Defense Counsel]: Would it have been especially important to remove people who had been victims of violent crimes?

[Mr. Scofield]: Yes.

[Defense Counsel]: Or who had relatives who had been victims of violent crimes?

[Mr. Scofield]: Absolutely.

[Defense Counsel]: As an attorney, why is that important to you?

[Mr. Scofield]: It has been my experience that people who have family members who are victims of violent crimes are biased toward the State. It would have been a very important factor, and one of the basic questions I would have inquired about in regard to the venire.

(Rule 32 R. Vol. 21 at 289-90).

to a new trial because Juror L.V. failed to disclose during voir dire that her nephew and his wife had been murdered. (1st R. 32 C. at 257–59.) On December 10, 1996, the circuit court conducted the first day of an evidentiary hearing on Jenkins's amended Rule 32 petition and postponed the remainder of the hearing until a later date. On January 18, 1997, after the first day of the evidentiary hearing but before the two final days of the hearing, the State filed a response to Jenkins's amended Rule 32 petition in which it asserted, among other things, that Jenkins's juror-misconduct claim was procedurally barred pursuant to Rules 32.2(a)(3) and (a)(5), Ala. R.Crim. P., because it could have been, but was not, raised at trial or on direct appeal. Thereafter, on January 20 and 21, 1997, the circuit court conducted the remainder of the evidentiary hearing, during which Jenkins presented the testimony of one of his two trial attorneys.

On December 31, 1997, the circuit court issued a detailed order denying relief on the claims contained in Jenkins's Rule 32 petition. (1st R. 32 C. at 267–346.) In its order, the circuit court determined, in relevant part, that Jenkins's claim contending that Juror L.V.'s failure to disclose during voir dire that her nephew and his wife had been murdered was procedurally barred pursuant to Rules 32.2(a)(3) and (a)(5), Ala. R.Crim. P., because this claim could have been, but was not, raised at trial or on direct appeal. (1st R. 32 C. at 275, 282.)

On February 27, 2004, this Court affirmed the circuit court's denial of Jenkins's Rule 32 petition. *See Jenkins v. State*, 972 So.2d 111 (Ala.Crim.App. 2004). Specifically, this Court held that Jenkins's juror-misconduct claim was barred pursuant to Rule 32.2(c), Ala. R.Crim. P., because it was raised in an untimely amendment to the original Rule 32 petition and did not relate back to any claim raised in the original petition. *Id*. at 120–21. On April 8, 2005, the Alabama Supreme Court reversed this Court's holding that Jenkins's juror-misconduct claim was time-barred and remanded the cause to this Court for further proceedings. *See Ex parte Jenkins*, 972 So.2d 159 (Ala. 2005).

On November 23, 2005, this Court again affirmed the circuit court's order denying relief on Jenkins's claim relating to juror misconduct. *See Jenkins v. State*, 972 So.2d 165 (Ala.Crim.App. 2005).

In affirming the circuit court's decision, this Court noted that Jenkins failed to present any evidence during the evidentiary hearing indicating that his juror-misconduct claim was not known and could not have been discovered in time to raise it at trial or on appeal. *Id*. at 167–68. Specifically, this Court explained:

> Jenkins submitted no evidence indicating why this claim was raised in the Rule 32 petition and not in earlier proceedings. Jenkins's attorney offered no explanation at the Rule 32 hearing. The only reference in the record concerning the lateness of raising this claim is the following statement contained in a response filed by Jenkins: "After filing his petition for postconviction relief but prior to the evidentiary hearing in this case, Mr. Jenkins obtained new evidence suggesting that [L.V.] had a close relative who had been murdered." (Supplemental record, vol. III, p. 402.)

*Id*. at 167. After noting that Jenkins failed to present any evidence indicating whether trial counsel knew of and thus could have raised the juror-misconduct claim earlier, this Court, applying the Alabama Supreme Court's holding in *Ex parte Pierce*, 851 So.2d 606 (Ala. 2000), held that the claim was procedurally barred because it could have been, but was not, raised at trial or on appeal. *Jenkins v. State*, 972 So.2d at 168. *See also Ex parte Pierce*, 851 So.2d at 614 (explaining that "Rule[s] 32.2(a)(3) and (5) would preclude [a juror-misconduct] claim if it could have been raised at trial or on appeal . . . [and to overcome the procedural bars contained in Rule 32.2(a), Ala. R.Crim. P., the petitioner must] show that his claim could not have been raised at trial or on direct appeal"). On May 18, 2007, the Alabama Supreme Court entered an order denying Jenkins's petition for a writ of certiorari.

On May 15, 2008, Jenkins filed a 28 U.S.C. § 2254 petition for writ of habeas corpus in the United States District Court for the Northern District of Alabama. After Jenkins filed his federal habeas corpus petition, the Alabama Supreme Court issued its decision in *Ex parte Burgess*, 21 So.3d 746 (Ala. 2008). In *Burgess*, the Alabama Supreme Court reviewed this Court's affirmance of the circuit court's summary dismissal of

Burgess's Rule 32 petition in which he raised a juror-misconduct claim. *Id.* at 751. Specifically, the Alabama Supreme Court reviewed whether this Court had properly held that Burgess's juror-misconduct claim was procedurally barred pursuant to Rules 32.2(a)(3) and (a)(5), Ala. R.Crim. P., because it could have been, but was not, raised at trial or on appeal. *Id*. See Rule 32.2(a)(3) and (a)(5) ("A petitioner will not be given relief under [Rule 32] based upon any ground: . . . 3) [w]hich could have been but was not raised at trial, unless the ground for relief arises under Rule 32.1(b); or . . . 5) [w]hich could have been but was not raised on appeal, unless the ground for relief arises under Rule 32.1(b).").

In *Ex parte Burgess*, the Alabama Supreme Court applied this Court's decision in *State v. Freeman*, 605 So.2d 1258 (Ala.Crim.App. 1992), and its own decision in *Ex parte Pierce*, 851 So.2d 606 (Ala. 2000), and reaffirmed the principle established by those cases that a Rule 32 petitioner raising [a] juror-misconduct claim relating to a jurors failure to disclose information during voir dire may overcome the procedural bars contained in Rules 32.2(a)(3) and (a)(5), Ala. R.Crim. P., if that petitioner "establishe[s] that the information was not known, and could not reasonably have been discovered, at trial or in time to raise the issue in a motion for new trial or on appeal." *Ex parte Burgess*, 21 So.3d at 751 (quoting *Ex parte Pierce*, 851 So.2d at 616 (emphasis added)). The Alabama Supreme Court noted that Burgess had alleged in his Rule 32 petition that the juror-misconduct claim was not discovered until it was too late to raise the claim at trial or on appeal. *Id*. The Court further noted that it was unreasonable to require trial or appellate counsel to blindly investigate possible juror-misconduct claims and that Burgess had alleged in his petition that he had no reason to suspect any juror misconduct. *Id*. at 754–55. Because Burgess had alleged facts indicating that his counsel was unaware of the juror-misconduct claim until it was too late to raise the claim at trial or on appeal and had alleged facts indicating that "nothing occurred during the trial or appears in the record that could have alerted him or his counsel to the [alleged juror misconduct]," the Alabama Supreme Court held that this Court erroneously determined, at the pleading stage, that Burgess's juror-misconduct claim was procedurally barred pursuant to Rule 32.2(a)(3) and (a)(5). *Id*. at 751–55. Therefore, the Alabama Supreme Court reversed the summary dismissal of Burgess's

Rule 32 petition. *Id*. at 755.

On October 2, 2008, Jenkins moved the federal district court to stay his habeas proceedings to allow him to file another Rule 32 petition reasserting his juror-misconduct claim. Specifically, Jenkins sought a stay in federal court to allow him to pursue his juror-misconduct claim pursuant to the Alabama Supreme Court's decision in *Ex parte Burgess*, 21 So.3d 746 (Ala. 2008). On November 12, 2008, the federal district court granted Jenkins's motion to stay his habeas proceedings.

On October 1, 2008, Jenkins filed a second Rule 32 petition in which he re-alleged that Juror L.V.'s failure to disclose during voir dire that her nephew and his wife had been murdered 20 years before Jenkins's trial violated his right to a fair trial. In his Rule 32 petition, Jenkins "incorporate[d] . . . the record of the [previous] evidentiary hearing conducted" on his juror-misconduct claim. (2d R. 32 C. at 6.) On October 31, 2008, the State filed an answer and motion to dismiss in which it asserted that Jenkins's petition was procedurally barred pursuant to Rules 32.2(b) and 32.2(c), Ala. R.Crim. P., and argued, based on the previous Rule 32 hearing, that Jenkins's juror-misconduct claim was without merit. The State further asserted that because Jenkins's claim was procedurally barred and without merit, it should be dismissed pursuant to Rule 32.7(d), Ala. R.Crim. P. On November 25, 2008, the circuit court issued a detailed order dismissing Jenkins's petition as procedurally barred and denying relief on the merits.

*Jenkins v. State*, 105 So. 2d 1234, 1236-39 (Ala. Crim. App. 2011) (footnotes omitted).

The Rule 32 court concluded:

Petitioner Mark Allen Jenkins is not entitled to relief on his juror misconduct claim – the sole claim that he raises in his second Rule 32 petition – because his claim is barred from this Court's review by the statute of limitations procedural bar and is not, therefore, properly before this Court. Assuming, however, that Jenkins's juror misconduct claim is properly before this Court – which it is not – this Court finds that it is meritless. As such, Jenkins's juror misconduct claim is denied, under Rule

32.7(d) of the Alabama Rules of Criminal Procedure.

(Second Rule 32 C.R. Vol. 9, Tab 18 at 23-24).

On appeal from the denial of his second Rule 32 petition, Jenkins argued that

the trial court erred in determining that his petition was time barred pursuant to Rule

32.2(c). The Alabama Court of Criminal Appeals summarized his argument as follows:

> First, Jenkins argues that the time limitation contained in Rule 32.2(c),
> Ala. R.Crim. P., does not apply to a successive petition filed pursuant to
> Rule 32.2(b)(2), Ala. R.Crim. P., based on a "new ground" for relief or
> based on a new rule of law. Jenkins then asserts that the Alabama
> Supreme Court "changed the law in Alabama with respect to when juror
> misconduct claims may be raised" when it decided *Ex parte Burgess*, 21
> So.3d 746 (Ala. 2008). (*Jenkins's brief*, at 34.) According to Jenkins,
> because he based his juror-misconduct claim on the "new ground" for
> Rule 32 relief that the Supreme Court established in *Ex parte Burgess* and
> because he filed his second Rule 32 petition within six months of the
> Supreme Court's release of its opinion in *Ex parte Burgess*, the time
> limitation contained in Rule 32.2(c), Ala. R.Crim. P., does not bar relief.
> Alternatively, Jenkins argues that even if the time limitation contained in
> Rule 32.2(c), Ala. R.Crim. P., does apply, he was entitled to equitable
> tolling because his juror-misconduct claim was based on the "new law"
> established in *Ex parte Burgess*. Again, Jenkins asserts that in *Ex parte
> Burgess*, the Alabama Supreme Court created a new law governing when
> juror-misconduct claims may be asserted and that this new law was not
> created until after the time limitation on his Rule 32 petition had expired;
> therefore, he is entitled to equitable tolling.

*Jenkins*, 105 So. 2d at 1247.

On August 26, 2011, the Alabama Court of Criminal Appeals affirmed the Rule

32 court's holding that the petition was barred by the statute of limitations:

Each of Jenkins's arguments regarding why his petition is not barred by the time limitation contained in Rule 32.2(c), Ala. R.Crim. P., is based on the premise that the Alabama Supreme Court established a "new law" or a "new ground" for Rule 32 relief in *Ex parte Burgess*. Contrary to Jenkins's assertions, the Alabama Supreme Court did not establish a new law in *Ex parte Burgess*; instead, it held that this Court had misapplied existing law. In *Ex parte Burgess*, the Alabama Supreme Court granted certiorari review "to determine whether the decision [of this Court, holding that Burgess's juror-misconduct claim was procedurally barred pursuant to Rule 32.2(a)(3) and (a)(5), Ala. R.Crim. P.,] conflict[ed] with *Ex parte Pierce*, 851 So.2d 606 (Ala. 2000), *Ex parte Dobyne*, 805 So.2d 763 (Ala. 2001), and *DeBruce v. State*, 890 So.2d 1068 (Ala.Crim.App. 2003)." *Ex parte Burgess*, 21 So.3d at 750. In *Ex parte Pierce*, the Alabama Supreme Court established that a juror-misconduct claim could be raised as a constitutional claim pursuant to Rule 32.1(a), Ala. R.Crim. P., and would not be procedurally barred pursuant to Rule 32.2(a)(3) and (a)(5), if the petitioner proved by a preponderance of the evidence "that the information was not known, and could not reasonably have been discovered, at trial or in time to raise the issue in a motion for new trial or on appeal." 851 So.2d at 616-17. The Supreme Court's holding in *Pierce* was reaffirmed in *Ex parte Dobyne*, 805 So.2d 763, 768 (Ala. 2001), and *DeBruce v. State*, 890 So.2d 1068 (Ala.Crim.App. 2003).

In *Ex parte Burgess*, the Alabama Supreme Court reviewed this Court's affirmance of the summary dismissal of Burgess's Rule 32 petition in which Burgess alleged that jurors had failed to disclose information during voir dire. Although Burgess had alleged that the juror-misconduct claim was not known to him and "that he could not have *reasonably* discovered the alleged juror misconduct in time to raise the claims in a motion or a new trial or on appeal," this Court held that his claims were procedurally barred because they could have been, but were not, raised at trial and on direct appeal. *Ex parte Burgess*, 21 So.3d at 754 (emphasis in original). The Alabama Supreme Court reversed this Court's decision, holding that this Court had erroneously applied the standard established in *Ex parte Pierce*, 851 So.2d 606, and *Ex parte Dobyne*, 805 So.2d 763, regarding what a Rule 32 petitioner must establish to

overcome the procedural bars contained in Rule 32.2(a)(3) and (a)(5), Ala. R.Crim. P. Specifically, the Alabama Supreme Court, relying on *Ex parte Pierce*, 851 So.2d 606, held that a Rule 32 petitioner can overcome the procedural bars contained in Rule 32.2(a)(3) and (a)(5), Ala. R.Crim. P., if that petitioner shows that he was unaware of and "that he could not have reasonably discovered the alleged juror misconduct in time to raise the claims in a motion or a new trial or on appeal." FN.10. *Ex parte Burgess*, 21 So.3d at 754. *See also Ex parte Pierce*, 851 So.2d at 616 ("Pierce's [juror-misconduct] claim was cognizable as long as he established that the information was not known, and could not reasonably have been discovered, at trial or in time to raise the issue in a motion for new trial or on appeal."). Accordingly, the Supreme Court did not, as Jenkins argues, establish a new rule of law or a new ground for Rule 32 relief when it decided *Ex parte Burgess*. FN.11. Instead, it determined that this Court had erroneously applied the standard established in *Ex parte Pierce*, 851 So.2d at 616.

> FN.10. This Court notes that Jenkins, during his first Rule 32 proceeding, failed to prove by a preponderance of the evidence "that the information [relating to his juror-misconduct claim] was not known, and could not reasonably have been discovered, at trial or in time to raise the issue in a motion for new trial or on appeal," *Ex parte Pierce*, 851 So.2d at 616–17, because Jenkins failed to elicit any testimony from trial counsel indicating that counsel was unaware of the claim. Because Jenkins failed to meet his burden to establish that the claim was unknown, this Court correctly applied *Ex parte Pierce*, 851 So.2d at 616–17, and held that the claim was procedurally barred because it could have been, but was not, raised at trial or on direct appeal. *Jenkins v. State*, 972 So.2d at 168.

> FN.11. Jenkins cites *King v. State*, 689 So.2d 931 (Ala.Crim.App. 1997), *Rice v. State*, 682 So.2d 485 (Ala.Crim.App. 1996), and *Mitchell v. State*, 547 So.2d 1194 (Ala.Crim.App. 1989), in support of his proposition that Rule 32 claims based on newly decided cases are not

subject to the time limitation contained in Rule 32.2(c), Ala. R.Crim. P. Unlike Jenkins's nonjurisdictional claim, the petitioners in each of these cases raised jurisdictional claims that, by their nature, are not subject to the time limitation contained in Rule 32.2(c), Ala. R.Crim. P. Therefore, these cases do not support his argument.

Because the Alabama Supreme Court did not establish a new law or a new ground for Rule 32 relief in *Ex parte Burgess*, Jenkins's assertion that the release of that case exempted his juror-misconduct claim from the application of the time limitation contained in Rule 32.2(c), Ala. R.Crim. P., is without merit. Likewise, because the Alabama Supreme Court did not establish a new law or a new ground for Rule 32 relief in *Ex parte Burgess*, Jenkins is not entitled to equitable tolling based on the release of that case. *See Fitts v. Eberlin*, 626 F.Supp.2d 724, 733 (N.D. Ohio 2009) ("Given that no new rule exists that applies to [the petitioner's] case, [his] plea for equitable tolling . . . must fail."). Therefore, unless Jenkins filed his Rule 32 petition before the time limitation expired, this circuit correctly dismissed the petition pursuant to Rule 32.7(d), Ala. R.Crim. P. *See Wood v. State*, 891 So.2d 398, 420 (Ala.Crim.App. 2003) (holding that juror-misconduct claims are nonjurisdictional); *Bowen v. State*, 899 So.2d 310, 312 (Ala.Crim.App. 2004) (holding that nonjurisdictional, constitutional claims are subject to the procedural bars set forth in Rule 32, Ala. R.Crim. P.); *Tucker v. State*, 956 So.2d 1170, 1171 (Ala.Crim.App.2006) (holding that nonjurisdictional claims are subject to the time limitation contained in Rule 32.2(c), Ala. R.Crim. P.).

Rule 32.2(c), Ala. R.Crim. P., provides:

Subject to the further provisions hereinafter set out in this section, the court shall not entertain any petition for relief from a conviction or sentence on the grounds specified in Rule 32.1(a) and (f), unless the petition is filed: (1) In the case of a conviction appealed to the Court of Criminal Appeals, within one (1) year after the issuance of the certificate of judgment by the Court of Criminal Appeals

under Rule 41, Ala.R.App.P.; or (2) in the case of a conviction not appealed to the Court of Criminal Appeals, within one (1) year after the time for filing an appeal lapses; provided, however, that the time for filing a petition under Rule 32.1(f) to seek an out-of-time appeal from the dismissal or denial of a petition previously filed under any provision of Rule 32.1 shall be six (6) months from the date the petitioner discovers the dismissal or denial, irrespective of the one-year deadlines specified in the preceding subparts (1) and (2) of this sentence; and provided further that the immediately preceding proviso shall not extend either of those one-year deadlines as they may apply to the previously filed petition. The court shall not entertain a petition based on the grounds specified in Rule 32.1(e) unless the petition is filed within the applicable one-year period specified in the first sentence of this section, or within six (6) months after the discovery of the newly discovered material facts, whichever is later; provided, however, that the one-year period during which a petition may be brought shall in no case be deemed to have begun to run before the effective date of the precursor of this rule, i.e., April 1, 1987.

The Alabama Supreme Court affirmed this Court's judgment affirming Jenkins's capital-murder convictions and sentences of death on May 28, 1993, *Ex parte Jenkins*, 627 So.2d 1054, and this Court issued its certificate of judgment on October 28, 1993. Jenkins did not file his current Rule 32 petition until October 1, 2008, well after the time limitation contained in Rule 32.2(c), Ala. R.Crim. P., had expired. Because Jenkins filed his Rule 32 petition after the time limitation had expired, the circuit court correctly dismissed it pursuant to Rule 32.7(d), Ala. R.Crim. P. FN.12.

> FN.12. Because this Court has affirmed the dismissal of Jenkins's petition based on Rule 32.2(c), Ala. R.Crim. P., it will not discuss the circuit court's alternative reasons for dismissing the petition.

For the foregoing reasons, the judgment of the circuit court is affirmed.

*Id*. at 1247-50.

On September 21, 2012, the Alabama Supreme Court denied certiorari as to the juror misconduct claim. *Ex parte Jenkins*, 105 So. 3d 1250 (Ala. 2012). The United States Supreme Court denied Jenkins's petition for a writ of certiorari on March 25, 2013. *Jenkins v. Alabama*, 133 S. Ct. 1634 (2013).

The respondent maintains that the state courts properly held in both post conviction proceedings, that Jenkins's juror misconduct claim was procedurally barred from review, and the claim is likewise barred from review in this court. (Doc. 40 at 8-16). Jenkins counters that his claim is properly before this court for *de novo* review of the merits, because "the Rule 32 court incorrectly found the claim was procedurally defaulted for failure to raise this claim at trial or on appeal." (Doc. 48 at 6). Jenkins's argument focuses solely on the finding made by the Alabama Court of Criminal Appeals during the first Rule 32 proceedings. Specifically, he argues that:

> The Alabama Court of Criminal Appeals ("CCA") held that Mr. Jenkins' claim was procedurally barred under Alabama Rules of Criminal Procedure 32.2(a)(3) and (5) because it was not raised at trial or on direct appeal. *See Jenkins v. State*, 972 So.2d 165, 168 (Ala. Crim. App. 2005) ("*Jenkins II*"). FN.2. However, the violation of a state procedural rule forecloses federal review only if the rule is "firmly established and regularly followed." *James v. Kentucky*, 466 U.S. 341, 348 (1984). At the time Mr. Jenkins raised the juror misconduct claim, Alabama did not have

68

a firmly established and regularly followed rule barring such claims first raised in Rule 32 proceedings; to the contrary, Alabama law expressly provided for such claims to be brought during Rule 32 proceedings. *See State v. Freeman*, 605 So.2d 1258, 1259 (Ala. Crim. App. 1992).

> FN.2. The Alabama courts subsequently denied Mr. Jenkins' successive Rule 32 petition raising this claim, also on procedural grounds related to the rules governing successive petitions in Alabama. (Respondent's Checklist-Successive Pet'n, Tab #R-18, pp. 17-40; Tab #R-20, pp. 23-27.) Mr. Jenkins understands the State to argue only that the original procedural bar the state courts invoked – that the juror misconduct claim should have been raised prior to post-conviction proceedings – precludes federal review of this claim. Of course, it would be exorbitant and manifestly unfair to preclude federal review of Mr. Jenkins' constitutional claims on the basis of a procedural bar that was invoked only after he attempted to provide the state courts with one more opportunity to rule on his claims. *See Lee v. Kemna*, 534 U.S. 362, 376 (2002); *Card v. Dugger*, 911 F.2d 1494, 1517 (11th Cir. 1990).

The Alabama Supreme Court ("ASC") finally resolved the inconsistent application of this procedural bar in *Ex parte Burgess*, 21 So.3d 746, 754 (Ala. 2008), when it held: "It is unreasonable to hold that a defendant must uncover any and all juror misconduct in the form of inaccurate responses to voir dire examination in time to raise such claims in a motion for new trial or on appeal." Because the procedural bar the State invokes to preclude merits review was neither firmly established nor regularly followed before the ASC decided *Burgess* in 2008, this Court should review the merits of Mr. Jenkins's juror misconduct claim. *See Lee v. Kemna*, 534 U.S. 362, 387 (2002) (remand for merits review where procedural bar was not an adequate state law ground barring relief).

(*Id.* at 6-7).

A claim is not subject to procedural default unless the "last state court to review

the claim states clearly and expressly that its judgment rests on a procedural bar . . . and that bar provides an adequate and independent state ground for denying relief." *Johnson v. Singletary*, 938 F.2d at 1173. The last state court to issue a reasoned opinion on this claim was the Alabama Court of Criminal Appeals, which held that the circuit court correctly dismissed Jenkins's second Rule 32 petition based upon Rule 32.2(c), Ala. R. Crim. P. Although Jenkins argues extensively that the appellate court's decision on appeal from the denial of his *first* Rule 32 petition does not provide an adequate and independent state ground for denying relief, because the rule at issue was not firmly established or regularly followed, he makes no such argument with respect to the appellate court's decision on his most recent Rule 32 petition. Indeed, the Eleventh Circuit has "specifically held that the Alabama statute of limitation in Rule 32.2 is firmly established and regularly followed for purposes of applying the procedural default doctrine." *Seibert v. Allen*, 455 F.3d 1269, 1271 (11th Cir. 2006) (citing *Hurth v. Mitchem*, 400 F.3d 857, 862–63 (11th Cir. 2005) (holding consistently with the earliest prior panel opinion that "Alabama's Rule 32.2(c) statute of limitations is firmly established and regularly followed in the courts of that state")). *See also Kuenzel v. Commissioner, Alabama Department of Corrections*, 690 F.3d 1311, 1314 (11th Cir. 2011) (holding that Rule 32.2(c) is an independent and adequate state procedural rule).

70

The last state court to address Jenkins's juror misconduct claim clearly held that the claim was procedurally barred by Rule 32.2(c). That bar provides an adequate and independent state ground for denying relief. Thus, the claim is procedurally barred from review in this court unless Jenkins can show that he had cause for the default and actual prejudice therefrom, or that the failure to consider the claim will result in a "fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. at 749-50. Jenkins has not alleged that cause and prejudice exist to excuse the default of this claim.

Although he claims that it would be "exorbitant and manifestly unfair" to preclude this claim on the basis of the procedural bar, Jenkins's argument does not meet the miscarriage of justice exception. That exception requires a petitioner to show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Schlup v. Delo*, 513 U.S. at 327. "To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him." *Id*. Jenkins makes no argument that he is actually, factually innocent. Thus, he cannot meet the "fundamental miscarriage of justice" exception.

Instead, Jenkins argues that "it would be exorbitant and manifestly unfair" for this court to decline to review his claim "on the basis of a procedural bar that was

invoked [by the state court] only after he attempted to provide the state courts with one more opportunity to rule on his claims." (Doc. 48 at 7 n.2). He cites *Lee v. Kemna*, 534 U.S. at 376 and *Card v. Dugger*, 911 F.2d at 1517 in support of this contention. The issue in both cases was whether a state court's procedural rule was firmly established and regularly followed. *Lee v. Kemna* held that there are "exceptional cases in which exorbitant application of a generally sound rule renders the state ground inadequate to stop consideration of a federal question. *See Davis v. Wechsler*, 263 U.S. 22, 24, 44 S.Ct. 13, 68 L.Ed. 143 (1923) (Holmes, J.) ("Whatever springs the State may set for those who are endeavoring to assert rights that the State confers, the assertion of federal rights, when plainly and reasonably made, is not to be defeated under the name of local practice."). *Kemna*, 534 U.S. at 376. *Card v. Dugger* held that "a state court's procedural rule must be faithfully and regularly applied" and "must not be manifestly unfair in its treatment of a petitioner's federal constitutional claim." *Card*, 911 F.2d at 1517.

Jenkins has offered no support for his theory that the default of this claim should be excused because it would be exorbitant and manifestly unfair for this court to uphold the procedural bar of his juror misconduct claim despite the decision of the last state court to address the claim, clearly and expressly stating that the claim was procedurally barred by Rule 32.2(c), a procedural bar that is firmly established and regularly

followed in Alabama courts. This court is not aware of any such exception to the procedural default rules.

Because the last state court to address Jenkins's juror misconduct claim clearly and expressly found the claim was procedurally defaulted pursuant to Rule 32.2(c), and that court's findings rest upon a firmly established and regularly followed state procedural rule, the claim is procedurally barred from review in this court.

Jenkins argues alternatively, that "[t]o the extent this [c]ourt finds that the state court denied the claim on the merits, the state court adjudication of this claim resulted in a decision that was contrary to, and involved an unreasonable application of, established United States Federal law, and was also based on an unreasonable determination of the facts in light of the state court record." (Doc. 36 at 11 n.3). The respondents counter that the claim should be dismissed because the claim was "thoroughly addressed" and denied on the merits," and Jenkins has not shown that the decision was contrary to or an unreasonable application of clearly established Federal law, or based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. (Doc. 40 at 16-21).

The AEDPA's deferential standard of review is limited to claims that were "adjudicated on the merits in State court proceedings." Title 28 U.S.C. § 2254(d). "A decision that is based on state procedural grounds is not an adjudication on the merits."

*Williams v. Alabama*, 791 F.3d 1267, 1273 (11th Cir. 2015) (citing *Harrington v. Richter*, 562 U.S. 86, 99 (2011)).

In Jenkins's case, the second Rule 32 court first found the claim to be "barred from this Court's review by the statute of limitations procedural bar," then alternatively addressed the merits of the claim, concluding that even if the claim were properly before the court, which it was not, it was meritless. (Second Rule 32 C.R. Vol. 9, Tab 18 at 15 and 23-24). The Court of Criminal Appeals affirmed the Rule 32 court, holding that because "Jenkins filed his [second] Rule 32 petition after the time limitation had expired, the circuit court correctly dismissed it pursuant to Rule 32.7(d), Ala. R. Crim. P." *Jenkins*, 105 So. 3d at 1249-50. The court noted that because it had "affirmed the dismissal of Jenkins's petition based on Rule 32.2(c)," . . . it would "not discuss the circuit court's alternative reasons for dismissing the petition." *Id*. at 1250 n. 12.

Neither the decision of the Rule 32 court, nor the decision of the Alabama Court of Criminal Appeals is entitled to deference under § 2254(d). First, this court cannot treat the appellate court's decision as a merits determination because that court clearly stated that it was affirming the Rule 32 court's decision "[b]ecause Jenkins filed his Rule 32 petition after the time limitation had expired." *Id.* at 1250. The appellate court noted that because it had "affirmed the dismissal of Jenkins's petition based on Rule 32.2(c), Ala. R. Crim. P., it [would] not discuss the circuit court's alternative reasons

for dismissing the petition." *Id*. at n.12. "As the Supreme Court explained in *Richter*, we only presume that a state court reached the merits when there is no 'reason to think some other explanation for the state court's decision is more likely.'" *Williams v. Alabama*, 791 F.3d 1267, 1273 (11th Cir. 2015) (quoting *Harrington v. Richter*, 562 U.S. 86, 99-100 (2011)). In Jenkins's case, the Alabama Court of Criminal Appeals expressly held that the claim was barred by the statute of limitations. Thus, this court cannot construe the state appellate court's decision as a merits determination that is entitled to deference under § 2254(d).

Likewise, the Rule 32 court's decision is not entitled to § 2254(d) deference. First, that court concluded that Jenkins was "not entitled to relief on his juror misconduct claim - the sole claim that he raises in his second Rule 32 petition - because his claim is barred from this Court's review by the statute of limitations procedural bar and is not, therefore, properly before this court." (Second Rule 32 C.R. Vol. 9, Tab 18 at 23). Although that court went on to find that the claim was meritless, it made clear that it was only addressing the merits of the claim alternatively, by stating that "[a]ssuming, however, that Jenkins's juror misconduct claim is properly before this court - which it is not - this Court finds that it is meritless." (*Id*. at 23-24). The court's alternative ruling on the merits of the claim does not negate its clear finding that the claim was procedurally barred by the statute of limitations.

Further, to the extent the Rule 32 court could be found to have ruled on the merits of the claim, that decision was rejected by the Alabama Court of Criminal Appeals when it held the claim was procedurally barred by the statute of limitations and specifically stated that it would not discuss the Rule 32 court's alternative reasons for dismissing the petition.

> This means that the Court of Criminal Appeals found itself—and necessarily, the Rule 32 court as well—without the authority to even consider the merits of [the petitioner's] claims. *See Davis*, 9 So.3d at 522 (applying Rule 32 procedural bar sua sponte and stating that "this Court has no authority to modify or amend the procedural bars contained in Rule 32"); *see also Hurth v. Mitchem*, 400 F.3d 857, 858 (11th Cir. 2005) ("A rule is jurisdictional if the petitioner's non-compliance with it actually divests the state courts of power and authority to decide the underlying claim, instead of merely offering the respondent an opportunity to assert a procedural defense which may be waived if not raised."). Thus, the Court of Criminal Appeals disagreed that the Rule 32 Court had jurisdiction to make any merits determination at all, including the one that it made.

> . . . [When] a state trial court issues a decision that the state appellate court does not agree with, we consider only the state appellate court's decision.

> . . . [In this case] the Court of Criminal Appeals' holding that the Rule 32 court did not have the authority to consider the merits of [the petitioner's] claims is not consistent with the Rule 32 court's decision addressing the merits of those claims. Thus, our respect for the state court judgment—and the "fundamental principle that state courts are the final arbiters of state law," *Herring v. Sec'y, Dep't of Corr.*, 397 F.3d 1338, 1355 (11th Cir. 2005) (quotation omitted)—prevents us from deferring to the Rule 32 court's decision.

*Williams v. Alabama*, 791 F.3d 1267, 1273-74 (11th Cir. 2015) (alterations added).

Because the Alabama Court of Criminal Appeals clearly held the claim was barred by the statute of limitations, this court is prevented from deferring to the Rule 32 court's alternative decision on the merits of this claim.

## B. The Eighth Amendment Prohibits Executing Mr. Jenkins Because he is Mentally Retarded

This claim was denied on March 31, 2015. (Doc. 54). Therefore, the court does not address it again in this Memorandum Opinion.

## C. Trial Counsel's Inadequate Performance Deprived Mr. Jenkins of the Effective Assistance of Counsel

Jenkins maintains that his attorneys were ineffective at all stages of his trial, and in particular, at the sentencing hearing, where he claims "they failed to do anything prior to trial, leaving them unprepared to present evidence or reasons for the jury to spare his life." (Doc. 12 at 25). He adds that his attorneys' abdication of their constitutional duty to subject the state's case to meaningful adversarial testing, resulted in their failure to meet the minimal standard of reasonableness, thereby allowing Jenkins to be convicted and sentenced to death in violation of *Strickland v. Washington*, 466 U.S. 668, 686 (1984). (*Id.*). Jenkins asserts that the state court's adjudication of these claims resulted in decisions that were contrary to, and/or an unreasonable application of clearly established Federal law, and were based on

77

unreasonable determinations of the facts. (*Id*.).

### 1.    Counsel's Deficient Performance Deprived Mr. Jenkins of the Effective Assistance of Counsel During the Penalty Phase

Jenkins alleges that his attorneys did no investigation into his background, history, record or character prior to the penalty phase of his trial. (*Id*. at 25-28). Specifically, he claims that:

> Trial counsel did not interview Mr. Jenkins's family members or friends at any time. Although counsel was awarded funds to retain an investigator, they failed to utilize these resources to retain an investigator to locate and interview penalty phase witnesses. Trial counsel did not interview jail guards who supervised Mr. Jenkins at the St. Clair County Jail. Trial counsel did [not] obtain any records from Mr. Jenkins's background or history, including records created by the State of Alabama documenting Mr. Jenkins's background and many of his positive qualities. Counsel took no action to obtain funds or retain a mental health expert, such as a psychologist, to testify and put Mr. Jenkins's background experiences in a more sympathetic context.

> It is undisputed that Mr. Jenkins's trial attorneys discussed the possibility of penalty phase for the first time just four days prior to trial. (R2 at 407; R3 at 419.) Even then, neither made any attempt to investigate and present mitigating evidence. Admittedly, counsel's failure to develop a mitigation case arose from a "complete lack of appreciation for . . . mitigating evidence and how it is presented." (R2 at 324.) Had counsel conducted even a minimal investigation, they would have readily uncovered a wealth of mitigating evidence which should have been presented to the jury. These failures, individually and collectively, rendered counsel's performance ineffective during the penalty phase of trial under. *Strickland v. Washington*, 466 U.S. 668 (1984).

(*Id*. at 27-28) (alteration added).

As with all ineffective assistance of counsel claims, both deficient performance and prejudice must be shown. To satisfy the deficient performance prong, counsel's representation must have fallen below "an objective standard of reasonableness," which is measured against the "prevailing professional norms" at the time. *Strickland,* 466 U.S. at 688. As the Supreme Court recently reemphasized, "[t]hat standard is necessarily a general one," as "[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." *Bobby v. Van Hook*, 558 U.S. 4, 7- 8 (2009) (quoting *Strickland,* 466 U.S. at 688-689) (finding the Court of Appeals erred by treating the ABA's guidelines "not merely as evidence of what reasonably diligent attorneys would do, but as inexorable commands with which all capital defense counsel 'must fully comply'").

When evaluating trial counsel's investigation and preparation for the penalty phase of a capital trial, there is no checklist of tasks counsel must complete to deem an investigation reasonable. It is nonetheless well-settled that trial counsel has an "obligation to conduct a thorough investigation of the defendant's background" when preparing for a capital sentencing. *Porter v. McCollum*, 558 U.S. 30, 39 (2009) (holding that counsel's obligation was "unquestioned" under prevailing professional norms at the time of trial) (quoting *Williams v. Taylor*, 529 U.S. at 396); *Schriro v.*

79

*Landrigan*, 550 U.S. 465 (2007) (counsel's investigation of possible mitigating evidence was indisputably constitutionally insufficient, given that counsel did little to prepare for the sentencing aspect of the case); *Wiggins v. Smith,* 539 U.S. 510 (2003); *Strickland v. Washington,* 466 U.S. at 691(counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary); *see also*, *Sears v. Upton*, 561 U.S. 945, 1032 (2010) (noting that it was "unsurprising" that the state postconviction court found that "the cursory nature of counsel's investigation into mitigation evidence – 'limited to one day or less, talking to witnesses selected by [the defendant's] mother' – was 'on its face . . . constitutionally inadequate'") (alteration added); *Williams v. Allen*, 542 F.3d 1326, 1339 (11th Cir. 2008) (investigation of mitigating evidence in capital defendant's background fell short of prevailing professional norms); *Housel v. Head*, 238 F.3d 1289, 1294 (11th Cir. 2001) (noting that a "failure to investigate can be deficient performance in a capital case when counsel totally fails to inquire into the defendant's past or present behavior or life history").

However, consideration must be given to "'counsel's perspective at the time' investigative decisions are made," and a "heavy measure of deference" must be given to counsel's judgments. *DeYoung v. Schofield,* 609 F.3d 1260, 1284 (11th Cir. 2010) (quoting *Rompilla v. Beard*, 545 U.S. 374, 380-81 (2005)). Thus, even when, in

hindsight, an investigation might be viewed as less than adequate, counsel's performance will not always be deemed deficient, especially when the defendant contributed in some way to counsel's perspective. *See, e.g., Bobby v. Van Hook*, 558 U.S. 4, 12-13 (2009) (because counsel had uncovered significant mitigating evidence from the defendant's background, decision not to seek more fell well within the range of professionally reasonable judgments); *Strickland,* 466 U.S. at 691(when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable); *Johnson v. Upton*, 615 F.3d 1318 (11th Cir. 2010) (an attorney does not perform deficiently by not discovering mitigating evidence that his client did not mention to him)*; Reed v. Secretary, Florida Dept. of Corrections*, 593 F.3d 1217 (11th Cir. 2010) (defendant's own words and deeds play a role in assessing the reasonableness of counsel's conduct); *Cummings v. Secretary for Dept. of Corrections*, 588 F.3d 1331 (11th Cir. 2009) (although counsel may not "blindly follow" his client's instructions not to look for or use mitigation evidence, a mentally competent defendant's instruction not to investigate or not to present mitigation evidence may make counsel's decision not to do so reasonable); *McClain v. Hall*, 552 F.3d 1245, 1251-52 (11th Cir. 2008) (whether defendant informed his trial counsel about defendant's abusive childhood is "extremely important" to determining

reasonableness of counsel's performance); *Newland v. Hall*, 527 F.3d 1162 (11th Cir. 2008) (defense attorney's investigation prior to penalty phase of the trial was reasonable due to the information provided by the defendant); *Stewart v. Sec'y, Dep't of Corr.*, 476 F.3d 1193, 1211 (11th Cir. 2007) (counsel's failure to present evidence of defendant's alleged abuse was not deficient because defendant did not inform counsel of this abuse); *Henyard v. McDonough*, 459 F.3d 1217, 1242 (11th Cir. 2006) (counsel's failure to discover evidence of sexual abuse was not deficient given defendant's repeated denials of abuse).

To satisfy the prejudice prong, a petitioner must show that, but for his counsel's deficiency, there is a reasonable probability he would have received a different sentence. *Porter v. McCollum*, 558 U.S. at 41. When evaluating a claim of ineffective assistance in the context of a penalty phase mitigation investigation, courts must undertake a "probing and fact-specific analysis" that considers the totality of the available mitigation evidence, both that adduced at trial and in any postconviction proceedings, in order to assess whether there is a reasonable probability that defendant would have received a different sentence after a constitutionally sufficient mitigation investigation. *Sears v. Upton*, 130 S.Ct. at 3266-67; *Porter v. McCollum*, 558 U.S. at 41; *Wong v. Belmontes*, 558 U.S. 15, 20 (2009).

Relevant to this analysis is whether the newly unearthed mitigating evidence is

merely cumulative or simply additional details about a defendant's background that would have "barely altered the sentencing profile presented to the sentencing judge," or whether it would have been the only evidence that could have "humanized" the defendant, allowing the jury or the sentencing judge to "accurately gauge his moral culpability." *Porter v. McCollum*, 558 U.S. at 41. Also relevant is whether the evidence might have been viewed unfavorably, or opened doors for the prosecution to bring in damaging rebuttal evidence, *Cook v. Upton*, Civil Action No. 5:09-CV-25 (CAR), 2010 WL 1050404, at *11 (M.D. Ga. Mar. 18, 2010) (counsel's failure to introduce evidence concerning the petitioner's mental health did not prejudice the petitioner since the records contained many details that were potentially harmful to the petitioner), or whether the aggravating circumstances of the crime are such that they would outweigh any prejudice caused by the failure to present mitigating evidence, *Dobbs v. Turpin,* 142 F.3d 1383, 1390 (11th Cir.1998).

Jenkins faults counsel for failing to investigate and present several types of mitigating evidence: (a) evidence relating to Jenkins's childhood and background; (b) Jenkins's age at the time of the offense, lack of significant prior criminal history, and intoxication at the time of the crime; and (c) Jenkins's model behavior and positive adjustment to pretrial incarceration. He also faults counsel for (d) failing to request a continuance of the penalty phase of the trial. These claims were raised in Jenkins's

Rule 32 petition and denied by the trial court. (Rule 32 C.R. Vol. 45, Tab 77 at 324-44). The Alabama Court of Criminal Appeals affirmed the denial of the claims:

> Jenkins argues that his attorney was deficient at the penalty phase of his capital trial for failing to investigate, to obtain records, to interview Jenkins's family members, and to seek expert assistance.

>> "In a challenge to the imposition of a death sentence, the prejudice prong of the Strickland inquiry focuses on whether 'the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.'" *Stevens v. Zant*, 968 F.2d 1076, 1081 (11th Cir. 1992), *cert. denied*, 507 U.S. 929, 113 S.Ct. 1306, 122 L.Ed.2d 695 (1993).

> *Jones v. State*, 753 So.2d 1174, 1197 (Ala.Crim.App. 1999).

>> When the ineffective assistance claim relates to the sentencing phase of the trial, the standard is whether there is "a reasonable probability that, absent the errors, the sentencer - including an appellate court, to the extent it independently reweighs the evidence - would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland* [*v. Washington* ], 466 U.S. [668,] at 695, 104 S.Ct. [2052,] at 2069 [(1984)].

> *Stafford v. Saffle*, 34 F.3d 1557, 1564 (10th Cir. 1994).

> Jenkins first argues that his attorneys never contacted any of his family members and that they failed to present mitigating evidence of his life and background.

> Scofield testified at the Rule 32 hearing that he was in charge of the guilt phase and that Downey was in charge of the penalty phase. Downey did not testify nor did he execute an affidavit to explain his strategy and

any preparation and investigation he conducted for the penalty phase. The record of the direct appeal also reflects that on October 1, 1989, Downey filed a motion for a continuance. In that motion he argued, "Further discovery and investigation (including a possible trip to California) [are] needed for proper preparation of the case, requiring more time than is available between this present day and the trial date now set on October 30, 1989." (Trial record, p. 68.) That motion was granted. The fee declaration Downey filed in circuit court for payment for his services is contained in the record. It reflects that Downey spent 171 hours on the case and that he spent over 25 hours talking with Jenkins in more than 10 visits to the jail where Jenkins was housed awaiting trial. It also shows that Downey spoke with Jenkins's grandmother. There was absolutely no testimony as to any conversations Downey had with Jenkins, although it is clear from Downey's itemization of hours in his attorney fee declaration that those conversations were extensive.

Scofield did testify at the Rule 32 hearing that Jenkins told him about his abusive childhood, his abusive relationship with his stepfather, the trouble he was in when he was a juvenile, and the fact that he ran away from home as a child. Scofield testified that he could not recall whether Jenkins told him that he was beaten on a daily basis but that he thought that he would have remembered that information. (R. 394.) Last, Scofield testified that he did not know what preparations Downey had made for the penalty phase. (R. 406.)

> The reasonableness of counsel's investigation and preparation for the penalty phase, of course, often depends critically upon the information supplied by the defendant. *E.g. Commonwealth v. Uderra*, 550 Pa. 389, 706 A.2d 334, 340-41 (1998) (collecting cases). Counsel cannot be found ineffective for failing to introduce information uniquely within the knowledge of the defendant and his family which is not provided to counsel.

*Commonwealth v. Bond*, 572 Pa. 588, 609-10, 819 A.2d 33, 45-46 (2002).

At the evidentiary hearing Jenkins presented the testimony of his half brother, Michael Jenkins; two cousins, Tammy Pitts and Betty DeLavega; his grandmother, Doris Wagoner; and a friend, Sherry Seal. When addressing this issue the circuit court made very detailed findings of fact that related to the witnesses Jenkins called to testify at the evidentiary hearing. We quote extensively from those very thorough findings:

> The Court initially finds that because Jenkins did not present any testimony from Stan Downey at the evidentiary hearing, he has not met his burden of proof under Rule 32.3. The record shows that Mr. Downey was responsible for the penalty phase of the trial. Yet, Mr. Downey, who was not shown to be unavailable to testify, was not called by Jenkins as a witness to support his claim of ineffectiveness at the penalty phase. Instead, Jenkins attempted to elicit testimony from Mr. Scofield concerning Mr. Downey's actions. The Court is puzzled as to why Jenkins did not call the one lawyer asserted to be responsible for that portion of the trial against which most of his criticism is levied. While this was Jenkins's choice, the Court finds that this choice resulted in Jenkins's failure to meet his burden of proof. The record is virtually silent as to what actions were or were not taken or what was or was not done by Mr. Downey at trial and why. It is possible that his actions could have been reasonable and strategic under the circumstances and, in large part, undertaken based upon what Jenkins told him. The Court, therefore, finds that Jenkins did not prove that Mr. Downey's representation was deficient or that he was prejudiced as a result of that representation.

> The Court will, however, based upon the evidence presented at the hearing, attempt to address Jenkins's claim of ineffectiveness of counsel at the penalty phase. As previously stated in this order, Jenkins must show that counsel's representation was both deficient and that the deficient performance prejudiced the defense. The Court

finds that Jenkins has not proven that, assuming counsel's deficiency, there was a reasonable probability that the sentencer, including the appellate court, to the extent it reweighs the evidence, would have concluded that a weighing of the aggravating and mitigating circumstances did not warrant death.

The Court notes that for the reasons that will follow, the evidence presented at the hearing would not have affected the sentence this Court would have imposed on Jenkins. The aggravating circumstances clearly outweighed any mitigation caused by Jenkins's "abusive childhood", below average intelligence, lack of a criminal history, and his age. Jenkins kidnapped, robbed, and brutally murdered Tammy Hogeland. He then disposed of her nude body on the side of the interstate, leaving her to decompose beyond recognition. Death was the appropriate punishment in this case.

After listening to the evidence presented at the hearing and observing the demeanor of the witnesses, the Court finds that the witnesses were biased, that they grossly exaggerated their testimony, and that they were not credible for the following reasons:

The record reflects that, at the time of the trial, friends and family of Jenkins were contacted by a probation officer regarding the preparation of a pre-sentence report. Nothing in the report indicated that Jenkins was abused to the extent alleged at the evidentiary hearing. Additionally, although numerous records were introduced at the hearing, there were no medical records which would corroborate the level of abuse alleged by several of Jenkins's witnesses.

Jenkins's cousin, Tammy Lynn Pitts, was not a credible witness. Ms. Pitts testified that she lived with Jenkins and his family on a daily basis for the majority of

her early life. She claimed that Jenkins was beaten "daily" from the time he was an infant, to the time he left home around the age of thirteen. Ms. Pitts stated that Jenkins was "pounded on" and that his stepfather would take whatever was in his hand, put all of his weight behind it, and hit Jenkins with "full force." She related one alleged incident where Jenkins's stepfather, a man over six feet tall, hit Jenkins more than once with a full size shovel on the back. Ms. Pitts described the incident as "normal." According to the witness, Jenkins would be laid up in bed for weeks at a time due to the severity of the beatings. Ms. Pitts even testified that Jenkins would receive additional beatings during the time he was laid up recovering from previous abuse. However, Jenkins was apparently never taken to the hospital and there were no medical records reflecting injuries consistent with the alleged severity of the abuse alleged by Ms. Pitts.

The Court also finds significant school records which noted that Jenkins suffered from a rash and gingivitis, but contained absolutely no indication that he was beaten on a regular basis. Ms. Pitts additionally testified concerning Jenkins's difficulty in controlling his bowels. She stated that, as a result of this problem, Jenkins would be forced by his parents to wear 'soiled' clothing to school 'all the time.' Again, the Court finds it difficult to believe that school records would reflect the notice of a rash, but would be completely devoid of any indication that a child was regularly attending school in clothes soiled with feces. Ms. Pitts also testified that Jenkins was locked in his room 24 hours a day 7 days a week. According to her, he was not even allowed to come out to eat dinner with the rest of the family. This contradicted the testimony of Jenkins's brother who stated that Jenkins was sent to bed without dinner, "on occasions," because he was bad. If Ms. Pitts is to be believed, Jenkins eked a meager existence of scraps thrown to him after dinner by other members of the family.

Ms. Pitts testified that she called Child Protection Services [(CPS)] on two occasions during her twenty plus years in the Jenkins household. She stated that the first time, CPS responded to the home but took no action. The second time, there was no response of any kind. The Court finds it to be unbelievable that Ms. Pitts would feel it necessary to call CPS on only two occasions when she claimed the abuse and maltreatment was a "daily" occurrence. It is also unbelievable that child protective services would take no action.

Finally, Ms. Pitts testified that she loved her cousin and felt it would be a tragedy if he were executed. She stated that she felt guilty about Jenkins's childhood and that she believed she was helping him by testifying at the hearing. Ms. Pitts displayed a strong bias in favor of Jenkins. During direct examination, Ms. Pitts appeared to be very emotional, often crying during her testimony. However, on cross-examination by the State, her demeanor changed dramatically. She became guarded and far less emotional. After hearing the testimony of Ms. Pitts, weighing the interests of the witness and observing the witnesses' demeanor, the Court finds the testimony to be incredible.

Not unlike the testimony of Tammy Lynn Pitts, the Court finds the testimony of Jenkins's half brother, Michael, biased and not credible. Not only did his testimony conflict with that of other witnesses, it was also self-contradictory. The Court will not discuss the testimony in its entirety, however, a few examples will make this point.

Michael Jenkins testified that the family moved ten or fifteen times during his youth because his father did not work very much. This conflicted with Ms. Pitt's claim that the family moved maybe four times and that the stepfather was gainfully employed. Michael Jenkins stated that Jenkins would occasionally miss meals because he was sent to his

room for "being bad." Ms. Pitts stated that Jenkins was not allowed to eat with the family and would leap up at the food thrown at him after dinner while locked in his room. Additionally, contrary to Ms. Pitts testimony that Jenkins was locked in his room "twenty-four hours a day seven days a week," Michael stated that Jenkins was locked in his room for "a couple of hours or so . . . every time he done something."

As noted above, the testimony of Michael Jenkins was also self-contradictory. Describing the frequency of the alleged beatings, Michael initially stated "if it wasn't once a day, it would be every other day or every three days." He then stated that Jenkins would get a whipping whenever he had a bowel movement in his pants and that his occurred "once a day." Subsequent to that, Michael described the discipline imposed stating that Jenkins "would be sent to his room and a number of things happened," including an occasional beating. The witnesses' testimony was in fact, filled with apparent confusion and contradictions. He originally testified that Jenkins was three or four years old at the time his stepfather went to prison for robbery. However, he subsequently testified that Jenkins was conceived while his stepfather was in prison. He also contradicted himself a number of times concerning whether Jenkins ever wrote to him requesting him to come to Alabama and testify during his capital murder trial. He finally stated conclusively that he received a letter mentioning that Jenkins might need him to testify at the trial. Michael stated that he had no "curiosity or concern about what was going on."

Finally, Michael testified that he believed that Jenkins was innocent and that he could not have committed the crime. Michael himself had never committed an act of violence despite the fact that he was raised in an environment similar to that of Jenkins. He also testified

90

concerning the problems his other two siblings were experiencing in their adult lives. The Court notes that all of the testimony indicated that these two individuals were never abused as children and were, in fact, babied and spoiled. They received this treatment despite the fact that Stephen Jenkins was not the biological father of either one of them. Any contention that a causal connection exists between the abuse allegedly suffered by Jenkins and the murder of Tammy Hogeland, is undercut by evidence within Jenkins's own family. After hearing the testimony of Michael Jenkins, weighing the interests of the witness and observing the witnesses demeanor, the court finds the testimony incredible and assigns it little weight.

Jenkins also presented the testimony of a friend, Sharon Seal. Mrs. Seal stated that she came to know Jenkins through her husband, Lonnie Seal. The trial record reveals that Lonnie Seal testified at the penalty phase of his trial as a character witness. After reviewing the testimony of Mrs. Seal, the Court finds that her testimony would have been cumulative to that of her husband. Furthermore, Mrs. Seal testified at the evidentiary hearing that her husband knew Jenkins better than she did.

The Court also noted contradictions in Mrs. Seal's testimony. For example, she testified that Jenkins's trial lawyers never talked to her or contacted her about being a witness at the trial. However, on cross-examination, Mrs. Seal stated that she did not attend the trial because "I was told by Mark's lawyers that we were not allowed in the courthouse because we might be potential witnesses." She specifically stated that she was told this by Mr. Downey. Because Mr. Downey did not testify at the hearing, the Court can only speculate as to why Mrs. Seal was not called to testify.

The witness in question also displayed a strong bias

91

in favor of Jenkins. She stated that she believed that he was innocent, that he did not get a fair trial, and that it would be a tragedy if he were executed. The Court would also point out that Mrs. Seal's testimony directly contradicted other theories of mitigation presented by counsel for Jenkins at the hearing. Her testimony related to the good character of Jenkins, his non-violent nature, his generous and caring attitude, his love for her children, and other qualities of a similar nature. Other evidence presented at the hearing, instead, dealt with Jenkins's abusive childhood, and culminated in Dr. David Lisak's testimony that abused children are at risk to commit violence. The evidence suggested on one hand that Jenkins was a wonderful person who would never hurt anyone. However, on the other hand, evidence was presented to support a theory that Jenkins's violent and chaotic background led him to murder Tammy Hogeland. Regarding the later theory, the Court finds it significant that the only documented act of violence committed by Jenkins was the murder of Tammy Hogeland. Based on all of the foregoing, the Court finds that Jenkins has proven neither deficient performance nor prejudice related to the failure to call Sharon Seal as a witness.

. . . .

The Court also finds that Betty DeLavega, Jenkins's second cousin, was not a credible witness and was biased. Ms. DeLavega had only seen Jenkins on two occasions in her life. Once when Jenkins and his family visited her in Indiana and once when she went to California to visit. Jenkins was very young when he came to Ms. DeLavega's home, and he was 11 or 12 when she visited in California. Ms. DeLavega testified that she stayed in the Jenkins home for five months with her husband and her four children.

Ms. DeLavega informed the Court that when Jenkins

92

and his family visited her in Indiana, Jenkins was not beaten by his stepfather because she "wouldn't have stood for that." However, Ms. DeLavega testified that Jenkins's stepfather was cruel to both Jenkins and his brother Michael, and specifically recounted an incident where she claimed that Jenkins's stepfather forced Jenkins to eat his own feces, in front of her and her family, out of his underwear with a spoon. Although claiming to be horrified at seeing this, Ms. DeLavega did nothing. She did not call the authorities and she and her four children continued to live in the Jenkins's home. Ms. DeLavega and Jenkins's brother, Michael, were the only two persons to recount that Jenkins was forced to eat his own feces with a spoon.

Ms. DeLavega also testified, demonstrating her bias, that she did not believe that Jenkins could hurt anybody and that he was innocent of the crime for which he was convicted. Ms. DeLavega testified that it would be a terrible thing for Jenkins to be executed. She also stated that she was asked to come and testify at the evidentiary hearing by Jenkins's grandmother, Doris Wagoner, "to get him off death row."

The Court finds that Ms. DeLavega basically had no knowledge of any long-term abuse Jenkins suffered because she had only seen Jenkins on two very brief occasions in her life. At the time of her testimony, she had not seen Jenkins since he was 11 or 12 years old. The Court finds it to be beyond belief that Ms. DeLavega could witness Jenkins being forced to eat his own feces with a spoon and do nothing. It is also beyond belief that she would remain in the home with her four children after witnessing such a horrifying event. After observing Ms. DeLavega and listening to her testimony, the Court finds her to be a biased and incredible witness, giving her testimony no weight.

The petitioner's grandmother, Doris Wagoner, was

93

also biased and incredible witness. She testified that Jenkins was 'slow' as an infant and could not sit up at the age of four months. Mrs. Wagoner was not offered as an expert in early childhood development and this Court does not accept her as such. She testified that she never witnessed any physical abuse and offered nothing which would establish "that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695.

Most importantly, Mrs. Wagoner testified that she was not available to testify at the penalty phase of Jenkins's trial. . . . Trial counsel can not be labeled ineffective for failure to present the testimony of a witness who, by her own admission, was unavailable and uninterested. Nothing in the testimony of Doris Wagoner mitigated Jenkins's crime.

(C.R. 325-35.)

Initially, Jenkins takes issue with the credibility choices that the circuit court made based on the witnesses' testimony at the Rule 32 hearing.

The resolution of . . . factual issue[s] required the trial judge to weigh the credibility of the witnesses. His determination is entitled to great weight on appeal. . . . "When there is conflicting testimony as to a factual matter . . ., the question of the credibility of the witnesses is within the sound discretion of the trier of fact. His factual determinations are entitled to great weight and will not be disturbed unless clearly contrary to the evidence."

*Calhoun v. State*, 460 So.2d 268, 269-70 (Ala.Crim.App. 1984) (quoting *State v. Klar*, 400 So.2d 610, 613 (La. 1981)).

Jenkins's grandmother, Doris Wagoner, testified that she did talk

94

to Scofield about representing her grandson and to several other people, whom she could not identify, and that she was in constant communication with Jenkins before his trial. She also testified: "Mark never had a chance. He didn't have a home life. He was badly mistreated and then he left. I was told by others - this is hearsay. I didn't see it." (R. 254.) Wagoner testified that she didn't come to his trial because, "I don't know why. I'm a very busy person - and still today even at my age. I don't know why. When the attorney started asking me for money, I didn't feel I could come down here and hire attorneys and this sort of thing." (R. 259.) Last, on cross-examination, Wagoner testified that Jenkins's mother did not "want anything to do with Mark." (R. 261.) Her testimony shows that she did not witness any abuse. Wagoner also testified that she was not available to testify at Jenkins's trial.

Michael Jenkins, Jenkins's stepbrother, testified that Jenkins was frequently beaten by his stepfather. When questioned on cross-examination as to whether Jenkins had communicated with him about possibly testifying at his trial, the following occurred:

> Q [Assistant attorney general]: In your earlier testimony-I'm just trying to clarify some things. You seemed to indicate in a response to [Jenkins's attorney's] question that you thought Mark wrote you about testifying at his trial. Is that correct or are you not sure?
>
> A [Michael Jenkins]: Before we go any further, I would like to clarify for the record, if I can. I had a severe accident in 1983 and I have a problem thinking. That is why I can't remember. I had a cracked skull in three places. I think he did, yes.
>
> Q: And specifically one of his letters mentioned that he might need you to testify in his trial?
>
> A: Yes.
>
> Q: From that, would it appear you were back in contact

before he actually went to trial?

A: You are confusing me.

Q: You do recall you got a letter from him.

A: Yes.

Q: Were you still in California at the time?

A: Yes.

Q: You do recall there was some reference to you testifying at this trial?

A: From Mark?

Q: Yes.

A: Yes.

(R. 161-62.) From the above-quoted portion of Michael Jenkins's testimony it is clear why the circuit court gave Michael Jenkins's testimony little weight.

Jenkins's cousin, Tammy Pitts, testified that Jenkins had been abused and neglected 24 hours a day, 7 days a week and that out of the 20 years that she lived with Jenkins she reported Jenkins's situation to Child Protective Services on two occasions. Pitts stated that the first time they investigated and took no action and that the second time they did not come to the house.

Betty DeLavega, Jenkins's cousin, testified; however, she stated that she had been around Jenkins on only two occasions and that she had not seen him since he was 11 years old. The following occurred on cross-examination:

Q [Assistant attorney general]: How did you come to be here today? Were you contacted by [Jenkins's attorney]?

A: My aunt contacted me.

Q: Which aunt?

A: Doris, his grandmother.

Q: Doris Wagoner.

A: Yes.

Q: What did she tell you?

A: She told me what had happened and that Mark was on death row.

Q: So you didn't even know he had been convicted of anything?

A: No.

Q: What did she say - "He was on death row and what"

A: They was trying to get a hearing.

Q: For what reason?

A: To get him off death row.

(R. 241-42.) This witness had had very limited contact with Jenkins and could not testify about any extended and significant abuse he might have suffered.

Sharon Seal, a friend of Jenkins's, testified that Jenkins was very generous and that he had helped her family move from California to

97

Alabama. Seal also testified that Jenkins's attorneys did not contact her about her being a possible witness in the case. However, on cross-examination the following occurred:

> Q [Assistant attorney general]: Did you attend the trial of Mr. Jenkins?
>
> A [Seal]: I was told by Mark's lawyers that we were not allowed in the courthouse because we might be potential witnesses.
>
> Q: So you were a potential witness?
>
> A: He said we might be called on as potential witnesses.
>
> Q: So he did talk to you about being a witness in this case?
>
> A: To me directly, no.
>
> Q: You knew there was a possibility you might be called as a witness?
>
> A: Correct.
>
> Q: Who knew Mr. Jenkins better-you or your husband?
>
> A: My husband.
>
> Q: And your husband testified at the sentencing phase?
>
> A: Yes.

(R. 63-64.) Seal's husband did testify at the penalty phase of Jenkins's trial. His testimony was virtually identical to Sharon Seal's testimony at the Rule 32 hearing. FN.15.

> FN.15. Sharon and Lonnie Seal are described in the

98

presentence report as "part time local pastors for the United
Methodist Church."

The trial court made a finding after listening to and viewing all of
Jenkins's witnesses that none of the witnesses was credible and that they
had exaggerated the level of abuse that Jenkins had been exposed to when
he was child. This was based on contradictions in the witnesses' own
testimony and on the fact no medical or school records memorialized such
abuse. The circuit court noted that the school records were very detailed
and even referenced that Jenkins had suffered from a rash and gingivitis
but the circuit court found it hard to believe that the records made no
reference to any injuries that Jenkins had sustained as a child. The circuit
court's ruling is supported by the testimony at the Rule 32 hearing and is
consistent with the findings made by the probation officer in the
presentence report. The probation officer described the level of abuse as
"moderate."

> "A defense attorney is not required to investigate all
> leads, however, and 'there is no per se rule that evidence of
> a criminal defendant's trouble childhood must always be
> presented as mitigating evidence in the penalty phase of a
> capital case.'" *Bolender* [*v. Singletary* ], 16 F.3d [1547,] at
> 1557 [ (11th Cir. 1994) ] (footnote omitted)(quoting *Devier
> v. Zant*, 3 F.3d 1445, 1453 (11th Cir.1993), *cert. denied*,
> [513] U.S. [1161], 115 S.Ct. 1125, 130 L.Ed.2d 1087
> (1995)). "Indeed, '[c]ounsel has no absolute duty to present
> mitigating character evidence at all, and trial counsel's
> failure to present mitigating evidence is not per se
> ineffective assistance of counsel.'" *Bolender*, 16 F.3d at
> 1557 (citations omitted).

*Marek v. Singletary*, 62 F.3d at 1300.

Also, many courts have observed that evidence of child abuse can
be a "double-edged sword" because it cuts both ways; therefore, it may
be a strategic choice not to present this type of evidence. *See Kitchens v.
Johnson*, 190 F.3d 698, 705 (5th Cir. 1999) (evidence of childhood abuse

and alcoholism may be more effective than a plea for mercy, "[y]et, it is equally possible that such evidence would have only served to inflame the jury"); *Stanley v. Zant*, 697 F.2d 955, 969 (11th Cir. 1983) ("[M]itigation may be in the eye of the beholder."); *United States ex rel. Cloutier v. Mote*, (No. 00-C-5476, January 8, 2003) (N.D.Ill. 2003) (not published in F.Supp.2d) ("This court recognizes that some mitigation testimony contains material that a jury may consider as aggravating instead of mitigating."); *Johnson v. Cockrell*, 306 F.3d 249, 253 (5th Cir. 2002) (evidence of brain injury, abusive childhood, and drug and alcohol abuse was "double edged" because it would support a finding of future dangerousness). *See also* cases upholding the failure to present evidence of child abuse given the horrific facts surrounding the murder. *See Santellan v. Cockrell*, 271 F.3d 190, 198 (5th Cir. 2001)( "Considering . . . history in light of the horrific nature of this offense, a reasonable court could conclude that there was no substantial likelihood that the outcome of the punishment phase would have been altered by evidence that [the defendant] suffered organic brain damage."); *Callins v. Collins*, 998 F.2d 269, 279 (5th Cir. 1993) ("Some evidence of [the defendant's] good character already had been admitted through his mother; the wantonness of the murder and [the defendant's] violent escapades after it, however, swamped this evidence, and we believe it equally would have overwhelmed the minimal mitigating evidence that [the defendant] now argues should have been introduced at the capital sentencing phase."); *People v. Rodriguez*, 914 P.2d 230, 296 (Colo. 1996) ("Given the brutal circumstances surrounding the murder of [the victim] and the overwhelming evidence of aggravation against [the defendant], we are not persuaded that trial counsel's failure to present the proposed mitigating evidence of child abuse materially affected the imposition of [the defendant's] death sentence."). *See also Rompilla v. Horn*, 355 F.3d 233 (3d Cir. 2004); *Byram v. Ozmint*, 339 F.3d 203 (4th Cir. 2003); *Lovitt v. Warden*, 266 Va. 216, 585 S.E.2d 801 (2003).

It is apparent from the record of Jenkins's trial that Scofield thoroughly prepared for the guilt phase. However, Downey was in charge of the penalty phase. Because we do not have the benefit of Downey's testimony as to what occurred and why, we are left with examining the record of Jenkins's trial.

The record shows that in his opening statement in the penalty phase Downey detailed all of the statutory mitigating circumstances and informed the jury that it was not limited to considering the mitigating circumstances contained in the statute but that it could consider any mitigating evidence that had been presented. The trial court also instructed the jury that any evidence presented in the guilt phase could be considered in mitigation. One witness was called to testify in Jenkins's behalf at the penalty phase. FN.17. Lonnie Seal testified that he traveled from California to Alabama with Jenkins, that Jenkins was a very giving and generous person, that Jenkins lived with his family when they arrived in Alabama, that Jenkins obtained work before he did and that he would give his entire paycheck to Seal's family, and that Jenkins was very helpful with Seal's children. FN.18. In closing, Downey argued that according to his interpretation of the Bible the jury should be cautious when sentencing Jenkins because his conviction was based solely on circumstantial evidence. The record shows that counsel argued residual doubt and Jenkins's good character at the penalty phase.

> FN.17. It appears from a review of the record that another witness, who is not identified, was also scheduled to testify; however, this witness did not. Neither the identity of this witness nor the reason for this witness's not testifying is contained in the trial record. Nor was Scofield questioned about this at the Rule 32 hearing.

> However, the record of the Rule 32 hearing indicates that Jenkins had been talking with his grandmother about testifying at his trial but Jenkins later told his attorneys that she was not going to be able to attend the trial. (R. 396)

> FN.18. This was evidence that humanized Jenkins - evidence that has been classified as mitigation. *See Emerson v. Gramley*, 883 F. Supp. 225, 245 (N.D. Ill. 1995).

As we noted above, great effort was expended in preparing for the guilt phase.

A lawyer's time and effort in preparing to defend his client in the guilt phase of a capital case continues to count at the sentencing phase. Creating lingering doubt has been recognized as an effective strategy for avoiding the death penalty. We have written about it. *See, e.g., Stewart v. Dugger*, 877 F.2d 851, 855-56 (11th Cir. 1989). In addition, a comprehensive study on the opinions of jurors in capital cases concluded:

> "Residual doubt" over the defendant's guilt is the most powerful 'mitigating' fact. - [The study] suggests that the best thing a capital defendant can do to improve his chances of receiving a life sentence has nothing to do with mitigating evidence strictly speaking. The best thing he can do, all else being equal, is to raise doubt about his guilt.

Stephen P. Garvey, *Aggravation and Mitigation in Capital Cases: What do Jurors Think?*, 98 Colum.L.Rev. 1538, 1563 (1998) (footnotes omitted); *see* William S. Geimer & Jonathan Amsterdam, *Why Jurors Vote Life or Death: Operative Factors in Ten Florida Death Penalty Cases*, 15 Am.J.Crim.L. 1, 28 (1988) ("[t]he existence of some degree of doubt about the guilt of the accused was the most often recurring explanatory factor in the life recommendation cases studied."); *see also* Jennifer Treadway, Note, *"Residual Doubt" in Capital Sentencing: No Doubt it is an Appropriate Mitigating Factor*, 43 Case W. Res.L.Rev. 215 (1992). Furthermore, the American Law Institute, in a proposed model penal code, similarly recognized the importance of residual doubt in sentencing by including residual doubt as a mitigating circumstance. So, the efforts of Tarver's lawyer, during trial and sentencing, to create doubt about Tarver's guilt may not only have represented an adequate performance, but evidenced the most effective performance in defense to the death penalty.

*Tarver v. Hopper*, 169 F.3d 710, 715-16 (11th Cir. 1999).

Evidence was presented at the guilt phase that Jenkins had been drinking at the time of the murders. (One witness testified that she saw Jenkins drink three beers and four quarts of wine on the night Hogeland was murdered.) In closing argument in the guilt phase, Scofield vigorously argued that based on the amount of alcohol that Jenkins had consumed before the murder it was impossible for Jenkins to have formed the intent to kill. He argued that Jenkins left a friend's house between 1:30 a.m. and 2:00 a.m., that when he left the house he fell down a flight of stairs, got into an old car, and backed into another car. He argued that Jenkins would have had to go to the Rocky Ridge Shell gasoline station, the location where the red Mazda automobile that was linked to Hogeland's murder had been stolen, and get to the Omelet Shoppe by 2:00 a.m. FN.19. Also, there was evidence presented that Jenkins was 21 years of age at the time of the murder. (R. 1148.)

> FN.19. Scofield testified that his approach to this case was to create a reasonable doubt in the minds of the jurors.

The trial court in its sentencing order found that Jenkins had no significant history of prior criminal activity - he had two misdemeanor convictions - that he was 21 at the time of the murder, and that he did consume alcohol at the time of the murder although he was not so impaired that he could not appreciate the criminality of his conduct. FN.20. The trial court also considered the mitigation evidence of Jenkins's childhood contained in the presentence report and the presentence memorandum that was prepared by Scofield; however, it gave this evidence little weight. The trial court found that the aggravating circumstances - that the murder was committed during the course of a robbery and a kidnapping - outweighed the mitigating circumstances and warranted a sentence of death.

> FN.20. The trial court specifically stated the following regarding Jenkins's alcohol consumption before the murder:
>
> > The Court does find that there was evidence

103

that the defendant, at some time during the night of April 17 or morning of April 18 had consumed alcoholic beverage, but the Court does not find that at the time of the commission of the capital offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired. The defendant's conduct, at approximately 5:00 a.m. on [April 18] at the service station, and his conversation with the two . . . witnesses and his later recollection of the events that occurred surrounding the commission of the offense, would indicate that the defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was not substantially impaired to the extent as required in this mitigating circumstance.

We believe that Downey's decision to concentrate on reasonable doubt and to portray Jenkins as a good person was reasonable under the circumstances. Moreover, the evidence that Jenkins submits should have been introduced - his abusive childhood and the fact that that abuse made him a violent adult - would have been in direct conflict with the evidence presented. Every witness questioned about Jenkins's demeanor at the Rule 32 hearing stated that Jenkins was meek and mild. We cannot say that counsel's conduct fell outside the wide range of professional conduct. *See Strickland*.

Last, Jenkins cannot show any prejudice. As the United States Supreme Court recently stated in *Wiggins v. Smith*, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), when reviewing a claim of ineffective assistance of counsel at the penalty phase of a capital murder trial:

In *Strickland* [*v. Washington*, 466 U.S. 668 (1984)], we

104

made clear that, to establish prejudice, a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*, at 694, 104 S.Ct. 2052. In assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence.

539 U.S. at 534, 123 S.Ct. at 2542.

The circuit court stated the following in its order denying relief:

The Court notes that for the reasons that will follow, the evidence presented at the hearing would not have affected the sentence this Court would have imposed on Jenkins. The aggravating circumstances clearly outweighed any mitigation caused by Jenkins's "abusive childhood," below average intelligence, lack of criminal history, and his age. Jenkins kidnapped, robbed, and brutally murdered Tammy Hogeland. He then disposed of her nude body on the side of the interstate, leaving her to decompose beyond recognition. Death was the appropriate punishment in this case.

(C.R. 326.) We, like the circuit court, have independently reweighed the alleged mitigating evidence against the aggravating circumstances that were proven by the State. Given the aggravating circumstances that were proven by the State and the facts surrounding Hogeland's murder, we, like the circuit court, are confident that death was the appropriate punishment for Jenkins's actions.

*Jenkins*, 972 So. 2d at 137-48 (alterations in original)(footnote omitted).

### a.    Childhood and background

The majority of Jenkins's claims of ineffective assistance of counsel in the

penalty phase of his trial concern counsel's failure to investigate, present and/or develop evidence regarding his childhood and background. Specifically, Jenkins argues that counsel failed to investigate, present and/or develop evidence that Jenkins had an impoverished childhood; was developmentally impaired since birth; was profoundly rejected as a child; was physically abused and scapegoated; was sexually abused; was chronically isolated as a child; was degraded and humiliated as a child; suffered childhood trauma that impaired his development; had parents who were drug abusers; experienced extreme neglect; was mentally retarded, learning disabled, and had significant other cognitive deficits; suffered academic failures despite his diligent efforts; was forced to become homeless as a child and turned to drugs to numb his pain; lacked support and appropriate, positive influences; and was severely disturbed and depressed his entire life. He further alleges that counsel failed to investigate and present evidence that the crime was a total aberration; failed to collect and present historical records, including birth, education, juvenile court, social services, health, psychiatric, and incarceration records, supporting the existence of numerous mitigating factors, including those listed above; failed to introduce expert testimony; and failed to develop or present any theory of mitigation, much less an adequate one.

The Alabama Court of Criminal Appeals thoroughly addressed these claims, concluding that counsel's failure to present the evidence to the jury in the penalty phase

of the trial did not fall outside the wide range of professional conduct and that Jenkins

failed to establish that he suffered prejudice as a result of counsel's failure to present

the evidence. Because Jenkins has failed to show that he was prejudiced by counsel's

failure to present this evidence in the penalty phase, the court foregoes analysis of the

*Strickland* performance prong. This approach was suggested by the Supreme Court in

*Strickland* and has been followed by the Eleventh Circuit. As explained in *Lee v.*

*Comm'r, Ala. Dept. of Corrections*:

> In this case, we need not reach the performance prong because we are so
> readily convinced Lee has not shown the requisite prejudice. *Strickland*,
> 466 U.S. at 697, 104 S.Ct. at 2069 ("[A] court need not determine
> whether counsel's performance was deficient before examining the
> prejudice suffered by the defendant as a result of the alleged
> deficiencies."); *Frazier v. Bouchard*, 661 F.3d 519, 531-32 (11th Cir.
> 2011) (stating we "may decline to reach the performance prong of the
> ineffective assistance test if convinced that the prejudice prong cannot be
> satisfied" (internal quotation marks omitted)); *Windom v. Sec'y, Dep't of*
> *Corr.*, 578 F.3d 1227, 1248 (11th Cir. 2009) (per curiam); *Hall v. Head*,
> 310 F.3d 683, 699 (11th Cir. 2002). Indeed, the Supreme Court has said
> that "[t]he object of an ineffectiveness claim is not to grade counsel's
> performance" and consequently, "[i]f it is easier to dispose of an
> ineffectiveness claim on the ground of lack of sufficient prejudice, which
> we expect will often be so, that course should be followed." *Strickland*,
> 466 U.S. at 697, 104 S.Ct. at 2069.

*Lee*, 726 F.3d 1172, 1193 (11th Cir. 2013).

To establish prejudice, Jenkins must show that there is a reasonable probability

that, but for counsel's failure to present this evidence to the jury in the penalty phase,

he would have received a different sentence. *See Porter v. McCollum*, 558 U.S. 30, 41 (2009). As the Alabama Court of Criminal Appeals noted, "in assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigation evidence." *Jenkins*, 972 So. 2d at 148. This includes evidence presented in the post conviction proceedings, in addition to the trial.

The defense theory at trial was to create reasonable doubt in the minds of the jurors. The defense argued that given the amount of alcohol Jenkins consumed before the murder, he lacked the intent to kidnap, rob or kill the victim, and that given the short timeline of events that took place prior to the crime, it would have been difficult, if not impossible, for Jenkins to have committed the crimes. (*See* R. Vol. 18, Tab 12 at 1561-1599; R. Vol. 9 at 1600-03).[25]

The defense called only one witness in the penalty phase, Jenkins's friend Lonnie Seal. Seal testified that Jenkins was a good friend, who was helpful, generous, and kind, and that he trusted Jenkins with his wife and baby; evidence tending to humanize Jenkins and portray him in a sympathetic light. (R. Vol. 9, Tab 19 at 1718-27). Jenkins contends that counsel should have introduced evidence of Jenkins's deprived, abusive childhood, and mental deficiencies. However, this evidence could have been a "double-

---

[25] Jenkins's trial attorney, Doug Scofield, testified at the Rule 32 evidentiary hearing that his approach to the case was to create a reasonable doubt in the minds of the jury with regard to identification and opportunity. (Rule 32 R. Vol. 21 at 307, 380-82).

edged sword," undermining defense counsel's residual doubt theory, by portraying Jenkins as someone more likely to have committed the crimes due to his less than ideal upbringing. Further, the Eleventh Circuit Court of Appeals has noted that "residual doubt is perhaps the most effective strategy to employ at sentencing." *Chandler v. United States*, 218 F.3d 1305, 1320 n.28 (citing *Tarver v. Hopper*, 169 F.3d 710, 715-16 (11th Cir. 1999)).

> [F]ocusing on acquittal at trial and then on residual doubt at sentencing (instead of other forms of mitigation) can be reasonable. Especially when—as in this case—the evidence of guilt was not overwhelming, we expect that petitioners can rarely (if ever) prove a lawyer to be ineffective for relying on this seemingly reasonable strategy to defend his client.

*Id*. at 1320 (citing *Tarver*, 159 F.3d at 715-16).

In accordance with *Strickland*, the Alabama Court of Criminal Appeals "independently reweighed the alleged mitigating evidence against the aggravating circumstances that were proven by the State." *Jenkins*, 972 So. 2d at 148. The state court found that "[g]iven the aggravating circumstances that were proven by the State and the facts surrounding Hogeland's murder, we, like the circuit court, are confident that death was the appropriate punishment for Jenkins's actions." *Id*. The state appellate court's finding that Jenkins was not prejudiced by counsel's failure to investigate and present this evidence in the penalty phase of the trial is not contrary to or an unreasonable application of *Strickland*, nor was it based upon an unreasonable

determination of the facts.

### b.    Age at the time of the offense; lack of significant criminal history; and severe intoxication

Jenkins faults counsel for failing to present to the jury several "simple facts" that he claims would have established "compelling statutorily mitigating" factors under Alabama law: his age at the time of the offense; his lack of significant criminal history; and his "severe" intoxication on the night of the offense. (Doc. 48 at 46-47). Alabama law provides:

> Mitigating circumstances shall include, but not be limited to, the following:
>
> (1) The defendant has no significant history of prior criminal activity;
>
> (2) The capital offense was committed while the defendant was under the influence of extreme mental or emotional disturbance;
>
> (3) The victim was a participant in the defendant's conduct or consented to it;
>
> (4) The defendant was an accomplice in the capital offense committed by another person and his participation was relatively minor;
>
> (5) The defendant acted under extreme duress or under the substantial domination of another person;
>
> (6) The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired; and
>
> (7) The age of the defendant at the time of the crime.

Ala. Code § 13A-5-51.

Jenkins was twenty-one years old in April, 1989, when he committed the murder.[26] Jenkins maintains that instead of preparing to prove this mitigating factor at the penalty phase of the trial, "counsel called a single witness who he asked to guess Mr. Jenkins's age." (Doc. 12 at 47). He adds that "[u]nfortunately for Mr. Jenkins, the witness guessed wrong, stating 'I guess twenty-five,' leaving the jury with the erroneous impression that he was significantly older and thus, negating any benefit of this statutory mitigating circumstance." (*Id.*).[27] Jenkins concludes that the "evidence from the Rule 32 hearing shows that counsel had not taken the minimal step of

---

[26] Jenkins was born on September 13, 1967. (Rule 32 C.R. Vol 19 at 474).

[27] Mr. Downey questioned the witness, Lonnie Seal, as follows:

> Q. Mr. Seal, let me ask you one more question. Do you know how old Mark is at this time?
>
> A. The same age as my wife. I'm not sure.
>
> MR. DAVIS: I object to any other speculation.
>
> A. I guess twenty-five.
>
> THE COURT: How much?
>
> Q. Well, you just don't know how old?
>
> A. No, sir, I don't know how old he is.

(R. Vol. 9, Tab 15 at 1726-27).

adequately preparing this witness to testify."[28] (Doc. 12 at 47).

Jenkins further alleges that despite the fact that he "did not have a significant history of prior criminal conduct" (doc. 12 at 48), counsel failed to present this "simple fact and argument that would have established another statutorily mitigating factor." (Doc. 48 at 47). Jenkins argues that counsel admitted at the Rule 32 hearing that this potentially mitigating circumstance was not presented to the jury, and counsel's failure

---

[28] Jenkins cites page 327 of the transcript of the Rule 32 hearing in support of his conclusion. On that page, the following transpired between Mr. Scofield and Jenkins's Rule 32 counsel:

> A. Mr. Downey approached me and suggested that I might wish to examine Lonnie Seals during the sentencing phase. He stated, "You probably know more about what he would say. Why don't you just put him on the stand?"

> Q. To your knowledge, did Mr. Downey ever interview Lonnie Seals prior to that date?

> A. It is my understanding at that time, that he had not. I responded to him, when he suggested that, I said, "The only reason - -

> [THE STATE]: I object, Your Honor. There is no question.

> THE COURT: Wait for a question.

> Q. What was your position with regard to Mr. Downey's request that you do the direct examination?

> A. I told him that he needed to put Mr. Seals on. That is what we agreed to – he would be handling that phase. I also instructed him and what I said was, "The only reason that I know more about what he is going to say is because I have taken the time to talk to him. Go downstairs and talk to him, interview him, and get him ready to put on."

(Rule 32 R. Vol. 21 at 327-28).

to investigate Jenkins's criminal record was not strategic.[29]

Finally, Jenkins contends that counsel "for the third time failed at presenting to the jury another simple fact and argument that would have established another compelling statutorily mitigating factor under Alabama law – Mr. Jenkins's intoxication at the time of the crime." (Doc. 48 at 48). Jenkins claims that "[w]hile evidence of Mr. Jenkins's severe intoxication was introduced during the guilt phase of his capital trial – and provided the basis for trial counsel's inconsistent closing argument – counsel failed to utilize this evidence as a basis for saving their client during the penalty phase." (Doc. 12 at 49).

The state maintains that when Jenkins raised these claims on appeal from the denial of his Rule 32 petition, the Alabama Court of Criminal Appeals denied them claims on the merits. (Doc. 20 at 36-41). It further asserts that Jenkins cannot show that the state court's decision resulted in a decision that was contrary to or involved an unreasonable application of clearly established Federal law, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court hearing. (*Id.*).

Jenkins disputes this contention. First, he argues that the state court failed to

---

[29] At the Rule 32 evidentiary hearing, Scofield testified that his failure to call witnesses at the penalty phase of trial or to seek records was not strategic. (Rule 32 R. Vol. 21 at 323).

adjudicate the claims concerning his age and lack of prior criminal history. (Doc. 48 at

46-48). With respect to the claim concerning counsel's failure to present evidence of

his age at the time of the crime, Jenkins argues that "the state court simply noted that

there was evidence at the Rule 32 evidentiary hearing that Mr. Jenkins was twenty-one

years old at the time of the crime, and failed to mention the relevance of that fact again

or otherwise adjudicate the claim. *Jenkins II*, 972 So. 2d at 147)." (Doc. 48 at 47).

Jenkins is incorrect. In context, the quote Jenkins cites reads as follows:

> Evidence was presented at the guilt phase that Jenkins had been
> drinking at the time of the murders. (One witness testified that she saw
> Jenkins drink three beers and four quarts of wine on the night Hogeland
> was murdered.) In closing argument in the guilt phase, Scofield vigorously
> argued that based on the amount of alcohol that Jenkins had consumed
> before the murder it was impossible for Jenkins to have formed the intent
> to kill. He argued that Jenkins left a friend's house between 1:30 a.m. and
> 2:00 a.m., that when he left the house he fell down a flight of stairs, got
> into an old car, and backed into another car. He argued that Jenkins would
> have had to go to the Rocky Ridge Shell gasoline station, the location
> where the red Mazda automobile that was linked to Hogeland's murder
> had been stolen, and get to the Omelet Shoppe by 2:00 a.m. FN.19. Also,
> there was evidence presented that Jenkins was 21 years of age at the time
> of the murder. (R. 1148.)

> > FN.19. Scofield testified that his approach to this case was
> > to create a reasonable doubt in the minds of the jurors.

*Jenkins*, 972 So. 2d at 146-47. The Alabama Court of Criminal Appeals was

referencing the evidence presented at the *guilt* phase of the trial, not at the Rule 32

evidentiary hearing. Further, appellate court cited page 1148 of the *trial* transcript in

support of its statement that "there was evidence presented that Jenkins was 21 years of age at the time of the murder." On that page, Sergeant Mark White of the Los Angeles County Sheriff's department, who interviewed Jenkins while he was incarcerated in the Los Angeles County jail, read the following from the notes he took during the interview: "The suspect is Mark Allen Jenkins, male, white, 21, d/o/b of 9/13/67 in custody." (R. Vol. 6 at 1148). As discussed more fully below, the Alabama Court of Criminal Appeals clearly addressed the claim that counsel were ineffective for failing to argue Jenkins's age as a mitigating factor in the penalty phase of the trial.

Jenkins further argues, with respect to his claim that counsel failed to present evidence that he lacked a significant criminal history, that instead of adjudicating this claim on the merits, the Alabama Court of Criminal Appeals "simply noted that the trial court 'in its sentencing,' found that Mr. Jenkins had no significant history of prior criminal activity," but "failed to mention the relevance of that fact again or otherwise adjudicate the claim." (Doc. 48 at 47). However, a review of the opinion of the Alabama Court of Criminal Appeals, as set out below, reveals that the court did in fact adjudicate this claim.

Finally, Jenkins argues that the state court's adjudication of his claim that counsel failed to present evidence of his "severe intoxication" to the jury at the penalty phase, resulted in a decision that was contrary to, and involved an unreasonable

application of, clearly established Federal law, and that it was based upon an unreasonable determination of the facts. (Doc. 12 at 49).

Both the Rule 32 court and the Alabama Court of Criminal Appeals addressed Jenkins's claims concerning counsel's failure to argue these statutory mitigating circumstances, and found them to be without merit. (Rule 32 C.R. Vol. 45, Tab 77 at 341-42); *Jenkins*, 972 So. 2d at 145-48. In denying the claims, the Alabama Court of Criminal Appeals found:

> It is apparent from the record of Jenkins's trial that Scofield thoroughly prepared for the guilt phase. However, Downey was in charge of the penalty phase. Because we do not have the benefit of Downey's testimony as to what occurred and why, we are left with examining the record of Jenkins's trial.
>
> The record shows that in his opening statement in the penalty phase Downey detailed all of the statutory mitigating circumstances and informed the jury that it was not limited to considering the mitigating circumstances contained in the statute but that it could consider any mitigating evidence that had been presented. The trial court also instructed the jury that any evidence presented in the guilt phase could be considered in mitigation. One witness was called to testify in Jenkins's behalf at the penalty phase. FN.17. Lonnie Seal testified that he traveled from California to Alabama with Jenkins, that Jenkins was a very giving and generous person, that Jenkins lived with his family when they arrived in Alabama, that Jenkins obtained work before he did and that he would give his entire paycheck to Seal's family, and that Jenkins was very helpful with Seal's children. FN.18. In closing, Downey argued that according to his interpretation of the Bible the jury should be cautious when sentencing Jenkins because his conviction was based solely on circumstantial evidence. The record shows that counsel argued residual doubt and Jenkins's good character at the penalty phase.

FN.17. It appears from a review of the record that another witness, who is not identified, was also scheduled to testify; however, this witness did not. Neither the identity of this witness nor the reason for this witness's not testifying is contained in the trial record. Nor was Scofield questioned about this at the Rule 32 hearing.

However, the record of the Rule 32 hearing indicates that Jenkins had been talking with his grandmother about testifying at his trial but Jenkins later told his attorneys that she was not going to be able to attend the trial. (R. 396)

FN.18. This was evidence that humanized Jenkins - evidence that has been classified as mitigation. *See Emerson v. Gramley*, 883 F. Supp. 225, 245 (N.D. Ill. 1995).

As we noted above, great effort was expended in preparing for the guilt phase.

A lawyer's time and effort in preparing to defend his client in the guilt phase of a capital case continues to count at the sentencing phase. Creating lingering doubt has been recognized as an effective strategy for avoiding the death penalty. We have written about it. *See, e.g., Stewart v. Dugger*, 877 F.2d 851, 855-56 (11th Cir. 1989). In addition, a comprehensive study on the opinions of jurors in capital cases concluded:

> "Residual doubt" over the defendant's guilt is the most powerful 'mitigating' fact. - [The study] suggests that the best thing a capital defendant can do to improve his chances of receiving a life sentence has nothing to do with mitigating evidence strictly speaking. The best thing he can do, all else being equal, is to raise doubt about his guilt.

117

> Stephen P. Garvey, *Aggravation and Mitigation in Capital Cases: What do Jurors Think?*, 98 Colum.L.Rev. 1538, 1563 (1998) (footnotes omitted); *see* William S. Geimer & Jonathan Amsterdam, *Why Jurors Vote Life or Death: Operative Factors in Ten Florida Death Penalty Cases*, 15 Am.J.Crim.L. 1, 28 (1988) ("[t]he existence of some degree of doubt about the guilt of the accused was the most often recurring explanatory factor in the life recommendation cases studied."); *see also* Jennifer Treadway, Note, *"Residual Doubt" in Capital Sentencing: No Doubt it is an Appropriate Mitigating Factor*, 43 Case W. Res.L.Rev. 215 (1992). Furthermore, the American Law Institute, in a proposed model penal code, similarly recognized the importance of residual doubt in sentencing by including residual doubt as a mitigating circumstance. So, the efforts of Tarver's lawyer, during trial and sentencing, to create doubt about Tarver's guilt may not only have represented an adequate performance, but evidenced the most effective performance in defense to the death penalty.

*Tarver v. Hopper*, 169 F.3d 710, 715-16 (11th Cir. 1999).

Evidence was presented at the guilt phase that Jenkins had been drinking at the time of the murders. (One witness testified that she saw Jenkins drink three beers and four quarts of wine on the night Hogeland was murdered.) In closing argument in the guilt phase, Scofield vigorously argued that based on the amount of alcohol that Jenkins had consumed before the murder it was impossible for Jenkins to have formed the intent to kill. He argued that Jenkins left a friend's house between 1:30 a.m. and 2:00 a.m., that when he left the house he fell down a flight of stairs, got into an old car, and backed into another car. He argued that Jenkins would have had to go to the Rocky Ridge Shell gasoline station, the location where the red Mazda automobile that was linked to Hogeland's murder had been stolen, and get to the Omelet Shoppe by 2:00 a.m. FN.19. Also, there was evidence presented that Jenkins was 21 years of age at the time of the murder. (R. 1148.)

FN.19. Scofield testified that his approach to this case was to create a reasonable doubt in the minds of the jurors.

The trial court in its sentencing order found that Jenkins had no significant history of prior criminal activity - he had two misdemeanor convictions - that he was 21 at the time of the murder, and that he did consume alcohol at the time of the murder although he was not so impaired that he could not appreciate the criminality of his conduct. FN.20. The trial court also considered the mitigation evidence of Jenkins's childhood contained in the presentence report and the presentence memorandum that was prepared by Scofield; however, it gave this evidence little weight. The trial court found that the aggravating circumstances - that the murder was committed during the course of a robbery and a kidnapping - outweighed the mitigating circumstances and warranted a sentence of death.

FN.20. The trial court specifically stated the following regarding Jenkins's alcohol consumption before the murder:

The Court does find that there was evidence that the defendant, at some time during the night of April 17 or morning of April 18 had consumed alcoholic beverage, but the Court does not find that at the time of the commission of the capital offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired. The defendant's conduct, at approximately 5:00 a.m. on [April 18] at the service station, and his conversation with the two . . . witnesses and his later recollection of the events that occurred surrounding the commission of the offense, would indicate that the defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was not

> substantially impaired to the extent as required
> in this mitigating circumstance.

We believe that Downey's decision to concentrate on reasonable doubt and to portray Jenkins as a good person was reasonable under the circumstances. Moreover, the evidence that Jenkins submits should have been introduced - his abusive childhood and the fact that that abuse made him a violent adult - would have been in direct conflict with the evidence presented. Every witness questioned about Jenkins's demeanor at the Rule 32 hearing stated that Jenkins was meek and mild. We cannot say that counsel's conduct fell outside the wide range of professional conduct. *See Strickland.*

Last, Jenkins cannot show any prejudice. As the United States Supreme Court recently stated in *Wiggins v. Smith*, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), when reviewing a claim of ineffective assistance of counsel at the penalty phase of a capital murder trial:

> In *Strickland* [*v. Washington*, 466 U.S. 668 (1984)], we made clear that, to establish prejudice, a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*, at 694, 104 S.Ct. 2052. In assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence.

539 U.S. at 534, 123 S.Ct. at 2542.

The circuit court stated the following in its order denying relief:

> The Court notes that for the reasons that will follow, the evidence presented at the hearing would not have affected the sentence this Court would have imposed on Jenkins. The aggravating circumstances clearly outweighed

120

> any mitigation caused by Jenkins's "abusive childhood,"
> below average intelligence, lack of criminal history, and his
> age. Jenkins kidnapped, robbed, and brutally murdered
> Tammy Hogeland. He then disposed of her nude body on
> the side of the interstate, leaving her to decompose beyond
> recognition. Death was the appropriate punishment in this
> case.
>
> (C.R. 326.) We, like the circuit court, have independently reweighed the
> alleged mitigating evidence against the aggravating circumstances that
> were proven by the State. Given the aggravating circumstances that were
> proven by the State and the facts surrounding Hogeland's murder, we,
> like the circuit court, are confident that death was the appropriate
> punishment for Jenkins's actions.

*Jenkins*, 972 So. 2d 111 at 145-48.

Again, because it is clear that Jenkins cannot show that he was prejudiced by counsel's failure to present to the jury in the penalty phase, evidence concerning his age at the time of the offense, his lack of criminal history, and his intoxication at the time of the crime, the court will address only the prejudice prong of *Strickland*. To establish prejudice, Jenkins must show that there is a reasonable probability that, but for counsel's failure to present to the jury in the penalty phase, evidence concerning his age at the time of the offense, his lack of criminal history, and his intoxication at the time of the crime, he would have received a different sentence. *See Porter v. McCollum*, 558 U.S. at 41.

During the penalty phase of the trial, defense counsel argued the following in his

opening statement:

> The Alabama Code sets out mitigating circumstances. I would like to
> hasten to add, though, that you are not limited to what the Code says that
> you may consider when you think about mitigating circumstances. This
> is in the Alabama Code 13A-5-51: mitigating circumstance generally.
> Mitigating circumstances shall include, but not be limited to the following:
> the defendant has no significant history of prior criminal activity. Two, the
> capital offense was committed while the defendant was under the
> influence of extreme mental or emotional disturbance. Three the victim
> was a participant in the defendant's conduct or consented to it. Four, the
> defendant was an accomplish [sic] in the capital offense committed by
> another person, and his participation was relatively minor. Five, the
> defendant acted under extreme duress or under the substantial domination
> of another person. Six, the capacity of the defendant to appreciate the
> criminality of his conduct or to conform his conduct to the requirements
> of the law was substantially impaired. And last, the age of the defendant
> at the time of the crime.

(R. Vol. 9, Tab 15 at 1710-11). Further, the court instructed the jury as follows in the

penalty phase:

> Each side may also rely in whole or in part on the evidence presented at
> the first stage of the trial, and that's the guilt stage . . . . In other words,
> you can consider the evidence presented in that trial insofar as the
> evidence relating to the aggravating and mitigating circumstances.

(*Id*. at 1703).

> Now, then, the mitigating circumstances that the defendant might present
> to the jury, there are seven of those, and I'll read all of those to you.
> Mitigating circumstances shall include but not be limited to the following.
> The defendant has – now this is a matter of proof. I'm not saying this is
> in existence or not in existence. It's just the mitigating circumstances that
> the defendant can present to the jury for your consideration. The
> defendant has no significant history of prior criminal activity. Number

two, the capital offense was committed while the defendant was under the influence of extreme mental or emotional disturbance. Number three, the victim was a participant in the defendant's conduct or consented to it. Number four, the defendant was an accomplice in the capital offense committed by another person, and his participation was relatively minor. The defendant acted under extreme or under the substantial domination of another person. The capacity of a defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired. The age – number seven, the age of the defendant at the time of the crime. Now, I told you that at the beginning of that. The defendant also in addition to these could offer any evidence to any other mitigating circumstances that would be material to this case. And you do not have to find that those exist beyond a reasonable doubt as I told you while ago.

(*Id*. at 1715-17).

And then even though the defendant has not specifically enumerated what mitigating circumstances he is relying on, I gave you all seven of those for your consideration. And at that time I also told you that you could consider any other mitigating circumstances that you might find have a bearing on your sentence in this case.

(*Id*. at 1739-40).

In making your determination in concerning the existence of aggravating or mitigating circumstances, you should consider the evidence presented at this sentencing hearing. You should also consider any evidence that was presented during the guilt stage of the trial that is relevant to the existence of any aggravating or mitigating circumstances.

(*Id*. at 1742).

Now, I have already read to you . . . the mitigating circumstances that you might consider. There are seven of them. And if there are other mitigating circumstances that are not enumerated in the Code section, you have a right to consider that also in reaching your decision as to punishment. I

123

have read you all of the seven mitigating circumstances set out in the Code. And I have instructed you that you may consider all seven of those whether they exist or not. A mitigating circumstances [sic] considered by you should be based on the evidence you have heard. When the factual existence of an offered mitigating circumstance is in dispute, the State shall have the burden of disproving the facts that exist of that circumstance by a preponderance of the evidence. The burden of disproving it by a preponderance of the evidence means that you are to consider that the mitigating circumstance does exist unless the evidence as a whole [sic] it is more likely than not the mitigating circumstances does [sic] not exist. Therefore, if there is a factual dispute over the existence of a mitigating circumstances [sic], then you should find and consider the mitigating circumstances does [sic] exist unless you find the evidence from the evidence [sic] that it is more likely than not that the mitigating circumstance did not exist.

(*Id*. at 1747-48).

The mitigating circumstances which are set out in the Code, and it is [sic] as follows. Mitigating circumstances shall include, but not be limited to the following. No. 1, the defendant has no significant history of a prior criminal activity. The capital offense was committed while the defendant was under influence of extreme mental or emotional distress. The victim was a participant in the defendant's conduct or consented to it. The defendant was an accomplice to the capital offense committed by another person, and his participation was relatively minor. The defendant acted under extreme duress and under the substantial domination of another person. The capacity of the defendant to appreciate the criminality of his conduct, or to conform his conduct to the requirements of law was impaired. And the age of the defendant at the time of the crime. Then, of course, that also starts off saying, this is not the only one I told you two or three times, that if there were any other mitigating circumstances that was [sic] offered, that you could consider that, if any other offered.

(*Id*. at 1759-60).

The jury was provided with a list of statutory mitigating circumstances several

124

times, advised that they should also consider any other mitigating circumstance not specifically listed, and instructed to should consider any evidence presented during the guilt phase of the trial, to the extent it was relevant to the existence of any aggravating or mitigating circumstances. Further, the court specifically advised the jury that although Jenkins had not stated which of the statutory mitigating circumstances he was relying on, they were required consider each of the statutory mitigating circumstances set out by the court, as well as any others that might have a bearing on the sentence.

There was evidence presented at the guilt phase of the trial that Jenkins was only twenty-one years old and that he was drinking or intoxicated on the night of the murder. (R. Vol. 4 at 633; R. Vol. 5 at 960, 969-70; R. Vol. 6 at 1148, 1156). In the closing argument during the guilt phase of the trial, defense counsel placed great emphasis on the fact that Jenkins was intoxicated on the night of the crime. (R. Vol. 8, Tab 12 at 1567, 1570, 1572, 1598, 1601-02). In its closing argument during the penalty phase of the trial, the state pointed out that although there had been mention of Jenkins's age, the jury should also consider the victim's age. (R. Vol. 9, Tab 15 at 1734). Further, there was no evidence or argument that Jenkins had any prior criminal history.

The jury clearly had before it, evidence concerning Jenkins's age and intoxication at the time of the crime, as well as no evidence that Jenkins had a prior criminal record. As instructed by the court, the jury was required to consider these

mitigating factors in reaching its decision. Thus, there is not a reasonable probability that Jenkins would have received a sentence of life without parole, even if counsel had specifically presented evidence of Jenkins's age, intoxication and lack of criminal history, during the penalty phase before the jury.[30] The Alabama Court of Criminal Appeals' finding that Jenkins cannot show any prejudice was not patently unreasonable.

### c.   Model behavior and positive adjustment to pretrial incarceration

Jenkins argues that counsel's failure to investigate and present evidence that he was a model inmate who made a positive adjustment to pretrial incarceration "undoubtably impacted his trial, and deprived [him] of his right to the effective assistance of trial" counsel. (Doc. 12 at 51-52). Jenkins alleges that:

> trial counsel did not even take the time to walk across the street to interview the jailers who supervised Mr. Jenkins for the two years of his pretrial detention. If they had taken even this minimal step they would have readily learned that Mr. Jenkins was, in terms of the Rule 32 court, an "absolutely model prisoner," and inmate who never complained, was respectful, polite and courteous and someone who always prefaced their remarks with "yes, sir," and "no, sir." (R2 at 19-24.) According Chief Jailer Bonnie Adams, who had worked at the St. Clair County Jail much of his adult life, Mr. Jenkins was a model inmate, "the very best I have ever supervised." (R2 at 26.)

---

[30] Additionally, the court notes that, in its sentencing order, the trial court specifically considered each of these mitigating factors, discounting the evidence of Jenkins's intoxication, before imposing the death sentence on Jenkins.

Virginia Price, a second correctional officer from the St. Clair County Jail testified at the Rule 32 hearing and agreed with Mr. Adams assessment of Mr. Jenkins, and characterized him as "one of the best" inmates she supervised in her correctional career. (R2 at 40.) In addition to being respectful, polite and courteous, and said she never heard Mr. Jenkins use a cross word or engage in backtalk. (R2 at 39-41.) Both officers testified that Mr. Jenkins never engaged in misconduct, never had a fight, never observed him make a threat and never had any other problems. The correctional officers also testified that no one from the defense ever interviewed them prior to Mr. Jenkins trial, but if they had, they would have given the same testimony. (R2 at 26-27, 41-42.)

In addition to the testimony of two jail guards, Mr. Jenkins introduced documentary evidence showing that during his pretrial detention he was a model of good behavior. (R3 at 545-714.) The hundreds of pages of documents, including progress notes memorializing the observations of dozens of mental health care workers, demonstrate Mr. Jenkins had no disciplinary problems, never engaged in misconduct, and was universally considered cooperative and polite. (*See, e.g.*, R3 at 601-46, 663-72.) The State has never offered any evidence or argument to rebut this compelling evidence, either at the Rule 32 hearing or elsewhere. Indeed, its own mental health expert testified Mr. Jenkins had made a positive adjustment to incarceration.

(Doc. 12 at 50-51).

Jenkins cites *Skipper v. South Carolina*, 476 U.S. 1, 6 (1986) in support of this

claim. He argues that:

The *Skipper* Court emphasized the special significance of objective sources – such as state-employed jail guards - of an inmate's pretrial conduct. "The testimony of more disinterested witnesses – and in particular, of jailers who would have had no particular reason to be favorably predisposed toward one of their charges – would quite naturally be given much greater weight by the jury." 476 U.S. at 8 (emphasis added). Where such objective indicia of a defendant's adjustment exists,

as in Mr. Jenkins's case it is "reasonably likely that the exclusion of evidence bearing on [the defendant's] behavior in jail . . . may have affected the jury's decision to impose the death sentence. Thus, under any standard, the exclusion of the evidence was sufficiently prejudicial to constitute reversible error." 476 U.S. at 8 (emphasis added).

Counsel's failure to investigate and present this undisputed evidence undoubtably impacted his trial, and deprived Mr. Jenkins of his right to the effective assistance of trial.

(Doc. 12 at 52).

The Alabama Court of Criminal Appeals denied the claim on the merits:

Jenkins argues that his trial counsel was ineffective for failing to investigate and introduce evidence of his good conduct while he was incarcerated in the county jail awaiting trial. At the Rule 32 hearing, Jenkins presented the testimony of two jailers who worked in the St. Clair County jail where Jenkins was housed for 18 months before he was tried. The two jailers stated that Jenkins was polite, courteous, and respectful and that he never complained.

The circuit court, when considering this issue, stated:

The inconsistencies in the different theories of mitigation presented through Sharon Seal's testimony is also true concerning the testimony of the two St. Clair County jailers who testified. Both jailers testified that Jenkins was an absolute model prisoner who was always courteous and respectful. Again, the Court finds this to be inconsistent with the theory that the abuse Jenkins allegedly suffered as a child caused him to commit violence as an adult. Additionally, the Court notes that the behavior observed by the jailers occurred after the crime. The observation also took place during time when Jenkins was confined alone to a prison cell, directly across from the guard desk. The Court finds nothing in the testimony of the jailers which mitigates

128

Jenkins's crime.

(C.R. 331.) Jenkins argues that the circuit court's findings are inconsistent with the United States Supreme Court's holding in *Skipper v. South Carolina*, 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986), because, he argues, a court must consider this type of evidence to be mitigating evidence.

The United States Supreme Court in *Skipper* held that evidence of Skipper's good behavior in prison was improperly excluded from the penalty phase of his capital trial after the State had introduced evidence of his assaultive behavior. The trial court refused to allow two jailers and one regular jail visitor to testify about Skipper's good behavior and his good adjustment to prison life. In reversing the lower court's ruling, the Supreme Court stated, "[E]vidence that the defendant would not pose a danger if spared (but incarcerated) must be considered potentially mitigating." 476 U.S. at 5, 106 S.Ct. 1669. Since *Skipper*, the United States Supreme Court has stated that its holding in *Skipper* was founded on due-process considerations. In *Simmons v. South Carolina*, 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994), the United States Supreme Court stated:

> In *Skipper v. South Carolina*, 476 U.S. 1 (1986), this Court held that a defendant was denied due process by the refusal of the state trial court to admit evidence of the defendant's good behavior in prison in the penalty phase of his capital trial. Although the majority opinion stressed that the defendant's good behavior in prison was "relevant evidence in mitigation of punishment," and thus admissible under the Eighth Amendment, *Id.*, at 4, citing *Lockett v. Ohio*, 438 U.S. [586], at 604 [ (1978) ] (plurality opinion), the *Skipper* opinion expressly noted that the Court's conclusion also was compelled by the Due Process Clause. The Court explained that where the prosecution relies on a prediction of future dangerousness in requesting the death penalty, elemental due process principles operate to require admission of the defendant's relevant evidence in rebuttal.

129

> 476 U.S., at 5, n. 1. *See also Id.*, at 9 (Powell, J., opinion
> concurring in judgment) ("[B]ecause petitioner was not
> allowed to rebut evidence and argument used against him,"
> the defendant clearly was denied due process)."

512 U.S. at 164, 114 S.Ct. 2187. Good conduct during pretrial
incarceration is not necessarily a mitigating circumstance. *State v. Spears*,
184 Ariz. 277, 279, 908 P.2d 1062 (1996). Whether potentially mitigating
evidence mitigates the offense is for the trial court to determine. *See Ex
parte Ferguson*, 814 So.2d 970 (Ala. 2001). "While *Lockett* and its
progeny require consideration of all evidence submitted as mitigation,
whether the evidence is actually found to be mitigating is in the discretion
of the sentencing authority." *Ex parte Slaton*, 680 So.2d 909, 924 (Ala.
1996), quoting *Bankhead v. State*, 585 So.2d 97, 108 (Ala.Crim.App.
1989).

Jenkins argues that his counsel was ineffective for failing to
investigate and present evidence of his good conduct while he was
incarcerated and awaiting trial. In order to show that counsel was
ineffective, the petitioner must satisfy the two-pronged test articulated in
*Strickland v. Washington*. The petitioner must show that counsel's
performance was deficient and that he was prejudiced by the deficient
performance. Here, neither attorney was questioned about this issue -
there is no explanation in the record as to whether counsel was in
possession of this information, and, if so, why this evidence was not
presented as potential mitigation at the penalty phase. Therefore, Jenkins
failed to meet his burden of proof.

Moreover, evidence of Jenkins's conduct while in jail awaiting trial
was at most "minimally mitigating." *State v. Spears*, supra. A defendant
facing trial on capital charges is more likely to be well-behaved in prison
than an individual who has already been convicted of a capital offense and
has no incentive to cooperate with his jailers. Also, as the trial court noted
the good conduct exhibited by Jenkins was when Jenkins was alone in a
cell that was located directly across from a guard desk. We are confident
that had this information been presented to the jury it would have had no
impact on the jury's recommendation of death in this case.

*Jenkins*, 972 So. 2d at 148-49 (alterations in original). Jenkins argues that the decision that "such compelling evidence was not mitigating is clearly unreasonable." (Doc. 48 at 49).

In *Skipper v. South Carolina*, 476 U.S. 1 (1986), the Supreme Court "held that a defendant was denied due process by the refusal of the state trial court to admit evidence of the defendant's good behavior in prison in the penalty phase of his capital trial." *Simmons v. South Carolina*, 512 U.S. 154, 164 (1994). In *Skipper*, the state introduced as evidence in aggravation of the offense, Skipper's history of sexually assaultive behavior, arguing in closing arguments that Skipper would pose disciplinary problems in prison if he was not sentenced to death. *Skipper*, 476 U.S. at 2-3. The Court pointed out that evidence of Skipper's possible future conduct in prison was relevant in light of the "prosecutor's closing argument, which urged the jury to return a sentence of death in part because [Skipper] could not be trusted to behave if he were simply returned to prison." *Id*. at 5, n.1. The Court explained that "where the prosecution specifically relies on a prediction of future dangerousness in requesting the death penalty, elemental due process principles operate to require admission of the defendant's relevant evidence in rebuttal." *Simmons*, 512 U.S. at 164 (citing *Skipper*, 476 U.S. at 5, n.1).

In Jenkins's case, his potential future dangerousness in prison was not suggested

131

as an aggravating factor. In fact, the only aggravating factors argued by the prosecution were that the murder was committed during the course of robbery and during a kidnapping. Jenkins's good behavior during pretrial incarceration could not have been mitigating in this regard, as was the evidence at issue in *Skipper*. Thus, the Alabama Court of Criminal Appeals' finding that Jenkins was not prejudiced by counsel's failure to present this evidence to the jury was neither contrary to nor an unreasonable application of clearly established Federal law, as determined by the United States Supreme Court in *Skipper*. There is no basis for habeas relief.

### d.   Failure to request a continuance of the penalty phase

Jenkins next contends that despite counsel's lack of preparation for and lack of evidence to present in the penalty phase of his trial, "counsel failed to request a continuance that might have allowed them to make up for their prior deficiencies." (Doc. 12 at 59). He argues that:

> Although Stan Downey had done virtually nothing the entire trial and had been nominally designated to handle the penalty phase only four days before trial, he still attempted to shirk this responsibility. After the end of the guilt phase, Downey asked Scofield to take over the penalty phase and to question the single witness available. To this Scofield testified that he instructed Downey, who had never spoke [sic] with the witness, to "[g]o downstairs and talk to him, interview him, and get him ready to put on." (R2 at 328.) The incompetent examination of this witness, which followed, is a testament to trial counsel's lack of preparation and ineffectiveness.

132

(*Id*. at 60). He concludes that counsel's "failure to move for a continuance in these circumstances was ineffective and prejudicial to Mr. Jenkins because it deprived counsel of the opportunity to overcome their lack of preparation, to secure witnesses, to secure records, and to secure the testimony of an expert witness." (*Id*.).

In denying this claim, the Alabama Court of Criminal Appeals stated:

> There was no testimony presented concerning this issue at the Rule 32 hearing. Scofield was asked whether he and Downey requested a continuance; however, he was not asked why they failed to do so. Jenkins has failed to meet his burden of proof in regards to this issue. *See* Rule 32.3., Ala.R.Crim.P.

*Jenkins*, 972 So. 2d at 149. Jenkins claims that this decision was contrary to or involved an unreasonable application of clearly established Federal law, and that it was based on an unreasonable determination of the facts.

The Alabama Court of Criminal Appeals found that by failing to present testimony at the Rule 32 evidentiary hearing concerning counsel's failure to request a continuance of the penalty phase of the trial, Jenkins had failed to prove either that counsel's failure to request a continuance amounted to constitutionally deficient performance, or that he was prejudiced by counsel's failure to request a continuance. Jenkins fails to offer any evidence to indicate that if counsel had requested a continuance, it would have been granted, or that if a continuance had been granted, there is a reasonable probability that he would have received a sentence of life without

parole, instead of death. Thus, the Alabama Court of Criminal Appeals' determination that Jenkins failed to meet his burden of proof on this claim was not contrary to or an unreasonable application of clearly established Federal law, and was not based on an unreasonable determination of the facts.

### 2.    Counsel's Deficient Performance Deprived Mr. Jenkins of the Effective Assistance of Counsel during the Sentencing Hearing

Jenkins contends that his attorney's[31] failure to investigate and develop evidence in preparation for the sentencing hearing, "given the disastrous impact of the prior failures, deprived [him] of the effective assistance of counsel." (Doc. 12 at 62-63). He claims that "although counsel knew the jury's recommendation was not binding, he was unaware that the law permitted him to introduce evidence before the sentencing judge." (*Id*. at 63). Jenkins concludes that as a result of counsel's "ignorance,"[32] he "conducted no investigation following the jury's verdict even though he had access to the

---

[31] Doug Scofield was the only attorney representing Jenkins at the sentencing phase before the trial judge. (Rule 32 R. Vol. 21 at 323).

[32] As examples of Scofield's "ignorance," Jenkins cites the following statements from Scofield's testimony at the Rule 32 hearing:

> • "[M]y recollection is it never really occurred to me to call and put on actual evidence before the Judge other than the pre-sentence report." (Rule 32 R. Vol. 21 at 321)

> • "I had never been through a penalty phase before. I didn't understand what I was doing." (*Id*. at 324).

presence report containing reference to an abundance of mitigating evidence and promising leads for investigation," and as a result, the trial judge "never heard evidence of the compelling mitigating circumstances from Mr. Jenkins's background, history and character." (*Id*.).

The Alabama Court of Criminal Appeals denied this claim on the merits on appeal from the denial of Jenkins's Rule 32 petition:

> Jenkins argues that his counsel failed to effectively argue his case in the separate sentencing hearing that was held before the trial court pursuant to § 13A-5-47(c), Ala.Code 1975.

> Here, counsel prepared a detailed presentence memorandum that mirrored information about Jenkins's childhood contained in the presentence report. Counsel also argued at the hearing before the trial court that Jenkins had no significant history of prior criminal activity, that Jenkins was intoxicated and was impaired at the time of the murder, that the murder was not premeditated, that Jenkins had been abused in his childhood, and that Jenkins lacked a normal family life.

> The trial court's sentencing order shows that it considered evidence of Jenkins's abusive childhood but that it chose to give this evidence little weight. It found that the aggravating circumstances outweighed the mitigating circumstances. We can find no evidence indicating that counsel's performance before the sentencing hearing held before the trial court was deficient. Jenkins has failed to satisfy the *Strickland* test.

*Jenkins*, 972 So. 2d 111, 149-50 (Ala. Crim. App. 2004). Jenkins argues that the state court's adjudication of this claim resulted in a decision that was contrary to, and involved an unreasonable application of, clearly established Federal law, and that it was

135

also based on an unreasonable determination of the facts. (Doc. 12 at 63-64).

At the sentencing hearing, counsel again argued the residual doubt theory it had pursued throughout the prior proceedings. (R. Vol. 9, Tab 24). Counsel submitted a detailed sentencing memorandum in which he set out the bleak history of Jenkins's childhood and argued as mitigating circumstances, the facts concerning Jenkins's upbringing; that he had no significant history of prior criminal activity; that the victim was a participant in Jenkins's conduct or consented to it; that his capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of the law was substantially impaired by his extreme intoxication; and that he was twenty-one years old at the time of the crime. The sentencing memorandum also offered lack of premeditation; the fact that the offense was not especially heinous, atrocious, or cruel when compared with other capital offenses; and lack of use of a dangerous weapon as mitigating circumstances. (Doc. 56-2 at 11-22). At the hearing, counsel went on to argue Jenkins's lack of prior criminal history; that the victim was a willing participant in the crime; that Jenkins was highly intoxicated at the time of the crime; that he could not have formed the requisite intent to kill; that while the offense was tragic, it was not heinous; his age at the time of the crime; as well as his deprived upbringing. (R. Vol. 9, Tab 24 at 1771-78, 1783-84).

In rendering its sentence, the court specifically considered the pre-sentence

136

report provided by the probation officer,[33] the aggravating circumstances relied upon by the state, Jenkins's lack of prior criminal history, his background and age, that he was under the influence of alcohol, and that the offense was not especially heinous, atrocious or cruel when compared to other capital offenses. (*Id*. at 1790-92). The court then weighed the aggravating circumstances against the mitigating circumstances, concluding that the aggravating circumstances outweighed the mitigating circumstances. (*Id*. at 1792-93). In its sentencing order, the trial court stated that it had considered "all mitigating circumstances as set out in Title 13A-5-51 of the 1975 Code of Alabama, together with other mitigating circumstances not set out in the above Code Section." (C.R. Vol. 45, Tab 73 at 16). The court went on to state:

> This Court has further considered the pre-sentence report going into the background of the Defendant prior to the commission of the offense[34] and also all of the mitigating circumstances as set out in the Defendant's Attorney's pre-sentence memorandum[35] and all of the mitigating circumstances enumerated in Title 13A-5-51 of the Code of Alabama.

---

[33] (Doc. 56-2 at 24-31).

[34] The presentence report outlined Jenkins's personal and social history. (*See* Doc. 56-2 at 24-31).

[35] In the pre-sentence memorandum, Jenkins set out the bleak history of his childhood and argued as mitigating circumstances that he had no significant history of prior criminal activity; the victim was a participant in Jenkins's conduct or consented to it; his capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of the law was substantially impaired by his extreme intoxication; and he was twenty-one years old at the time of the crime. He also asked that lack of premeditation; the fact that the offense was not especially heinous, atrocious, or cruel when compared with other capital offenses; lack of use of a dangerous weapon; and Jenkins's background and lack of education be considered as mitigating circumstances. (Doc. 56-2 at 11-22).

(C.R. Vol. 45, Tab 73 at 18).

The Alabama Court of Criminal Appeals noted that counsel prepared the detailed presentence memorandum, and that the trial court's sentencing order indicates that the court considered the evidence of Jenkins's abusive childhood, but chose to give it little weight. *Jenkins*, 972 So. 2d at 150. The court found that Jenkins failed to satisfy the deficient performance prong of the *Strickland* test. Jenkins has offered nothing to establish that this finding was contrary to or an unreasonable application of *Strickland*, or that it was based upon an unreasonable determination of the fact.

### 3.   Trial Counsel Failed To Object and Take Action To Ensure Appellate Review of the Prosecutor's Discriminatory Use of Peremptory Challenges

Jenkins maintains that the prosecutor at his trial removed each of the three qualified blacks from the jury venire, and used fourteen of the state's twenty-one strikes to remove women, for a total of seventeen of twenty-one peremptory challenges to remove individuals from protected classes from the venire.[36] (Doc. 12 at 64). He

---

[36] When he raised this claim in his Amended Rule 32 Petition, Jenkins challenged only the alleged systematic exclusion of blacks from the jury; he did not mention women being excluded. (Rule 32 C.R. Vol. 18, Tab 46 at 225-30; Rule 32 C.R. Vol. 18, Tab 47 at 358-59). Although he included women in his argument on appeal from the denial of the Rule 32 petition, the Alabama Court of Criminal Appeals considered only the portion of the claim pertaining to the alleged exclusion of blacks from the jury, specifically noting that although Jenkins made "other arguments in support of this contention," the court would not consider those arguments for the first time on appeal, since its review was "limited to evidence and arguments considered by the trial court." *Jenkins*, 972 So. 2d at 127 n.9. Because the state courts have never reviewed this claim as it pertains to women, the claim is now barred from review in this court.

contends that counsel were ineffective for failing to object to the prosecutor's unconstitutional use of peremptory challenges and for failing to insure that the appellate record contained the necessary documentation to prove the prosecutor's unconstitutional use of peremptory challenges. (*Id.*). These claims will be addressed separately.

### a.   Failure to object to the prosecutor's discriminatory use of peremptory challenges

Prior to trial, defense counsel filed a "Motion to Enjoin the Prosecutor from Utilizing His Peremptory Challenges to Systematically Exclude Minorities from the Jury Panel." (C.R. Vol. 10, Tab 27 at 88). The motion reads as follows:

> Defendant, Mark Allen Jenkins, by the undersigned counsel, moves this Court for an order enjoining the prosecutor from using his peremptory challenges to systematically exclude minorities from the jury panel which will try the defendant.

> As grounds therefore, defen[d]ant states the following:

> 1. The defen[d]ant is part Mexican-blood, and is charged with killing a white person.

> 2. The prosecutor's use of peremptory challenges to systematically exclude minorities violates the defendant's Sixth and Fourteenth Amendment rights to trial by a jury composed of a fair cross-section of the community and his Fourteenth Amendment rights to due process and equal protection of the law, as well as his right to trial by an impartial jury. *People v. Kagen*, 420 N.Y.S. 2d 987 (Sup. Ct. N.Y. Co. 1979); *Commonwealth v. Soares*, 387 N.E.2d 499 (Mass. 1979); *People v. Wheeler*, 22 Cal. 3d 258, 583 P.2d [sic] (1978).

139

(*Id.*) (alterations added). The trial judge reserved ruling on the motion until it was "raised in the proper manner at the time of the selection of the jury," noting that everyone was familiar with the *Batson* holding, and stating that he expected the state to comply with *Batson* if it were applicable. (R. Vol. 1, Tab 3 at 42). The prosecutor stated his opinion that *Batson* was not applicable to the case because Jenkins is not "a member of the black race." (*Id*. at 42-43). He added that he did not "intend to hold back on any striking of any blacks from this jury because of this motion" if he did not "particularly like" their answers to *voir dire* questions. (*Id*. at 43). Defense counsel explained that the motion was "just to preclude the State from systematically excluding minorities," not to "say that they don't have the right to strike any minority." (*Id*. at 44). Subsequently, the only three blacks on the venire, Lesley Sanders, juror number 29, James Cunningham, juror number 40, and David Jones, juror number 45, were removed by the state. (R. Vol. 3 at 445-450). Defense counsel did not object to the removal of these three men. (*Id*.).

Jenkins claims that counsel were ineffective for failing "to object to the prosecutor's unconstitutional use of peremptory challenges, even though the defense was aware of the impropriety and had even filed a pretrial motion to bar such conduct."

(Doc. 12 at 64).[37] In denying this claim on appeal from the denial of Jenkins's Rule 32

petition, the Alabama Court of Criminal Appeals found:

> Jenkins argues that Scofield failed to object to the State's alleged discriminatory use of its peremptory strikes. He argues that Scofield failed to make a *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), objection after the jury was struck and after all of the blacks had been removed from the venire. The United States Supreme Court in *Batson* held that black prospective jurors could not be excluded from a black defendant's jury solely on the basis of their race. FN.4.

>> FN.4. *Batson* has also been extended to defense counsel in *Georgia v. McCollum*, 505 U.S. 42, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992), and to gender in *J.E.B. v. Alabama*, 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994).

> Jenkins was convicted on March 19, 1991. On April 1, 1991, the United States Supreme Court released its decision in *Powers v. Ohio*, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991), holding that "a criminal defendant may object to race-based exclusions of jurors effected through peremptory challenges whether or not the defendant and the excluded juror share the same race." 499 U.S. at 402, 111 S.Ct. 1364. Jenkins is white. FN.5.

>> FN.5. All of the court documents reflect that Jenkins is white. However, witnesses at the Rule 32 proceeding testified that Jenkins is of Hispanic descent

---

[37] In his brief, Jenkins also alleges that "counsel's failure to argue all the relevant facts in support of the prima facie showing [of a *Batson* violation] was also constitutionally deficient." (Doc. 48 at 90). While Jenkins seems to have made such a claim in his brief on appeal from the denial of his Rule 32 petition (Rule 32 C.R. Vol. 37, Tab 52 at 15-21), he did not make it in the Rule 32 court (Rule 32 C.R. Vol. 18, Tab 46 at 225-30; Rule 32 C.R. Vol. 18, Tab 47 at 358-59). The Alabama Court of Criminal Appeals specifically noted that in his appellate brief, Jenkins made "other arguments" in support of his *Batson*-related ineffective assistance of counsel claims, but declined to consider those arguments for the first time on appeal. *Jenkins*, 972 So. 2d at 127 n.9. Because the state courts have never reviewed this claim, it is also barred from review in this court.

The trial court made the following findings of fact concerning this issue:

> On April 30, 1986, the United States Supreme Court decided *Batson v. Kentucky*, 476 U.S. 79 (1986), which held that a State denies a black defendant equal protection when it puts him on trial before a jury from which members of his race have been purposefully excluded. The jury which convicted Jenkins was struck and empaneled on March 13, 1991. On February 7, 1991, trial counsel for Jenkins filed a "motion to enjoin the prosecution from utilizing his peremptory challenges to systematically exclude minorities from the jury panel." In support of the motion, counsel asserted that Jenkins "[was] part Mexican-blood, and [was] charged with killing a white person." Trial counsel argued that the motion addressed "all minorities" including blacks, despite the fact that the law did not support that contention. At the relevant time, a defendant could establish a prima facie case of "purposeful discrimination in selection of the petit jury solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial." *Batson*, 476 U.S. at 96. However, to establish such a case, "the defendant first must show that he [was] a member of a cognizable racial group and that the prosecutor ha[d] exercised peremptory challenges to remove from the venire members of the defendant's race." The claim in the amended petition relates to "African-American veniremembers." Because Jenkins is not an African American, an objection to the striking of members of that race would have been meritless at the relevant time.

> Subsequent to Jenkins's conviction, the United States Supreme Court decided *Powers v. Ohio*, 499 U.S. 400, 404-17 (1991), which held that under the Equal protection clause, a criminal defendant may object to race-based exclusions of jurors through peremptory challenges whether or not the defendant and the excluded jurors share the same

race. *Powers* was a change in the law. *Farrell v. Davis*, 3 F.3d 370, 371-72 (11th Cir.1993). Alabama courts on many occasions have refused to hold trial counsel's performance ineffective for failing to forecast changes in the law. *State v. Tarver*, 629 So.2d 14, 17-18 (Ala.Crim.App. 1993), . . . ; *Morrison v. State*, 551 So.2d 435 (Ala.Crim.App. 1989), *cert. denied*, 495 U.S. 911 (1990). It appears, however, that trial counsel did forecast *Powers*. The trial court simply did not share trial counsel's foresight. Trial counsel's performance was certainly not outside 'the wide range of reasonable professional assistance.' *Strickland v. Washington*, 466 U.S. at 689. Finally, there is no reasonable probability that had a *Batson/Powers* motion been made and entertained by the trial court, the result of the trial would have been different.

(C.R. 307-09.)

The trial court's findings are consistent with Alabama caselaw. We have frequently held that counsel's performance is not deficient for failing to "forecast changes in the law." *See Dobyne v. State*, 805 So.2d 733 (Ala.Crim.App. 2000), *aff'd*, 805 So.2d 763 (Ala. 2001); *Nicks v. State*, 783 So.2d 895 (Ala.Crim.App. 1999), *cert. quashed*, 783 So.2d 926 (Ala. 2000); *Lawhorn v. State*, 756 So.2d 971 (Ala.Crim.App. 1999); *Davis v. State*, 720 So.2d 1006 (Ala.Crim.App. 1998); *McArthur v. State*, 652 So.2d 782 (Ala.Crim.App. 1994); *State v. Tarver*, 629 So.2d 14 (Ala.Crim.App. 1993). Jenkins's attorneys were not "'obliged to object based on possible future developments in the law in order to render effective assistance.'" *Thompson v. State*, 581 So.2d 1216, 1236 (Ala.Crim.App. 1991), quoting trial court's order, which this Court adopted.

*Jenkins*, 972 So. 2d at 122-23.

Jenkins asserts that the state court's application of *Powers v. Ohio*, 499 U.S. 400 (1991) was contrary to clearly established Federal law because it "ignored the Supreme

143

Court's well-established rule that its decisions are binding in all criminal cases in which convictions are not yet final." (Doc. 48 at 86). He bases this contention on *Griffith v. Kentucky*, in which the Court held that "a new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final, with no exception for cases in which the new rule constitutes a 'clear break' with the past." *Griffith*, 479 U.S. 314, 328 (1987). Jenkins argues that:

> In this case, Mr. Jenkins's was not even sentenced until after *Powers*, and did not exhaust his appeals for another three years. *See Jenkins v. Alabama*, 511 U.S. 1012 (1994). Accordingly, *Powers* applies. Moreover, because Mr. Jenkins's case was still pending before the circuit court, *Powers* was clearly established Federal law at the time of his trial as well as for his appeal. *See Adkins v. Warden, Holman CF*, 710 F.3d 1241, 1247 (11th Cir. 2013) ("[T]here can be no doubt that *Powers* was 'clearly established Federal law' within the meaning of 28 U.S.C. § 2254(d) at the time Mr. Adkins's case was pending on direct appeal before the Alabama Courts.") (citing *Greene v. Fisher*, __U.S. __, 132 S.Ct. 38, 45 (2011) (holding that "clearly established Federal law" for the purposes of § 2254(d) includes Supreme Court decisions in existence at the time of the state-court adjudication on the merits)).

> The CCA decision adopting the circuit court's ruling in post-conviction was contrary to clearly established Federal law. "[I]f the state court applies a rule that contradicts the governing law set forth in our cases" that decision is "contrary to" clearly established Federal law, under § 2254(d)(1). *Williams*, 529 U.S. at 405. Under *Griffith* and clearly established retroactivity law, *Powers* was not a future development but was in fact the law when the trial court still had jurisdiction over the case. Because the CCA's decision was "contrary to" the law, and its *Strickland* analysis of counsel's performance both at trial on appeal was based on an

144

erroneous understanding of the applicable law, Mr. Jenkins is entitled to de novo review of this claim.

(Doc. 48 at 87-88).

This argument is frivolous. Of course, *Powers* applied to Jenkins's case because *Powers* was decided before his case became final on direct review. In fact, when Jenkins claimed on direct appeal that he was deprived of a fair trial by the state's racially discriminatory use of its peremptory challenges, the Alabama Court of Criminal Appeals noted that *Powers* had extended the *Batson* ruling. *Jenkins*, 627 So. 2d at 1042. However, the appellate court denied the claim because Jenkins failed to establish a *Batson* violation. *Id*.

Jenkins suggests that because *Powers* allowed him to claim on direct appeal that blacks were improperly excluded from the jury, his attorneys can also be faulted for failure to object to the state's peremptory challenges at trial, *prior to* the decision in *Powers*. Jenkins cites *Adkins v. Warden, Holman CF*, 710 F.3d 1241, 1247 (11th Cir. 2013) in support of his contention that because his case did not become final on direct review until after *Powers* was decided, "*Powers* was clearly established Federal law at the time of his trial as well as for his appeal." (Doc. 48 at 87). However, *Adkins* did not involve a claim that counsel were ineffective for failing to object to the prosecutor's alleged discriminatory use of peremptory challenges. Rather, it involved only a

substantive *Batson* claim. Jenkins has cited nothing to support his argument that

counsel striking a jury before *Powers* was decided, can be found deficient for failing

to raise a *Powers*/*Batson* claim at trial, simply because *Powers* was decided prior to the

completion of direct review of the case. This claim has no merit.

Jenkins further argues that the Alabama Court of Criminal Appeals'

determination that counsel's performance was not deficient was based upon an

unreasonable finding of fact under § 2254(d)(1). Specifically, he alleges:

> At the time of trial, however, Alabama law also allowed for the
> very relief Mr. Jenkins's [sic] sought in his pretrial motion because it
> permitted white defendants to raise *Batson* challenges to the exclusion of
> African Americans from the venire. *See, e.g., Duncan v. State*, 575 So.2d
> 1198, 1206 n.1 (Ala. Crim. App. 1990) (citing *Holland v. Illinois*, 493
> U.S. 474, 492 (1990) (Marshall, J., dissenting)) (noting "the agreement
> of five Justices that a defendant's race is irrelevant to the Fourteenth
> Amendment standing inquiry"); *Guthrie v. State*, 598 So.2d 1013,
> 1014-17 (Ala. Crim. App. 1991) (discussing pre-*Powers Batson* hearing
> for a white defendant); *Kuenzel v. State*, 577 So.2d 474, 485 (Ala. Crim.
> App. 1990) (assuming white defendant has standing to raise a *Batson*
> claim). Consequently, in addition to his federal right under *Powers*, Mr.
> Jenkins also had a state right to this relief. Counsel's deficient
> performance is cognizable because the Sixth Amendment right to the
> effective assistance of counsel applies to claims that are founded on state
> or Federal law. *See, e.g., Alvord v. Wainwright*, 725 F.2d 1282, 1291
> (11th Cir. 1984) (holding that the issue of counsel's ineffectiveness, "even
> when based on the failure of counsel to raise a state law claim-is one of
> constitutional dimension"); *Sussman v. Jenkins*, 636 F.3d 329 (7th Cir.
> 2011) (counsel deemed ineffective in child pornography and sexual
> assault of minor case for failure to adequately present evidence of the
> minor's prior false accusation permissible under state law); *Bell v. Miller*,
> 500 F.3d 149 (2d Cir. 2007) (counsel ineffective for failing to consult

146

with and call a medical expert regarding the reliability of the victim's identification of the defendant where state law prohibited testimony on the reliability of eyewitness identification from social scientists and it was likely the trial court would have permitted rebuttal testimony).

(Doc. 48 at 89).[38]

Jenkins bases his argument that he had a *state right* to raise a *Batson* objection at trial on *Duncan v. State*, *Guthrie v. State*, and *Kuenzel v. State*. In *Duncan v. State*, the white defendant argued that his Fourteenth Amendment rights were violated by the prosecutor's use of peremptory challenges to remove blacks from the jury. *Duncan*, 575 So. 2d 1198, 1205 (Ala. Crim. App. 1990). While noting that the Supreme Court had "not yet determined a white defendant's standing to raise such a claim," but had "left open such a possibility," the court went on to consider the claim under *Batson*, remanding the case to the trial court for a *Batson* hearing. *Id*. at 1206-07.

In *Guthrie v. State*, the white defendant objected to the prosecutor's use of peremptory strikes to remove ten of the twelve black members of the jury venire. *Guthrie*, 598 So. 2d 1013, 1015 (Ala. Crim. App. 1991). The prosecutor maintained

---

[38] The court first notes that Jenkins did not make the argument concerning state law in the Rule 32 court. (Rule 32 C.R. Vol. 18, Tab 46 at 225-30; Rule 32 C.R. Vol. 18, Tab 47 at 358-59). While he seems to have made the argument in his brief on appeal from the denial of his Rule 32 petition (Rule 32 C.R. Vol. 37, Tab 52 at 22-24), the Alabama Court of Criminal Appeals declined to consider arguments raised for the first time on appeal. *See Jenkins*, 972 So. 2d at 127 n.9. The claim is procedurally barred because it was not properly presented to the state courts. Regardless, the state law argument is without merit.

that the defendant did not have standing to object because he was white and had failed to establish a prima facie case of racial discrimination. *Id*. The trial court found "no purposeful prima facie showing of purposeful discrimination," and noted that the defendant was "of the Caucasian race." *Id*. However, prior to sentencing, in light of the recently decided Supreme Court case of *Holland v. Illinois*, 493 U.S. 474 (1990)[39], the state filed a motion to supplement the record by adding the state's race-neutral reasons for striking certain prospective jurors from the venire. *Id*. The trial court held a hearing on that motion, at which the prosecution maintained its position that the defendant had not established a prima facie case of racial discrimination, but went on to state the reasons for its peremptory challenges. *Id*. at 1015-17. The trial court held to its same ruling that the defendant had not made a prima facie case of purposeful discrimination. *Id*. at 1017. On appeal, after *Power*s was decided, the Alabama Court of Criminal Appeals reversed and remanded the case to the trial court for further proceedings on the *Batson* issue. *Id*. at 1020.

In *Kuenzel v. State*, both the defendant and the victim were white. *Kuenzel*, 577 So. 2d 474, 485 (Ala. Crim. App. 1990). The defendant claimed for the first time on appeal that the prosecutor used peremptory strikes in a racially discriminatory manner.

---

[39] In *Holland*, the Court held that a white defendant has standing to raise a Sixth Amendment "fair cross section" challenge to the exclusion of blacks from the petit jury, without showing that he is a member of the cognizable group excluded. 493 U.S. at 475-77.

The court found that "even assuming that this white defendant has standing to raise a *Batson*-type objection," he had not proven a *prima facie* case of purposeful discrimination. *Id.* at 486.

It is a stretch to contend, based upon these cases, that Jenkins had a *state right* to bring a *Batson* claim prior to the *Powers* decision. While the applicability of *Batson* to a white defendant was considered in each of the cases, the cases in no way established a right under state law to bring such a claim. Further, other Alabama cases from the same time period specifically held that a white defendant did not have standing to raise a *Batson* objection. *See, e.g., Mathis v. State*, 594 So. 2d 690, 690-91 (finding that a non-black defendant may not raise a *Batson* claim); *Gordon v. State*, 587 So. 2d 427, 428 (Ala. Crim. App. 1990)(same); *Owen v. State*, 586 So. 2d 958, 959 (Ala. Crim. App. 1990)(same); *Pierce v. State*, 576 So. 2d 236, 242 (Ala. Crim. App. 1990)(same); *Bankhead v. State*, 585 So. 2d 97, 101 (Ala. Crim. App. 1989)(same); *Bui v. State*, 551 So. 2d 1094, 1114 (Ala. Crim. App. 1988), *aff'd*, 551 So. 3d 1125 (Ala. 1989)(same); *Smith v. State*, 515 So.2d 149, 150 (Ala. Crim. App. 1987)(same). In light of all the cases to the contrary, and absent a ruling by the Alabama Supreme Court specifically stating that defendants had a right under state law at the time to raise a *Batson* objection, this court cannot find that such a right existed. Thus, the Alabama Court of Criminal Appeals' decision was not based upon an unreasonable finding of

fact.

> ### b.  Failure to take action in insure appellate review of the prosecutor's discriminatory use of peremptory challenges

Jenkins further claims that counsel were ineffective for failing to "insure that the record contained the necessary documents to demonstrate the prosecutor's discriminatory action" and failing to "supplement the record with the information necessary to support the claim" on appeal. (Doc. 12 at 64-65; Doc. 48 at 92). The Alabama Court of Criminal Appeals found that counsel's performance in this regard was not deficient:

> Jenkins also argues that Scofield failed to ensure that the record on direct appeal to this Court and on appeal to the Alabama Supreme Court was supplemented to support Jenkins's *Batson* claim. He relies heavily on this Court's decision in *Watkins v. State*, 632 So.2d 555 (Ala.Crim.App. 1992) (Taylor and Montiel, JJ., dissenting), FN.6 in support of this contention.

> FN.6. When the Alabama Supreme Court quashed the petition for certiorari review, four Justices dissented and stated that this Court's decision in *Watkins* should be reversed. The composition of the Supreme Court has changed since it decided Watkins.

> When addressing this issue the circuit court stated:

> Trial counsel Doug Scofield testified at the evidentiary hearing that he continued to represent Jenkins on appeal. Although he was the attorney of record, Mr. Scofield stated that he was assisted a great deal by an

attorney with the Capital Resource Center, Hillary Hoffman. The Court notes that the Capital Resource Center represented death row inmates almost exclusively and the majority of that representation was at the appellate level. Regarding the extent of Ms. Hoffman's involvement in the case, Mr. Scofield stated the following:

> I continued to be involved in the sense of Hillary would prepare things. I would review them for signature and things like that. She did the majority of the work after that point. I reviewed court opinions. I reviewed her drafts and this, that and the other. Primarily, at that point, she became more involved in the actual appellate aspect of the case. I argued the case before the Courts. In terms of the actual preparation, she would make drafts, send them to me and I would review them.

The Court does not find it to be insignificant that the Capital Resource Center was, in essence, raising the issues on appeal and preparing the supporting argument. The past experience of an attorney is an important consideration in evaluating ineffective assistance of counsel claims. *See State v. Whitley*, 665 So.2d 998, 999 (Ala.Crim.App. 1995) (denying ineffective assistance of counsel claim while pointing out that "[d]efendant's attorney had extensive experience in the trial of criminal cases and specifically homicide cases.")

(C.R. 309-10.)

In *Watkins v. State*, 632 So.2d 555 (Ala.Crim.App. 1992), a majority of this Court held that an attorney's performance before the Alabama Supreme Court was deficient because the attorney failed to ensure that the record was supplemented to support Watkins's Batson

151

argument that counsel pursued before the Alabama Supreme Court. We held that the failure to supplement the record in the Alabama Supreme Court to include the racial composition of the jury members constituted deficient performance and that "*the petitioner did not have to show any prejudice* other than the reasonable probability that the Alabama Supreme Court would have granted his motion to supplement the record to show that a Batson hearing was warranted had one been made." 632 So.2d at 563 (emphasis added).

At first blush it appears that our holding in *Watkins* supports Jenkins's claim and warrants relief. However, a closer examination of our decision in *Watkins* reveals that our conclusion - that Watkins was denied the effective assistance of counsel when pursuing his appeal before the Alabama Supreme Court - was based on a faulty legal premise - that a defendant has a constitutional right to counsel when pursuing an appeal to the Alabama Supreme Court.

The United States Supreme Court in *Douglas v. California*, 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963), "held that denial of counsel to indigents on first appeal as of right amounted to unconstitutional discrimination against the poor." *Pennsylvania v. Finley*, 481 U.S. 551, 554, 107 S.Ct. 1990, 95 L.Ed.2d 539 (1987). The *Douglas* Court also noted, "We are not here concerned with problems that might arise from the denial of counsel for the preparation of a petition for discretionary or mandatory review beyond the stage in the appellate process at which the claims have once been presented by a lawyer and passed upon by an appellate court." 372 U.S. at 356, 83 S.Ct. 814. The United States Court of Appeals for the Eleventh Circuit, in *Williams v. Turpin*, 87 F.3d 1204, 1209 (11th Cir.1996), aptly stated the rationale behind the Douglas holding:

> The right to effective assistance of counsel during the first appeal attaches because once a state has created a right of appeal, the state must ensure that all persons have an equal opportunity to enjoy the right. [*Douglas v. California*, 372 U.S. 353,] at 356-57, 83 S.Ct. [814] at 816 [ (1963) ]. However, "once a defendant's claims of error are organized

152

and presented in a lawyerlike fashion" during the first appeal as of right, the obligation of ensuring equal access to the court system is no longer constitutionally required. *Ross v. Moffitt*, 417 U.S. 600, 615-16, 94 S.Ct. 2437, 2446-47, 41 L.Ed.2d 341 (1974). "The duty of the State . . . is not to duplicate the legal arsenal that may be privately retained by a criminal defendant in a continuing effort to reverse his conviction, but only to assure the indigent defendant an adequate opportunity to present his claims fairly in the context of the State's appellate process." *Id*.

We have consistently followed the *Douglas* holding and concluded that the right to counsel does not extend beyond the first appeal as of right. *See State v. Tarver*, 629 So.2d 14 (Ala.Crim.App. 1993); *Jackson v. State*, 612 So.2d 1356 (Ala.Crim.App. 1992); *Cunningham v. State*, 611 So.2d 510 (Ala.Crim.App. 1992); *James v. State*, 564 So.2d 1002 (Ala.Crim.App. 1989); *Kinsey v. State*, 545 So.2d 200 (Ala.Crim.App. 1989); *Thomas v. State*, 511 So.2d 248 (Ala.Crim.App. 1987); *Bies v. State*, 418 So.2d 940 (Ala.Crim.App. 1982). We have also applied the *Douglas* holding to death-penalty cases. *See State v. Tarver*, *supra*, and *Thomas v. State*, 511 So.2d 248 (Ala.Crim.App.1987).

In Alabama, the right to appeal a criminal conviction is a statutory right. *See* § 12-22-130, Ala.Code 1975. A defendant convicted of a felony has the right to appeal his conviction to the Alabama Court of Criminal Appeals; therefore, the first appeal as of right is to this Court. *See* § 12-3-9, Ala.Code 1975 ("The Court of Criminal Appeals shall have exclusive appellate jurisdiction of all . . . felonies."). "Appellant is constitutionally entitled to effective assistance of counsel, which includes the filing of an appellate brief on first appeal as a matter of right." *Johnson v. State*, 584 So.2d 881, 883 (Ala.Crim.App. 1991). As we stated in *State v. Tarver*, 629 So.2d at 18, also a death-penalty case, "a criminal defendant is guaranteed one appeal from his conviction, and that appeal is to this court."

Recently, in *Ex parte Berryhill*, 801 So.2d 7, 11 (Ala. 2001), the Alabama Supreme Court reiterated the principle that a defendant has a

153

constitutional right to counsel in his first appeal:

> Historically, courts have emphasized the importance of appellate review:

>> The need for forceful advocacy does not come to an abrupt halt as the legal proceeding moves from the trial to [the] appellate stage. Both stages . . ., although perhaps involving unique legal skills, require careful advocacy to ensure that rights are not forgone and that substantial legal and factual arguments are not inadvertently [overlooked].

> *Penson v. Ohio*, 488 U.S. 75, 85, 109 S.Ct. 346, 102 L.Ed.2d 300 (1988).

>> In bringing an appeal as of right from his conviction, a criminal defendant is attempting to demonstrate that the conviction, with its consequent drastic loss of liberty, is unlawful. To prosecute the appeal, a criminal appellant must face an adversary proceeding that - like a trial - is governed by intricate rules that to a layperson would be hopelessly forbidding.

> *Evitts v. Lucey*, 469 U.S. 387, 396, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985). Therefore, the constitutional right to effective assistance of counsel applies to appellate proceedings. *Id.*, 469 U.S. at 398, 105 S.Ct. 830 (criminal defendants have constitutional rights to effective counsel during the first appeal as of right); *see Williams v. Turpin*, 87 F.3d 1204, 1209 (11th Cir. 1996)."

801 So.2d at 11.

We are aware that the majority of Alabama cases that have

followed *Douglas* are not death-penalty cases and that at the time our decision in *Watkins* was released a defendant convicted of a capital offense and sentenced to death was granted an automatic review by this Court and that a petition for a writ of certiorari was automatically granted by the Alabama Supreme Court. *See* Rule 39, Ala.R.App.P. FN.7. However, an appeal to the Alabama Supreme Court is a second appeal conducted after this Court has considered and addressed the issues raised by an attorney in the brief to this Court. FN.8. The State's obligation to provide counsel was satisfied by providing counsel on the first appeal to this Court. *See Douglas v. California*, 372 U.S. at 356, 83 S.Ct. 814; *Williams v. Turpin*, 87 F.3d at 1209. Moreover, the scope of the Alabama Supreme Court's certiorari review is limited to determining the correctness of this Court's decision. *See* Rule 39, Ala.R.App.P. The primary responsibility for reviewing all death-penalty convictions and sentences is with this Court. *See* § 13A-5-53(a), Ala.Code 1975.

> FN.7. Effective May 19, 2000, Rule 39, Ala.R.App.P., was amended to provide that the review of death-penalty cases by the Alabama Supreme Court is discretionary. A petition for a writ of certiorari is no longer automatically granted in death-penalty cases.

> FN.8. Section 13A-5-53(a), Ala.Code 1975, specifically addresses appeals in death-penalty cases, and provides, in part: "In any case in which the death penalty is imposed, in addition to reviewing the case for any error involving the conviction, the Alabama Court of Criminal Appeals, subject to review by the Alabama Supreme Court, shall also review the propriety of the death sentence." This Code section places with this Court the primary responsibility for reviewing a capital-murder conviction and death sentence. The only provision for an automatic grant of a petition for a writ of certiorari in the Alabama Supreme Court was Rule 39, Ala.R.App.P. That provision was never codified. The Supreme Court pursuant, to the rule-making authority granted it by the Alabama Constitution, amended Rule 39 to delete the automatic-review provision of death-penalty

cases.

In *Thomas*, 511 So.2d 248, this Court addressed a claim that an attorney's performance in his death-penalty appeal before the United States Supreme Court was deficient. In refusing to recognize the right to counsel beyond that which is constitutionally required, we stated:

> While we quickly recognize the apparent differences between the two types of punishment [a sentence of death versus a sentence of life imprisonment], we know of no reason why the magnitude of the death sentence should distort the guarantee of effective counsel beyond the scope defined by the Supreme Court.

511 So.2d at 258. As the Ohio Supreme Court stated in *State v. Buell*, 70 Ohio St.3d 1211, 1211, 639 N.E.2d 110, 110 (1994):

> [The defendant's] 1986 appeal to [the Ohio Supreme Court] was his second appeal. "[T]he right to appointed counsel extends to the first appeal as of right, and no further." (Emphasis added.) *Pennsylvania v. Finley* (1987), 481 U.S. 551, 555, 107 S.Ct. 1990, 1993, 95 L.Ed.2d 539, 545. *See, also, Evitts v. Lucey* (1985), 469 U.S. 387, 394, 105 S.Ct. 830, 834-835, 83 L.Ed.2d 821, 828. Having no constitutional right to counsel on a second appeal, [the defendant] had no constitutional right to the effective assistance of counsel.

There is no right to counsel when pursuing a second appeal before the Alabama Supreme Court; therefore, there is no right to the effective assistance of counsel. Our decision in *Watkins* improperly expands the holding of the *Douglas* court.

Moreover, we question the continued validity of our decision in *Watkins* given the Alabama Supreme Court's subsequent decision in *Ex parte Frazier*, 758 So.2d 611 (Ala.1999). The Alabama Supreme Court in *Frazier* abrogated in part the decision in *Watkins* by holding that a

similar Batson claim did not constitute per se ineffective assistance of counsel. The *Frazier* court stated:

> Frazier blames his attorneys for the fact that the record does not permit review of the *Batson* issue, and he urges us to remand this case for a new trial because his attorneys failed to preserve this issue for review. . . . *Failure to make a record of the race or gender of persons against whom the prosecution asserted peremptory strikes is not per se ineffective assistance of counsel; it would constitute ineffective assistance only if a prima facie case of purposeful discrimination existed. See Ex parte Yelder*, 575 So.2d [137] at 139 [ (Ala.1991) ].

758 So.2d at 616 (emphasis added).

Accordingly, as the Alabama Supreme Court noted in *Ex parte Frazier*, the petitioner must establish a prima facie case of purposeful discrimination. Jenkins's only argument before the circuit court to support this contention was that the State struck three blacks, or all of the blacks, from the venire. Numbers alone; however, are not sufficient to establish a prima facie of discrimination. As the Alabama Supreme Court stated in *Sharrief v. Gerlach*, 798 So.2d 646 (Ala. 2001):

> The [defendant's] only objection regarding the [State's] strikes of women, if it can be characterized as an objection, was to the fact that only three women were left on the jury. However, "'[I]t is important that the defendant come forward with facts, not just numbers alone, when asking the [trial] court to find a prima facie case' of . . . discrimination." *McElemore v. State*, 798 So.2d 693, 696 (Ala.Crim.App. 2000) (*quoting Mitchell v. State*, 579 So.2d 45, 48 (Ala.Crim.App. 1991), *in turn quoting United States v. Moore*, 895 F.2d 484, 485 (8th Cir. 1990)).

798 So.2d at 655. FN.9.

157

FN.9. In his brief to this Court Jenkins makes other arguments in support of this contention. However, those arguments were not presented to the circuit court. "This court will not consider an argument raised for the first time on appeal; its review is limited to evidence and arguments considered by the trial court." *Myrick v. State*, 787 So.2d 713, 718 (Ala.Crim.App. 2000).

For the reasons stated above, we overrule our decision in *Watkins*, 632 So.2d 555. As Justice Ingram wrote in his dissenting opinion in *Watkins v. State*, 632 So.2d 566 (Ala. 1994), a 5-4 decision in which a majority of the Justices on the Alabama Supreme Court voted to quash the writ of certiorari:

> I believe that society's expectation of its courts, under the law and within the rules, is that we should establish some reasonable point at which post-judgment review would end. At least we should preclude the same issue, once raised, reviewed, and decided, from recurring on appeal. I believe this case would be an appropriate one in which to establish that point.

The United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), stated that the proper standard for judging attorney performance in regard to ineffective-assistance-of-counsel-claims is "simply reasonableness under prevailing professional norms." 466 U.S. at 688, 104 S.Ct. at 2065. Further, it addressed the temptation of looking backward with the knowledge of current law:

> A fair assessment of attorney performance requires that every effort be made to eliminate *the distorting effects of hindsight*, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the

158

conduct from counsel's perspective at the time.

466 U.S. at 689, 104 S.Ct. at 2065. (Emphasis added.)

632 So.2d at 567 (Ingram, J., dissenting).

Scofield's performance was not deficient because he failed to ensure that the record on appeal was supplemented to support an argument that had no legal foundation at the time the alleged error occurred in the trial court and that was not presented to the trial court. To hold otherwise would subject appellate counsel's performance to a stricter level of review than trial counsel's performance.

*Jenkins*, 972 So. 2d at 123-28.

Jenkins first challenges the Alabama Court of Criminal Appeals' holding that "Scofield's performance was not deficient because he failed to ensure that the record on appeal was supplemented to support an argument that had no legal foundation at the time the alleged error occurred in the trial court and that was not presented to the trial court." (Doc. 48 at 91). He contends that this determination is contrary to and an unreasonable application of clearly established Federal law because it is "predicated on the erroneous assumption that *Powers* does not apply" to Jenkins's ineffective assistance of trial counsel claim. (*Id*.). However, as previously discussed, Jenkins has cited nothing to establish that counsel striking a jury before *Powers* was decided, can be found deficient for failing to raise a *Powers*/*Batson* claim at trial, simply because *Powers* was decided prior to the completion of direct review of the case.

Jenkins further alleges that the "conclusion that Mr. Jenkins's appellate ineffectiveness claim 'had no legal foundation,'" is contrary to and an unreasonable application of clearly established Federal law, because "*Powers* applied to Mr. Jenkins's direct appeal and unambiguously held that a defendant's race was irrelevant to making a *Batson* claim." (*Id*. at 92). However, the Alabama Court of Criminal Appeals did not find that Jenkins's appellate ineffectiveness claim had no legal foundation. Rather, the finding was that Jenkins's *Batson* claim "had no legal foundation at the time the alleged error occurred in the trial court." *Jenkins*, 972 So. 2d at 128. This finding was not contrary to or an unreasonable application of Federal law. Jenkins further argues that it "was also unreasonable because Alabama law already permitted white defendants to raise *Batson* challenges to the exclusion of African American jurors." (Doc. 48 at 92). As previously discussed, there is nothing to support a claim that Jenkins had a right under Alabama law at the time of his trial to raise a *Batson* claim. This finding was not contrary to or an unreasonable application of clearly established Federal law.

Jenkins next contends that the Alabama Court of Criminal Appeals's determination that the *Batson* claim "was not presented to the trial court" was an unreasonable determination of the facts in light of the state court record because, he claims, "the *Batson* claim was presented to the trial court." (*Id*.). Jenkins claims that:

160

the CCA opinion itself acknowledges "counsel for Jenkins filed a 'motion to enjoin the prosecution from utilizing his peremptory challenges to systematically exclude minorities from the jury panel.'" *Jenkins II*, 972 So. 2d at 122 (quoting circuit court order). Not only is the CCA finding internally inconsistent and contradicted by the record, it ignores altogether [sic] that counsel filed a motion for new trial on the grounds that the trial court erred in denying this pre-trial motion. (RHCC, vol. 10, p. 188) Consequently, the CCA's fact findings are contrary to the state court record and because the record is clear, the court's determination was unreasonable. *See, e.g., Lynch v. Sec'y, Dep't of Corr.*, 897 F. Supp. 2d 1277, 1303 (M.D. Fla. 2012) (finding state court's determination that defendant did not present evidence was an unreasonable determination of the facts because defendant presented evidence). That counsel had raised a *Batson* claim — albeit ineffectively — before and after trial underscores how his failure to provide the appellate courts with information they needed to rule constitutes deficient performance.

(*Id*. at 92-93).

This claim is without merit. Prior to trial, counsel filed a "Motion to Enjoin the Prosecutor from Utilizing his Peremptory Challenges to Systematically Exclude Minorities from the Jury Panel." (R. Vol. 10, Tab 27 at 88). In the motion, counsel noted that Jenkins is "part Mexican-blood, and is charged with killing a white person," and asked that the prosecution be enjoined from using peremptory challenges to systematically exclude minorities from the jury panel. (*Id*.). The trial judge acknowledged that the parties were familiar with the *Batson* holding, stated that he expected the state to comply with *Batson* if it were applicable, and reserved ruling on the motion until it was "raised in the proper manner at the time of the selection of the

161

jury." (R. Vol. 1, Tab 3 at 42). However, defense counsel did not raise a *Batson*

objection during the selection of the jury. (R. Vol. 3 at 445-452). Although the trial

court never ruled on Jenkins's "Motion to Enjoin the Prosecutor from Utilizing his

Peremptory Challenges to Systematically Exclude Minorities from the Jury Panel,"

Jenkins argued in a motion for new trial that the "Court erred in denying defendant's

Motion to prohibit the State from striking minorities from the jury," (R. Vol. 10, Tab

27 at 188). Clearly, Jenkins never made a proper *Batson* objection during jury

selection. His motions made prior to trial and after trial did not amount to *Batson*

objections. Thus, the Alabama Court of Criminal Appeals's finding that Jenkins did not

present a *Batson* claim to the trial court was not an unreasonable determination of the

facts.

In raising his ineffective assistance of appellate counsel claim on appeal from the

denial of his Rule 32 petition, Jenkins relied on *Watkins v. State*, 632 So. 2d 555, 560-

61 (Ala. Crim. App. 1992).[40] (Rule 32 C.R. Vol. 37, Tab 52 at 25-29). Jenkins argued

---

[40] In *Watkins*, the defendant raised a *Batson* claim for the first time on direct appeal in a petition for writ of certiorari to the Alabama Supreme Court, and the court elected to address the claim. *Ex parte Watkins*, 509 So. 2d 1074, 1075 (Ala. 1987). The Alabama Supreme Court affirmed Watkins's conviction, finding that the record did not "show that the state exercised any of its peremptory challenges to remove prospective black jurors from the venire," and that the "record as a whole" simply did not raise an inference that the state was engaged in the practice of purposeful discrimination. *Id*. at 1076.

In a state collateral petition, *Watkins* argued that "counsel was ineffective on appeal because, when asserting the *Batson* claim before the Alabama Supreme Court, he failed to move to supplement

that counsel's failure to supplement the record to contain information necessary to prove a *Batson* claim was ineffective under *Watkins*, which "held that counsel's failure to supplement the record with facts necessary to support a *Batson* claim, where he knew no such facts were in the record, constitutes ineffective assistance of counsel." (*Id.* at 27) (citing *Watkins v. State*, 632 So. 2d 555, 560-61 (Ala. Crim. App. 1992). The Alabama Court of Criminal Appeals overruled *Watkins*, finding that there is "no right to counsel when pursuing a second appeal before the Alabama Supreme Court; therefore, there is no right to the effective assistance of counsel. *Jenkins*, 972 So. 2d at 127. The court also noted that in *Ex parte Frazier*, 758 So. 2d 611 (Ala. 1999), the Alabama Supreme Court "abrogated in part the decision in *Watkins* by holding that a similar *Batson* claim did not constitute per se ineffective assistance of counsel." *Id*.

Jenkins states that:

the CCA held that its holding in *Watkins* - that a lawyer's failure to supplement the record on appeal to the ASC to support a *Batson* claim constituted deficient performance, *see Jenkins II*, 972 So.2d at 127 - was erroneous in light of Alabama law that a defendant has only one appeal as a matter of right; thus, Mr. Jenkins was entitled to effective counsel

the record to show the racial composition of the venire and the race of each venireperson struck by the prosecution, in order to factually support the *Batson* claim and, thus, present plain error." *Watkins v. State*, 632 So. 2d at 559. The trial court denied the claim on the merits. *Id*. On appeal from the denial of Watkins's collateral petition, the Alabama Court of Criminal Appeals concluded that "based on the knowledge that counsel possessed or should have possessed at the time of the petitioner's appeal in which he raised *Batson*, counsel should have moved to supplement the record before the Alabama Supreme Court, and any failure to do so was deficient performance within the meaning of *Strickland v. Washington*." *Id*. at 564.

only in his first appeal to the CCA. *See id.* at 126-27. FN.24.

> FN.24. The CCA held that its "decision in *Watkins* improperly expands the holding of [*Douglas v. California*, 372 U.S. 353 (1963).]" *Jenkins II*, 972 So. 2d at 127.

The CCA, however, was silent about Mr. Jenkins's allegation that appellate counsel was constitutionally ineffective for failing to supplement the record in his first direct appeal to the CCA, and failed to address that at the time Mr. Jenkins sought review in the ASC, that review was mandatory and automatic. *Id.* at 126 n.7.

(Doc. 48 at 84-85). Jenkins argues that this ruling:

> resulted in a decision about ineffective assistance of appellate counsel that was contrary to or an unreasonable application of clearly established Federal law because it acknowledged but did not address the fact that at the time Mr. Jenkins sought review in the ASC, that review was mandatory and automatic. As the CCA itself recognized in a footnote, it was in the year 2000 that the relevant court rule was "amended to provide that the review of death-penalty cases by the Alabama Supreme Court is discretionary." *Jenkins II*, 972 So. 2d at 126 n.7. But, at the time Mr. Jenkins appealed to the ASC, that review was mandatory and "automatically granted." *Id*. The CCA thus unreasonably applied *Strickland* because it failed to account for the relevant law at the time of appellate counsel's actions and instead (mis)placed emphasis on an inapplicable case, *Douglas v. California. See* n.24, *supra*, and associated text at 84. Its decision was also based on an unreasonable determination of the facts because it appears to ignore the date in [sic] which ASC review became discretionary.

(*Id*. at 93-94).

Jenkins's claim is based upon his assertion that the Alabama Court of Criminal

Appeals held he was entitled to effective assistance of counsel only on his first appeal

to the Court of Criminal Appeals. He argues that the court failed to address his claim that counsel was ineffective for failing to supplement the record on his first direct appeal to the Alabama Court of Criminal Appeals, and failed to mention that when Jenkins sought review in the Alabama Supreme Court, review in that court was mandatory and automatic.

First, there is nothing in the Alabama Court of Criminal Appeals's opinion to indicate that the court found that Jenkins was not entitled to effective counsel on direct appeal to the Alabama Supreme Court. Further, the court was fully aware that when Jenkins sought review in the Alabama Supreme Court, review in that court was mandatory and automatic. The court noted that Jenkins's appeal took place from 1992-1993, and, as Jenkins points out, the court specifically stated that "[e]ffective May 19, 2000, Rule 39, Ala.R.App.P., was amended to provided that the review of death-penalty cases by the Alabama Supreme Court is discretionary." *Jenkins*, 972 So. 2d at 119 and 126 n.7.

The court addressed *Watkins* because Jenkins argued it in support of his claim. The court overruled *Watkins* because the case was "an appropriate one in which to establish" a reasonable point at which post-judgment review ends. *Jenkins*, 972 So. 2d at 127. The court recognized Jenkins's claim to be that appellate counsel was ineffective for failing "to ensure that the record on direct appeal to this Court and on

165

appeal to the Alabama Supreme Court was supplemented to support [his] *Batson* claim." *Id*. at 123. The court held that counsel's "performance was not deficient because he failed to ensure that the record on appeal was supplemented to support an argument that had no legal foundation at the time the alleged error occurred in the trial court and that was not presented to the trial court." *Id*. at 128.

The court never stated that it was denying Jenkins's claim that counsel was ineffective for failing to supplement the record on appeal to the Alabama Supreme Court because he was not entitled to counsel when he went before that court on direct appeal. Rather, it appears that the Alabama Court of Criminal Appeals addressed Jenkins's claims that counsel was ineffective for failing to supplement the record on appeal to both the Alabama Court of Criminal Appeal and the Alabama Supreme Court. Jenkins's arguments that the court found he was entitled to effective counsel only on appeal to the Court of Criminal Appeals, that the court did not address his claim that counsel was ineffective on direct appeal to the Court of Criminal Appeals, and that the court ignored the fact that Supreme Court review was mandatory at the time of Jenkins's appeal, were contrary to or an unreasonable application of clearly established Federal law and were based on an unreasonable determination of the facts, are baseless.

Jenkins further argues:

166

Finally, to the extent that the state court's rejection of Mr. Jenkins's *Batson*-ineffectiveness-of-appellate-counsel claim is predicated on the assertion of the procedural bar that Alabama recognizes "no right to counsel" and "therefore . . . no right to the effective assistance of counsel" "when pursuing a second appeal before the Alabama Supreme Court," *Jenkins II*, 972 So.2d at 126-27, that bar was neither firmly established nor regularly followed. *See generally Section* A.1, supra, at 8-14. In particular, at the time Mr. Jenkins prosecuted his appeal, *Watkins* clearly recognized a capital appellant's right to the effective assistance of counsel on direct appeal to the ASC, and it was only in his case some twelve years later that the CCA reversed this decision. Therefore, the application of this bar to reviewing the merits of this claim was not only inconsistent but appears never to have been applied in a capital case until a decade after Mr. Jenkins exhausted his direct appeal. Therefore, this change in law is no barrier to addressing the merits of Mr. Jenkins's claim.

(Doc. 48 at 94). As previously discussed, there is nothing in the Alabama Court of Criminal Appeals's decision to indicate that it rejected this claim based upon a finding that Jenkins did not have a right to counsel on appeal to the Alabama Supreme Court. There is certainly nothing in the decision to suggest that it rejected the claim based upon a procedural bar. This claim is without merit.

Jenkins next challenges the Alabama Court of Criminal Appeals's holding "that the only evidence [he] offered in support of a *prima facie* showing was the number of African Americans the State struck." (*Id.* at 85). He claims that this holding involved an unreasonable application of clearly established Federal law, an unreasonable determination of the facts in light of the evidence presented to the state court under 28

167

U.S.C. § 2254(d)(2) and/or was based upon a clearly erroneous determination of the facts under 28 U.S.C. § 2254(e)(1), because his allegations about counsel's failure to preserve the record of the *prima facie* case were not limited to the prosecution's removal of all the blacks from the jury. (*Id*. at 85, 96). He claims that "[u]nder *Batson*, the court 'should consider all relevant circumstances' that support an inference of discrimination," but the Alabama Court of Criminal Appeals, "like every state court before it - did not consider all of the circumstances." (*Id*. at 96).

When Jenkins raised this claim in his amended Rule 32 petition, he argued that:

> Trial counsel failed to supplement the record before the Alabama Court of Criminal Appeals and the Alabama Supreme Court with facts to show that the prosecution removed all of the African-Americans from the venire to support his Batson argument. *See Watkins v. State*, 632 So.2d 555, 559-63 (Ala.Cr.App. 1992) (death row inmate's case remanded for hearing to determine merits of Batson claim raised in state postconviction proceeding where court concludes that petitioner was deprived the effective assistance of counsel when appellate counsel failed to supplement the record on appeal to reflect facts to support the claim).

(Rule 32 C.R. Vol. 18, Tab 47 at 358-59). In his brief, Jenkins argued:

> Mr. Jenkins was also denied the effective assistance of counsel during jury selection because trial counsel failed to object to the prosecution's systematic removal of all the qualified prospective jurors who were African-American. *See Ex parte Yelder*, 575 So. 2d 137, 139 (Ala. 1991) ("failure of trial counsel to make a timely Batson objection to a prima facie case of purposeful discrimination by the state in the jury selection process through its use of peremptory challenges is presumptively prejudicial to a defendant"), *cert. denied*, 502 U.S. 898 (1991). The exercise of a single peremptory challenge by the prosecution

against an African-American venireperson warrants a *Batson* hearing. *Huntley v. State*, 627 So. 2d 1013, 1014 (Ala. 1992). *See United States v. Allison*, 908 F.2d 1531 (11th Cir. 1990), *cert. denied*, 500 U.S. 904 (1991) ("Under *Batson*, the striking of one black juror for a racial reason violates the Equal Protection Clause"). Trial counsel's error was compounded by his failure to insure that the record reflected the race of all prospective jurors because that oversight prevented the Alabama appellate courts from reviewing the violation, *see Jenkins v. State*, 627 So. 2d at 1042 ("The record simply does not support an inference of plain error on the alleged *Batson* violation. (citing *Ex parte Watkins*, 509 So. 2d 1074 (Ala.), *cert. denied*, 484 U.S. 918 (1987))"), and entitles Mr. Jenkins to have this Court to grant his petition. *Watkins v. State*, 632 So. 2d 555, 559-63 (Ala. Cr. App. 1992).

At Mr. Jenkins' capital trial, voir dire of five panels of prospective jurors was completed in less than one day. On March 13, 1991, the parties selected the jury for Mr. Jenkins' trial by alternating peremptory challenges to remove jurors from the remaining venire until only twelve jurors remained. (R. 445-50) During the selection process, the prosecution exercised peremptory challenges to remove juror number twenty-nine, Lesley D. Sanders, juror number forty, James F. Cunningham, and juror number forty-five, David Jones. (C. 111) Although (as will be shown) Cunningham, Sanders and Jones are all African-Americans, qualified to serve on this capital jury, trial counsel failed to object to their removal by the prosecution or to insure that the record reflected the race of all prospective jurors. (R. 445-50; Ev. 329) The prosecution's systematic removal of all qualified African-American individuals from the venire violated Mr. Jenkins right to a fair trial and equal protection under *Batson v. Kentucky*, 476 U.S. 79 (1986), and *Ex parte Branch*, 526 So. 2d 609 (Ala. 1987).

## The Venire Lists

At the evidentiary hearing on his Rule 32 petition, Mr. Jenkins introduced copies of the original venire lists from the trial as Petitioner's Exhibits Number 2 and 3. (Ev. 292, 296) These venire lists are not included in the original appellate record. Petitioner's Exhibit 2 consists of

169

four separate documents, in the following order: (1) a one-page strike sheet noting two disqualified jurors; (2) an eleven-page venire list dated October 30, 1989; (3) a one-page strike sheet denoting the parties peremptory challenges and the final jury; and (4) a twelve-page venire list dated February 19, 1991. (Pet. Ex. #2.) Trial counsel identified the two strike sheets in Petitioner's Exhibit 2 as the actual strike sheets used by the defense in striking a jury; the second of which was the actual list the defense "struck from." (Pet. Ex. #2, at 13; Ev. 292) Petitioner [sic] Exhibit 3 is a ten-page venire list dated March 12, 1991. (Pet. Ex. #3; Ev. 292-93) Trial counsel testified that Petitioner's Exhibits 2 and 3 are copies of the actual venire lists taken from his own file. (Ev. 292, 295)

The venire lists are alphabatized [sic] lists of all persons originally included in the group of individuals eligible to be summoned for jury service for Mr. Jenkins trial. (Ev. 294) In addition to the prospective jurors names, the venire lists also include the individual's birthdate, age, address, and gender. (Pet. Ex. #2 & 3) Importantly, each of the venire lists also includes the race of each prospective juror. According to the venire list dated February 18, 1991, and introduced as part of Petitioner's Exhibit 2, James F. Cunningham and David Jones are African-American men. (Pet. Ex. #2) Similarly, according to the venire list dated March 12, 1991, and introduced as Petitioner's Exhibit 3, Lesley D. Sanders is an African-American man. (Pet. Ex. #3) Comparison of the final strike sheet with the venire list reveals that Cunningham, Jones and Sanders were the only African-Americans remaining on the venire following the exercise of cause strikes. (c. 111; Pet. Ex. #2 & 3)

During the evidentiary hearing, trial counsel was asked about his failure to raise an objection to the prosecution's systematic removal of African-Americans. As the following exchange demonstrates, trial counsel's failure to raise the objection was not strategic.

> [Counsel for Petitioner]: Following the jury selection in this case, did you raise a *Batson* objection?

> [Trial Counsel]: I don't recall making a *Batson* objection after the jury was struck and before they were sworn.

[Counsel for Petitioner]: Your failure to make a *Batson* objection, was there any strategic decision relating to that?

[Trial Counsel]: No.

(Ev. 329)

In sum, it is indisputable that the prosecution removed all of the qualified African-Americans from the jury venire prior to Mr. Jenkins trial, and that such unconstitutional conduct resulted in an all-white jury. (C. 111; R. 450; Pet. Ex. #2 & 3; Ev. 296) Equally undisputed is the fact that trial counsel failed to object to this violation, failed to preserve the record for purposes of appeal and that these failures lacked any strategic purpose. (Ev. 329)

In death penalty cases, Batson errors constitute "plain error," and are reviewable on appeal even if trial counsel failed to lodge a proper objection at trial *See, e.g., Ex parte Adkins*, 600 So. 2d 1067 (Ala. 1992); *Ex parte Bankhead*, 585 So. 2d 112, 117 (Ala. 1992); *Guthrie v. State*, 616 So. 2d 913 (Ala. Cr. App. 1992), on return to remand, 616 So. 2d 914 (Ala. Cr. App. 1993). 'When raised in the context of ineffective assistance claims, Alabama Courts have assumed that prima facie Batson violations are presumptively prejudicial to the defendants, and have remanded for hearings on the merits of the claims. *See Ex parte Yelder*, 575 So. 2d at 138 ("failure of trial counsel to make timely Batson objection to prima facie case of purposeful discrimination . . . is presumptively prejudicial . . . and we remand the case with directions to remand it to the trial court for a Batson hearing"); *Taylor v. State*, 598 So. 2d 1056 (Ala. Cr. App. 1992) (court grants pro se petitioner granted Batson hearing where trial counsel was ineffective for raising objection at trial); *Winchester v. State*, 580 So. 2d 749 (Ala. Cr. App. 1991) (postconviction claim of trial counsel's ineffectiveness in failing to raise Batson objection requires remand where prosecution removed all African-Americans from venire; "Winchester's allegation of ineffective counsel is not precluded on the grounds that it was raised or addressed at trial or on appeal or that it could have been raised but was not raised at trial or on appeal, Rule 20.2(a)(2)-(5)").

171

In *Ex parte Yelder*, the Alabama Supreme Court considered the identical issue Mr. Jenkins raises here: whether a criminal defendant is denied the effective assistance of counsel when his trial attorney fails to make a *Batson* objection when the prosecution disciminates [sic] in the exercise of its peremptory challenges. The court concluded that counsel's failure is presumptively prejudicial:

> We adopt the dissenting opinion of Judge Bowen and hold that the failure of trial counsel to make a timely *Batson* objection to a prima facie case of purposeful discrimination by the State in the jury selection process through its use of peremptory challenges is presumptively prejudicial to a defendant. Accordingly, we reverse the judgment of the Court of Appeals to the extent it holds to the contrary . . . and we remand the case with directions to remand it to the trial court for a *Batson* hearing.

*Yelder*, 575 So. 2d at 138. Under the circumstances of this case, and pursuant to *Batson*, *Branch*, and *Yelder*, Mr. Jenkins is due to have his petition granted because trial counsel's failure to object to the prosecution's discriminatory use of peremptory challenges is presumed to have prejudiced him.

(Rule 32 C.R. Vol. 18, Tab 46 at 225-230) (footnotes omitted).

In dismissing the claim, the Rule 32 court specifically noted that:

[t]he only evidence Jenkins has asserted is that the State removed three African-Americans from the venire. A defendant must offer some evidence in addition to the striking of blacks that would raise an inference of discrimination. Jenkins, who has the burden of proof, has not presented sufficient evidence to establish a finding of prima facie discrimination.

(Rule 32 C.R. Vol. 45, Tab 77 at 312).

It was not until Jenkins's brief on appeal from the denial of his Rule 32 petition

that he argued further evidence in support of a *prima facie* case of discrimination. In his brief, Jenkins argued that the heterogeneity of the group, the state's pattern of strikes, the manner of the state's voir dire, the disparate treatment of blacks, the disparate impact on blacks, and the state's removal of all or most black people raise an inference of intentional race discrimination. (Rule 32 C.R. Vol. 37, Tab 52 at 15-21).

In its opinion, the Alabama Court of Criminal Appeals stated that "Jenkins's only argument before the circuit court to support this contention was that the State struck three blacks, or all of the blacks, from the venire." *Jenkins*, 972 So. 2d at 127. The court specifically noted that Jenkins made other arguments in his appellate brief, but refused to consider them since they were not presented to the Rule 32 court:

> In his brief to this Court Jenkins makes other arguments in support of this contention. However, those arguments were not presented to the circuit court. "This court will not consider an argument raised for the first time on appeal; its review is limited to evidence and arguments considered by the trial court." *Myrick v. State*, 787 So.2d 713, 718 (Ala.Crim.App. 2000).

*Id*. at 127 n.9.

As the court stated, Jenkins's only argument before the Rule 32 court was that the state struck all three of the blacks from the venire. *Id.* at 127. The court recognized that Jenkins made other arguments in his brief on appeal, but declined to consider arguments that had not been raised in and considered by the trial court. *Id.* at 127 n.9.

Thus, the court's statement was not an unreasonable determination of the facts in light of the evidence presented to the state court under 28 U.S.C. § 2254(d)(2) and was not based upon a clearly erroneous determination of the facts under 28 U.S.C. § 2254(e)(1).

Jenkins further challenges the Alabama Court of Criminal Appeals's finding that "numbers alone" were not sufficient to raise an inference of discrimination. (Doc. 48 at 85, 95). He argues that this "ruling is an unreasonable application of clearly established Federal law for two reasons: (1) it incorrectly reads *Batson* to require more than numbers to raise an inference of discrimination; and (2) it turns on a finding that 'numbers' provide the only evidence in this case—a finding that is not supported by a review of 'all relevant circumstances' that *Batson* itself requires." (Doc. 48 at 95).

Jenkins first argues that "under *Batson*, numbers alone can suffice to support a *prima facie* case." (*Id.*). He states that in *Batson*, the Supreme Court "explicitly recognized that 'a "pattern" of strikes against black jurors included in the particular venire *might* give rise to an inference of discrimination.'" (*Id.* at 95-96) (quoting *Batson*, 476 U.S. at 97) (emphasis added). He argues that the Alabama Court of Criminal Appeals erroneously concluded that *Batson* created a "bright-line threshold for raising an inference of discrimination," and that because "numbers alone are all the Court considered in *Batson*, the CCA's holding that they can never suffice to make a

174

*prima facie* case is an unreasonable application of clearly established Federal law." (*Id.* at 96).

However, the Court in *Batson* did not hold that numbers alone were sufficient to prove a *prima facie* case of discrimination in jury selection. In *Batson*, the Court discussed the relevant factors a defendant could argue in attempting to establish a *prima facie* case of racial discrimination. The Court stated:

> [A] defendant may establish a *prima facie* case of purposeful discrimination in selection of the petit jury solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial. To establish such a case, the defendant first must show that he is a member of a cognizable racial group, *Castaneda v. Partida*, supra, 430 U.S. at 494, 97 S.Ct. at 1280, and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race. Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits "those to discriminate who are of a mind to discriminate." *Avery v. Georgia*, 345 U.S. at 562, 73 S.Ct. at 89. Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race. This combination of factors in the empaneling of the petit jury, as in the selection of the venire, raises the necessary inference of purposeful discrimination.
>
> In deciding whether the defendant has made the requisite showing, the trial court should consider all relevant circumstances. For example, a "pattern" of strikes against black jurors included in the particular venire might give rise

175

> to an inference of discrimination. Similarly, the prosecutor's questions and statements during voir dire examination and in exercising his challenges may support or refute an inference of discriminatory purpose. These examples are merely illustrative. We have confidence that trial judges, experienced in supervising voir dire, will be able to decide if the circumstances concerning the prosecutor's use of peremptory challenges creates a *prima facie* case of discrimination against black jurors.

*Batson*, 476 U.S. 79, 96–97 (1986). The burden of proof rests on the petitioner to establish a factual basis for the relief he seeks. *Hill v. Linahan*, 697 F.2d 1032, 1034 (11th Cir. 1983); *Corn v. Zant*, 708 F.2d 549, *reh'g denied*, 714 F.2d 159 (11th Cir. 1983), *cert. denied*, 467 U.S. 1220 (1984).

Jenkins's only argument in support of his allegation of purposeful discrimination in the selection of the jury, was that the state "struck three blacks, or all of the blacks, from the venire.[41] *Jenkins*, 972 So. 2d at 127. As the Eleventh Circuit Court of Appeals has held:

> the *prima facie* case determination is not to be based on numbers alone but is to be made in light of the totality of the circumstances. *Johnson v. California*, 545 U.S. 162, 168, 125 S.Ct. 2410, 2416, 162 L.Ed.2d 129 (2005) (the defendant must make out a prima facie case "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose") (quoting *Batson*, 476 U.S. at 93–94, 106 S.Ct. at 1712); *Ochoa–Vasquez*, 428 F.3d at 1044 (in order to determine whether a prima

---

[41] As previously noted, Jenkins raised additional arguments in his brief on appeal from the denial of his Rule 32 petition, but the Alabama Court of Criminal Appeals refused to consider them since they were raised for the first time on appeal. *Jenkins*, 972 So. 2d at 127 n.9.

facie case has been established "courts must consider all relevant circumstances").

*United States v. Hill*, 643 F.3d 807, 839 (11th Cir. 2011). While this "pattern" of strikes against black jurors might give rise to an inference of discriminatory purpose, Jenkins identified no other relevant circumstance that would be material to whether the he established a *prima facie* case of discrimination. These facts, without more, are insufficient to establish a *prima facie* case of discrimination under *Batson*. Thus, the Alabama Court of Criminal Appeals's holding that numbers alone are not sufficient to establish a *prima facie* case of discrimination is not an objectively unreasonable application of clearly established Federal law.

Jenkins also claims that the court's failure to consider "all relevant circumstances" that support an inference of discrimination was "an additional unreasonable application of clearly established Federal law." (Doc. 48 at 96). He reasons that since *Batson* instructed that the court "'should consider all relevant circumstances' that support an inference of discrimination," it was unreasonable for the court not to consider "several other circumstances that constitute evidence in support of a prima facie case of discrimination." (*Id.*). However, the court made it clear that it was not considering the other circumstances argued by Jenkins on appeal, because he had waived the right to argue those circumstances on appeal, by failing to present them

177

to the trial court.[42] Because those arguments were not properly before the court, it was not an unreasonable application of *Batson* for the court to decline to consider them. This claim is without merit.

Because Jenkins has failed to establish that the Alabama Court of Criminal Appeals' finding --- that counsel's performance on appeal was not deficient --- was contrary to or an unreasonable application of Federal law, or was based on an unreasonable determination of the facts, it is unnecessary to address his argument that he was prejudiced by counsel's performance.

### c.   Prejudice

Finally, Jenkins alleges that the Alabama Court of Criminal Appeals "erroneously resolved the *Strickland* question of whether the attorneys' deficient performance at trial and on appeal 'prejudiced the defense.'" (Doc. 48 at 98). He

---

[42] As the court stated, appellate courts "will not consider an argument raised for the first time on appeal; its review is limited to evidence and arguments considered by the trial court." *Jenkins*, 972 So. 2d at 127 n.9 (quoting *Myrick v. State*, 787 So. 2d 713, 718 (Ala. Crim. App. 2000). *See also Eastland v. State*, 677 So. 3d 1275, 1276 (Ala. Crim. App. 1996) (same); *Abbott v. Hurst*, 643 So.2d 589, 593 (Ala. 1994) (same); *Andrews v. Merritt Oil Co.*, 612 So.2d 409, 410 (Ala. 1992) (same); *Rodriguez–Ramos v. J. Thomas Williams, Jr., M.D., P.C.*, 580 So.2d 1326, 1328 (Ala. 1991) ("This Court cannot put a trial court in error for failing to consider a matter which, according to the record, was not presented to, nor decided by it."); *Defore v. Bourjois, Inc.*, 105 So.2d 846, 847 (1958) ("The functions of this court in its appellate character are strictly confined to the action of trial courts upon questions which are presented to and ruled upon by them. We cannot put a trial court in error for failure to rule on a matter which, according to the record, was not presented to, nor decided by him . . . ; or as otherwise expressed, 'Courts of last resort are without authority to put the lower court in error, in the absence of some ruling of such court showing or containing error.'").

contends that "[c]ontrary to the circuit court's summary conclusion that there was 'no reasonable probability' of a different outcome, Mr. Jenkins's case provides ample evidence to support a *prima facie* showing of discrimination at trial and on appeal." (*Id.*). Jenkins reasons that, if counsel's performance had been adequate, both the trial court and the appellate courts would have had considered his *Batson* claim "in light of 'all relevant circumstances.'" (*Id.* at 99). However, as discussed above, Jenkins has not shown that the Alabama Court of Criminal Appeals' determinations that counsel were not constitutionally deficient was contrary to or involved an unreasonable application of Federal law, or that it was an unreasonable application of the facts. Because Jenkins is unable to satisfy the performance prong of *Strickland*, the court need not address the prejudice prong. *Strickland*, 466 U.S. at 697.

### 4. Counsel's Deficient Performance Deprived Mr. Jenkins of the Effective Assistance of Counsel during the Guilt Phase

Jenkins contends that trial counsel deprived him of effective assistance of counsel during the guilt phase of his trial and that counsel's errors "'were so serious as to deprive [him] of a fair trial, a trial whose result was reliable.' *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993)." (Doc. 12 at 65). Jenkins divides this claim into multiple sub-claims of ineffective assistance of counsel, specifically: lack of sufficient funding; failure to object to original co-counsel's conflict of interest; failure to

179

interview Sarah Harris, Doug Thrash and Frieda Vines; failure to discover that another

suspect was detained and questioned in connection with the victim's murder; failure to

conduct appropriate voir dire; failure to object to the prosecutor's misconduct; failure

to object to the trial court's misstatements of the law; failure to ensure that the trial

court's errors were preserved for appellate review; and failure to present a coherent and

consistent theory of defense. Jenkins's subclaims will be addressed separately.

### a.    Lack of sufficient funding

Jenkins claims that "[i]n part, counsel's ineffectiveness was the product of the

grossly insufficient funding available for defense counsel in a capital case." (Doc. 12

at 66). Specifically, he argues:

> At the time of Mr. Jenkins's trial, Alabama law provided that
> court-appointed attorneys in capital cases could not be compensated more
> than $1,000 for out-of-court work for trial, based on a $20 hourly rate.
> Ala. Code § 15-12-21 (1975). Mr. Jenkins's counsel received no
> compensation for out-of-court work in excess of fifty hours, and were
> compensated at rates far below market level even for the time they
> worked.
>
> As a growing number of courts have recognized, the inadequate
> and statutorily limited compensation constitutes an unconstitutional taking
> of private property by denying just compensation, thus violating the
> separation of powers doctrine. *See May v. State*, 672 So.2d 1310 (Ala.
> 1995) (Maddox, J., concurring specially) (endorsing the position that
> inadequate compensation constitutes an improper taking); *Makemson v.
> Martin County*, 491 So.2d 1109, 1115 (Fla. 1986) (holding $3,500
> compensation limit in capital trial violates separation of powers and
> effective assistance of counsel mandates). The practice of curtailing

spending also discriminates against indigent capital defendants by depriving them of their right to the effective assistance of counsel, in violation of the guarantee of due process and equal protection under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. The state court adjudication of this claim resulted in a decision that was contrary to, and involved an unreasonable application of, clearly established law. The state court adjudication of the claim was also based on an unreasonable determination of the facts.

(*Id.* at 66-67).

The respondent maintains in his answer that this claim is procedurally barred from review in this court because Jenkins failed to raise the claim at trial, or on direct appeal, or in collateral proceedings. (Doc. 20 at 55-57). Despite arguing in his petition that the state court's adjudication of this claim was contrary to and involved an unreasonable application of Federal law, and was based on an unreasonable determination of the facts, Jenkins argues in his brief that he "did not raise this issue in the state court." (Doc. 35 at 5).

In its amended answer, the state reverses course, arguing that Jenkins <u>did</u> raise the claim in state court:

> Petitioner Jenkins curiously and mistakenly contends that he did not raise that claim in state court. Doc. 35 at 5. The record reveals that Jenkins implicitly raised that claim in his amended Rule 32 petition – (C.R2. 355-356, 360.) – and that he clearly raised that claim on pages 64 and 152 in his opening brief before the Court of Criminal Appeals on Rule 32 appeal. Although neither the circuit court nor the Court of Criminal Appeals expressly addressed that claim, this Court must presume that those courts adjudicated Jenkins's claim on the merits. *See, e.g., Johnson*

*v. Williams*, 133 S. Ct. 1088, 1096 (2013) ("When a state court rejects a federal claim without expressly addressing that claim, a federal habeas court must presume that the federal claim was adjudicated on the merits – but that presumption can in some limited circumstances be rebutted."); *Harrington v. Richter*, 131 S. Ct. 770, 784 (2011) ("Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing that there was no reasonable basis for the state court to deny relief.").

(Doc. 40 at 25-26).

Although the state maintains that Jenkins "implicitly" raised this claim in his amended Rule 32 petition, the claim was not raised in that petition.[43] However, the claim was raised on appeal from the denial of the Rule 32 petition. In that appeal, Jenkins argued:

> XVI. THE INADEQUATE COMPENSATION OF TRIAL COUNSEL DEPRIVED MR. JENKINS OF HIS RIGHT TO COUNSEL.
>
> Mr. Jenkins was deprived of his constitutional right to the effective assistance of counsel due to the unconscionably low limitations placed on fees paid to capital counsel pursuant to Alabama Code § 15-12-21. Representation of capital defendants requires mastery of a complex and highly specialized body of law and procedure, aw well as extensive investigation into the particulars of each case and the history of the accused. Alabama's limitations on compensation discourage

---

[43] The state cites pages 355-56 and 360 of the amended Rule 32 petition as the pages on which Jenkins "implicitly" raised the claim that counsel were ineffective in part because of inadequate state funding. However, the claims on those pages involving funding are claims that counsel failed to utilize funds provided by the court to retain a private investigator, a forensic expert, and mental health experts. (Rule 32 C.R. Vol. 18, Tab 47 at 355-56, 360). There is nothing on those pages suggesting or implying that funding was inadequate.

representation of indigent capital defendants and effectively reduces the quality of legal representation provided to such defendants by court-appointed attorneys, as was the case here. As previously noted, Mr. Jenkins was represented by two attorneys who lacked the necessary qualifications to represent him in his capital trial. Moreover, the severe limitations imposed by the statute on compensation even for these unqualified lawyers insured that no investigation was done. The confluence of the unconscionable compensation and unqualified counsel deprived Mr. Jenkins of his right to counsel and his right to a fair and reliable trial, and requires reversal of his conviction and death sentence.

(Rule 32 C.R. Vol. 37, Tab 52 at 154).

In response, the state argued that this claim was procedurally barred from review because Jenkins did not raise the claim in his amended Rule 32 petition:

Issue XVI, the claim of error that trial counsel was inadequately compensated, was not contained in Jenkins's Amended Petition and should, therefore, not be considered by this Court. Should this Court determine to address it, however, this claim is barred from review on Rule 32 for the following reasons: it could have been, but was not, raised at trial, Rule 32.2(a)(3); It could have been, but was not, raised on appeal, Rule 32.2(a)(5).

(Rule 32 C.R. Vol. 38, Tab 53 at 132). Jenkins argued in his reply brief on appeal that the claim was not procedurally barred:

Appellee assert[s] that a majority of Mr. Jenkins's claims for relief are barred from review by Rule 32. Mr. Jenkins disagrees. Each of these claims was sufficiently pleaded, and the application of procedural bars is not only error of fact and law, since similarly situated petitioners have not been so barred, but would constitute a denial of fundamental fairness. As to arguments that Appellee asserts are barred because they were previously raised, at trial or on direct appeal, Mr. Jenkins disagrees and has demonstrated that the arguments are fundamentally different, or that

183

the earlier claims were incomplete.

(Rule 32 C.R., Vol. 39, Tab 54 at 38).

The Alabama Court of Criminal Appeals did not address this claim in its opinion affirming the Rule 32 court's denial of Jenkins's petition. In his application for rehearing in the Alabama Court of Criminal Appeals, Jenkins argued that "[t]he Court's opinion does not address issue XVI, and therefore, the Court should reconsider that issue and grant relief." (Rule 32 C.R. Vol. 39, Tab 59 at 60). The court denied the application for rehearing. *Jenkins*, 972 So. 2d 111. In his petition for a writ of certiorari, Jenkins argued:

> This Court should grant Mr. Jenkins's petition for writ of certiorari under Rule 39(a) (1) (D) because the Court of Criminal Appeals did not address his claim that the statutory compensation for attorneys rendered counsel ineffective. At the time of Mr. Jenkins's trial, court-appointed attorneys in Alabama were limited to a maximum of $1000 for out-of-court trial preparation for each phase of the capital trial, based on a $20 per hour rate in capital trials. ALA. CODE §15-12-21; *Ex parte Grayson*, 479 So. 2d 76, 79-80 (Ala.), *cert. denied sub nom*, 474 U.S. 865 (1985). Because the compensation scheme under which original counsel was forced to work curtailed Mr. Jenkins's right to effective assistance of counsel, *Strickland*, 466 U.S. 668, this Court's review is warranted.

(Rule 32 C.R. Vol. 40, Tab 60 at 56-57). In his brief in support of his certiorari petition, Jenkins argued:

> The State of Alabama denied Mr. Jenkins effective assistance of counsel, in part, because of the insufficient funds provided for

184

court-appointed attorneys in capital cases. At the time of Mr. Jenkins's capital trial, Ala. Code § 15-12-21 limited court appointed attorneys trying capital cases to a maximum of $1000 for out-of-court trial preparation for each phase of the capital trial, based on a $20 per hour rate. *See Ex parte Grayson*, 479 So. 2d 76, 79-80 (Ala.), *cert. denied sub nom, Grayson v. Alabama*, 474 U.S. 865 (1985). As a result, the State denied trial counsel any compensation for his work over fifty out-of-court hours.

"It is well established that the Sixth Amendment guarantees to criminal defendants not only the right to assistance of counsel, but requires that assistance to be legally effective." *Walthrop v. State*, 506 So. 2d 273, 275 (Miss. 1987); S*trickland*, 466 U.S. 668; *Williams*, 529 U.S. 362. Had counsel been better compensated by the State of Alabama, they would have been paid to fully investigate the case, talk to all the State's witnesses before the trial, amass information on the members of Mr. Jenkins's venire to aid in jury selection, argue and present the defense case to the jury, thoroughly investigate and present mitigating evidence, and would have been better prepared at trial and been prepared to factually and legally address the State's improprieties. Without adequate funding, the time that counsel was capable of devoting to this case was severely restricted, and this restriction was a direct causative factor of counsel's ineffectiveness.

This court should find that the severe compensation limitations pose an unconstitutional taking of private property by denying just compensation, violate the separation of powers doctrine, arbitrarily and unreasonably deny indigent capital defendants their constitutional right to effective assistance of counsel, and violate the Equal Protection Clause. *See May v. State*, 672 So. 2d 1310 (Ala. 1995) (Maddox, J., concurring specially); *Makemson v. Martin County*, 491 So. 2d 1109, 1115 (Fla. 1986), *cert. denied*, 479 U.S. 1043 (1987); *DeLisio v. Alaska Superior Court*, 740 P.2d 437, 443 (Alaska 1987). The compensation of counsel at trial and at the penalty phases was grossly inadequate, and greatly contributed to the ineffective assistance of counsel Mr. Jenkins received during his capital trial and penalty phases. *Strickland*, 466 U.S. 668.

185

(Rule 32 C.R. Vol. 40, Tab 61 at 105-06). The Alabama Supreme Court "affirmed the judgment of the Court of Criminal Appeals insofar as it affirmed the trial court's denial of the other claims[44] presented in Jenkins's Rule 32 petition." *Ex parte Jenkins*, 972 So. 2d at 165.

"When a state court decision summarily rejects without discussion all the claims raised by a defendant, including a federal claim subsequently pressed in federal court, the federal habeas court must presume, subject to rebuttal, that the federal claim was adjudicated on the merits." *Viers v. Warden*, 605 F. App'x 933, 941 (11th Cir. 2015), *cert. denied sub nom. Viers v. Shepard*, 136 S. Ct. 829 (2016), *reh'g denied*, 136 S. Ct. 1488 (2016) (citing *Harrington v. Richter*, 562 U.S. 86, 97–100 (2011)). The Supreme Court has extended the *Richter* presumption to cases "when a state-court opinion addresses some but not all of a defendant's claims." *Johnson v. Williams*, 133 S.Ct. 1088, 1094 (2013). The *Johnson* Court "observed that there are good reasons why state courts do not address every single argument made by a defendant, including 'instances in which a state court may simply regard a claim as too insubstantial to merit discussion.'" *Lee v. Comm'r, Alabama Dep't of Corr.*, 726 F.3d 1172, 1212 (11th Cir. 2013), *cert. denied sub nom. Lee v. Thomas*, 134 S.Ct. 1542 (2014) (quoting *Johnson,*

---

[44] The court reversed the appellate court's judgment on the juror misconduct claim, remanding that claim for further proceedings. *Ex parte Jenkins*, 972 So. 2d at 165.

133 S.Ct. at 1095). A petitioner may rebut the presumption of an adjudication on the merits if "the evidence leads very clearly to the conclusion that a federal claim was inadvertently overlooked in state court." *Johnson*, 133 S. Ct. at 1097.

Jenkins clearly raised this claim on appeal from the denial of his Rule 32 petition. Although the Alabama Court of Criminal Appeals addressed the merits of other claims raised in the appeal, and found other claims to be procedurally barred, that court did not expressly address Jenkins's claim that his trial counsel were ineffective due to allegedly inadequate compensation available to court appointed counsel in capital cases. Jenkins has offered nothing to suggest that the Alabama Court of Criminal Appeals inadvertently overlooked this claim. Thus, pursuant to *Johnson*, this court presumes that the Alabama Court of Criminal Appeals addressed the claim on the merits.

Jenkins claims that the "grossly insufficient funding" available to defense counsel in capital cases constitutes an "unconstitutional taking of private property by denying just compensation, thus violating the separation of powers doctrine," and deprives capital defendants of their right to "effective assistance of counsel, in violation of the guarantee of due process and equal protection under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution." (Doc. 12 at 66-67). Jenkins lacks standing to assert a claim for the loss of counsel's property by virtue of an

unconstitutional taking. Jenkins was not denied just compensation. Rather, his lawyers labored under the severe compensation caps, perhaps depriving them of fair compensation for their work. Similarly, even if the compensation caps amount to a violation of the separation of powers doctrine, and the court does not believe that they do, Jenkins has no standing to object to it. As with the takings claim, Jenkins's lawyers suffered any injury caused by the allegedly inadequate compensation, not Jenkins. Thus, the attorneys, not Jenkins, would have standing to assert such a claim.

Finally, Jenkins's due process and equal protection claims seem to assert that the compensation cap deprives him and other indigent defendants of due process and equal protection because the cap necessarily results in a denial of effective assistance of counsel. This claim is nothing more than a free-floating claim of ineffective assistance of counsel. That will not do. Under *Strickland*, Jenkins must establish that his counsel was constitutionally ineffective and that he was actually prejudiced thereby. *Strickland v. Washington*, 466 U.S. 668, 690, 693 (1984); *see also United States v. Cronic*, 466 U.S. 648, 658–59 n.26 (1984)("Apart from circumstances [of the complete denial of counsel], however, there is generally no basis for finding a Sixth Amendment violation unless the accused can show how specific errors of counsel undermined the reliability of the finding of guilt.") (citations omitted). The *Strickland* Court wrote:

> A convicted defendant making a claim of ineffective assistance

188

> must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. In making that determination, the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case.

*Strickland*, 466 U.S. at 690. Thus, Jenkins's claim that compensation caps hindered the ability of counsel to represent him must be accompanied by reference to specific errors or shortcomings purportedly caused by the allegedly inadequate funding. It is not and accordingly fails. As the district court for the Southern District of Alabama has held:

> Petitioner argues that counsel was ineffective "in part" due to "grossly insufficient funding available for defense counsel in capital cases." Am. Pet. ¶¶ 28–30. Smith pleads no facts in support of this claim. Instead, his argument is based on the assumption that counsel was *ipso facto* inadequate because, in Smith's opinion, Alabama inadequately compensated his attorneys. But Smith's conclusion does not follow. Other capital defendants in this state have made similar claims based on Alabama's statutory scheme. *See, e.g., Hallford v. Culliver*, 379 F.Supp.2d 1232, 1279 (M.D. Ala. 2004) ("The essence of [Petitioner]'s argument becomes simply that the court ought to presume counsel could not provide constitutionally adequate representation because of the inadequate compensation."), *aff'd*, 459 F.3d 1193 (11th Cir. 2006). However, even if the Court were to agree that the compensation provided to defense counsel in death cases in Alabama is woefully inadequate, "that fact is insufficient as a matter of law to overcome the presumption of effectiveness which attends the performance of counsel." [*Hallford*, 379 F.Supp.2d at 1279.] Whereas "attorneys are expected to competently represent indigent clients" regardless of how much or little they are paid, *See id.* (citing *Waters v. Kemp*, 845 F.2d 260, 263 (11th Cir. 1988)), and whereas Petitioner has pled no facts to rebut that presumption, the Court does not find that counsel's performance was deficient and concludes that

189

no habeas relief is due Petitioner on his inadequate compensation-based claim.

*Smith v. Thomas*, Civil Action No. 05–0474–CG–M, 2013 WL 5446032, *11 (S.D. Ala. Sept. 30, 2013) (*rev'd on other grounds sub nom. Smith v. Campbell*, 620 Fed. Appx. 734 (11th Cir. 2015) (footnote omitted).

Like the petitioner in *Smith v. Thomas*, Jenkins has alleged counsel were ineffective "in part" due to inadequate funding but . Additionally, he, too, he has failed to allege a specific connection between the inadequate funding and the allegedly deficient performance of his trial counsel. Instead, Jenkins complains about the below market hourly compensation and the 50–hour cap for out-of-court work on his case. However, he offers absolutely nothing to indicate that counsel's performance was substandard <u>due to</u> insufficient funding. Because Jenkins has failed to connect the allegedly insufficient funding to any deficiency in counsel's performance or to any resulting prejudice (and, under *Strickland*, he must show <u>both</u>), his claim lacks merit. It follows that he has not established that the state court adjudication of this claim resulted in a decision that was contrary to, and involved an unreasonable application of, clearly established law, or that it was based on an unreasonable determination of the facts.

**b.    Failure to object to original co-counsel's conflict of interest**

190

Jenkins claims that "counsel failed to object to a patent conflict of interest in his original co-counsel's representation of the jailhouse informant, George Jeffcoat, who gave critical testimony against [him]". When Jenkins raised this claim on appeal from the denial of his Rule 32 petition, the Alabama Court of Criminal Appeals denied it on the merits:

> Jenkins argues that Scofield failed to object to the fact that one of Jenkins's initial attorneys, Luther Gartrell, who withdrew from the case, had an actual conflict of interest because he represented a material State witness.
>
> The circuit court stated the following about this issue:
>
> > The claim that trial counsel failed to object to an actual conflict of interest in co-counsel's representation of a material witness for the state.
> >
> > This claim is set forth above precisely as it appears in Jenkins's amended petition for relief. This claim is dismissed because it violates the "clear and specific statement of the grounds" requirement of Rule 32.6(b) of the Alabama Rules of Criminal Procedure.

(R. 322.)

> Moreover, the following occurred at the evidentiary hearing:
>
> Q: Did there come a time when Luther Gartrell moved to withdraw from this case?
>
> A: Yes.
>
> Q: What were the circumstances under which he withdrew?

191

> A: Sometime during the course of the discussions that we were having with Mark, Luther Gartrell realized that he had represented an individual by the name of George Jeffcoat. George Jeffcoat was going to be a state's witness in this particular case. At that particular time, he said "Wait a minute. I think I have a conflict." He handled that. What he told Judge Holladay about that, I don't know, but I know that was the basis of him withdrawing.

> (R. 284-85.) There is no more information in the record on this issue. Clearly, Jenkins failed to meet his burden of proof on this claim. *See* Rule 32.6, Ala.R.Crim.P.[45]

*Jenkins*, 972 So. 2d at 131-32. Jenkins maintains that the state court's adjudication of this claim resulted in a decision that was contrary to, or an unreasonable application of, clearly established Federal law, and was also based on an unreasonable determination of the facts. (Doc. 12 at 73).

Attorney Doug Scofield was originally retained by Jenkins's family to represent Jenkins. (C.R. Vol. 10, Tab 27 at 3; 54). On September 14, 1989, Mr. Scofield advised the court that the family was not financially able to pay for his services. (*Id*.). Scofield indicated that he would be willing to accept an appointment to Jenkins's case, on the condition that local counsel be appointed to assist him. (*Id*.). On September 14, 1989, the court appointed Mr. Scofield to represent Jenkins. (*Id*.). Simultaneously, the court appointed Luther Gartrell to represent Jenkins as co-counsel. (*Id*.). Seven days later,

---

[45] A dismissal based upon Rule 32.6(b) constitutes a ruling on the merits for AEDPA purposes. *Frazier v. Bouchard*, 661 F.3d 519, 526–27 (11th Cir. 2011).

on September 21, 1989, Mr. Gartrell moved to withdraw from the case, noting that

"after arraignment on September 14, 1989, [he] discovered he had a conflict and could

not represent this Defendant." (*Id*. at 66). It is unclear when Mr. Gartrell was relieved

as co-counsel. The case action summary indicates that Gartrell was relieved as co-

counsel on September 14, 1989, one week prior to filing his motion to withdraw from

the case:

> The Honorable Luther Gartrell appeared before this Court this date
> and as a result of a conference held with the defendant now advises the
> Court that he has a conflict of interest and request[s] to be relieved as
> defendant's counsel. The matters concerning said conflict were presented
> to the Court and this Court if of the opinion that Mr. Gartrell does have
> a conflict of interest.
> Therefore, be it ORDERED that the Hon. Luther Gartrell be
> relieved as counsel for the defendant.

(C.R. Vol. 10, Tab 27 at 4; 64-65). In any event, it appears that Mr. Gartrell was

relieved as counsel prior to October 2, 1989, since Stan Downey was appointed on that

date to serve as co-counsel for Jenkins. (*Id.* at 4).

In order to succeed on this claim, Jenkins must show that Mr. Scofield's failure

to object to Mr. Gartrell's "patent conflict of interest" was unreasonable, and that it

prejudiced the defense. Jenkins cannot show either. The record reflects that Mr.

Gartrell represented Jenkins for a maximum of eighteen days, being appointed on the

day of Jenkins's arraignment. The record further reflects that Mr. Gartrell notified the

193

court immediately upon discovering the conflict, and the court relieved him from representing Jenkins soon afterwards. Thus, there was no need for Mr. Scofield to object to Mr. Gartrell's conflict of interest; Mr. Gartrell himself alerted the court.

Further, Jenkins has offered nothing to indicate that his defense suffered any prejudice whatsoever as a result of Mr. Scofield's failure to object to Mr. Gartrell's appointment as co-counsel. Mr. Gartrell himself asked to be removed from the case upon discovering his conflict, and the court promptly granted his request, appointing different co-counsel. There is nothing to indicate that Gartrell's association with Jenkins's case for such a short period of time so early in the case adversely impacted Jenkins in any way. The finding by the Alabama Court of Criminal Appeals that Jenkins failed to meet his burden of proof on this claim was neither contrary to nor an unreasonable application of clearly established Federal law, not was it based on an unreasonable determination of the facts.

### c.    Failure to interview Sarah Harris

Jenkins contends that trial counsel were ineffective for failing to interview Sarah Harris prior to trial. (Doc. 12 at 67-69). He claims that, at trial, Ms. Harris identified Jenkins for the first time, after previously failing to identify him on two separate occasions. (*Id*. at 68-69). He adds that:

a pretrial interview would have either prevented her from making a

surprise, mid-trial identification, would have provided counsel with a basis for a pretrial motion to suppress the identification (rather than waiting until the tainted information had already been introduced) or, it would have prepared counsel for that identification and to head off her prejudicial and inflammatory explanation – that she had not previously identified Mr. Jenkins because she feared for her life. (R1 at 529-46, 571-610.)

(*Id*. at 69). The Alabama Court of Criminal Appeals denied this claim on the merits:

> Jenkins first argues that Scofield failed to interview Sara Harris-a coworker of the victim's who identified Jenkins as the man she saw the victim with on the night of April 18, 1989. Specifically, he argues that Scofield should have interviewed Harris so that he could have effectively cross-examined her on her failure to identify Jenkins in two different pretrial lineups.

> The following occurred during the evidentiary hearing:

> Q [Defense counsel]: I'm talking specifically about Sara Harris. Did you not point that out to the trial court that she did not positively identify Mr. Jenkins?

> A [Scofield]: Yes, she was cross-examined on that item-no question about it. My assumption going into trial was she was not going to be able to identify him. She couldn't on two different occasions. All of a sudden she shows up, after having had a meeting with the [district attorney], and now she is saying, "Yes, that is the guy" and identified him. . . .

> Q: You made that argument, did you not?

> A: There is no question she was cross-examined and the jury was pointed that out on two prior occasions. Whether they believed and discredited her, I can't say.

(R. 381-82.)

195

At the Rule 32 hearing Scofield was questioned about Harris's identification testimony. Scofield stated that he knew that Harris's identification of Jenkins was questionable because he had been present at one pretrial lineup where she was unable to identify Jenkins. He also stated-and the trial record supports his statement-that he thoroughly cross-examined Harris about the fact that although she was unable to identify Jenkins before trial she was able to identify him at trial.

> [T]he failure to interview or take the depositions of the State's witnesses for impeachment purposes is not prejudicial *per se. See McCleskey v. Kemp*, 753 F.2d 877, 900 (11th Cir. 1985) (en banc) (holding no prejudice shown where attorney failed to interview two of State's witnesses and potential defense witnesses); *Boykins v. Wainwright*, 737 F.2d 1539, 1543 (11th Cir. 1984) (holding no prejudice shown where attorney failed to interview prosecution's expert witnesses), *cert. denied*, [470] U.S. [1059], 105 S.Ct. 1775, 84 L.Ed.2d 834 (1985); *Solomon v. Kemp*, 735 F.2d 395, 402 (11th Cir. 1984) (holding no prejudice shown where attorney failed to talk to all of the State's witnesses and did not seek funds for an investigator), *cert. denied*, [469] U.S. [1181], 105 S.Ct. 940, 83 L.Ed.2d 952 (1985).

*Aldrich v. Wainwright*, 777 F.2d 630, 636-37 (11th Cir. 1985). Jenkins has failed to show that his counsel's performance was deficient or that he was prejudiced by Scofield's failure to interview Sara Harris. Jenkins has failed to satisfy the *Strickland* test.

*Jenkins*, 972 So. 2d at 128-29.

Sarah Harris testified at trial that she was working at the Omelet Shoppe with Tammy Hogeland on April 18, 1989. (R. Vol. 3, Tab 9 at 518-20). At around 2:00 a.m., a red car pulled into the parking lot and almost jumped the curb. (*Id*. at 522-23). A "white male with dark complexion, dark hair, wearing a brown, plaid shirt and blue

jeans" exited the car and entered the Omelet Shoppe. (*Id.* at 523-24). Ms. Harris later gave the man's physical description to Birmingham Police Officer Belinda Weldon. (*Id.* at 524). Once inside the Omelet Shoppe, the man "walked to the end of the counter and began to talk to Tammy [Hogeland]." (*Id.* at 525). Shortly after the man arrived, Ms. Harris saw him leaving in the red car, with Tammy Hogeland as his passenger. (*Id.* at 526). Tammy Hogeland never returned to the Omelet Shoppe. (*Id.*).

When Ms. Harris was asked "do you see the individual in the courtroom today that you remember seeing on the 18th of April 1989," defense counsel objected, requesting to take the matter up outside the presence of the jury. (*Id.* at 529). The court overruled the objection, again allowing the prosecution to ask Ms. Harris if she saw "in the courtroom today the person who Tammy Hogeland left with on [sic] the early morning hours of the 18th of April 1989." (*Id.* at 530). Defense counsel unsuccessfully lodged the same objection two more times. (*Id.*). Ms. Harris was finally allowed to point out and identify Jenkins as having been the man in the red car. (*Id.*). She testified that his appearance had changed since 1989, in that, by the time of trial, his hair was different, his complexion was lighter[46] and he had gained weight. (*Id.* at 530-31).

The court then held a hearing outside the presence of the jury, at which defense

---

[46] Ms. Harris explained that on April 18, 1989, his skin tone was "more of a dark complexion like Mexican." (*Id.* at 531).

counsel argued that Ms. Harris's in-court identification of Jenkins should be suppressed because of the suggestive nature of the prior identifications. (*Id*. at 533-34).[47] Ms. Harris testified that when she was shown a photographic lineup in 1989, she was not able to positively identify the man from the red car, but chose "Number 2" in the lineup[48] as appearing to be that man. (*Id*. at 539). Ms. Harris also testified that in June, 1989, she appeared at a live lineup, but was unable to identify the man from the red car. (*Id*. at 542-43). She explained, still outside the presence of the jury, that she did not identify Jenkins in the live lineup because she "was afraid." (*Id*. at 545).

When the trial resumed, defense counsel cross-examined Ms. Harris, getting her to admit that Tammy Hogeland did not appear to be in distress when she was talking to the man from the red car; that Tammy did not appear to leave involuntarily; that she did not see Tammy walking out of the Omelet Shop, but saw her in the car as it was driving off; and that she could not see who was driving the car, but assumed it was the same person who drove up in the car. (*Id*. at 577-79). Defense counsel also brought out on cross-examination that Ms. Harris had failed to identify Jenkins in a photo lineup and a live lineup; that the week before the trial, Ms. Harris met with the District

---

[47] Defense counsel argued that it "was the point of [the defense's] motion that any in court identification should be suppressed." (*Id*. at 533-34). The defense had filed a "Motion to Suppress Identification" on September 5, 1989. (C.R. Vol. 10, Tab 27 at 37-39).

[48] Number 2 in the lineup was Jenkins. (*Id*.)

Attorney, who showed her more photographs and went over what he would ask Ms. Harris in court and what her testimony would be; and that she indicated that Jenkins's appearance had changed since the night at the Omelet Shoppe. (*Id.* at 583-88).

Jenkins alleges that counsel were ineffective for failing to interview Ms. Harris prior to the trial. To prevail on this claim, Jenkins must show that counsel's performance was deficient and that the deficient performance prejudiced the defense. Jenkins seems to combine the two parts of the *Strickland* test into an argument that counsel were necessarily ineffective because he was prejudiced by their failure to interview Ms. Harris prior to trial.

Jenkins claims that a pretrial interview would have prevented Ms. Harris from identifying him for the first time at trial; or would have provided counsel with a basis for a pretrial motion to suppress the identification; or would have prepared counsel for that identification so counsel could have prevented "her prejudicial and inflammatory explanation" that she had not previously identified Jenkins because she feared for her life. (Doc. 12 at 69). However, Jenkins offers no explanation as to how interviewing Ms. Harris prior to trial would have prevented her from identifying him at trial. Further, counsel did file a pretrial "Motion to Suppress Identification," asking the court to "suppress any testimony by a Mr. or Mrs. Cole, or any other State witness regarding their identification of the defendant at a photographic lineup following the alleged

199

murder of Tammy Hogeland," and "any identification of the defendant from observing or viewing him in Court or at any other time or place." (C.R. Vol. 10, Tab 27 at 37). Finally, Ms. Harris's "prejudicial and inflammatory explanation - that she had not previously identified Mr. Jenkins because she feared for her life" was made in an in-camera hearing, outside of the presence of the jury; therefore, it could have had no impact on the jury.

Jenkins has not shown that counsel's failure to interview Ms. Harris prior to trial was either deficient or resulted in any prejudice to his defense. Thus, the Alabama Court of Criminal Appeals' finding that Jenkins failed to satisfy the *Strickland* test was neither contrary to nor an unreasonable application of clearly established Federal law, nor was it based on an unreasonable determination of the facts.

### d.    Failure to interview Doug Thrash

Jenkins claims that counsel were ineffective for failing to interview Doug Thrash prior to trial. He alleges that, at trial, Mr. Thrash claimed for the first time that, on the night of April 18, 1989, "he heard Mr. Jenkins talk to Ms. Vines about Ms. Hogeland and in that conversation he heard something about the '10th Avenue Omelet Shoppe,' the location where Ms. Hogeland had transferred." (Doc. 12 at 68). Jenkins argues that because there was no evidence that he knew the 10th Avenue Omelet Shoppe even existed, much less that the victim had been transferred there, "this dubious

testimony proved decisive." (*Id*.). He concludes that a pretrial interview would have prevented this new testimony or would have given the defense the opportunity to alter its theory to accommodate it. (*Id*.). The Alabama Court of Criminal Appeals found the claim to be without merit:

> Jenkins argues that counsel was ineffective in failing to interview Doug Thrash - the manager of the Riverchase Omelet Shoppe where the victim worked. Thrash testified that he sent the victim to the Tenth Avenue Omelet Shoppe on the evening of April 18, 1989, because the Tenth Avenue location was short of personnel. The record shows that Thrash made a pretrial statement to police in which he said that he overheard Jenkins and another employee talking at the Riverchase Omelet Shoppe and that he did not hear any mention of the fact that the victim had been sent to work at another location that evening. At trial, Thrash testified that he overheard someone mention the Tenth Avenue Omelet Shoppe when Jenkins was in the Riverchase Omelet Shoppe.

> The record shows that counsel did impeach Thrash with this information. Counsel questioned him as to why he did not tell police that the Tenth Avenue location was mentioned when Jenkins was at the Riverchase Omelet Shoppe. The record does not support Jenkins's contention.

*Jenkins*, 972 So. 2d at 129. Jenkins maintains that the state court's adjudication of this claim resulted in a decision that was contrary to, or an unreasonable application of, clearly established Federal law, and was also based on an unreasonable determination of the facts. (Doc. 12 at 73).

Doug Thrash, the district supervisor at Omelet Shoppe, testified that Jenkins was

201

a regular customer who came into the Omelet Shoppe "just about every shift at least once or twice a day," and talked to "just about everybody that worked there." (R. Vol. 5 at 960). On the night of April 18, 1989, Mr. Thrash was working at the Riverchase store with waitresses Shirley Harrelson and Frieda Vines when Jenkins entered the store at approximately 1:00 a.m. with Christine, a former Omelet Shoppe employee. (*Id*. at 959-60). Mr. Thrash testified that while Jenkins was talking to the waitresses that night, he heard one of the waitresses and Jenkins mention the 10th Avenue Omelet Shoppe, but did not recall Tammy Hogeland being mentioned. (*Id*. at 962-63).

On cross-examination, Mr. Thrash admitted that he had met with the district attorney the week prior to trial. (*Id*. at 972). Defense counsel also brought out on cross-examination that, during that meeting, the district attorney explained to Mr. Thrash that he would be called to testify in the case, why he was being called to testify, and the significance of his testimony. (*Id*. at 972-73). Defense counsel then cross-examined Mr. Thrash on his interview with Officer Ronnie Cribbs in June, 1989:

> Q. Back in June of 1989 when you were interviewed by Ronnie Cribbs, Ronnie Cribbs specifically asked you if you had heard or had Mark Jenkins inquired about Tammy going to the 10th Avenue store, and you told him that you did not hear anything about that, isn't that true?
>
> A. I didn't hear him ask any specific question about where she was, no. But that night, I did hear somebody mention something about the 10th Avenue. Now, I don't know what kind of question was asked.

202

Q. And you don't know what was said?

A. No, I don't know –

Q. You just remember 10th Avenue?

A. Yes, sir.

Q. You don't remember anything else about the conversation?

A. No, sir.

Q. And you didn't hear anything else that was said but 10th Avenue?

A. I remember 10th Avenue being brought up, and the reason I do is because we're not supposed to inform anybody, customers or other employees where an employee is working, their phone number, address, or anything else.

Q. And to your knowledge, no one was doing that; is that correct?

A. Well, as far as I know –

Q. You just heard the words 10th Avenue, isn't that correct?

A. I heard the words 10th Avenue, and I knew that Tammy was supposed to work in that unit. She was scheduled to work in that unit that night.

Q. Well, Christine was working at that store at that time, wasn't she?

A. She wasn't employed. I think she had just quit.

Q. And Laurie Acton, you saw her out there that night, and she was with them and she was employed?

A. Now, that, I don't remember.

Q. But it is true that you never told Ronnie Cribbs anything about 10th Avenue?

A. I'd say that's been a couple of years ago. I don't remember all the conversation I had with Ronnie Cribbs.

Q. But you won't deny you never told Ronnie about 10th Avenue, would you?

A. No, but I'm not going to say I didn't.

(*Id*. at 973-75).

Jenkins alleges that counsel were ineffective for failing to interview Mr. Thrash prior to the trial. To prevail on this claim, Jenkins must show that counsel's performance was deficient and that the deficient performance prejudiced the defense. Again, Jenkins seems to combine the two parts of the *Strickland* test into an argument that counsel were necessarily ineffective because he was prejudiced by their failure to interview Mr. Thrash prior to trial.

Additionally, Jenkins offers no explanation as to how interviewing Mr. Thrash prior to trial would have prevented his testimony at trial. Defense counsel did impeach Mr. Thrash at trial, pointing out the inconsistency between his pretrial statement to the police (that he did not hear Jenkins and another employee discussing the 10th Avenue Omelet Shoppe) and his trial testimony (that "somebody" mentioned the 10th Avenue Omelet Shoppe location). However, there is simply nothing to indicate that a pretrial

204

interview would have changed or prevented Mr. Thrash's testimony, or that it would have changed the outcome of the trial.

Jenkins has failed to show that counsel's failure to interview Mr. Thrash prior to trial was either deficient or resulted in any prejudice to his defense. Thus, the Alabama Court of Criminal Appeals' finding that the record failed to support Jenkins's contention that counsel were ineffective for failing to interview Mr. Thrash was not contrary to or an unreasonable application of clearly established Federal law, nor was it based on an unreasonable determination of the facts.

### e.    Failure to interview Frieda Vines

Jenkins asserts that counsel were ineffective for failing to interview Frieda Vines prior to trial. He claims that while her testimony in the Rule 32 proceedings was favorable to the defense and entirely consistent with Mr. Thrash's pretrial statement, it contradicted Mr. Thrash's trial testimony. (Doc. 12 at 68). He argues that Ms. Vines's testimony at trial would have contradicted and impeached Mr. Thrash's trial testimony. (*Id.* at 69). The Alabama Court of Criminal Appeals denied this claim on the merits:

> Jenkins next argues that Scofield failed to interview Frieda Vines, an employee of the Riverchase Omelet Shoppe, who, he alleges, could have testified that when Jenkins was in that store no one mentioned the Tenth Avenue Omelet Shoppe.

Vines was called to testify at the Rule 32 hearing. She testified that she could not remember whether any conversation took place about the Tenth Avenue Omelet Shoppe. (R. 298-99.) Jenkins failed to present evidence to support this contention.

*Jenkins*, 972 So. 2d at 129. Jenkins maintains that the state court's adjudication of this claim resulted in a decision that was contrary to, or an unreasonable application of, clearly established Federal law, and was also based on an unreasonable determination of the facts. (Doc. 12 at 73).

Ms. Vines did not testify at trial. However, she testified as follows in the Rule 32 proceedings:

Q. Do you remember, following Ms. Hogeland's disappearance and ultimate death, do you remember having a conversation with a police officer, Ron Cribbs?

A. I remember a conversation. I don't remember the cop's name.

Q. If Ronnie Cribbs filed a police report in which he documents your statements about this case, would that be consistent about your recollection?

A. Yes.

Q. Do you remember your conversation with Mr. Cribbs?

[The Prosecution]: Your Honor, it might be helpful if Mr. Flood shows her her statement.

The Court: You are asking if she recalls the conversation?

Mr. Flood: Yes.

206

The Court: That is a yes or no.

Q. Do you remember that conversation?

A. You mean do I remember what I told him?

Q. Yes.

A. (Nods head in the affirmative.)

Q. Prior to this hearing today, I asked you if you would like to read over your statement, and you said you wouldn't. Is that correct?

A. Yes.

Q. Would you like to read over it now?

A. If you want me to read it, I will; but I remember what it says.

Q. The crux of your conversation with Corp. Ronnie Cribbs was related to a conversation you had with Mr. Jenkins the night of the crime. Right?

A. Yes.

Q. Do you remember that conversation?

A. Yes.

Q. Do you remember if during that conversation, Mr. Jenkins ever talked about Ms. Hogeland?

A. No.

Q. Do you remember during that conversation if you or Mr. Jenkins ever talked about the 10th Avenue Omelet Shop[pe]?

207

[The Prosecution]: Your Honor, this is leading.

The Court: Try not to lead.

A. No.

Mr. Poole: Could we have a clarification if "No, she doesn't remember" or "No, he didn't."

A. No, I don't remember.

Q. You don't remember?

A. I don't remember specifically if he did or did not.

Q. Do you remember having a conversation with me this past November and we talked about this?

A. Yes.

Q. Do you remember telling me that he did not talk about that?

A. Yes. I also told you I didn't remember if I did or didn't.

Q. Which is it? It is my recollection you said he did not talk about that?

A. Right.

Q. Was there a conversation between you and Mr. Jenkins about the 10th Avenue Omelet Shop[pe]?

A. No.

[The Prosecution]: Your Honor, is it "No, there was no conversation" or "No, she doesn't remember"?

The Court: I understand her to say there was no

208

conversation. Is that right?

A. Yes, that's right.

Q. Did the police officer who took your statement ever tell you or provide information to you there was another suspect in this case?

[The Prosecution]: Your Honor, objection. That is irrelevant.

The Court: She can answer if she knows.

A. No.

Q. That's all.

On examination by [the Prosecution]:

Q. Just because you don't recall any conversation with yourself and Mr. Jenkins concerning Tammy Hogeland, the victim in this case, that doesn't mean that you don't know if he talked about it to anybody else, do you?

A. I have no idea.

Q. That's all.

(Rule 32 R. Vol. 21 at 366-70).

The Alabama Court of Criminal Appeals found that Jenkins failed to provide evidence to support this claim. The court specifically noted that Ms. Vines "testified that she could not remember whether any conversation took place about the Tenth Avenue Omelet Shoppe." *Jenkins*, 972 So. 2d at 129. Jenkins argues that "[c]ontrary to the state court's finding, Ms. Vines (who did not testify at trial) testified in Rule 32

that she did not discuss Ms. Hogeland or the 10th Avenue Omelet Shoppe, as was

suggested by Mr. Thrash." (Doc 12 at 68). Jenkins adds that:

> Vines' testimony contradicts the part of the account that Thrash changed
> at trial. Absent this contradiction, the State was able to fill a critical gap
> in its proof and, thereby, connect Mr. Jenkins to the victim by arguing that
> Vines directed him to where Ms. Hogeland was working the night she
> disappeared.[49] Because there was no evidence Mr. Jenkins even knew
> that the 10th Avenue Omelet Shoppe existed, much less that Ms.
> Hogeland had been transferred there, this dubious testimony proved
> decisive.

(*Id*.).

Vines's testimony at the hearing on the Rule 32 petition was not entirely clear.

When asked if she remembered Jenkins talking about Tammy Hogeland, Ms. Vines

testified that she did not remember if he did or if he did not. (Rule 32 R. Vol. 21 at 367-

68). When asked if she remembered if she or Jenkins talked about the 10th Avenue

Omelet Shoppe, she testified that she did not remember. (Rule 32 R. Vol. 21 at 367-

68). When Jenkins's Rule 32 counsel asked Vines if she remembered telling counsel

previously that Jenkins did not talk about the 10th Avenue Omelet Shoppe, she stated

that she did remember telling counsel that *Jenkins* did not talk about the 10th Avenue

Omelet Shoppe, but added that she also told counsel that she did not remember if *she*

talked about it or not. (*Id*. at 368). When questioned further, Ms. Vines stated that there

---

[49] Jenkins cites nothing to support his assertion that the State argued that Vines "directed" him to the
10th Avenue Omelet Shoppe.

was no conversation between her and Jenkins about the 10th Avenue Omelet Shoppe. (*Id*. at 369). However, on cross-examination, Ms. Vines explained that she had no idea whether Jenkins discussed the 10th Avenue Omelet Shoppe with anyone else. (*Id.*).

Jenkins argues that Vines's testimony at trial would have been critical to his defense, because if she had testified that she did not discuss the victim or the 10th Avenue Omelet Shoppe on the night of the murder, there would have been no evidence that Jenkins even knew the 10th Avenue Omelet Shoppe existed. However, given Ms. Vines's somewhat contradictory testimony, it is equally possible that a jury could have concluded from her testimony that she simply could not remember whether or not anyone had mentioned to or discussed with Jenkins either Ms. Hogeland or the 10th Avenue Omelet Shoppe. Thus, Jenkins has not shown that his counsel was constitutionally ineffective.

Furthermore, Officer Cribbs testified that someone he interviewed during his investigation of the crime indicated to him that "they told [Jenkins] that Tammy was at the 10th Avenue store." (R. Vol. 7 at 1245). Thus, even had Vines testified at trial in the manner that Jenkins suggests, the jury still would have heard Officer Cribbs's testimony, which the jury could find suggested that Jenkins did have knowledge of where the victim was working the night she was killed. Thus, Jenkins cannot show that he was prejudiced in any way by counsel's failure to interview Vines prior to trial.

211

As Jenkins has failed to show ineffective assistance or prejudice, he necessarily has filed to show that the state court's finding was contrary to or an unreasonable application of clearly established Federal law, or that it was based on an unreasonable determination of the facts.

### f.   Failure to discover that another suspect was detained and questioned in connection with the victim's murder

Jenkins further claims that counsel were ineffective for "failing to thoroughly review the prosecution's files and discovering [sic] that a report indicating that a man, matching the description of the suspect, was detained in a highly unusual set of circumstances, extradited back to Alabama and questioned in connection with Tammy Hogeland's murder." (Doc. 12 at 69-70). He contends that this information would have been invaluable to him in advancing an "identification defense" by casting doubt on state witness identifications, and it would have "put a face on another suspect who had both the opportunity to abduct Ms. Hogeland and who fit the eyewitness descriptions of the suspect." (*Id.* at 70). The Alabama Court of Criminal Appeals denied this claim on the merits:

> Jenkins argues that Scofield failed to review the prosecution's files. Specifically, he argues that Scofield should have discovered that another suspect had been arrested in connection with Hogeland's murder. FN.10.
>
> FN.10. Jenkins also argues that the State violated *Brady v.*

*Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by failing to disclose this information to the defense. We note that Jenkins's arguments on this issue appear to be inconsistent.

Scofield testified at the evidentiary hearing that the State had an open-file discovery policy, that he reviewed the State's files, that he had conversations with the district attorney about the State's evidence, and that he had been mailed reports from the National Crime Information Center ("NCIC") regarding several of the State's witnesses. The following occurred at the evidentiary hearing:

Q [Defense attorney]: Did you review the entire District Attorney file in this case?

A [Scofield]: Yes, I did.

Q: During the review of that evidence, was there any time at which you saw the State had any information regarding other suspects for this crime?

A: No, I don't remember seeing anything in the file about other suspects.

Q: Had there been information in the files, do you think you would have recalled that?

A: That is definitely one of the things I would have been looking for.

Q: Why is that?

A: In an identification case like this, that is generally one of the things that is helpful. You are always looking for 'Is this guy the only person they have ever focused on?' Or 'Are there other people that match the description?' You are always looking at 'Do the descriptions match? How

213

accurate are the identifications? Misidentifications. Suspects.' That is basic stuff you look for.

Q: You described this as an identification case. What do you mean by that?

A: The State's case, at the time prior to trial, they had no one who could positively identify Mark Allen Jenkins as the individual who left with Tammy Hogeland the night of the murders. They had one person who supposedly was an eyewitness, who previously could not pick Mark out of a photographic lineup or a live lineup. I actually attended that live lineup. She couldn't pick Mark out of that lineup. I was told she couldn't pick him out of a photographic lineup. There was one other witness whose identification was a little bit questionable-the older couple. There was some talk about maybe they saw something on Crime-Stoppers. FN.11. The question there was any subsequent identifications-were they identifying Mark as the person they saw on Crime-Stoppers or were they identifying him from the time. They had some real questionable issues with regard to being able to identify Mark as the individual who was at the Omelet Shoppe that night.

> FN.11. Crime-Stoppers' was a television segment that would be aired on the local newscast, seeking information from viewers to help police solve a recent crime.

Q: Were there any special circumstances which would have given you a heightened sensitivity to identification issues or other suspect evidence in this case?

A: You know, one case I previously tried and had specific recollection, I had gotten a conviction overturned on a *Brady* [*v. Maryland*, 373 U.S. 83 (1963) ], issue in which the State failed to disclose this type of evidence. In that

particular case, the police failed to disclose two-

[Assistant attorney general]: Your Honor, this other case is irrelevant.

The Court: It really is. I understand you are showing he is aware of an issue. Let's move along.

Q: I show you what has been marked-Your Honor, this is a document that has been turned over to me by the State of Alabama during the discovery process. It was represented this came out of the District Attorney's file. It was provided to me by opposing counsel. It has been in my custody and possession since I have received it.

[Assistant attorney general]: We have some objections to this document being offered at this time.

The Court: We'll see.

Q: Will you take a look at what is marked Petitioner's No. 4. Have you seen this before?

A: Yes, I have.

Q: Where did you see it the first time?

A: At my office Saturday morning.

Q: Prior to Saturday, January 18, 1997, had you seen this document before?

A: I had not.

Q: What does that document appear to be?

A: It appears to be a police report from Jackson,

215

> Mississippi, in which an individual by the name of Potagly or something like that-Bragley or something-was arrested apparently in connection with Tammy Hogeland's disappearance. It appears from this document that the St. Clair County Sheriff's Office requested he be held on a warrant and extradited back to St. Clair County with regard to the missing person-the Tammy Hogeland case.

(R. 298-302.) The above testimony shows that Jenkins has failed to satisfy the *Strickland* test.

*Jenkins*, 972 So. 2d at 129-131. Jenkins claims that the state court's adjudication of this claim resulted in a decision that was contrary to, and involved an unreasonable application of, clearly established Federal law, and that it was based on an unreasonable determination of the facts.

The report in question is a police report from the Jackson, Mississippi Police Department. (Rule 32 C.R. Vol. 19 at 462-71). The report documents that on April 24, 1989, John Beraglia was traveling on a Greyhound bus when witnesses overheard him talking about killing and shooting people. (*Id*. at 465-66). The witnesses contacted the police who found Beraglia at the Greyhound Bus Station. (*Id*. at 469). Beraglia stated that he "started riding the bus on about" April 19, 1989, but was not sure if he got off the bus in Birmingham. (*Id*. at 467-68). According to the report, the police took Beraglia into custody pursuant to a teletype from the Pell City, Alabama police department, because he matched the general description of Jenkins, except that he

216

weighed 100 pounds more than Jenkins. (*Id*. at 465, 467). District Attorney Van Davis testified at the Rule 32 evidentiary hearing that "some BOLO's" had been issued by Alabama authorities "to agencies between Alabama and California," indicating that Jenkins was possibly traveling by bus. (Rule 32 R. Vol. 22 at 559). Mr. Davis added that they were looking for Jenkins, not an unknown suspect. (*Id*.). Mr. Davis further testified that he had an "open-file policy," and his routine was to meet with opposing attorneys to allow them to look through his file, and request copies of any document they wanted. (*Id*. at 539). He added that he did not withhold the police report from defense counsel. (*Id*. at 540).

Jenkins's trial attorney, Doug Scofield, testified at the Rule 32 evidentiary hearing that he reviewed the district attorney's entire file in Jenkins's case, but he did not "remember seeing anything in the file about other suspects." (Rule 32 R. Vol. 21 at 298). He later testified that he was "absolutely positive" he did not see the police report in the district attorney's file. (*Id*. at 325). Jenkins faults counsel for failing to discover the report, claiming that the report would have advanced his "identification defense," and would have given the jury another suspect who fit the eyewitness descriptions of the suspect. (Doc. 12 at 70).

Mr. Scofield testified that he thoroughly reviewed the district attorney's file but did not see the police report. (Rule 32 R. Vol. 21 at 324). At most, counsel's failure to

217

discover the report was mere negligence on their part and cannot be said to constitute an error so serious that they were not functioning as the counsel guaranteed by the Sixth Amendment. *See Strickland*, 466 U.S. at 687.

Regardless of whether counsel's failure to discover the report was constitutionally deficient, Jenkins cannot show that he was prejudiced as a result. First, it does not appear that the report would have helped Jenkins to establish that there was ever another suspect in his case, <u>since Beraglia was stopped merely on suspicion of being Jenkins</u>, who was the only suspect in the case. Further, Jenkins was identified by several witnesses at trial as being the man who was last seen with the victim.[50] Finally, the circumstantial evidence against Jenkins was substantial. In short, Jenkins cannot show that, had counsel known about the Beraglia police report, the outcome of his trial would have been any different.

Thus, the finding of the Alabama Court of Criminal Appeals that Jenkins failed to establish counsel were ineffective for failing to discover the Beraglia police report was not contrary to or an unreasonable application of clearly established Federal law, nor was it based upon an unreasonable determination of the facts.

---

[50] Sarah Harris identified Jenkins at trial as being the man with whom the victim left the Omelet Shoppe in a red car. (R. Vol. 3, Tab 9 at 530). Geraldine and Bobby Coe identified Jenkins as the man they had seen at around 5:00 a.m. on April 18, 1989, at the Chevron gasoline station in Springville, Alabama, in a little red car, with a girl apparently passed out or asleep in the passenger seat. (R. Vol. 5, at 869-76; 900-11).

### g.     Failure to conduct appropriate voir dire

Jenkins claims that, during jury selection, his attorneys were disorganized, lacked a strategy, and failed to ask effective questions, causing them to fail to develop juror bias that would have led to challenges for cause or informed peremptory challenges. (Doc. 12 at 70). He adds that:

> As a result of counsel's ineffectiveness during jury selection numerous jurors who were unqualified to serve, due to their strong views in favor of the death penalty (R1 at 335, 337, 361, 363), the use of alcohol (R1 at 300-01), defendants testifying (R1 at 360), law enforcement (R1 at 235, 352, 354, 358), or knowledge about the case (R1 at 212), were not removed for cause or by peremptory challenge. Conversely, trial counsel failed to rehabilitate jurors who expressed views against the death penalty, and did nothing to educate the jury about the identification evidence or to determine whether jurors held biases against such a defense, and remove jurors who could not be impartial.

(*Id*. at 71). The Alabama Court of Criminal Appeals denied this claim on the merits:

> Jenkins argues that his attorneys failed to conduct an adequate voir dire examination that he says would have disclosed biases of certain prospective jurors. Specifically, Jenkins argues that the examination failed to disclose those jurors who favored capital punishment, failed to disclose jurors who were biased against individuals who consumed alcohol, failed to disclose jurors who believed that a defendant, if innocent, should testify, and failed to disclose those jurors who were opposed to capital punishment.
>
> > The circuit court stated the following concerning this general claim:
> >
> > > In setting forth this claim in his petition, Jenkins failed to include a "full disclosure of the factual basis" of the grounds upon which he contends he is entitled to relief. Rule

219

32.6(b), A.R.Crim.P. Likewise, other than general questions of trial counsel about the jury selection, Jenkins presented no evidence relevant to this claim at the evidentiary hearing. In fact, it was established at the hearing that Stan Downey was primarily responsible for the selection of the jury due to his status as a "local" attorney. However, Jenkins failed to call Mr. Downey as a witness. There was no indication that Mr. Downey was unavailable to testify.

Jenkins has offered nothing concerning how the voir dire of the jury panel should have been conducted. He has not shown that the voir dire, as handled by trial counsel, fell outside "the wide range of reasonable professional assistance." *Strickland v. Washington*, 466 U.S. at 668. Furthermore, Jenkins has not shown a reasonable probability that, had a different method of voir dire been employed, the result of the trial would have been different. *Id*. at 694-95. Jenkins has the burden to prove by a preponderance of the evidence the facts necessary to show that he was entitled to relief. Rule 32.3, A.R.Crim.P. He has failed to meet his burden.

(C.R. 306-07.)

As to the specific claims Jenkins raises in his brief to this Court, there was no evidence presented to support any of the grounds raised in the petition. Jenkins failed to present any evidence to support this claim; therefore, he failed to meet his burden of proof. See Rule 32.3, Ala.R.Crim.P.

*Jenkins*, 972 So. 2d at 135. Jenkins maintains that the state court's adjudication of this claim was contrary to, and involved an unreasonable application of, clearly established Federal law, and that it was based upon an unreasonable determination of the facts. (Doc. 12 at 73).

220

Jenkins has offered nothing but conclusions in support of this claim. Although he argues that counsel should have conducted voir dire differently, he does not identify what counsel should have done differently. In short, he offers nothing that would indicate counsel's performance in regard to voir dire was unreasonable. Further, even if counsel performed unreasonably, Jenkins offers nothing to show that there is a reasonable probability that, had counsel conducted voir dire differently, the result of his trial would have been different. Therefore, this court cannot find that the Alabama Court of Criminal Appeals' determination that he failed to present any evidence to support this claim was contrary to, and involved an unreasonable application of, clearly established Federal law, or that it was based upon an unreasonable determination of the facts.

### h.    Failure to make numerous objections at trial

Jenkins contends that counsel were ineffective for failing to make numerous objections at trial, including failing to object to the prosecutor's misconduct, failing to object to the trial court's misstatements of the law, and failure to ensure that the trial court's errors were preserved for appellate review. (Doc. 12 at 71-72). Specifically, he claims that:

> Trial counsel denied Mr. Jenkins of the effective assistance of counsel in failing to adequately protect his constitutional rights by objecting to the prosecutor's highly improper and prejudicial misconduct,

including misstatements of the law regarding reasonable doubt, elements of capital murder, robbery as an aggravating factor, robbery as an afterthought, kidnapping, and the State's burden of proof. (R1 at 1550, 1551-53, 1560, 1609, 1610, 1611-13, 1614, 1615, 1619, 1621-22, 1735, 1736, 1737, 1748.) *See*, Issue F, *supra*. Trial counsel failed to object to the prosecutor's other misconduct including expressing personal opinions about guilt, vouching for the State's evidence, arguing in favor of non-statutory aggravating circumstances, arguing deterrence, introducing improper victim impact, comparing the rights of the victim to those of the defendant, encouraging the jury to base its verdict on speculation and hearsay, commenting on Mr. Jenkins's failure to testify, making improper burden-shifting arguments, and referring to inflammatory evidence which had been excluded. (R1 at 1548-51, 1553, 1556-57, 1604, 1608, 1609, 1611, 1612, 1614, 1619, 1622, 1623, 1625, 1629, 1630, 1633-35, 1734-37.) *See*, Issue F, *supra*.

Trial counsel failed to object and properly preserve the numerous instances where the trial court either misstated the law, failed to charge or gave inadequate or misleading instructions on lesser included offenses of felony-murder, unintentional murder, and intoxication, on aggravating circumstances, robbery as an afterthought, voluntariness, on Mr. Jenkins's failure to testify, circumstantial evidence and reasonable doubt, and the jury's advisory verdict. (R1 at 1550, 1613, 1647, 1649-50, 1652, 1661-64, 1666, 1669, 1672-73, 1687-89, 1714-17.) *See*, Issue E, *supra*.

Trial counsel also rendered ineffective assistance in failing to insure [sic] that the record preserved additional errors including failing to object to the improper double-counting a single criminal act – the act of murder – in order to elevate a non-capital murder into a kidnapping-capital murder, failing to adequately object to the admission of inflammatory photographs, failing to object to and moving for a mistrial due to the emotional outbursts from the victim's family, failing to object to the method of execution, failing to object to victim impact evidence, failing to object to breaks in the chain of custody and evidence lacking a proper legal foundation, and failing to object to hearsay.

(Doc. 12 at 71-72). The Alabama Court of Criminal Appeals denied the claims on the

merits on appeal from the denial of Jenkins's Rule 32 petition:

222

Jenkins also argues that Scofield failed to object to the repeated misconduct on the part of the prosecutor, failed to object to instances where the trial court misstated the law, failed to object and to ensure that a complete record was transcribed for appellate review, failed to object to allegedly improper venue, and failed to make a laundry list on appeal of other objections that should have been made at trial. Again, Jenkins merely includes a laundry list of where he thinks objections could have been made and failed to offer any evidence to support each specific instance he alleges Scofield failed to make an objection. When addressing this issue, the circuit court stated:

> Trial counsel testified that during the course of the trial, he objected to matters he felt were improper. He additionally testified concerning his extensive appellate experience and stated that he knew the importance of preserving and protecting a record. Trial counsel's performance cannot be said to have been "outside the wide range of professionally competent assistance" simply because he failed to raise every available objection to argument. The Constitution does not guarantee a perfect trial but rather a "fair and a competent attorney." *Engle v. Isaac*, 456 U.S. at 134; *Stanley v. Zant*, 697 F.2d 955, 964 n. 7 (11th Cir. 1983), *cert. denied*, 467 U.S. 1219 (1984) ("[A] defendant is not entitled to perfection but to basic fairness."). A lawyer's "heat-of-trial decision," concerning when to object, should not be second-guessed by those having the benefit of hindsight. *Fleming v. Kemp*, 748 F.2d 1435, 1450 (11th Cir. 1984), *cert. denied*, 475 U.S. 1058 (1986). Finally, Jenkins has failed to show that a different outcome of the trial probably would have resulted but for counsel's allegedly ineffective performance. He has failed to meet the required showing of both deficient performance and prejudice pursuant to Strickland.

(C.R. 313.)

As we stated in *Daniels v. State*, 650 So.2d 544, 555

223

(Ala.Crim.App. 1994):

> "[E]ffectiveness of counsel does not lend itself to measurement by picking through the transcript and counting the places where objections might be made." *Stringfellow v. State*, 485 So.2d 1238, 1243 (Ala.Cr.App.1986). "Even though there were several instances where counsel could have objected, 'that does not automatically mean that the [appellant] did not receive an adequate defense in the context of the constitutional right to counsel.' *Ex parte Lawley*, 512 So.2d 1370, 1373 (Ala. 1987)." *O'Neil v. State*, 605 So.2d 1247, 1250 (Ala.Cr.App. 1992). As this Court observed in *Graham v. State*, 593 So.2d 162, 166 (Ala.Cr.App. 1991):

>> "The lawyer whose performance the appellant now attacks zealously and vigorously defended the appellant. No particular decision to object or not object, even if it is a bad decision, is in itself proof that counsel's performance fell below acceptable professional standards."

As the United States Court of Appeals for the Eleventh Circuit stated in *Marek v. Singletary*, 62 F.3d 1295 (11th Cir. 1995):

> We begin any ineffective assistance inquiry with "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." [*Strickland v. Washington*, 466 U.S. 668,] at 689, 104 S.Ct. [2052] at 2065 [ (1984) ]; *accord, e.g., Atkins v. Singletary*, 965 F.2d 952, 958 (11th Cir. 1992) ("We also should always presume strongly that counsel's performance was reasonable and adequate. . . ."), *cert. denied*, [515] U.S. [1165], 115 S.Ct. 2624, 132 L.Ed.2d 865 (1995). "[A] petitioner seeking to rebut the strong presumption of effectiveness bears a difficult burden." *Waters v. Thomas*, 46 F.3d 1506, 1512 (11th Cir. 1995) (en banc).

62 F.3d at 1299. Jenkins has failed to satisfy the *Strickland* test.

*Jenkins*, 972 So. 2d at 135-37.

As the state court noted, Jenkins has presented nothing more than a laundry list of objections he believes counsel could have made during the trial. Even assuming that counsel could be found deficient for failing to make each of these objections, Jenkins has offered nothing to suggest that there is a reasonable probability that, had counsel made them, the outcome of his trial would have been different. Because he has failed to establish that he was prejudiced as a result of counsel's failure to make these objections, this Court finds that the state court's determination that Jenkins failed to meet the *Strickland* standard was neither contrary to nor an unreasonable application of clearly established Federal law, nor was it based upon an unreasonable determination of the facts.

### i.   Failure to present a coherent and consistent theory of defense

Finally, Jenkins argues that counsel were ineffective for failing:

to present a coherent and consistent theory to the jury and, in presenting mutually inconsistent theories – innocence based on misidentification and manslaughter based on intoxication – undermined both. *See Cave v. Singletary*, 971 F.2d 1513 (11th Cir. 1992) (finding trial counsel ineffective for talking out of both sides of her mouth by arguing defendant was guilty of armed robbery but then trying to convince the jury she was not guilty of felony murder).

225

(Doc. 12 at 73). Jenkins presented this claim in his amended Rule 32 petition and on appeal from the denial of that petition, but the Rule 32 court was the last court to specifically address the claim. In denying the claim, the trial court held:

> As part of this claim, Jenkins asserts that "[t]rial counsel's ineffectiveness included, but is not limited to, . . . failing to develop and argue a coherent defense theory of the case." (Jenkins's amended petition at p. 14) To the extent that any of the general claims above relate to specifically pled claims found elsewhere in Jenkins's petition, this Court incorporates by reference any applicable portions of this order. However, in so far as the above quoted contentions are set forth as independent claims, they are dismissed for failure to meet the "clear and specific statement of the grounds" requirement of Rule 32.6(b), which requires that a claim for relief include "full disclosure of the factual basis" of the grounds upon which relief is sought. Jenkins has failed to meet this requirement.

(Rule 32 C.R. Vol. 45, Tab 77 at 315-16).

Jenkins asserts that defense counsel failed to present a coherent and consistent theory to the jury by arguing "mutually inconsistent theories" in their closing statement to the jury. (*Id*.). He submits that, in their closing argument, defense counsel argued that Jenkins was innocent based upon misidentification and also argued that Jenkins committed manslaughter because he was too intoxicated to form the intent to kill the victim. (*Id*.). However, a review of closing argument reveals that the focus of the defense counsel's argument was that Jenkins was not the perpetrator of the crime. (R. Vol. 8, Tab 12 at 1561-99; R. Vol. 9 at 1600-03). Defense counsel argued that Jenkins

lacked intent to commit any crime, or even to see the victim the night of the crime, and

that he was too intoxicated to have committed the crime, given the short timeline of

events. (*Id*.). It was not until the very end of the closing argument that defense counsel

argued for a finding of manslaughter. (*Id*. at 1602-03). At that point, counsel argued

that:

> And when you [weigh] the evidence of intent, when you look to see if
> there was any evidence based on what you heard and on what the State
> brought you, that Mark Allen Jenkins intended to cause the death of
> Tammy Hogeland, I believe that after considering the evidence that if you
> are convinced beyond a reasonable doubt that Mark Allen Jenkins was
> involved in the death of Tammy Hogeland, and again, I attempted to
> address some of the reasonable doubt as to identification, but if you are
> convinced, then I submit to you that the appropriate verdict in this case is
> a verdict for manslaughter, not capital murder, but for reckless murder
> under manslaughter.

(*Id*. at 1602-03). Counsel did not argue inconsistent theories. Clearly the defense theory

was that Jenkins could not have and, in fact, did not commit the crime. Counsel only

urged at the end of the argument that, <u>if</u> the jury did not accept Jenkins's argument that

he was not the perpetrator of the crime, they should not convict him of capital murder

because of the lack of evidence of intent to kill. Defense counsel never argued that

Jenkins committed manslaughter or even conceded that Jenkins was involved with the

victim's death at all.

However, even if counsel could be found constitutionally deficient for his closing

argument, Jenkins has offered nothing to indicate that he was prejudiced. Thus, the trial

court's finding that Jenkins failed to allege a factual basis for a claim of ineffective

assistance of counsel was not contrary to or an unreasonable application of Federal law,

and it was not based upon an unreasonable determination of the facts.

### 5.   The Cumulative Effect of Counsel's Errors Deprived Mr. Jenkins of the Effective Assistance of Counsel

Finally, Jenkins argues that:

> While each of these specific deficiencies warrant a new trial and sentencing, when taken together, their cumulative impact denied Mr. Jenkins of his right to the effective assistance of counsel, due process, a fair trial, and to a reliable guilt and punishment determination. *See Williams v. Taylor*, 529 U.S. 362, 399 (2000) (holding state court correct in concluding that "the entire postconviction record, viewed as a whole and cumulative of mitigation evidence presented originally," raised reasonable probability that result of sentencing proceeding would have been different) (emphasis added); *see also Dobbs v. Zant*, 506 U.S. 357, 359 n. (1993) (holding that "an inadequate or harmful closing argument, when combined . . . with a failure to present mitigating evidence, may be highly relevant to the ineffective-assistance determination under Eleventh Circuit law") (emphasis added); *United States v. Cronic*, 466 U.S. 648, 657 n.20 (1984) (acknowledging that "the Court of Appeals focused on counsel's overall representation of respondent, as opposed to any specific error or omission counsel may have made").

(Doc. 12 at 73-74).

Jenkins raised this claim on appeal from the denial of his Rule 32 petition. (Rule

32 C.R. Vol. 37, Tab 52 at 130). However, the Alabama Court of Criminal Appeals did

not specifically rule on the claim. Absent any showing by Jenkins that the state court

inadvertently overlooked this claim, this court presumes that the Alabama Court of Criminal Appeals denied the claim on the merits. *Johnson v. Williams*, 133 S.Ct. 1088, 1094-97 (2013); *Harrington v. Richter*, 562 U.S. 86, 97–100 (2011).

"The cumulative-error doctrine provides that 'a sufficient agglomeration of otherwise harmless or nonreversible errors can warrant reversal if their aggregate effect is to deprive the defendant of a fair trial.'" *Finch v. Secretary, Dept. of Corrections*, No. 14–12981, 2016 WL559363 at *5 (11th Cir. Feb. 12, 2016) (quoting *Insignares v. Sec'y, Fla. Dep't of Corr.*, 755 F.3d 1273, 1284 (11th Cir. 2014)). "We address claims of cumulative error by first considering the validity of each claim individually, and then examining any errors that we find in the aggregate and in light of the trial as a whole to determine whether the appellant was afforded a fundamentally fair trial." *Morris v. Sec'y, Dep't of Corr.*, 677 F.3d 1117, 1132 (11th Cir. 2012) (citing *United States v. Calderon*, 127 F.3d 1314, 1333 (11th Cir. 1997).

The Eleventh Circuit Court of Appeals has made clear that where there is no error, a cumulative error argument is without merit. *Insignares v. Sec'y, Fla. Dep't of Corr.*, 755 F.3d 1273, 1284. None of Jenkins's ineffective assistance of counsel claims has any merit, therefore, there is nothing to aggregate. Accordingly, the Alabama Court of Criminal Appeals finding that Jenkins's cumulative error argument was without merit was not contrary to or an unreasonable application of Federal law, and was not based

upon an unreasonable determination of the facts.

**D.**    **The State Failed To Disclose *Brady* Evidence to the Defense**

Jenkins argues that the state failed to disclose exculpatory information and mitigating evidence and thereby deprived him of his rights to due process, a fair trial, and a reliable sentencing proceeding in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments. (Doc. 12 at 74-76). Specifically, he complains that the state: (1) "suppressed various reports and documents demonstrating that a person fitting the description of the suspect, other than Mr. Jenkins, was arrested and extradited back to Alabama to answer questions in connection with Tammy Hogeland's murder," and (2) "withheld compelling evidence developed by a state facility." (*Id*. at 74-75).    In *Brady v. Maryland*, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment." *Brady*, 373 U.S. 83, 87 (1963). A *Brady* violation has three components: "(t)he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). The prejudice or materiality requirement is satisfied if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been

different." *United States v. Bagley*, 473 U.S. 667, 682 (1985); *see also Kyles v. Whitley*, 514 U.S. 419, 433 (1995). Materiality is determined by asking whether the government's evidentiary suppressions, viewed cumulatively, undermine confidence in the guilty verdict. *See Kyles*, 514 U.S. at 434, 436-37 & n. 10.

Jenkins unsuccessfully raised his *Brady* claim in his Amended Rule 32 petition, and the Alabama Court of Criminal Appeals affirmed the trial court's denial of relief:

> Jenkins argues that the State failed to comply with *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by failing to disclose exculpatory evidence. Specifically, he argues that police failed to disclose that another individual had been arrested and detained for the murder and that the State also withheld evidence about Jenkins's background and character.

> The circuit court made the following findings about this issue:

> > Jenkins alleged . . . that the prosecution failed to make available to him "exculpatory materials" and "mitigating evidence" in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). Jenkins specifically claims: (1) that the prosecution failed to provide him with evidence that another suspect had been questioned about Tammy Hogeland's murder, and (2) that the prosecution withheld mitigating evidence at the penalty phase. This mitigating evidence included aspects of Jenkins's allegedly abusive childhood. Although not specifically referenced in his amended petition, this mitigating evidence was apparently contained in Jenkins's Taylor Hardin [Secure Medical Facility] records and in the pre-sentence report.

> > Turning first to the "other suspect" information, the Court finds that Jenkins did not meet his burden of proving

231

this *Brady* claim at the evidentiary hearing. A *Brady* violation occurs where (1) the prosecutor suppressed evidence; (2) the evidence was favorable to the defendant; and (3) the evidence was material to the issues at trial. Initially, Jenkins did not prove that the evidence was suppressed.

The St. Clair County District Attorney and prosecuting attorney at Jenkins's trial, Van Davis, testified at the evidentiary hearing that his discovery policy now, and at the time of Jenkins's trial, was an "open-file policy." Anything in the file was available to defense counsel for inspection and copying. When shown Petitioner's Exhibit 4, the alleged "other suspect" information, Mr. Davis testified that he recognized the document, that it was part of the file, and that it was absolutely not withheld from Jenkins's trial counsel. Mr. Davis testified that it was his policy at the time of Jenkins's trial to make the entire file available to the defense. Defense counsel would then be allowed to go through the file and identify and mark any material they wanted copied. The D.A.'s office would then make photocopies for defense counsel. This testimony contradicted Jenkins's trial counsel's earlier testimony that he was not permitted to photocopy the file, but instead had to copy by hand the information he wanted. According to both parties, defense counsel was permitted to spend as much time looking at the file as was needed.

Mr. Davis further testified that he never removed anything from Jenkins's file and considered nothing in a capital case to be work product. He stated that nothing had been added to the file in the time period between the end of Jenkins's trial and the turning over of the file to the Attorney General's Office, unless it was some type of post-conviction pleadings.

The Court also finds contradictions in Mr. Scofield's

testimony concerning the police report of the "other suspects." Mr. Scofield initially testified at the evidentiary hearing that he did not "remember seeing anything in the file about other suspect," but subsequently testified that he was "absolutely positive" that he did not see the police report in the file. Based upon the testimony presented at the evidentiary hearing, the observation of the witnesses, and credibility determinations, it is the Court's finding that Jenkins has failed to prove that the "other suspect" report was withheld by the prosecution in violation of *Brady*.

Even assuming arguendo that the "other suspect" information was withheld, the Court further finds that Jenkins has failed to prove that the information was either exculpatory or material. The "other suspect" information consisted of a Jackson, Mississippi, "Police Department Offense/Supplementary," wherein there was information from a Mississippi officer that an individual had been detained in that State. According to the report, the man had been traveling on a bus, reportedly talking about killing and shooting people, and was taking pills. The individual had signs of scars or scratches on his left forearm, and had in his possession bus tickets to continue on to Dallas, El Paso, San Diego, and San Francisco. He also had in his possession tickets that had been used from Richmond, Philadelphia, and Washington, D.C. The tickets had been purchased in Fort Lauderdale.

The individual had been detained because Mississippi officials had received a teletype from St. Clair County concerning Jenkins. The individual told the officer that he thought he began riding the bus on April 19, 1989. He stated that he was asleep on the bus when it arrived in Birmingham and he could not remember if he had gotten off the bus. The supplement also contained information that the individual detained in Mississippi matched Jenkins's description except for his weight. The individual detained in Mississippi

weighed 250 pounds, almost 100 pounds more than the 165-pound Jenkins.

The Court finds that this information was not exculpatory. The fact that an individual was detained in Mississippi who resembled Jenkins in no way exculpated Jenkins in Tammy Hogeland's murder. Van Davis testified at the evidentiary hearing that a [be on the lookout] had been sent to agencies between Alabama and California that Jenkins was possibly traveling by bus. Mr. Davis further testified that they were not looking for an unknown suspect, but that they were looking for Jenkins. The person detained in Mississippi, although generally matching Jenkins's physical description, did not match Jenkins's weight. As previously noted, Jenkins, at the time of his arrest, weighed approximately 100 pounds less than the individual detained in Mississippi.

The amount of evidence incriminating Jenkins in Tammy Hogeland's murder, at the time the individual in Mississippi was detained, was overwhelming. Once it was determined that the individual detained in Mississippi was not Jenkins, the authorities continued to search for Hogeland's murderer. The detention of the individual in Mississippi did not exculpate Jenkins and, thus, no *Brady* violation occurred.

Although unnecessary, the Court will go yet another step further to show that, even assuming that the evidence was both suppressed and exculpatory, Jenkins did not prove that it was material. The other suspect information would have been material "only if there [was] a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682 (1985). Jenkins has

234

offered no evidence that the "other suspect" information would have, to a reasonable probability, changed the outcome of his trial. The evidence establishing Jenkins's guilt was overwhelming, and the information would not have influenced the outcome of his trial.

Moreover, the report was inadmissible hearsay and Jenkins could not prove that it would have been admissible at his trial. Alabama law provides that "other suspect" information is not admissible. "It is recognized that an accused is not entitled to prove, without more, that another has been suspected of committing the crime for which the accused is being tried." *Land v. State*, 678 So.2d 201, 207 (Ala.Crim.App. 1995). "The general rule in Alabama is that an accused is not entitled to introduce testimony that someone else was suspected of committing the crime for which he is being tried." *Land*, 678 So.2d at 207. Here, the "other suspect" was not a suspect at all. He was detained because there was a possibility that he was Mark Allen Jenkins, the one and only suspect. For the above reasons, there was no *Brady* violation concerning the "other suspect" information.

Turning next to the alleged withholding of mitigating evidence at the penalty phase, the Court again finds that there was no *Brady* violation. The information that Jenkins complains was withheld, allegedly mitigating aspects of his childhood and adolescent years that are detailed on page 28 of the amended petition, was information that was within Jenkins's knowledge and could not have been suppressed by the prosecution. There is no *Brady* violation where the information was available to the defense at the time of trial. *Carr v. State*, 505 So.2d 1294, 1297 (Ala.Crim.App. 1987). Moreover, defense counsel testified at the evidentiary hearing that he had some knowledge of most of the information that Jenkins now claims was withheld."

(C.R. 283-88.) The circuit court's findings are correct.

To establish a *Brady* violation a defendant must show (1) that the prosecution suppressed evidence, (2) favorable to the defendant or exculpatory, and (3) material to the issues at trial. *Martin v. State*, 931 So.2d 736, 744 (Ala.Crim.App. 2003).

Here, the record shows that Jenkins was identified as the individual who was last seen with the victim. The police were never looking for another suspect. A BOLO (be on the lookout) was issued for Jenkins, and a person who resembled Jenkins was arrested in Mississippi. This information was not exculpatory evidence.

Moreover, any evidence about Jenkins's childhood that he alleges was withheld was information within his knowledge.

'There is no *Brady* violation where the information in question could have been obtained by the defense through its own efforts.' *Johnson* [*v. State* ], 612 So.2d [1288] at 1294 [ (Ala.Crim.App. 1992) ]; *see also Jackson v. State*, 674 So.2d 1318 (Ala.Cr.App. 1993), *aff'd in part and rev'd in part on other grounds*, 674 So.2d 1365 (Ala. 1995). ' "Evidence is not 'suppressed' if the defendant either knew . . . or should have known . . . of the essential facts permitting him to take advantage of any exculpatory evidence." *United States v. LeRoy*, 687 F.2d 610, 618 (2d Cir. 1982)[, *cert. denied*, 459 U.S. 1174, 103 S.Ct. 823, 74 L.Ed.2d 1019 (1983) ].' *Carr v. State*, 505 So.2d 1294, 1297 (Ala.Cr.App. 1987) (noting, 'The statement the appellant contends was suppressed in this case was his own, and no reason was set forth to explain why he should not have been aware of it.'). Where there is no suppression of evidence, there is no *Brady* violation. *Carr*, 505 So.2d at 1297.

*Freeman v. State*, 722 So.2d 806, 810-11 (Ala.Crim.App. 1998). Jenkins has failed to prove that the State violated *Brady*.

*Jenkins v. State*, 972 So. 2d 111, 155-58 (alterations in original).

With respect to his claim that the state suppressed evidence indicating the existence of another suspect in the murder, Jenkins contends that John Beraglia, a person fitting the description of the suspect, was arrested and extradited back to Alabama to answer questions in connection with Tammy Hogeland's murder. (Doc. 12 at 74). He adds that Beraglia "became a suspect because of his physical attributes, his recent flight from Birmingham, suspicious scratches on his arms consistent with having committed a violent assault, and his admission that he had recently killed someone in the Birmingham area." (*Id*. at 74-75).

However, as the Alabama Court of Criminal Appeals stated, the record shows that "Jenkins was identified as the individual who was last seen with the victim" and that the "police were never looking for another suspect." *Jenkins*, 972 So. 2d at 157. Rather, Beraglia, a person who resembled Jenkins, was arrested in Mississippi, pursuant to a BOLO (be on the lookout) issued for Jenkins. *Id*.

Jenkins has offered nothing to support his assertion that Beraglia was a separate suspect in the murder. Thus, the appellate court's finding that the information regarding Beraglia's arrest was not exculpatory evidence (as required to establish a *Brady* violation) was neither contrary to nor an unreasonable application of clearly established Federal law, nor was it based upon an unreasonable determination of the facts in light

of the evidence presented in the state court proceeding.

With respect to his claim that the state violated *Brady* by withholding "compelling evidence developed by a state facility," Jenkins contends that this "evidence showed that Mr. Jenkins suffered from various psychological disorders; was reared in a chaotic and abusive environment; was chronically scapegoated by his family; came from a family with a history of mental illness; had a history of depression and suicide; suffered from drug and alcohol addiction; suffered from learning disabilities and disorders, and very limited intellectual abilities; failed in school; suffered from hallucinations; was intoxicated at the time of the offense; had a history of alcoholic blackouts; made a positive adjustment to incarceration; and had been respectful and cooperative during his pretrial detention." (Doc. 12 at 75).

As the Alabama Court of Criminal Appeals noted, this is information that was clearly within Jenkins's knowledge. *Jenkins*, 972 So. 2d at 157. "Evidence is not 'suppressed' if the defendant either knew . . . or should have known . . . of the essential facts permitting him to take advantage of any exculpatory evidence." *United States v. LeRoy*, 687 F.2d 610, 618 (2d Cir. 1982)(*cert. denied*, 459 U.S. 1174 (1983). Jenkins has offered nothing to explain why he should not have been fully aware of this information. Thus, the appellate court's finding that this information was not suppressed (as required to establish a *Brady* violation) was neither contrary to nor an

unreasonable application of clearly established Federal law, nor was it based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

## E.     The Trial Court's Unconstitutional Instructional Errors

Jenkins claims that during both phases of his trial the court "provided instructions which misled the jury regarding critical aspects of the law and failed to instruct on several critical legal principles supported by the evidence." (Doc. 12 at 76). He adds that these errors were significantly compounded by the prosecutor's closing arguments, depriving him of a fair trial. (*Id.*). Each of the six alleged errors is discussed separately below.

### 1.     The Trial Court's Failure To Instruct the Jury on Applicable Lesser-Included Offenses

Jenkins first claim is that the trial court's failure to instruct the jury on robbery as an afterthought and felony murder or unintentional murder violated his right to a fair trial, due process, and a reliable determination of guilt and punishment. (Doc. 12 at 76-78). At the conclusion of the guilt phase of the trial, the trial judge instructed the jury on the elements of capital murder during the course of a robbery and during the course of a kidnapping, on the lesser included offenses of murder and manslaughter, and on voluntary intoxication. (R. Vol. 9, Tab 14 at 1644-65; 1689-90). The court also

instructed the jury that it could return a verdict of not guilty. (*Id*. at 1682-87).

On direct appeal, Jenkins argued that the jury was entitled to a charge instructing the jury that they must find that the intent to commit robbery preceded any intentional murder (C.R. Vol. 12, Tab 28 at 42), and that given the considerable evidence indicating that he was highly intoxicated at the time of the crime, the jury should have been allowed to consider whether he possessed the requisite intent to commit capital murder. (C.R. Vol. 13, Tab 32 at 13-15). Therefore, he reasoned that the jury should have been charged on robbery as an afterthought and on the lesser included offense of felony murder.

The state appellate courts considered this claim on the merits and denied it.

> The appellant next contends that the trial court's instructions on intent were incorrect statements of the law. The appellant maintains that the trial court should have given the following instruction: "An accused is not guilty of capital robbery-murder where an intent to deprive the alleged victim of his or her property is formed only after the alleged victim is deceased." The trial court correctly denied this instruction because it is not consistent with Alabama law. As the state correctly argues, the relevant law is thoroughly discussed in *Hallford v. State*, 548 So.2d 526 (Ala.Cr.App.1988), *aff'd*, 548 So.2d 547 (Ala.), *cert. denied*, 493 U.S. 945, 110 S.Ct. 354, 107 L.Ed.2d 342 (1989). We said:

>> The capital crime of robbery when the victim is intentionally killed is a single offense beginning with the act of robbing or attempting to rob and culminating in the act of intentionally killing the victim; the offense consists of two elements, robbing and intentional killing. *Davis v. State*, 536 So.2d 110 (Ala.Cr.App.1987). The intentional murder must occur

240

during the course of the robbery in question; however, the taking of the property of the victim need not occur prior to the killing. *Clark v. State*, 451 So.2d 368 (Ala.Cr.App.), *cert. denied*, 451 So.2d 368 (Ala.1984). While the violence or intimidation must precede or be concomitant with the taking, it is immaterial that the victim is dead when the theft occurs. *Thomas v. State*, 460 So.2d 207 (Ala.Cr.App.1983), *aff'd*, 460 So.2d 216 (Ala.1984).

> As the Alabama Supreme Court held in *Cobern v. State*, 273 Ala. 547, 142 So.2d 869 (1962), "the fact that the victim was dead at the time the property was taken would not militate [against a finding] of robbery if the intervening time between the murder and the taking formed a continuous chain of events." *Clements v. State*, 370 So.2d 708, 713 (Ala.Cr.App.1978), *affirmed in pertinent part*, 370 So.2d 723 (Ala.1979). To sustain any other position "would be tantamount to granting to would-be robbers a license to kill their victims prior to robbing them in the hope of avoiding prosecution under the capital felony statute."

> Although a robbery committed as a "mere afterthought" and unrelated to the murder will not sustain a conviction under § 13A–5–40(a)(2) for the capital offense of murder-robbery, the question of a defendant's intent at the time of the commission of the crime is usually an issue for the jury to resolve. *Crowe v. State*, 435 So.2d 1371, 1379 (Ala.Cr.App.1983). The jury may infer from the facts and circumstances that the robbery began when the accused attacked the victim and the capital offense was consummated

> when the defendant took the victim's property
> and fled. The defendant's intent to rob the
> victim can be inferred where "the intervening
> time, if any, between the killing and robbery
> was part of a continuous chain of events. . . ."

548 So.2d at 534–35, citing *Connolly v. State*, 500 So.2d 57
(Ala.Cr.App.1985), *aff'd*, 500 So.2d 68 (Ala.1986)
(citations omitted). The trial court's instructions on the
elements necessary to convict the appellant of robbery and
intentional murder were sufficient. *See Proposed Pattern
Jury Instructions for Use in the Guilt Stage of Capital
Cases Tried Under Act No. 81–178* (Alabama Bar Institute
for Continuing Legal Education 1982).

*Jenkins*, 627 So. 2d at 1049.

The Court of Criminal Appeals held that "[t]here was no evidence
to support an instruction on felony-murder [because] the evidence
revealed that the victim died as a result of manual strangulation." 627
So.2d at 1050.

Jenkins argues that, even assuming the jury believed that he
committed the robbery and/or the kidnapping, it still could have found that
he did not intentionally kill Hogeland during the course of the robbery or
kidnapping; he says the jury could have found he was so intoxicated that
he lacked the specific intent required for capital murder under §
13A–5–40(b), Ala.Code 1975.

We have reviewed the record in this case, including the oral
instructions given to the jury, and we conclude, in view of the particular
facts and circumstances of this case, that the trial judge did not err to
reversal in instructing the jury. *See, Wright v. State*, 494 So.2d 726
(Ala.Cr.App.1985), *affirmed*, 494 So.2d 745 (Ala.1986), a capital case
conducted prior to *Beck v. Alabama*, 447 U.S. 625, 100 S.Ct. 2382, 65
L.Ed.2d 392 (1980). The Court of Criminal Appeals initially reversed
Wright's conviction and remanded the case on authority of *Beck*, but the

United States Supreme Court, 457 U.S. 1114, 102 S.Ct. 2920, 73 L.Ed.2d 1325 (1982), reversed the judgment and remanded the case to the Court of Criminal Appeals for further consideration in light of *Hopper v. Evans*, 456 U.S. 605, 102 S.Ct. 2049, 72 L.Ed.2d 367 (1982), which modified *Beck* by holding that a lesser included offense instruction must be given in a capital case "only when the evidence warrants such an instruction." *Hopper*, 456 U.S. at 611, 102 S.Ct. at 2053, 72 L.Ed.2d at 373 (emphasis in original). *See also Ex parte Julius*, 455 So.2d 984 (Ala.1984) (a capital case in which this Court held that even though the trial court's instruction was "technically incorrect," when viewed "in the context of the overall charge" it was, at most, harmless). In this case, even assuming that the failure of the trial court to instruct the jury on the lesser included offense of felony-murder was incorrect, when we view it in the context of the overall charge to the jury, we, like the Court of Criminal Appeals, find no reversible error.

*Ex parte Jenkins*, 627 So. 2d at 1056-57 (alterations in original).

Jenkins argues that these decisions were contrary to and involved an unreasonable application of *Beck v. Alabama*, 477 U.S. 625 (1980), and were based on an unreasonable determination of the facts. (Doc. 12 at 79). *Beck* addressed Alabama's previous capital punishment regimen, under which the trial judge was

specifically prohibited from giving the jury the option of convicting the defendant of a lesser included offense. Instead, the jury [was] given the choice of either convicting the defendant of the capital crime, in which case it [was] required to impose the death penalty, or acquitting him, thus allowing him to escape all penalties for his alleged participation in the crime. If the defendant [was] convicted and the death penalty imposed, the trial judge [was then required to] hold a hearing with respect to aggravating and mitigating circumstances; after hearing the evidence, the judge [was permitted to] refuse to impose the death penalty, sentencing the defendant to life imprisonment without possibility of parole.

*Beck*, 447 U.S. at 628-29 (footnotes omitted).

In *Beck*, the defendant and an accomplice had been charged with the capital offense of an intentional killing during the course of a robbery. The evidence adduced at trial would have entitled the defendant to an instruction on "felony murder" as a lesser included offense, absent the statutory prohibition on such instructions.

> Because of the statutory prohibition, the court did not instruct the jury as to the lesser included offense of felony murder. Instead, the jury was told that if petitioner was acquitted of the capital crime of intentional killing in the course of a robbery, he "must be discharged" and "he can never be tried for anything that he ever did to Roy Malone [the victim]." Record 743. The jury subsequently convicted petitioner and imposed the death penalty; after holding a hearing with respect to aggravating and mitigating factors, the trial court refused to overturn that penalty.

*Id.* at 630 (alteration added). Beck appealed, eventually to the United States Supreme Court, where he argued that:

> the prohibition on giving lesser included offense instructions in capital cases violates both the Eighth Amendment as made applicable to the States by the Fourteenth Amendment and the Due Process Clause of the Fourteenth Amendment by *substantially increasing the risk of error in the factfinding process*. Petitioner argues that, in a case in which the evidence clearly establishes the defendant's guilt of a serious noncapital crime such as felony murder, forcing the jury to choose between conviction on the capital offense and acquittal creates a danger that it will resolve any doubts in favor of conviction.

*Id.* at 632 (emphasis added) (footnote omitted)[51]. The Supreme Court agreed, holding

---

[51] The Supreme Court granted certiorari to decide the following question:

that Alabama's statutory prohibition on giving lesser included offense instructions in capital cases was unconstitutional because it substantially increased the risk of prejudicial error in the factfinding process. *Beck*, 447 U.S. at 637 ("[W]hen the evidence unquestionably establishes that the defendant is guilty of a serious, violent offense – but leaves some doubt with respect to an element that would justify conviction of a capital offense – the failure to give the jury the 'third option' of convicting on a lesser included offense would seem inevitably to enhance the risk of an unwarranted conviction.").

Jenkins is not entitled to habeas relief based on the claim that the trial court failed to instruct the jury on robbery as an afterthought and felony or unintentional murder in violation of *Beck*. *Beck* has not been extended by the Supreme Court. In fact, the Court has taken pains to explain that *Beck's* holding does not stretch beyond the peculiar facts it addressed. *See id*. at 635 ("Alabama's failure to afford capital defendants the protection provided by lesser included offense instructions is *unique in American criminal law*.") (emphasis added) (footnote omitted). For example, in *Schad*

---

"May a sentence of death constitutionally be imposed after a jury verdict of guilt of a capital offense, when the jury was not permitted to consider a verdict of guilt of a lesser included non-capital offense, and when the evidence would have supported such a verdict?"

*Beck v. Alabama*, 447 U.S. at 627 (quoting *Beck v. Alabama*, 444 U.S. 897 (1979) (memorandum)).

*v. Arizona*, 501 U.S. 624 (1991), the Court rejected an argument that due process

required a jury in a capital case to be instructed on *every* lesser included offense

supported by the evidence:

> Petitioner's second contention is that under *Beck v. Alabama*, 447 U.S. 625 (1980), he was entitled to a jury instruction on the offense of robbery, which he characterizes as a lesser included offense of robbery murder. *Beck* held unconstitutional an Alabama statute that prohibited lesser included offense instructions in capital cases. Unlike the jury in *Beck*, the jury here was given the option of finding petitioner guilty of a lesser included noncapital offense, second-degree murder. While petitioner cannot, therefore, succeed under the strict holding of *Beck*, he contends that the due process principles underlying *Beck* require that the jury in a capital case be instructed on every lesser included offense supported by the evidence, and that robbery was such an offense in this case.

> Petitioner misapprehends the conceptual underpinnings of *Beck*. Our fundamental concern in *Beck* was that a jury convinced that the defendant had committed some violent crime but not convinced that he was guilty of a capital crime might nonetheless vote for a capital conviction if the only alternative was to set the defendant free with no punishment at all. We explained:

>> "[O]n the one hand, the unavailability of the third option of convicting on a lesser included offense may encourage the jury to convict for an impermissible reason – its belief that the defendant is guilty of some serious crime and should be punished. On the other hand, the apparently mandatory nature of the death penalty may encourage it to acquit for an equally impermissible reason – that, whatever his crime, the defendant does not deserve death . . . . [T]hese two extraneous factors . . . introduce a level of uncertainty and unreliability into the factfinding process that cannot be altered in a capital case." [*Beck*, 447 U.S. at 642-43]

246

(footnote omitted).

> We repeatedly stressed the all-or-nothing nature of the decision with which the jury was presented. *See id.*, at 629, 630. 632, 634, 637, 642-43, and n.19. As we later explained in *Spaziano v. Florida*, 468 U.S. 447, 455 (1984), "[t]he absence of a lesser included offense increases the risk that the jury will convict . . . simply to avoid setting the defendant free . . . . The goal of the *Beck* rule, in other words, is to eliminate the distortion of the factfinding process that is created when the jury is forced into an all-or-nothing choice between capital murder and innocence." *See also, Hopper v. Evans*, 456 U.S. 605, 609 (1982). The central concern of *Beck* is simply not implicated in the present case, for petitioner's jury was not faced with an all-or-nothing choice between the offense of conviction (capital murder) and innocence.

*Schad v. Arizona*, 501 U.S. at 645-47 (citations and footnote omitted).

*Beck* and its progeny do not entitle Jenkins to a jury instruction on robbery as an afterthought, or on felony murder. Therefore, the state appellate courts' denial of this claim was neither contrary to nor an unreasonable application of *Beck*. The United States Supreme Court in *Schad* instructed that *Beck's* holding applied only to the "all or nothing" situation faced by the jury in *Beck.* Jenkins's circumstances are not akin to those of the petitioner in *Beck,* because the jury in Jenkins's case was not faced with a decision to convict him of capital murder or acquit him completely. Instead, his jury was instructed on several lesser included offenses. If the jurors had been convinced that Jenkins had committed a homicide, but not convinced that he was guilty of capital murder, they were presented with the option of convicting him of the lesser-included,

noncapital offense of murder. Moreover, the jurors were also instructed on manslaughter and voluntary intoxication. These instructions allowed the jury to determine whether Jenkins's intoxication was so extreme that it negated the specific intent element required to commit murder, which would have justified a manslaughter conviction. Thus, Jenkins's jury was not "faced with an all-or-nothing choice between the offense of conviction (capital murder) and innocence." *Schad*, 501 U.S. at 647.

Jenkins has failed to show that the state appellate courts' denial of this claim was either "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Likewise, he has failed to show that the adjudication of this claim was based upon an unreasonable determination of the facts.

## 2. The Trial Court's Failure To Instruct the Jury on Voluntariness

Jenkins maintains that, in its guilt phase jury charge, "the trial court made no reference to [his] custodial statements and specifically did not instruct the jury to determine first whether it was voluntary before deciding whether to rely on it in reaching a verdict." (Doc. 12 at 79). He asserts that "[b]ecause the voluntariness of a purported confession by a defendant is an issue of fact which he is entitled to have determined ultimately by the jury, even where the trial court already has separately

found the statements to be admissible," the trial court's failure to instruct the jury on voluntariness violated his rights to due process, a fair trial, and a reliable determination of guilt and punishment. (*Id.* at 79-80).

Jenkins first raised this claim in state court in his brief on certiorari to the Alabama Supreme Court on direct appeal. (C.R. Vol. 14, Tab 35 at 11-15). The Alabama Supreme Court specifically addressed just one claim in its opinion affirming the Alabama Court of Criminal Appeals' affirmance of Jenkins's conviction and death sentence. *Ex parte Jenkins*, 627 So. 2d 1054 (Ala. 1993).[52] However, the court noted the following in its opinion:

> The petitioner, Mark Allen Jenkins, raises numerous issues for our review, all of which, as far as we can tell, were also raised on direct appeal to the Court of Criminal Appeals and addressed by that Court in an opinion. *Jenkins v. State*, 627 So. 2d 1034 (Ala. Crim. App. 1992).
>
> . . . .
>
> We have carefully reviewed the opinion of the Court of Criminal Appeals, the transcript of the trial, and the briefs and the oral arguments of the parties, and we conclude that the judgment of conviction and sentence of death were due to be affirmed. . . .
>
> . . . .
>
> Although we have not addressed Jenkins's other arguments specifically, we have examined the record very carefully and we have also

---

[52] The only claim addressed by the Alabama Supreme Court was whether the trial court erred in refusing to instruct the jury on the lesser-included offense of felony or unintentional murder. *Id.*

249

> reviewed the propriety of the sentence of death, as we are required to do, and we conclude that the Court of Criminal Appeals properly affirmed the judgment of conviction and the sentence of death.

*Id*. at 1054-57.

The respondent argues that the Alabama Supreme Court denied this claim on the merits. (Doc. 20 at 90). Jenkins, in turn, argues that the "state court adjudication of this claim resulted in a decision that was contrary to, and involved an unreasonable application of clearly established United States Federal law" and was "also based upon an unreasonable determination of the facts." (Doc. 12 at 80).

However, the Alabama Supreme Court was mistaken when it stated that each issue presented to it had been "raised on direct appeal to the Court of Criminal Appeals and addressed by that Court in an opinion." *Ex parte Jenkins*, 627 So. 2d at 1054. This issue was neither presented to nor addressed by the Alabama Court of Criminal Appeals. When the Alabama Supreme Court affirmed the appellate court's affirmance of Jenkins's conviction and death sentence, it did not resolve the merits of this claim, since the claim was never presented to the appellate court. When a state court does not resolve the merits of a § 2254 petitioner's claim, no deference under § 2254(d)(1) is owed. *Calhoun v. Sec'y, Florida Dep't of Corrections*, 607 Fed. Appx. 968, 970-71 (11th Cir. 2015) (*citing Davis v. Sec'y for the Dep't of Corrections*, 341 F.3d 1310, 1313 (11th Cir. 2003)). Thus, this court will review this claim *de novo*.

250

This claim concerns a statement Jenkins made to Sergeant Mark L. Winters and Detective Jerome Beck of the Los Angeles County Sheriff's Department on May 2, 1989, when he was in custody in California. The officers testified at trial about the statement. Sergeant Winters and Detective Beck testified that they met Jenkins on May 2, 1989, when they interviewed him at the Central Jail in Los Angeles. (R. Vol. 6 at 1136-38, 1143, 1198). Prior to interviewing him, Sergeant Winters read the standard *Miranda* warning to Jenkins, after which Jenkins stated that he understood his rights and wanted to talk to the officers about the case, without the presence of an attorney. (*Id.* at 1138-42, 1198). Neither officer made threats or promises of any nature to induce Jenkins to give a statement. (*Id*. at 1142, 1198). Although the interview was not recorded, Sergeant Winters made notes during the interview, as was his practice in conducting investigations. (*Id*. at 1144-45). Jenkins told the officers that he had been arrested by the FBI the day before, at the home of one of his relatives in Wilmington, California (*Id*. at 1146). Jenkins initially denied knowing anyone in Alabama named Tammy Hogeland, but later indicated that he did know a lady named Tammy who worked at an Omelet Shoppe. (*Id.* at 1149-53).

Jenkins claimed that on the night of April 16, 1989, he got extremely intoxicated at a party at his friend Christine's house. (*Id*. at 1154-56). He left the party at around 2:00 a.m. on the morning of April 17, 1989, then returned home and slept until 9:00

a.m. (*Id.*). When he woke up on April 17, 1989, he realized he was late for work and would probably lose his job, so he decided to return to California. (*Id.* at 1156-57). Jenkins stated that he sold his car to a man named Steve at Rocky Ridge Hardware, then returned home to pack his belongings. (*Id.* at 1157). His friend Mitchell Babb gave him a ride to the Greyhound Bus Terminal, where he purchased a ticket he believed would take him to Arizona. (*Id.*). However, his ticket only got him to Houston, Texas, where he was ejected from the bus. (*Id.* at 1157-58).

When the officers asked Jenkins about a red Mazda RX7 sports car, Jenkins denied ever being in an RX7 in his entire life. (*Id.* at 1162). However, he stated that he wished he "had been in one," because "it's a nice car." (*Id.* at 1163). Jenkins asked the officers what the significance of the RX7 was, and they advised him that he had been seen in the vehicle with the victim. (*Id.*).

Jenkins then changed his story about the night before he left Alabama. (*Id.* at 1158, 1163). When the officers asked Jenkins if he had ever been in an RX7, he answered, "Leon's Texaco." (*Id.* at 1164). He stated that after he left the party at Christine's house at 2:30 or 3:00 a.m April 17, 1989, he parked his car at Leon's Texaco and walked home. (*Id.* at 1159, 1164). The next morning, he returned to Leon's Texaco at 7:30 a.m. to find that someone had tried to steal his car. (*Id.*). Jenkins stated that he later drove his car to "Bell Camps Market" to make a phone call to his mother

252

in California, to ask her for money to return to California. (*Id*. at 1160-61). While he was there, he saw Christine who told him her mother was angry at him because when he was leaving early that morning, he fell down the stairs and woke some of the neighbors. (*Id*. at 1161). Jenkins stated that he did not remember falling down but he did have a small bump on his forehead, that he did remember being too drunk to drive home after the party, but that he did not suffer from blackouts of memory loss due to his intoxication. (*Id*.). Jenkins then stated the he sold his car for $88 to an unknown individual, then saw his friend Mitchell Babb who drove him to the bus station. (*Id*. at 1162).[53] He also claimed that he smoked marijuana on the bus to Texas. (*Id*.).

Jenkins denied having any involvement with the victim's death or ever having blackouts. (*Id*. at 1164-65). He stated that he was "a little hung over" on the day he left Alabama on the bus, but still had a good memory of the events leading up to his leaving the state. (*Id*. at 1165). Jenkins was able to describe the uniforms worn by waitresses at the Omelet Shoppe and recounted his activities after leaving Alabama, including things he did in Houston, Phoenix, and San Diego, on the way to Los Angeles. (*Id*.) Jenkins stated that he unsuccessfully tried to get money from the Salvation Army in Houston for a bus ticket to Los Angeles, then hitchhiked to Phoenix, then to San Diego,

---

[53] At various times during the interview, Jenkins stated that he left Alabama on April 17, 18, and 19, 1989. He finally settled on April 17, 1989, as being the date he left the state. (*Id*. at 1183).

and finally to Los Angeles, where he arrived the morning of April 22 or 23, 1989. (*Id.* at 1181-82).

Jenkins again denied any involvement in Tammy Hogeland's death, stating that he had only known her as a waitress, and the only contact he ever had with her was placing an order at the Omelet Shoppe. (*Id.* at 1165-66). He denied ever being in the MX7 or any car with the victim, and denied picking her up at the Omelet Shoppe the night she disappeared. (*Id.* at 1166).

Jenkins informed the officers that he wanted to provide them with names and contact information for some people who could provide information about him, but the information was in his wallet with the rest of his belongings. (*Id.*). The officers retrieved Jenkins's personal property, which had been sealed in a plastic bag with a heat sealer, and opened the package in Jenkins's presence. (*Id.* at 1168, 1198-1200). Jenkins retrieved his wallet and went through the contents, including a card from a motel in Harbor City, and another for a golf course in Florida. (*Id.* at 1168-69; R. Vol. 7 at 1200-1203). Jenkins provided the officers with the contact information for Jim Bob Sheedy, P.S. Edwards Company, Charles, Easy Turf, Steve Musser, Christine, Al Vinsant, and Lee Wooten. (R. Vol. 6 at 1179-80).

The trial court did not reference this statement in its charge to the jury. Jenkins alleges that the trial court's failure to reference his custodial statement and instruct the

jury that it had to first determine whether the statement was voluntary before deciding whether to rely upon it in reaching a verdict violated his rights to due process, a fair trial, and a reliable determination of guilt and punishment. (Doc. 12 at 79).

The United States Supreme Court has made it clear that, in the context of jury instructions,

> [t]he only question for [the habeas court] is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Cupp v. Naughten*, 414 U.S. 141, 147, 94 S.Ct. 396, 400-01, 38 L.Ed.2d 368 (1973); *see also Henderson v. Kibbe*, 431 U.S. 145, 154, 97 S.Ct. 1730, 1736-37, 52 L.Ed.2d 203 (1977); *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974) ("'[I]t must be established not merely that the instruction is undesirable, erroneous, or even "universally condemned," but that it violated some [constitutional right]'"). It is well established that the instruction "may not be judged in artificial isolation," but must be considered in the context of the instructions as a whole and the trial record. *Cupp v. Naughten*, *supra*, 414 U.S., at 147, 94 S.Ct., at 400-01. In addition, in reviewing an ambiguous instruction . . . we inquire "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution. *Boyde v. California*, 494 U.S. 370, 380, 110 S.Ct. 1190, 1198, 108 L.Ed.2d 316 (1990). FN.
>
> > FN. In *Boyde*, . . . we made it a point to settle on a single standard of review for jury instructions - the "reasonable likelihood" standard - after considering the many different phrasings that had previously been used by this Court. 494 U.S., at 379-380, 110 S.Ct., at 1197-1198 (considering and rejecting standards that required examination of either what a reasonable juror "could" have done or "would" have done). So that we may once again speak with one voice on this issue, we now . . . reaffirm the standard set out in

> *Boyde.*
>
> And we also bear in mind our previous admonition that we "have defined the category of infractions that violate 'fundamental fairness' very narrowly." *Dowling v. United States*, 493 U.S. 342, 352, 110 S.Ct. 668, 674, 107 L.Ed.2d 708 (1990). "Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation." *Ibid*.

*Estelle v. McGuire*, 502 U.S. 62, 72-73 (1991) (alteration added). *See also Jones v. United States*, 527 U.S. 373, 389-390 (1999).

Jenkins did not request that the jury be instructed that they first had to determine whether the custodial statement was voluntary before the jury could rely on the statement in reaching a verdict, and the trial court did not give such an instruction. However, the absence of the instruction did not render Jenkins's trial unfair. Both Sergeant Winters and Detective Beck testified that Sergeant Winters informed Jenkins of his *Miranda* rights, that no one threatened or coerced Jenkins to make a statement, and that Jenkins indicated his desire to talk to the officers. (R. Vol. 6 at 1138-42, 1198). Further, the court instructed the jury that:

> Now, ladies and gentlemen, it is your duty to reconcile all of the testimony in this case and make it speak the truth if you can. It is a matter of discretion with you what testimony you will believe or which you will not believe. You have the right to reject what you think is untrue and consider only that part which you think is true. And that applies to the testimony of all the witnesses. If you think that a witness has told the truth in some matters and his testimony is either untrue or inaccurate as to other matters, you have the right in your discretion to reject that part which you

think is not true and consider only that part which you think is true. On the other hand, if you believe a witness has willfully and corruptly testified falsely to a material matter in the case, then the law gives you the right in your discretion to reject that witness' testimony entirely if you see fit to do so. Now, ladies and gentlemen, when you sit in the jury box, you are just called on to use your common sense like you would do anywhere else. Therefore, when you listen to the testimony, you have the right not only to listen to what a witness says, but you have the right to do like you do in ordinary affairs of life in dealing with men in business matters or otherwise. That is, you observe the manner and demeanor of the witnesses on the witness stand, his facial expressions, and so forth, and you take all of these things into consideration in determining what weight you will give to his testimony. You also have the right to consider the bias or interest or any other motive a witness might have which might cause him to stray from the pathway of truth. In other words, if there is any reason why a witness is likely not to tell the truth, you have the right to take that into consideration. If he has an interest the [sic] in the case that would cause him to hold back a little, or paint the picture a little bit different than what it was, you of [sic] the right to take that into consideration. You also have the right to take into consideration any lack of interest, or lack of any bias, or lack of motive that a witness I [sic] might have. If he is a disinterested witness and has no reason to tell it except the way he saw it, of course, you can take that into consideration also.

(R. Vol. 9, Tab 14 at 1669-71). In light of the testimony of Sergeant Winters and Detective Beck and the jury instruction regarding determining facts and reconciling testimony, there is no reasonable likelihood that Jenkins's trial was rendered fundamentally unfair by the trial court's failure to give the charge about which Jenkins now complains. This claim is due to be dismissed.

**3.     The Trial Court's Improper Instruction Regarding Mr. Jenkins's Failure To Testify**

257

In the guilt phase of the trial, the trial court instructed the jury as follows:

> Ladies and gentlemen, the defendant in this case has elected not to testify. That is his right. The State has the burden of proving the defendant's guilt beyond a reasonable doubt. The defendant is not required to prove his innocence. Therefore, I instruct you that you are not permitted to draw any inference or conclusion from the defendant's failure to testify in this case.

(R. Vol. 9, Tab 14 at 1687-88).[54]

Jenkins alleges that this "erroneous and misleading instruction on [the] exercise of his Fifth Amendment right not to take the stand" violated his "rights to a fair trial, due process, and a reliable determination of guilt and punishment, under the Fifth, Sixth, Eighth, and Fourteenth Amendments," because the instruction "failed to specifically direct the jury not to draw any inferences adverse to Mr. Jenkins from his failure to testify. (R1 at 1687-88.)." (Doc. 12 at 80). Jenkins raised this claim for the first time in his brief on certiorari to the Alabama Supreme Court, following the affirmance of his conviction and sentence on direct appeal. (C.R. Vol. 14, Tab 35 at 15-22). Like the previous claim, the Alabama Supreme Court erroneously stated that

---

[54] Jenkins requested this instruction. In the requested charge, the third sentence read: "The State has the burden of proving the defendant's guilt beyond a reasonable doubt and to a moral certainty." The instruction was given exactly as Jenkins proposed it, except the court deleted "and to a moral certainty" from the charge. (*See* C.R. Vol. 10, Tab 27 at 181).

the Alabama Court of Criminal Appeals had addressed this claim in its opinion.[55]

Because the state court did not resolve the merits of this claim, no deference under §

2254(d)(1) is owed, and this court will review it *de novo*. *See Calhoun*, 607 Fed. Appx.

at 970-71.

The Supreme Court has held that "the Fifth Amendment requires that a criminal

trial judge must give a 'no-adverse-inference' jury instruction when requested by a

defendant to do so." *Carter v. Kentucky*, 450 U.S. 288, 300 (1981). The purpose of a

"no-adverse-inference" instruction is to "minimize the danger that the jury will give

evidentiary weight to a defendant's failure to testify." *Id.* at 305.

It is undisputed that Jenkins requested a "no-adverse-inference" instruction. It

is further undisputed that the court gave an instruction almost identical to the instruction

Jenkins requested. Jenkins maintains that the instruction given by the trial court was

inadequate because it did not "specifically direct the jury not to draw any inferences

*adverse* to Mr. Jenkins from his failure to testify."[56] (Doc. 12 at 80).

_____

[55] Additionally, the respondent again argues that this claim was adjudicated on the merits in state court (doc. 20 at 90), and the petitioner argues that the "state court adjudication of this claim resulted in a decision that was contrary to, and involved an unreasonable application of clearly established United States Federal law" and was "also based upon an unreasonable determination of the facts." (Doc. 12 at 80-81).

[56] The instruction advised the jury that it was not to "draw any inference" from Jenkins's failure to testify, but did not specifically identify the inference that should not be drawn as being *adverse* to Jenkins. (R. Vol. 9, Tab 14 at 1687).

In *United States v. Russo*, the trial court instructed the jury as follows:

> The indictment or formal charge against any Defendant is not evidence of guilt. Indeed, the Defendant is presumed by the law to be innocent. The law does not require a Defendant to prove his innocence or produce any evidence at all; and if a Defendant elects not to testify, you should not consider that in any way during your deliberations. The government has the burden of proving a Defendant guilty beyond a reasonable doubt, and if it fails to do so you must find the Defendant not guilty.

*United States v. Russo*, 796 U.S. 1443, 1454-55 (11th Cir. 1986). The defendants argued that the instruction "did not remove all danger that the jury would infer guilt from their decisions not to testify." *Id*. at 1455. The court held that the instruction was adequate under *Carter*. *Id*.

Similarly, other courts have upheld instructions that did not specifically prohibit drawing an inference adverse to the defendant from his failure to testify. *See, e.g.*, *United States v. Padilla*, 639 F.3d 892, 897 (9th Cir. 2011) (instruction that "the law prohibits you in arriving at your verdict from considering that the defendant may not have testified" is "sufficient to put the jury on notice of its obligation to draw no adverse inference"); *United States v. Barraza Cazares*, 465 F.3d 327, 332 (8th Cir. 2006) (instruction not to consider defendant's failure to testify sufficient under *Carter*); *Welch v. City of Pratt*, 214 F.3d 1219, 1220-22 (10th Cir. 2000) (instruction that jurors "should not consider the fact that the defendant did not testify in arriving at [a]

verdict" adequate under *Carter*); *United States v. Ladd*, 877 F.2d 1083, 1089 (1st Cir. 1989) (instruction that "the fact that the defendant does not [testify] cannot even be considered by you in arriving at your verdict" sufficient under *Carter*).

The instruction given at Jenkins's trial, including the instruction that "you are not permitted to draw any inference or conclusion from the defendant's failure to testify in this case," was sufficient to put the jury on notice of its obligation to draw no *adverse* inference from Jenkins's failure to testify, thereby "minimiz[ing] the danger that the jury" gave evidentiary weight to his failure to testify. *See Carter*, 450 U.S. at 305. This claim is without merit.

### 4. The Trial Court's Erroneous Instruction Concerning Circumstantial Evidence

Jenkins alleges that the trial court's "misleading and erroneous instruction on circumstantial evidence" violated his "rights to a fair trial, due process, and a reliable determination of guilt and punishment, under the Fifth, Sixth, Eighth, and Fourteenth Amendments." (Doc. 12 at 81). He objects to the following portion of the trial court's guilt phase jury instruction:

> Ladies and gentlemen, the guilt of the defendant may be proved by circumstantial evidence as well as by direct evidence. Circumstantial evidence is the proof of certain facts and circumstances in a given case from which a jury may infer other connected facts which usually and reasonably follow according to the common experience of mankind. The test of the sufficiency of circumstantial evidence is where the

261

circumstances as proved produce a finding to the exclusion of all reasonable doubt of the guilt of the accused where they are incapable of explanation upon any reason [sic] hypothesis consistent with his innocence. Upon circumstantial evidence there should not be a conviction unless it excludes every other reason [sic] hypotheses than that of the guilt of the defendant. No matter how strong may be the circumstances if they can be reconciled with the theory that someone other than the defendant may have done the act, then the guilt of the defendant is not shown by that full measure of proof the law requires. Circumstantial evidence is entitled to the same weight as direct evidence when it points to the guilt of the accused.

(R. Vol. 9, Tab 14 at 1665-66). Jenkins asserts that this portion of the instruction "improperly and unconstitutionally shifted the burden to Mr. Jenkins to show that 'someone other than the defendant may have done the act,' before the jury was allowed to consider finding him not guilty. (R1 at 1665-66). *See, e.g.*, *Sandstrom v. Montana*, 442 U.S. 510 (1979)." (Doc. 12 at 81).

Jenkins raised this claim for the first time in his brief on certiorari to the Alabama Supreme Court, following the affirmance of his conviction and sentence on direct appeal. (C.R. Vol. 14, Tab 35 at 15-22). Like the previous two claims, the Alabama Supreme Court erroneously stated that the Alabama Court of Criminal Appeals had addressed this claim in its opinion.[57] Because the state court did not resolve the merits

---

[57] Additionally, the respondent again argues that this claim was adjudicated on the merits in state court (doc. 20 at 90), and the petitioner argues that the "state court adjudication of this claim resulted in a decision that was contrary to, and involved an unreasonable application of clearly established United States Federal law" and was "also based upon an unreasonable determination of the facts." (Doc. 12 at 81).

of this claim, no deference under § 2254(d)(1) is owed, and this court will review it *de novo*. *See Calhoun*, 607 Fed. Appx. at 970-71.

Jenkins claims that the court's instruction on circumstantial evidence "improperly and unconstitutionally shifted the burden to [him] to show that 'someone other than the defendant may have done the act,' before the jury was allowed to consider finding him not guilty." As previously discussed, in reviewing jury instructions, the court must consider the challenged instruction in the context of the trial as a whole and the trial record, to determine whether there is a reasonable likelihood that the jury applied the challenged instruction in a way that violates the Constitution. *Estelle v. McGuire*, 502 U.S. at 72-73.

The record reveals that the trial court further instructed the jury concerning circumstantial evidence and the state's burden of proof:

> The burden of proof is on the State of Alabama in this case. The defendant is always presumed to be innocence [sic]. And the fact that he has been arrested, indicted, and brought before the bar of justice does not create any presumption against him at all. He comes into the court clothes [sic] with the presumption of innocence, and that presumption of innocence remains with him throughout the trial until it's overcome by evidence which proves his guilt to each one of you beyond a reasonable doubt. And the burden is on the State of Alabama to show the guilt of the defendant from the evidence of the offenses [sic] charged in the indictment beyond a reasonable doubt before you would be authorized to convict him. Now, I say that the offense charged in the indictment, that includes any lesser included offenses embraced in the indictment. You will want to know what a reasonable doubt is. It is rather difficult to

263

define. Sometime attempting to define it is more confusing than if the judge leaves it off all together. When I say that the State is under the burden of proving guilt beyond reasonable doubt that does not mean that the State must prove an alleged crime beyond every imaginable or speculated doubt or beyond all possibility of mistake, because that would be impossible. A reasonable doubt means the actual substantial doubt arising out of the testimony, or from the lack of the testimony. It is a doubt for which a reason can be assigned.

. . . .

The Court charges the jury that the innocence of the defendant is presumed until his guilt is established by the evidence in all material aspects of the case beyond a reasonable doubt. And it also may be said that evidence of guilt must be strong and cogent, and, unless it is so strong and cogent to show that the defendant is guilty to a moral certainty, the defendant should be found not guilty.

The Court charges the jury that a person charged with an offense should not be convicted unless the evidence excludes to a moral certainty every reasonable hypothesis but that of his guilt; no matter how strong the circumstances are they do not come up to the full measure of proof which the law requires if they can be reasonably reconciled with the theory that the defendant is not guilty.

The Court charges the jury that a reasonable doubt can arise from a part of the evidence. If after considering all of the evidence, you have a reasonable doubt as to the defendant's guilt arising out of any part of the evidence, you must find the defendant not guilty.

The Court charges the jury that when the evidence relied upon for a conviction is circumstantial, the chain of circumstances must be complete and [of] such character as to convince beyond a reasonable doubt, and if they [sic] circumstances shown and proven, with the other evidence in the case, fails to so convince you beyond a reasonable doubt that the defendant is guilty, then you should return a verdict of not guilty in this case.

264

The Court charge[s] the jury that if a conviction in this case depends upon the testimony of a single witness, and if you have a reasonable doubt of the truthfulness of the testimony of such witness, you may acquit the defendant.

The Court charges the jury that you should carefully examine all of the testimony and that if upon the whole evidence your mind is left in a state of doubt and uncertainty, so that you cannot say beyond a reasonable doubt that the defendant is guilty, you must acquit him.

The Court charges the jury that the defendant Mark Allen Jenkins should not be convicted unless the evidence in this case excludes to a moral certainly [sic] every reasonable hypothesis but that of his guilt. No matter how strong the circumstances are, they do not come up to the full measure of proof which the law requires, if they can be reasonably reconciled with the theory that Mark Allen Jenkins is not guilty.

Ladies and gentlemen, I charge you that [if] any or all of the witnesses for the State have exhibited or admitted bias, prejudice, anger, or ill will against the defendant, or from all of the evidence in the case you find such bias, prejudice, anger or ill will on the part of all or any of the State's witnesses, and if these things, when considered by you in connection with all the other evidence in the case, create in your minds a reasonable doubt of the defendant's guilty [sic], you should acquit him.

The Court charges the jury that if you find from the evidence that the circumstances in this case only lead to a suspicion of the guilt of the defendant, then in that event, you cannot convict the defendant.

The Court charges the jury that intent, or the lack thereof, is for the jury alone to determine.

Ladies and gentlemen, I charge you that while you are under a duty to draw whatever permissible inferences you may from the evidence in this case, including circumstantial evidence, mere speculation, conjecture or surmise that the accused is guilty of the offense charged, does not authorize a conviction. A defendant should not be convicted on mere

suspicion or out of fear that he might have committed the crime. While reasonable inferences from the evidence may furnish a basis for proof beyond a reasonable doubt, mere possibility, suspicion, or guesswork, no matter how strong, will not overturn the presumption of innocence.

(R. Vol. 9, Tab 14 at 1668-69, 1682-86).

After reviewing the entirety of the trial court's charge to the jury, this court is satisfied that the jury instructions regarding circumstantial evidence were constitutionally sufficient. There is no reasonable likelihood that the jury misunderstood the instructions as requiring Jenkins to prove "someone other than the defendant" committed the crimes before the jury could consider finding Jenkins not guilty. This claim is without merit.

## 5.    The Trial Court's Improper Reasonable Doubt Instructions

Jenkins maintains that the court's reasonable doubt instructions violated his right to due process, a fair trial and a reliable guilt and sentencing determination under the Fifth, Sixth, Eighth and Fourteenth Amendments. (Doc. 12 at 82-83). When he raised the claim on direct appeal, the Alabama Court of Criminal Appeals found it to be without merit:

Initially, the appellant contends that the trial court's instructions on reasonable doubt violated the United States Supreme Court holding in *Cage v. Louisiana*, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990). Specifically, he maintains that the instruction imposed a higher degree of doubt than that required for acquittal under the reasonable doubt standard. The trial court gave the following instruction:

266

> When I say that the State is under the burden of proving guilt beyond reasonable doubt that does not mean that the State must prove an alleged crime beyond every imaginable or speculated doubt or beyond all possibility of mistake, because that would be impossible. A reasonable doubt means the actual substantial doubt arising out of the testimony, or from the lack of the testimony. It is a doubt for which a reason can be assigned.

The terms in *Cage*, which the United States Supreme Court found to be offensive were "grave uncertainty," "moral certainty," and "actual and substantial doubt." The Supreme Court stated that these terms when used together suggest a higher degree of doubt necessary to acquit than that constitutionally mandated. *Cage*, 111 S.Ct. at 329. *See also Gaskins v. McKellar*, 500 U.S. 961, 111 S.Ct. 2277, 114 L.Ed.2d 728 (1991).

> "In construing the instruction, we consider how reasonable jurors could have understood the charge as a whole. *Francis v. Franklin*, 471 U.S. 307, 316, 105 S.Ct. 1965, 1972, 85 L.Ed.2d 344 (1985). . . . It is plain to us that the words 'substantial' and 'grave,' as they are commonly understood, suggest a higher degree of doubt than is required for acquittal under the reasonable doubt standard. When those statements are then considered with the reference to 'moral certainty,' rather than evidentiary certainty, it becomes clear that a reasonable juror could have interpreted the instruction to allow a finding of guilt based on proof below that required by the Due Process Clause."

*Smith v. State*, 588 So.2d 561, 568 (Ala.Cr.App. 1991), *quoting Cage*, 111 S.Ct. at 329–30.

The instruction [given in this case] does not violate the Supreme Court's holding in *Cage*. This court has recently stated, "'The mere use of some terminology which happened to also appear in *Cage*, does not necessarily constitute reversible error.' *Earhart v. State*, 593 So.2d 119, 119 (Ala.Cr.App. 1991)." *Herbert Williams v. State*, 627 So.2d 985, 992

(Ala.Cr.App. 1991). *See also Smith*, supra; *Luther Williams*, supra; *McMillian*, 594 So.2d at 1283; *Adams v. State*, 587 So.2d 1265 (Ala.Cr.App. 1991).

*Jenkins v. State*, 627 So. 2d at 1048-49.

Jenkins argues that the court's instruction on reasonable doubt, when read as a whole, violated *Cage v. Louisiana*, 498 U.S. 39 (1990), because it "impermissibly allowed for a conviction upon a standard of proof below that required by the Due Process Clause by suggesting a 'higher degree of doubt than is required for acquittal under the reasonable doubt standard.'" (Doc. 12 at 82-83) (citations omitted). Specifically, he challenges the portion of the jury charge in which the court defined reasonable doubt as "the actual substantial doubt arising out of the testimony, or from lack of the testimony," and "a doubt for which a reason can be assigned." (*Id*. at 82)(quoting R. Vol. 9, Tab 14 at 1669). He claims that the instruction was defective because it "improperly equated 'reasonable doubt' with a 'substantial doubt,' required that such a doubt arise from 'testimony' - meaning defects in the physical evidence would be insufficient - and, most important, required any juror with doubts be able to articulate them and assign them to a specific cause for them to be regarded as reasonable." (*Id*. at 82-83). He argues that the "instruction requiring jurors to articulate 'substantial' doubts based on specific testimony is constitutionally infirm because it requires jurors to arrive at a morally right reason or possess considerable cause before

268

finding a defendant not guilty." (*Id*. at 83).

It is well-established that the "government must prove beyond a reasonable doubt every element of a charged offense." *Victor v. Nebraska*, 511 U.S. 1, 5 (1994) (citing *In re Winship*, 397 U.S. 358 (1970)). Although the beyond a reasonable doubt standard is a requirement of due process, "the Constitution neither prohibits trial courts from defining reasonable doubt nor requires them to do so as a matter of course." *Id.*

> Indeed, so long as the court instructs the jury on the necessity that the defendant's guilt be proved beyond a reasonable doubt, *see Jackson v. Virginia*, 443 U.S. 307, 320, n. 14, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), the Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof. *Cf. Taylor v. Kentucky*, 436 U.S. 478, 485–486, 98 S.Ct. 1930, 56 L.Ed.2d 468 (1978). Rather, "taken as a whole, the instructions [must] correctly conve[y] the concept of reasonable doubt to the jury." *Holland v. United States*, 348 U.S. 121, 140, 75 S.Ct. 127, 99 L.Ed. 150 (1954).

*Id*. (alterations in original).

In reviewing the constitutionality of such an instruction, the proper inquiry is whether "there is a reasonable likelihood that the jury understood the instruction to allow conviction without proof beyond a reasonable doubt." *Tyler v. Cain*, 533 U.S. 656, 658 (2001) (footnote omitted)[58]; *see also Johnson v. Alabama*, 256 F.3d 1156,

---

[58] In *Tyler*, the Supreme Court explained the evolution of this standard of review:

> In *Cage*, this Court observed that a reasonable juror "could have" interpreted the instruction at issue to permit a finding of guilt without the requisite proof. In *Estelle v. McGuire*, however, this Court made clear that the proper inquiry is not whether the

1192 (11th Cir. 2001) ("[T]he appropriate standard is whether there exists a 'reasonable likelihood' that the jury read the instruction to lower the required threshold." (citing *Estelle v. McGuire*, 502 U.S. 62, 72 (1991) and *Victor*, 511 U.S. at 5-6). The standard requires courts to look at the challenged jury instruction as a whole and to avoid strained readings. *See Jones v. United States*, 527 U.S. 373, 391 (1999) ("We previously have held that instructions that might be ambiguous in the abstract can be cured when read in conjunction with other instructions." (citations omitted)).

Jenkins complains about the following sentence from the trial court's instructions on reasonable doubt, in which he claims the court equated reasonable doubt with a substantial doubt, required that such a doubt arise from testimony, and required a juror with doubts to be able to articulate those doubts and assign a specific cause for them to be reasonable:

> A reasonable doubt means the actual substantial doubt arising out of the testimony, or from the lack of the testimony. It is a doubt for which a reason can be assigned.

(R. Vol. 9, Tab 14 at 1668-69). However, the court's complete instruction on reasonable doubt was much more extensive:

---

instruction "could have" been applied unconstitutionally, but whether there is a reasonable likelihood that the jury *did* so apply it. . . .

*Tyler*, 533 U.S. at 658 n. 1 (emphasis in original) (internal citations omitted).

Ladies and gentlemen, the guilt of the defendant may be proved by circumstantial evidence as well as by direct evidence. Circumstantial evidence is the proof of certain facts and circumstances in a given case from which a jury may infer other connected facts which usually and reasonable follow according to the common experience of mankind. The test of the sufficiency of circumstantial evidence is where the circumstances as proved produce a finding to the exclusion of all reasonable doubt of the guilt of the accused where they are incapable of explanation upon any reason[able] hypothesis consistent with his innocence. Upon circumstantial evidence there should not be a conviction unless it excludes every other reason[able] hypotheses [sic] than that of the guilt of the defendant. No matter how strong may be the circumstances if they can be reconciled with the theory that someone other than the defendant may have done the act, then the guilt of the defendant is not shown by that full measure of proof the law requires. Circumstantial evidence is entitled to the same weight as direct evidence when it points to the guilt of the accused.

. . . .

The burden of proof is on the State of Alabama in this case. The defendant is always presumed to be innocence [sic]. And the fact that he has been arrested, indicted, and brought before the bar of justice does not create any presumption against him at all. He comes into the court clothes [sic] with the presumption of innocence, and that presumption of innocence remains with him throughout the trial until it's overcome by evidence which proves his guilt to each one of you beyond a reasonable doubt. And the burden is on the State of Alabama to show the guilt of the defendant from the evidence of the offenses charged in the indictment beyond a reasonable doubt before you would be authorized to convict him. Now, I say that the offense charged in the indictment, that includes any lesser included offenses embraced in the indictment. You will want to know what a reasonable doubt is. It is rather difficult to define. Sometime attempting to define it is more confusing than if the judge leaves it off all together. When I say that the State is under the burden of proving guilt beyond reasonable doubt that does not mean that the State must prove an alleged crime beyond every imaginable or speculated doubt

271

or beyond all possibility of mistake, because that would be impossible. A reasonable doubt means the actual substantial doubt arising out of the testimony, or from the lack of the testimony. It is a doubt for which a reason can be assigned.

(R. Vol. 9, Tab 14 at 1665-66; 1668-69). The court continued:

The Court charges the jury that the innocence of the defendant is presumed until his guilt is established by the evidence in all material aspects of the case beyond a reasonable doubt. And it also may be said that evidence of guilt must be strong and cogent, and, unless it is so strong and cogent to show that the defendant is guilty to a moral certainty, the defendant should be found not guilty.

The Court charges the jury that a person charged with an offense should not be convicted unless the evidence excludes to a moral certainty every reasonable hypothesis but that of his guilt; no matter how strong the circumstances are they do not come up to the full measure of proof which the law requires if they can be reasonably reconciled with the theory that the defendant is not guilty.

The Court charges the jury that a reasonable doubt can arise from a part of the evidence. If after considering all of the evidence, you have a reasonable doubt as to the defendant's guilt arising out of any part of the evidence, you must find the defendant not guilty.

The Court charges the jury that when the evidence relied upon for a conviction is circumstantial, the chain of circumstances must be complete and such character as to convince beyond a reasonable doubt, and if they circumstances shown and proven, with the other evidence in the case, fails to so convince you beyond a reasonable doubt that the defendant is guilty, then you should return a verdict of not guilty in this case.

The Court charge[s] the jury that if a conviction in this case depends upon the testimony of a single witness, and if you have a reasonable doubt of the truthfulness of the testimony of such witness, you

may acquit the defendant.

The Court charges the jury that you should carefully examine all of the testimony and that if upon the whole evidence your mind is left in a state of doubt and uncertainty, so that you cannot say beyond a reasonable doubt that the defendant is guilty, you must acquit him.

The Court charges the jury that the defendant Mark Allen Jenkins should not be convicted unless the evidence in this case excludes to a moral certainly [sic] every reasonable hypothesis but that of his guilt. No matter how strong the circumstances are, they do not come up to the full measure of proof which the law requires, if they can be reasonably reconciled with the theory that Mark Allen Jenkins is not guilty.

Ladies and gentlemen, I charge you that [if] any or all of the witnesses for the State have exhibited or admitted bias, prejudice, anger, or ill will against the defendant, or from all of the evidence in the case you find such bias, prejudice, anger or ill will on the part of all or any of the State's witnesses, and if these things, when considered by you in connection with all the other evidence in the case, create in your minds a reasonable doubt of the defendant's guilty [sic], you should acquit him.

The Court charges the jury that if you find from the evidence that the circumstances in this case only lead to a suspicion of the guilt of the defendant, then in that event, you cannot convict the defendant.

The Court charges the jury that intent, or the lack thereof, is for the jury alone to determine.

Ladies and gentlemen, I charge you that while you are under a duty to draw whatever permissible inferences you may from the evidence in this case, including circumstantial evidence, mere speculation, conjecture or surmise that the accused is guilty of the offense charged, does not authorize a conviction. A defendant should not be convicted on mere suspicion or out of fear that he might have committed the crime. While reasonable inferences from the evidence may furnish a basis for proof beyond a reasonable doubt, mere possibility, suspicion, or guesswork, no

273

matter how strong, will not overturn the presumption of innocence.

(*Id*. at 1682-86).

Jenkins asserts that the trial court's definition of reasonable doubt violated *Cage* by impermissibly lowering the prosecution's burden of proof because it equated "reasonable doubt" with "actual substantial doubt." (Doc. 12 at 82-83). He also complains that the definition suggested that such a doubt could arise from testimony alone, without regard to the physical evidence, and required that jurors be able to articulate their doubts and assign them a specific cause for them to be reasonable. (*Id*.).

While the Supreme Court has agreed that equating reasonable doubt with actual substantial doubt is "problematic," the instruction still passes constitutional muster if the trial court makes it clear that use of the word "substantial" means "not seeming or imaginary." *Victor v. Nebraska*, 551 U.S. 1, 19-20 (1994) (holding that any ambiguity in equating reasonable doubt with substantial doubt was removed by distinguishing substantial doubt from a doubt arising from mere possibility, from bare imagination, or from fanciful conjecture). In other words, if the trial court "makes clear that 'substantial' is used in the sense of existence rather than magnitude of the doubt," any ambiguities created by the phrase have been rectified and the instruction is constitutionally sound. *Id.* at 20. The trial court ended its jury charge by emphasizing that Jenkins could not be convicted based only on a "suspicion of guilt," "mere

274

speculation, conjecture or surmise that the accused is guilty of the offense charged," " mere suspicion or out of fear that he might have committed the crime," or "mere possibility, suspicion, or guesswork, no matter how strong." (R. Vol. 9, Tab 14 at 1686). Thus, there is no reasonable likelihood that the jury interpreted the instruction to lower the prosecution's burden of proof.

Although Jenkins has not specifically complained about the court's reference to "moral certainty" in the jury charge, the court notes that "moral certainty" was used several times. The use of the phrase "moral certainty," standing alone, has also been considered questionable, because it "might not be recognized by modern jurors as a synonym for 'proof beyond a reasonable doubt.'" *Victor*, 511 U.S. at 14. Unless the remainder of the instruction "lends content to the phrase," the inherent ambiguities of "moral certainty" could certainly render an instruction containing that phrase unconstitutional. *Victor,* 511 U.S. at 14-15. However, in Jenkins's case, the court followed its references to "moral certainty" with the explanation that "no matter how strong the circumstances are they do not come up to the full measure of proof which the law requires if they can be reasonably reconciled with the theory that the defendant is not guilty." (*See id.*). Thus, the trial court's use of the term 'moral certainty' in the present case survives scrutiny.

Jenkins also alleges that the court's reasonable doubt instruction suggested that

a reasonable doubt could arise from testimony alone, without regard to the physical evidence and required that jurors be able to articulate their doubts and assign a specific reason for such doubts. (Doc. 12 at 82-83). However, the court clearly instructed the jury that they were required to consider "all of the evidence" and the "whole evidence" in the case, not just the testimony of witnesses. (R. Vol. 9, Tab 14 at 1683-84). Further, the remainder of the charge made it clear to the jury that it was not in fact required to articulate a specific reason for doubting the evidence, but must acquit Jenkins if the evidence could be reasonably reconciled with the theory that Jenkins was not guilty.

After reviewing the entirety of the trial court's charge to the jury, this court is satisfied that the jury instruction on reasonable doubt was constitutionally sufficient. Thus, the Alabama Court of Criminal Appeals' decision was not contrary to or an unreasonable application of clearly established law, nor was it based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

**6.    The Trial Court's Reference to the Jury's Verdict as "Merely Advisory" Was Improper and Prejudicial**

Jenkins claims that his rights to a fair trial, due process and a reliable determination of guilt and punishment under the Sixth, Eighth, and Fourteenth Amendments were violated "when the trial court instructed the jury, throughout the

276

trial, that its penalty phase verdict was merely advisory." (Doc. 12 at 84). He argues that "[i]nevitably, an instruction which informs a jury that its decision is not final, will be reviewed, or that the moral obligation rests elsewhere, lessens a juror's sense of moral responsibility [and] violates *Caldwell v. Mississippi*, 472 U.S. 320 (1985)." *Id.*

Jenkins first raised this claim in his Rule 32 petition. (Rule 32 C.R. Vol. 18, Tab 47 at 384-85). The trial court held that the claim was procedurally barred from review because it could have been but was not raised on appeal. (Rule 32 C.R. Vol. 45, Tab 77 at 280-83). Jenkins raised the claim again on appeal from the denial of his Rule 32 petition. (C.R. Vol. 37, Tab 52 at 146-147). However, the Alabama Court of Criminal Appeals did not specifically address this claim.[59]

The last state court to issue a reasoned opinion on this claim was the Rule 32 court which held, as the respondents contend, that the claim was procedurally defaulted pursuant to Rule 32.2(a)(5) of the Alabama Rules of Criminal Procedure. Jenkins has offered nothing to excuse the procedural default of this claim. Thus, it is procedurally barred from review in this court.

Alternatively, the claim is without merit. In *Caldwell v. Mississippi*, 472 U.S.

---

[59] The Alabama Court of Criminal Appeals addressed several claims that the trial court had found to be procedurally barred because they were not raised on direct appeal, but the claim challenging the trial court's reference to the jury's verdict as "merely advisory" was not included. *See Jenkins*, 972 So. 2d at 158.

320 (1985), the prosecutor "urged the jury not to view itself as determining whether the defendant would die, because a death sentence would be reviewed for correctness by the State Supreme Court." 472 U.S. at 323. The Court held that the comment sought to minimize the jury's sense of responsibility for determining the appropriateness of a death sentence, thereby violating the Eighth Amendment. *Id*. at 341. The Court found that the prosecutor's argument was "inaccurate, both because it was misleading as to the nature of the appellate court's review and because it depicted the jury's role in a way fundamentally at odds with the role that a capital sentencer must perform," and because it was "not linked to any arguably valid sentencing consideration." *Id*. at 336.

Jenkins claims that the trial judge "instructed the jury, throughout the trial, that its penalty phase verdict was merely advisory." (Doc. 12 at 84). Jenkins has not cited a single page in the trial transcript where the judge "instructed" the jury that their verdict in the penalty phase was "merely advisory."[60] Nonetheless, Alabama law provides that a jury's role in the penalty phase is "advisory." *Ala. Code* § 13A-5-46 (1975). Thus, any "instruction" to the jury that their verdict was advisory was entirely consistent with Alabama Law. As the Eleventh Circuit Court of Appeals stated in

---

[60] Further, a review of the court's instructions to the jury in both phases of the trial reveals that, while the court made several references to the fact that the jury would "recommend" the punishment in the case, he never specifically stated that the penalty phase verdict would be "merely advisory," or gave the jury the impression that their verdict was not final, would be reviewed, or that the moral obligation of determining the sentence rested elsewhere. (*See* R. Vol. 9, Tabs 14 and 23).

*Duren v. Hopper*, 161 F.3d 655 (11th Cir. 1998):

> In outlining the jury's proper sphere, the court did not mislead the jury, diminish its importance, or absolve it of responsibility for its decision. *See Harich v. Dugger*, 844 F.2d 1464, 1473 (11th Cir.1988)(holding that informing jury of its "advisory" function does not violate *Caldwell*). FN.
>
> > FN. This court in *Harich* held that "a *Caldwell* violation should include some affirmative misstatement or misconduct that misleads the jury as to its role in the sentencing process." *Harich v. Dugger*, 844 F.2d 1464, 1473 (11th Cir.1988). There was no such affirmative misinformation in this case.
>
> Rather, unlike the prosecutor's comments in *Caldwell*, the instruction given by the trial court in this court was accurate and in accordance with Alabama law. Thus, Duren cannot satisfy the prejudice prong of *Strickland*, and his ineffective assistance of counsel claim must fail.

*Duren*, 161 F.3d at 664. This claim will be denied both because it lacks factual support in the record and independently and alternatively because it lacks merit.

## F.     The Prosecutors Engaged in Misconduct throughout Mr. Jenkins's Trial

Jenkins asserts that repeated occurrences of prosecutorial misconduct deprived him of his "right to due process, to a fair trial, and to a reliable guilty [sic] and penalty phase determination pursuant to the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. (Doc. 12 at 85-86). On habeas review of claims of prosecutorial misconduct, "[t]he relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a

denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting

*Donnelly v. DeChristoforo*, 416 U.S. 637 (1974)).

In *Spivey v. Head,* the Eleventh Circuit Court of Appeals explained:

> Improper prosecutorial arguments, especially misstatements of law, must be considered carefully because "while wrapped in the cloak of state authority [they] have a heightened impact on the jury." *Drake v. Kemp*, 762 F.2d 1449, 1459 (11th Cir. 1985). When assessing this type of claim, this Court examines the entire context of the judicial proceeding to determine if it was fundamentally unfair. *See Brooks v. Kemp*, 762 F.2d 1383, 1400 (11th Cir. 1985) (en banc), *vacated*, 478 U.S. 1016, 106 S.Ct. 3325, 92 L.Ed.2d 732 (1986), *reinstated*, 809 F.2d 700 (1987). Not every improper prosecutorial remark, therefore, renders the trial unfair. *See id*. Improper arguments do, however, render the capital sentencing hearing fundamentally unfair and require reversal when there is a reasonable probability that they changed the outcome of the case. *See id.* at 1402. "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Id*. at 1401 (quoting *Strickland v. Washington*, 466 U.S. 668, 669, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)).

*Spivey v. Head*, 207 F.3d 1263, 1275-76 (11th Cir. 2000), *cert. denied*, 531 U.S. 1053

(2000) (alteration in original). Moreover, "improper statements during argument can

be cured by clear and accurate jury instructions." *Johnson v. Alabama,* 256 F.3d 1156,

1185 (11th Cir. 2001). Further:

> "[a] permissible argument, no matter how 'prejudicial' or 'persuasive,' can never be unconstitutional." *Brooks v. Kemp*, 762 F.2d 1383, 1403 (11th Cir.1985) (en banc), *vacated on other grounds by* 478 U.S. 1016, 106 S.Ct. 3325, 92 L.Ed.2d 732 (1986), *reinstated by* 809 F.2d 700 (11th Cir.1987) (en banc); *Romine* [*v. Head*], 253 F.3d at 1366 ("[N]o matter how outcome-determinative it is a proper argument cannot render the proceedings fundamentally unfair and therefore cannot be the basis for a

constitutional violation."); *Spivey v. Head*, 207 F.3d 1263, 1276 (11th Cir.2000) ("Proper arguments, regardless of their impact on the outcome of the case, do not render a trial unfair."). "[P]rosecutorial arguments will not warrant habeas corpus relief unless they . . . have encouraged the jury to take into account matters that are not legitimate sentencing considerations." *Johnson v. Wainwright*, 778 F.2d 623, 630 (11th Cir. 1985).

*Reese v. Secretary, Florida Department of Corrections*, 675 F.3d 1277, 1291 (11th Cir. 2012) (first two alterations added, last alteration in original).

Jenkins divides his prosecutorial misconduct claims into two parts: comments made by the prosecutor in his closing argument in the guilt phase of the trial, and comments made by the prosecutor in his closing argument in the penalty phase of the trial. When Jenkins raised these claims on direct appeal, the Alabama Court of Criminal Appeals denied them on the merits. *Jenkins v. State*, 627 So. 2d at 1050-52.[61] That decision was neither contrary to nor an unreasonable application of clearly established Federal law, nor was it based on an unreasonable determination of the facts in light of the evidence presented. As set out below, the record establishes that the comments were either not improper, or did not "so infect the trial with an unfairness" that Jenkins was deprived of constitutional due process. When considered in light of the weight of the evidence, the arguments made by defense counsel, and the trial court's instructions

---

[61] The Alabama Supreme Court affirmed, without specifically addressing the prosecutorial misconduct claims. *Ex parte Jenkins*, 627 So. 2d 1054, 1057 (1993).

to the jury, the prosecutor's comments were unlikely to have improperly influenced the

jury's decision. *See Darden*, 477 U.S. at 182 (citing *United States v. Young*, 470 U.S.

1 (1985)).

### 1.    Prosecutor's prejudicial comments in the guilt phase

Jenkins claims that, during the guilt phase of his trial, the prosecutor:

> improperly commented on Mr. Jenkins failure to testify (R1 at 1551,
> 1553, 1608-09, 1621, 1631), misused irrelevant and prejudicial photos to
> inflame the jury (R1 at 1615), repeatedly expressed personal opinions and
> vouched for the quality of the prosecution's case and witnesses (R1 at
> 1559, 1618-19, 1633, 1634, 1634, 1[6]35,), injected unsworn and
> inflammatory testimony that was not admitted into evidence (R1 at 1618-
> 19), and misstated the law on reasonable doubt (R1 at 1559, 1605, 1608,
> 1614), the elements of capital murder (R1 at 1550, 1609, 1613), robbery
> as an aggravating circumstance (R1 at 1612, 1627), kidnapping as an
> aggravating circumstance (R1 at 1555, 1610), robbery as an afterthought
> (R1 at 1613), and the State's burden of proof, (R1 at 1550, 1551-53,
> 1560, 1605, 1608, 1609, 1612, 1613, 1614, 1621), improperly
> encouraged the jury to speculate about the existence of evidence where
> the State's proof was lacking. (R1 at 1608, 1612, 1614, 1621-22),
> improperly shifted the burden to Mr. Jenkins, (R1 at 1621), and referred
> to inflammatory evidence that had been excluded. (R1 at 1619.)

(Doc. 12 at 85-86) (alteration added)[62].

In denying these claims on the merits, the Alabama Court of Criminal Appeals

held that:

---

[62] Jenkins offers nothing in his petition to support this claim, except the references to pages from the
trial transcript. Therefore, the court will look to the claims raised by Jenkins on direct appeal to
determine the factual basis for the claims.

The appellant next contends that various comments made by the prosecutor in his closing arguments in the guilt phase prejudiced him. The appellant contends that the prosecutor commented on his failure to testify, commented on evidence that was not before the jury, gave his personal opinions, and misstated the elements of capital murder. We have reviewed all of the complained-of instances and conclude that no reversible error occurred. "In order for a prosecutor's comments made during argument before the jury to require a new trial, the entire trial must have been so infected with unfairness as a result of these comments that the appellant was denied due process. *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986)." *Hart v. State*, 612 So.2d 520, 527 (Ala.Cr.App. 1992). "'Whatever is in evidence is considered subject to legitimate comment by counsel.'" (Citation omitted.)

Furthermore, the trial court instructed the jury that any arguments of counsel were not to be considered as evidence in the case. "'[A] criminal conviction is not [to] be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial.'" *Dill v. State*, 600 So.2d 343, 358 (Ala.Cr.App. 1991), quoting *United States v. Young*, 470 U.S. 1, 11, 105 S.Ct. 1038, 1043, 84 L.Ed.2d 1 (1985). Statements made by counsel in argument to the jury are considered as having been made in the heat of debate. *Henderson v. State*, 583 So.2d 276 (Ala.Cr.App. 1990), *aff'd*, 583 So.2d 305 (Ala. 1991), *cert. denied*, 503 U.S. 908, 112 S.Ct. 1268, 117 L.Ed.2d 496 (1991). "[I]t is unlikely that any [alleged] impropriety in the State's argument could have affected the jury's verdict." *Henderson*, 583 So.2d at 287.

*Jenkins v. State*, 627 So. 2d at 1050 (second alteration added, all other alterations in original).

### a.    The prosecutor improperly commented on Jenkins's failure to testify, and "improperly shifted the burden" to Jenkins

When Jenkins presented this claim on direct appeal, he argued that "in order to

draw the jury's attention away from its weak case," the prosecutor "repeatedly commented on Mr. Jenkins' failure to testify or present evidence on his behalf, and improperly shifted the burden of proof from the State to Mark Jenkins." (C.R. Vol. 13, Tab 30 at 14). Jenkins continued:

> Most egregious were the prosecutor's repeated direct and indirect comments on Mark Jenkins' failure to testify at trial. While arguing whether there was sufficient evidence to find that Mark Jenkins had committed a first degree kidnapping, the prosecutor argue[d]

>> I'm like Kelly [the assistant prosecutor], nobody said she got in the car and drove off in it.[63]

> (R. 1609) and again, in discussing whether the victim left voluntarily,

>> . . . [W]hat the defense will argue to some degree is that Tammy Hogeland left voluntarily. There is no evidence to that.[64]

> (R. 1553) The prosecutor also used similar tactics while discussing whether or not the victim was drunk:

>> If there was any evidence of intoxication on the part of the victim, you would have heard about it this week.

> (R. 1631)

---

[63] The petitioner misquoted this statement by the prosecutor. The prosecutor actually said, "I'm like Kelly, nobody said she got in the car voluntarily. We know she drove off in it." (R. Vol. 9, Tab 13 at 1609).

[64] The petitioner misquoted this statement by the prosecutor. The prosecutor actually said, "what the defense will argue to some degree will be that Tammy left the Omelet Shop, and she left the Omelet Shop voluntarily. There is no evidence to that." (R. Vol. 8, Tab 11 at 1553).

What all of these arguments assume is that Mark Jenkins, who according to the State was the last person with Tammy Hogeland, could provide this evidence but did not. The prosecutor, in closing argument at the guilt phase, told the jury:

> You are going to have to do some speculating. Tammy Ruth Hogeland will never tell her story because she is dead and gone. There has to be some speculation about what happened. There are some things that I can't account for and I don't think you can as a jury.

(R. 1608-9) Because the prosecution's theory of the case was that Mark Jenkins was the last person with Tammy Hogeland before she died, and the only person with her when she died, the obvious implication was that only Mark Jenkins could provide the full story and had chosen not to do so. *See Ex parte Wilson*, 571 So. 2d 1251 (Ala. 1990) (prosecutor's comment that the "full story" surrounding the offense had not been disclosed reversed as impermissible comment on defendant's silence despite attempt at curative instruction by trial court to which there was no objection). This implication was slammed home to the jury as the prosecutor discussed the possibility of a conviction for a lesser included offense, manslaughter:

> And this ain't a manslaughter case. This is no reckless killing. There is not one iota of evidence before this jury that this is a reckless killing, not [a] bit. The only evidence is that Dr. Warner said she died of strangulation.

(R. 160[8]) Since Mark Jenkins was allegedly the only other person present when Tammy Hogeland was killed and hence was the only person who could testify to his state of mind and actions, this was clearly an indirect yet obvious comment on his failure to testify at trial.

The prosecutor later made the same argument again, and hence again infected the verdict with error, by arguing, "This is not a reckless killing. This is not a killing during a sudden heat of passion. There is no evidence of that." Again, the only person who could provide such

285

evidence was the defendant, Mark Jenkins. Again, no curative instruction was given by the trial court, and the prejudicial effect of this argument was unremedied and infected the jury's deliberations. *See Windsor v. State, supra* (reversible error for the prosecutor to argue that defense could not explain evidence of possession of weapon, since defendant was the only person who could explain it and no curative instruction was given); *see also Ex parte Williams*, 461 So. 2d 852 (Ala. 1984).

The prosecution made a similar, and similarly egregious, error while arguing the value of the identification testimony presented by the State:

> If he [Danny Lightfoot, a potential suspect] looked anywhere similar to Mark Allen Jenkins, they have subpoena power, and they would have had him here for you to look at, I'll assure you of that, if Danny Lightfoot looked anything like Mark Allen Jenkins, I assure you of that.[65]

(R. 1621). It is, of course, wholly improper for the prosecutor to "assure" or "promise" the jury anything of an evidentiary nature; this is simply a form of vouching for his own unsworn testimony and arguments based on his personal experience and professional expertise (*see supra*, pp. __). This argument, however, is also another example of the State's attempt to shift the burden of proof to the defendant, and as such wholly improper. The defendant is under no obligation to call witnesses on his own behalf, and any such implication by the State is reversible error. *See Lowery v.*

---

[65] In context, the prosecutor stated:

> [The defense] wants you to speculate that the [victim's fiancé, Danny Lightfoot,] might have done this. These officers testified that the finance [sic] did not meet the physical description of the person [the victim] left that Omelet Shop with. He wasn't the target of this investigation. If he looked anywhere similar to Mark Allen Jenkins, they have subpoena power, and they would have had him here for you to look at, I'll assure you of that, if Danny Lightfoot looked anything like Mark Allen Jenkins. I promise you that.

(R. Vol. 9, Tab 13 at 1621) (alterations added).

*State*, 108 So. 351 (Ala.Cr.App. 1923) (improper for state to argue that defendant did not call witnesses to substantiate his alibi).

All of these comments are inherently of a "highly prejudicial and harmful nature." *Ex parte Williams*, 461 So. 2d 852 (Ala. 1984); *Ex parte Brooks*, 562 So. 2d 604 (Ala. 1990). Moreover, these arguments impermissibly shifted the burden of proof from the State to Mr. Jenkins. It is the State's burden to prove beyond a reasonable doubt that Mr. Jenkins had the particularized intent necessary to find him guilty of capital murder; it is the State's burden to prove beyond a reasonable doubt that Tammy Hogeland did not get into the car voluntarily with Mark Jenkins, and that Mark Jenkins later formed the specific intent to kidnap Tammy Hogeland. *See In re Winship*, 397 U.S. 358 (1970). The State's argument that the defendant, who has a constitutionally protected right to remain silent and present no case at all, has not presented evidence to prove that he has not committed intentional murder, or that he did not kidnap or rob the victim, does not meet this burden of proof; rather it simply serves to focus the jury on the defendant's failure to testify or present evidence on his behalf, and thus render the jury's verdict constitutionally unreliable.

The prejudicial effect of these arguments is all the greater in a case based wholly on circumstantial evidence. The prosecutor's arguments suggested to the jury that Mark Jenkins had the ability and indeed the obligation to destroy the chain of circumstances presented by the state with his testimony. Combined with the State's misstatements of the applicable law, *see infra pp.* __ , these arguments could have led the jury to believe that the State's burden of proof was far less that it was, particularly in the crucial matter of intent. Such a belief renders their verdict constitutionally unreliable, and it must be reversed.

(C.R. Vol. 13, Tab 30 at 15-19)(first two alterations in original, other alterations added).

The Supreme Court has held that direct comments by the prosecution on a defendant's silence violate the Fifth Amendment. *Griffin v. California*, 380 U.S. 609

(1965). When determining whether an impermissible comment on a defendant's right to remain silent has occurred, federal courts must consider the totality of the circumstances and evaluate "whether the remark is 'manifestly intended' by the prosecutor or 'would naturally and necessarily be understood by the jury' as a comment on the defendant's silence." *Matire v. Wainwright*, 811 F.2d 1430, 1435 (11th Cir. 1987) (citing *United States v. Vera*, 701 F.2d 1349 (11th Cir. 1983).

In *Isaacs v. Head*, 300 F.3d 1232 (11th Cir. 2002), the Eleventh Circuit described the proper manner in which to evaluate a *Griffin* claim:

> The Fifth Amendment prohibits a prosecutor from commenting directly or indirectly on a defendant's failure to testify. A prosecutor's statement violates the defendant's right to remain silent if either (1) the statement was manifestly intended to be a comment on the defendant's failure to testify; or (2) the statement was of such a character that a jury would naturally and necessarily take it to be a comment on the failure of the accused to testify. The question is not whether the jury possibly or even probably would view the remark in this manner, but whether the jury necessarily would have done so. The defendant bears the burden of establishing the existence of one of the two criteria. The comment must be examined in context, in order to evaluate the prosecutor's motive and to discern the impact of the statement . . . .

*United States v. Knowles*, 66 F.3d 1146 (11th Cir. 1995) (citations, quotations, and footnotes omitted). *See also United States v. LeQuire*, 943 F.2d 1554, 1565 (11th Cir. 1991) (same); *Solomon v. Kemp*, 735 F.2d 395, 401 (11th Cir. 1984).

> In applying *Griffin*, we have strictly enforced the requirement that a defendant show that the allegedly offensive comment was either manifestly intended to be a comment on the defendant's silence or that the comment naturally and necessarily related to the defendant's silence.

*Isaacs*, 300 F.3d at 1270 (alterations in original).

Jenkins has not shown that the prosecutor's comments were intended to be a comment on his silence, that the comments were of such a character that the jury would necessarily have viewed them as comments on his silence, or that the comments amounted to vouching or improperly shifted the burden of proof to him.

He first argues that the prosecutor referenced his failure to testify while addressing the sufficiency of the evidence on the kidnapping charge, when he argued that,

> I'm like [the assistant prosecutor], nobody said [the victim] got in the car voluntarily. We know she drove off in it.

(R. Vol. 9, Tab 13 at 1609) (alterations added), and when he argued that,

> what the defense will argue to some degree will be that Tammy left the Omelet Shop[pe], and she left the Omelet Shop[pe] voluntarily. There is no evidence to that.

(R. Vol. 8, Tab 11 at 1553).

This was clearly not a comment on Jenkins's failure to testify, but a valid argument pointing out the lack of evidence indicating that the victim had left with Jenkins voluntarily.

289

Jenkins also challenges the following comments by the prosecutor:

> Now, I don't know if she was alive or dead, and that doesn't really matter at this point in time whether she was alive or dead or unconscious. I don't know. But there was evidence that she was alive out there on that scene. She might have been unconscious. I don't know. You can infer anything you want to from the facts. I'll [sic] will tell you this, Mrs. Coe, I believe said, she thought she appeared to be passed out. If there was any evidence of intoxication on the part of the victim, you would have heard about it this week.

(R. Vol. 9, Tab 13 at 1630-31);

> You are going to have to do some speculating. Tammy Ruth Hogeland will never tell her story, because she is dead and gone. There has to be some speculation about what happened. There are some things in this case that I can't account for, and I don't think that you can as a jury.

(R. Vol. 9, Tab 13 at 1608);

> And this ain't a manslaughter case. This is no reckless killing. There is not one iota of evidence before this jury that this is a reckless killing, not a bit. The only evidence is that Dr. Warner said she died of strangulation. Now, if strangulation is recklessness, so be it. Find manslaughter. This is not a reckless killing.

(R. Vol. 9, Tab 13 at 1608-09); and

> This is not a reckless killing. This is not a killing during a sudden heat of passion. There is no evidence of that.

(R. Vol. 9, Tab 13 at 1613-14).

Jenkins maintains that these comments necessarily referenced his failure to testify. He reasons that since he was allegedly the only person present when the victim was killed,

and the last person to see her alive, he was the only person who could have testified as to whether she was intoxicated at the time of her death or if the killing was intentional.

The comment regarding evidence of the victim's intoxication was made in relation to Mrs. Coe's testimony that the victim appeared to be "passed out" when she saw her, and to point out that there had been no evidence indicating that the victim was intoxicated. The comments regarding the manner of the victim's death were made in response to defense counsel's argument that there was no direct evidence of Jenkins's guilt, and were an attempt both to explain the need to rely on circumstantial evidence and to point out the absence of any evidence indicating the victim's death was anything but intentional.

Jenkins also claims that these comments shifted to him the burden to prove that the victim did not voluntarily get into the car with him and that he did not have the specific intent to kill her. However, the comments were clearly made by the prosecutor to point out the lack of any evidence indicating that the victim had left with Jenkins voluntarily, and to point out the absence of evidence indicating the victim's death was anything but intentional. The arguments in no way shifted the burden of proof to Jenkins. Further, the jury was clearly instructed by the court that the arguments by counsel were not evidence and that the burden of proof was on the State. (R. Vol. 9, Tab 14 at 1640, 1668, 1682).

When viewed in context, none of these statements was manifestly intended to be a comment on Jenkins's failure to testify, nor were the comments of such a character that a jury would naturally and necessarily have taken them to be a comment on his failure to testify. Rather, the comments were legitimate statements concerning the circumstantial evidence presented at trial. Further, these comments did not shift the burden of proof to Jenkins.

Jenkins further argues that the following comments by the prosecutor were improper:

> [The defense] wants you to speculate that the [victim's fiancé][66] might have done this. These officers testified that the finance [sic] did not meet the physical description of the person [the victim] left that Omelet Shop with. He wasn't the target of this investigation. If he looked anywhere similar to Mark Allen Jenkins, they have subpoena power, and they would have had him here for you to look at, I'll assure you of that, if Danny Lightfoot looked anything like Mark Allen Jenkins. I promise you that.

(R. Vol. 9, Tab 13 at 1621) (alterations and footnote added). He argues that the prosecutor "vouch[ed] for his own unsworn testimony and arguments based on his personal experience and professional expertise" by assuring the jury of "anything of an evidentiary nature." (C.R. Vol. 13, Tab 30 at 17). He claims that this is another attempt by the state to shift the burden of proof, requiring him to prove his innocence. (*Id.*). Clearly, the prosecutor was not vouching for the credibility of his unsworn arguments

---

[66] Danny Lightfoot was the victim's fiancé.

or attempting to shift the burden of proof to Jenkins. Rather, the comment was a legitimate response to defense counsel's attempt[67] to convince the jury that the victim's fiancé, instead of Jenkins, had killed her.

        **b.**    **The prosecutor misused irrelevant and prejudicial photos to inflame the jury**

On direct appeal, Jenkins argued that, during closing argument, the prosecutor improperly urged the jury to consider "shocking and irrelevant pictures of the victim's body in an advanced state of decomposition" as evidence of Jenkins's intent to commit the underlying felonies of kidnapping and robbery. (C.R. Vol. 13, Tab 30 at 19). Jenkins refers to this portion of the closing argument:

> Mr. Scofield talked a lot about intent and when it's got to be present. Intent is an aspect of a murder, intentional type murder. But, intent, what he failed to tell you, and what the Judge will tell you, that intent can be inferred from the circumstances. Intent to kill. I want to tell you a little bit about, talk about motive in this case. What motive did Mark Jenkins have? I tell you what motive he had. Christine turned him down. He got drunk and went over there. He was hitting on her; it's in her statement. He was hitting on her. Telling her he loved her, and she run [sic] him off. That's his motive. Christine turned him down. So, I'll go find Tammy. I'm low on gas. I'll go over to the station and get in another car and go find her. Yeah, you can speculate. You can infer anything you want to from the evidence in this case, ladies and gentlemen of the jury. Can be inferred, and there is no burden on the State to show when that intent was inferred. It can be inferred from the totality of the circumstances, and that's what I want you to do in this case. I'll tell you what intent and motive is. That's intent and motive. You look at it when you get back

---

[67] (See R. Vol. 5 at 838, 840, 856).

there. I don't even like to look at it. That's intent and motive.

(R. Vol. 9, Tab 13 at 1614-15).

Jenkins maintained that this argument was intended to inflame the jury, since the depiction of advanced decomposition could tell the jury nothing about intent to rob or kidnap the victim. (C.R. Vol. 13, Tab 30 at 20).

Initially, the court notes that the argument in question seems to address intent to kill, rather than intent to commit a robbery or kidnapping. Further, the photographs in question were admitted into evidence by the State without objection by the defense. (R. Vol. 4 at 705-08). Thus, they were the proper subject of argument by the prosecutor. Finally, the court clearly instructed the jury on intent. (R. Vol 9, Tab 14 at 1650). Accordingly, the Alabama Court of Criminal Appeals correctly determined that any impropriety in the prosecutor's closing argument contained no reversible error.

### c.   The prosecutor repeatedly expressed personal opinions and vouched for the quality of the prosecution's case and witnesses

Jenkins claimed on direct appeal that "the prosecutor repeatedly put his personal opinion of the defendant's guilt and of the evidence in the case before the jury, as if it were evidence for the jury to consider." (C.R. Vol. 13, Tab 30 at 24-25). Specifically, he challenged the following statements:

When you listen to the terminology in regard to reasonable doubt, it's not all that complicated. Reasonable doubt is a doubt for which you can

294

attach a sound sensible reason. Okay. It's a doubt for which you can attach a sound sensible reason. Not a whimsical doubt. It's not a fanciful doubt. If you can attach a reasonable doubt. I don't believe you can. There are many more items of evidence to be talked about in this case. There is one more thing I would ask of you. There is one thing I would ask of all of you. No one ever asked any of you to leave your common sense at home. Common sense is something that no one gave you. It's not something they can take away. The judge will charge you on the law and you will weigh the facts. And I hope that in doing and being attentive to the facts and the law, you will use your common sense. Thank you.

(R. Vol. 8, Tab 11 at 1560-61);

> You know there are a lot of coincidences if there is no evidence in this case. A lot of coincidences. Isn't it a coincidence that Mark Jenkins, undisputed testimony, Mark Jenkins left Christine's house around approximately 2:00 o'clock and he was drunk. Isn't it a coincidence that that very same night a red Mazda RX-7 just happened to come up missing from the same service station where Mr. Mark Allen Jenkins keeps his car parked? Isn't it a coincidence that a drunk person shows up over at the Omelet Shop on 10th Avenue and almost runs through the curb and comes in and starts talking to Tammy? Isn't that a coincidence? Isn't it a coincidence that a few hours later this same person that is positively identified by the Coes as being out at the Springville Chevron about three miles from where Tammy's body was found in a red sports car, and he is under the influence. He smells of alcohol. Now, that's some strange coincidences. No, ma'am; no sir, that's strong circumstantial evidence, as strong as it gets, and it's good evidence. It's as strong as it gets.

(R. Vol. 9, Tab 13 at 1617-18); and

> That's good evidence, folks, puts this defendant right in the middle of this crime. I could go on and on talking about this case. The evidence in this case is overwhelming. The officers in this case worked hard, and they put this case together just like we presented it to you. Just like Kelly said, just like a puzzle, and the whole picture should be clear to you now. I think probably that I have stood up here as long as I need to. I'm not going to

attempt to go over every witnesses' [sic] testimony. I am going to say to you this, that I feel like the presumption of innocence that this defendant came before you with is gone now. That cloak has been stripped from his back. He stands before each and everyone of you as guilty. He stands before you guilty of capital murder just like we proved it with all of this evidence. . . . I submit to you that you haven't got to speculate on anything. You can take the overwhelming evidence, direct and circumstantial, that the Judge will tell you is good evidence in this case and put it all together, and use your common sense, and you should have absolutely no problem going back there and finding this defendant guilty as charged of capital murder: Murder during the course of robbery, murder during the course of kidnapping. Do it in the interest of justice. Thank you.

(*Id.* at 1633-35).

Jenkins argued that these arguments "invoke the prosecutor's personal experience and professional expertise to bolster the State's case," and encourage the jury to rely upon the prosecutor's opinions concerning Jenkins's guilt, rather than the evidence. (C.R. Vol. 13, Tab 30 at 25-26). These comments were not improper. Rather, they were made by the prosecutor to remind the jury about all of the state's evidence, and to argue that the evidence was sufficient to support a finding of guilt. *See Melson v. State*, 775 So. 2d 857 at 883 (Ala. Crim. App. 1999), *aff'd sub nom. Ex parte Melson*, 775 So. 2d 904 (Ala. 2000) (rejecting similar argument and holding that prosecutor's arguments were "merely that the state's evidence was sufficient to overcome" the presumption of innocence and that the trial court properly instructed the jury on the presumption of innocence and that the comments of attorneys were not

evidence.)

### d. The prosecutor injected unsworn and inflammatory testimony that was not admitted into evidence, and had been excluded

On direct appeal, Jenkins claimed that the prosecution intentionally put before the jury unsworn testimony regarding Sarah Harris's failure to identify Jenkins, and exacerbated the prejudicial effects of this argument by vouching for its truth with his professional experience and expertise as a law enforcement official. (C.R. Vol. 13, Tab 30 at 20-21). Jenkins objected to the following comment:

> Sarah Harris, the black lady from the Omelet Shop that testified, sat on that witness stand as confident as anybody I have ever seen and said that's the man that came in that Omelet Shop that night. And that's the man that Tammy left with. That's direct evidence, that's direct evidence. There has been a big issue made about her failure to identify him at this prior lineup. I believe the testimony was when she was shown the first lineup, you will have it there, that she couldn't be positive, but she said, I think it's No. two. You look and see who No. two is. Belinda told you No. two in her lineup is the defendant. But she couldn't be positive. I don't know how many people come and go. But then we get around to the live lineup Ms. Harris did. She was unable, and we will submit that she was unable to make an ID. But don't you know why, ladies and gentlemen of the jury? You can infer from the circumstances in this case and the evidence in this case. She was probably scared. She was probably scared. She was looking at a man over there that she knows by this time has strangled the life out of a co-worker. And I don't know how many times I have heard, and I know you people have heard, and you are not even in my field of work, how people don't want to get involved. They are reluctant to get involved. You might have sensed that a little bit from some of our witnesses. We called a lot of witnesses. People are scared about getting involved in murder cases. And that's what happened to say Sarah Harris. That's the reason she didn't point him out in that live lineup.

(R. Vol. 9, Tab 13 at 1618-19). Jenkins claimed that this was not an argument from the evidence presented at trial. (C.R. Vol. 13, Tab 30 at 21). He pointed out that the jury heard no testimony from Sarah Harris indicating that she had failed to identify Jenkins in a lineup because she was scared, making it improper for the prosecutor present this alleged reason as a fact.[68] (*Id*.). He adds that the error was compounded by the prosecutor's vouching, based on his personal expertise and professional experience, that he knew she could have identified Jenkins but for her fear of him. (*Id*. at 22).

The prosecutor's comment does not appear to have been a statement of fact, allegedly supported by Sarah Harris's testimony, or improper vouching by the prosecutor. The prosecutor admitted the fact that Ms. Harris had failed to identify Jenkins at the first lineup. However, he stressed the fact that she had identified Jenkins in open court as the man with whom the victim left the Omelet Shoppe on the night she disappeared. In an effort to refute the defense argument that Jenkins was not the perpetrator of the crimes since Ms. Harris, the only person who saw the victim leave the Omelet Shoppe that night, was originally unable to identify him, the prosecutor urged the jurors to use their own life experiences to conclude that she was probably afraid to identify Jenkins in the live lineup.

---

[68] Sarah Harris testified in a proceeding held outside of the presence of the jury, that she did not identify Jenkins in the live lineup because she was "afraid." (R. Vol. 3, Tab 9 at 545).

The prosecution did not present Ms. Harris's fear of identifying Jenkins as a fact.

The prosecution clearly argued that "[s]he was probably scared." (R. Vol. 9, Tab. 13

at 1619). However, to the extent the argument might have been taken as a statement of

fact that Ms. Harris was afraid, the jury was clearly instructed by the court that:

> An attorney's statements and arguments are intended to help you understand the evidence and apply the law. However, they are not evidence, and you should disregard any remark, statement, or argument which is not supported by the evidence or by the law as given to you by the Court.

(R. Vol. 9, Tab 14 at 1682).

"Jurors are presumed to follow the instructions of the trial court." *Melson v. State*, 775

So. 2d at 884. This claim will be denied.

> **e.** **The prosecutor misstated the law on reasonable doubt, improperly encouraged the jury to speculate about the existence of evidence where the State's proof was lacking, and misstated the elements of capital murder, robbery as an aggravating circumstance, kidnapping as an aggravating circumstance, robbery as an afterthought, and the state's burden of proof**

On direct appeal, Jenkins claimed the prosecutor "played fast and loose with the

definition of reasonable doubt." (C.R. Vol. 13, Tab 30 at 30). Jenkins referenced the

following statement by the prosecutor:

> When you listen to the terminology in regard to reasonable doubt, it's not all that complicated. Reasonable doubt is a doubt for which you can attach a sound sensible reason. Okay. It's a doubt for which you can

299

attach a sound sensible reason. Not a whimsical doubt. It's not a fanciful
doubt. If you can attach a reasonable doubt. I don't believe you can.

(R. Vol. 8, Tab 11 at 1560). Jenkins claimed this mischaracterized the reasonable doubt

standard by improperly suggesting that "even if the State's proof had not persuaded a

juror, the resulting doubt could not be regarded as 'reasonable' unless the juror was

able to articulate a reason for it." (C.R. Vol. 13, Tab 30 at 30-31). He further argued

that the following comments urged the jury "to convict based not on a sifting of the

evidence and a finding of guilt from the evidence beyond a reasonable doubt, but rather

on gut instinct and sheer conjecture." (*Id*. at 28)

> I'm going to ask you to speculate. You are going to have to do some
> speculating. Tammy Ruth Hogeland will never tell her story, because she
> is dead and gone. There has to be some speculation about what happened.
> There are some things in this case that I can't account for, and I don't
> think that you can as a jury. But you are going to be able to reconcile the
> evidence in this case when it's over with. . . . But intent, what he failed
> to tell you, that intent can be inferred from the circumstances. Intent to
> kill. . . . Yeah, you can speculate. You can infer anything that you want
> to from the evidence in this case, ladies and gentlemen of the jury. Can be
> inferred, and there is no burden on the State to show when that intent was
> inferred. It can be inferred from the totality of the circumstances, and
> that's what I want you to do in this case.

(R. Vol. 9, Tab 13 at 1608, 1614-15).

Examining these comments in context, it does not appear that the prosecutor was

attempting to convince the jury to convict Jenkins based upon any other standard

besides reasonable doubt, or to mislead the jury as to the correct definition of

300

reasonable doubt. Rather, the prosecutor was trying to explain to the jury that they would have to infer facts essential to the case from the circumstantial evidence the State had presented. Further, even if the comments were improper, the court clearly instructed the jury on the definition of reasonable doubt (R. Vol. 9, Tab 14 at 1669), and that the arguments made by counsel were not evidence (*Id.* at 1682).

Jenkins further claimed on appeal that the prosecutor "repeatedly misstated the elements of capital murder, the legal burden of proof, and the elements necessary to prove first degree robbery and kidnapping." (C.R. Vol. 13, Tab 30 at 26). He claimed that the following comments advised the jury that they could find Jenkins guilty of capital murder, even if he did not have the specific intent to kill:

> Now, if you have a robbery in the case and you find the man committed a murder, then therefore you have capital murder. I think when you think about that for a moment, if you have a robbery in the case and you have a murder, you will have a capital murder.

(R. Vol. 8, Tab 11 at 1550);

> This is not a reckless killing. This is not murder, and let me tell you why. Because Tammy Hogeland was kidnapped, and she was robbed.

(R. Vol. 9, Tab 14 at 1609); and

> And that's what makes this case capital. If it had just been a murder where somebody walked into an Omelet Shop[pe] and shot somebody, or grabbed them around the throat and chocked [sic] the life out of them right there and drove off, that's murder. But it's capital murder under our law when you commit another felony offense during the course of a

murder, and that's what we have.

(R. Vol. 9, Tab 14 at 1613). Jenkins further argued that the following statement by the prosecutor misstated the legal requirement for proving the elements of capital murder during a kidnapping by implying that the victim was necessarily kidnapped since she most likely intended to return to the Omelet Shoppe:

> [N]obody said she got in that car voluntarily. We know she drove off in it. The chances are pretty good, she knew Mark Allen Jenkins, that's undisputed, and she probably did go out there and sit down in that car. It's 2:00 o'clock, or approximately in the morning, probably business was light, there wasn't [sic] a bunch of customers, and she went out and sat down in this new red sports car that Mr. Jenkins drove up in. She probably did. But I submit to you, ladies and gentlemen of the jury, a woman, and there are some of you on this jury, you don't go off and leave your purse with your makeup and your brush, particularly, if you are a heavy smoker, your cigarettes behind and go off wearing your apron if you are going to go off and stay the morning or the night with somebody. If she left there, she intended to come back, I submit to you. And you can use your own common sense to figure that out. And it's kidnapping at that point. You listen to the Judge's charge.

(R. Vol. 9, Tab 14 at 1609-10).

These comments were not misstatements of the law of the capital offenses of murder during a robbery and murder during a kidnapping, nor can they be interpreted, in context, as statements of the legal principles involved in the case. Rather, the comments clearly were an attempt to explain to the jury that, for the murder to be made capital, it necessarily involved the aggravating circumstances of robbery and/or

kidnapping. Additionally, the court clearly instructed the jury on the elements of capital murder, first degree robbery and kidnapping, and the legal burden of proof (R. Vol. 9, Tab 14 at 1640-41, 1644-65), and that the arguments made by counsel were not evidence. (*Id.* at 1682).

Jenkins has not established that the state court's adjudication of his claims regarding the prosecutor's prejudicial comments during the guilt phase was contrary to or an unreasonable application of clearly established Federal law, or that it involved an unreasonable determination of the facts.

### 2.     Prosecutor's prejudicial comments in the penalty phase

During the state's rebuttal closing argument in the penalty phase of the trial, the prosecutor argued the following:

> MR. DAVIS: Ladies and gentlemen of the jury, this will be the last time the lawyers are going to stand before you in this case. Again, I appreciate the patience you have shown and the attentiveness you have shown. I do want to remind you of one thing, and that is that back when we questioned prospective jurors for this case, if you remember I asked each and everyone of you about leaving sympathy out of your decision making process in this case. I want to ask you one more time to do that. We don't want any sympathy. The state of Alabama is not asking for sympathy on behalf of anyone. We don't want you to let sympathy come into play on what you recommend in this case. Each and everyone of you indicated that if the evidence in this case after being presented to you so just justified it that each one of you thought that you could return a death penalty. I can assure you that the State of Alabama did not leave anyone on the jury panel that said otherwise. There has been some mention here about Mark Jenkins' age. Well, you consider the victim's age, too,

303

Tammy Hogeland's age. She was twenty-three years old, and she worked for a living. That's what she was doing the morning that she died, working for a living. She had a paycheck in her purse that she never go to take home to her twenty-one month old baby. She worked like Jenkins worked. I ask you not to let that come into play, the sympathy factor there. I will say this, and I want you to consider this, I want you to consider what a humiliating death Tammy died on the side of that highway that morning. You can consider that, and you can infer anything that you want to from the evidence you heard in this case. She died a humiliating, very humiliating death in my opinion. It was humiliating for me to walk up out there that afternoon and see what was –

MR. SCOFIELD: I object to his personal knowledge about humiliating what he saw. That is improper, and Mr. Davis knows it's improper. It's not evidence in this case.

THE COURT: I didn't here [sic] what he said.

MR. SCOFIELD: He said he was humiliated when he walked up on that scene.

THE COURT: I will ask you not to consider the statement made by counsel.

MR. DAVIS: You have a picture of what was out there at the scene. You look at it and you ask if that was humiliating. And, yes, I will ask you to return a death penalty in this case, because the State of Alabama knows and feels that that's a deterrent in these kind of cases. And I feel good about asking you to send out deterrent messages, because the minute you come back and recommend the death penalty, it will be all over this County in short order, and the State, and this general area, that the juries in St. Clair Counts [sic] are not going to tolerate people being strangled to death and robbed in St. Clair County[,] Alabama. It will go out, and it will be a good message, and it will deter the future Mark Allen Jenkins that might consider doing the same thing. We don't want vengeance at all. Nobody ever asked for vengeance, and I hope I haven't insinuated that in any manner. We don't want vengeance. And I speak to [sic] behalf of

everybody connected with this case. We want you to be fair to that
defendant right there. I want you to be fair. I want you to have the same
amount of mercy on him when you go back there and deliberate his fate
that he had on Tammy Hogeland the morning of the 18th out there on that
bank on the side of I-59 when he strangled the life out of her. That's all
we ask. If you will do that, show him the same amount of mercy he
showed Tammy, you will return a death penalty recommendation in this
case. Thank you.

(R. Vol. 9, Tab 22 at 1733-37) (alteration added).

Jenkins claims that in this statement, the prosecutor:

improperly argued for the existence of non-statutory aggravating
circumstances (R1 at 1734, 1735), improperly encouraged the jury to
reject mercy (R1 at 1734, 1736-37), improperly encouraged the jury to
vote for death to deter others (R1 at 1735-36), and, improperly compared
the victim's rights to Mr. Jenkins (R1 at 1737.).

(Doc. 12 at 86).[69] In holding that these arguments by the prosecutor were not improper,

the Alabama Court of Criminal Appeals first noted that:

The appellant next argues that several instances of prosecutorial
misconduct in the closing argument in the penalty phase resulted in
prejudice to him. In each instance cited by the appellant, no objection was
made. "'This court has concluded that the failure to object to improper
prosecutorial arguments . . . should be weighed as part of our evaluation
of the claim on the merits because of its suggestion that the defense did
not consider the comments in question to be particularly harmful.'"
*Kuenzel*, 577 So.2d at 489.

*Jenkins v. State*, 627 So. 2d at 1050-51. That court went on to address the merits of

---

[69] Jenkins offers nothing in his petition to support this claim except the references to pages from the
trial transcript.

Jenkins' individual claims, which are set out below.

>     a.     **The prosecutor improperly argued for the existence of non-statutory aggravating circumstances**

When Jenkins raised this claim on direct appeal, he argued that the prosecutor improperly urged the jury to consider the victim's "humiliating death," as evidenced by the photographs of the victim's body, taken at the scene. (C.R. Vol. 13, Tab 30 at 57-49). He claimed that this "was all the more improper because the State specifically chose not to rely on the aggravating factor that the offense was especially heinous, atrocious, or cruel . . . and no evidence of this was or could have been presented at either the guilt or penalty phase." (*Id*. at 57-58). In denying this claim, the Alabama Court of Criminal Appeals found:

> The first instance was when the prosecutor stated that the victim had died a "humiliating" death. "[A prosecutor] may argue every matter of legitimate inference and may examine, collate, sift, and treat the evidence in his own way." *Donahoo v. State*, 505 So.2d 1067, 1072 (Ala.Cr.App.1986).

*Jenkins v. State*, 627 So. 2d at 1051.

Clearly, the prosecutor's comment, urging the jury to "consider what a humiliating death Tammy died on the side of that highway that morning" (R. Vol. 9, Tab 22 at 1735), was not intended to prove, as an additional aggravating factor, that the offense was especially heinous, atrocious, or cruel. As the Alabama Court of

Criminal Appeals correctly noted, a prosecutor "may argue every matter of legitimate

inference and may examine, collate, sift, and treat the evidence in his own way."

*Jenkins*, 627 So. 2d at 1051 (quoting *Donahoo v. State*, 505 So.2d 1067, 1072 (Ala.

Crim. App.1986)). This was a proper argument based on a legitimate inference from

the evidence presented at trial. It did not constitute an improper argument of

nonstatutory aggravating circumstances. The state court's determination that the

prosecutor's argument was not improper was neither contrary to nor an unreasonable

application of clearly established Federal law, nor was it based upon an unreasonable

determination of the facts in light of the evidence.

> **b.    The prosecutor improperly encouraged the jury to reject mercy and improperly compared the victim's rights to Mr. Jenkins's**

When he raised this claim on direct appeal, Jenkins argued that the prosecutor

improperly urged the jury not to let sympathy come into play in determining the

sentence, and to show Jenkins the same amount of mercy he had on the victim when

he strangled the life out of her. (C.R. Vol. 13, Tab 30 at 60-62). In holding this

argument was not improper, the Alabama Court of Criminal Appeals held:

> The appellant also argues that the following comment incorrectly urged the jury not to use sympathy in their decision making:

>> We don't want vengeance at all. Nobody ever asked for vengeance, and I hope I haven't insinuated that in any

307

manner. We don't want vengeance. And I speak on behalf of everybody connected with this case. We want you to be fair to that defendant right there. I want you to be fair. I want you to have the same amount of mercy on him when you go back there and deliberate his fate that he had on Tammy Hogeland the morning of the 18th out there on that bank on the side of I–59 when he strangled the life out of her. That's all we ask. If you will do that, show him the same amount of mercy he showed Tammy, you will return a death penalty recommendation in this case.

This court addressed a similar argument in *Kuenzel* [*v. State*, 577 So. 2d 474, 498 (Ala. Crim. App. 1990), *aff'd sub nom. Ex parte Kuenzel*, 577 So. 2d 531 (Ala. 1991)], *supra*. Judge Bowen stated:

> [I]n *California v. Brown*, 479 U.S. 538, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987), the Supreme Court decided that "an instruction informing jurors that they 'must not be swayed by *mere* sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling' during the penal phase of a capital murder trial [does not violate] the Eighth and Fourteenth Amendments to the United States Constitution." 479 U.S. at 539, 107 S.Ct. at 838.

*Kuenzel*, 577 So.2d at 496, (emphasis added in *Kuenzel*). *See also Saffle v. Parks*, 494 U.S. 484, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990).

> On the basis of these decisions, we find no plain error in the prosecutor's comments against mercy and sympathy. "In order to obtain relief [from an alleged misstatement of the law by a prosecutor], . . . petitioner must show that: (1) the prosecutor in fact misstated the law; and (2) the misstatement rendered the trial fundamentally unfair."

*Kuenzel*, 577 So.2d at 498 (quoting *Harich v. Wainwright*, 813 F.2d 1082, 1091 (11th Cir. 1987), *aff'd on rehearing*, 844 F.2d 1464, 1468–69 (11th Cir. 1988), *cert. denied*, 489 U.S. 1071, 109 S.Ct. 1355, 103

L.Ed.2d 822 (1989). The prosecutor's comments were not incorrect statements of the law. No error occurred here.

*Jenkins v. State*, 627 So. 2d at 1051 (alterations in original).

Citing to *Drake v. Kemp*, 762 F.2d 1449, 1460 (11th Cir. 1985) and *Wilson v. Kemp*, 777 F.2d 621, 626 (11th Cir. 1985), Jenkins maintained before the Rule 32 Court that the Eleventh Circuit has explicitly found that a prosecutor may not argue that sympathy or mercy are not appropriate factors to consider in sentencing. (Rule 32 C.R. Vol. 13, Tab 30 at 61-62). He contends that the prosecutor's closing argument in the sentencing phase of his trial accordingly was improper.

Jenkins is correct that a jury may show sympathy and mercy in determining the sentence. Here, however, the prosecutor did not suggest that sympathy and mercy were inappropriate factors to consider. Rather, the prosecutor acknowledged the circumstances of the victim's death, then appropriately urged the jurors not to let sympathy come into play in their decision, but to be fair, and to show Jenkins the same amount of mercy he showed his victim. As the Eleventh Circuit Court of Appeals held in a similar case, the prosecutor's remarks "presupposed that the jury would consider showing [the petitioner] mercy, but the prosecutor legitimately argued that [he] did not deserve mercy." *Reese v. Secretary, Florida Department of Corrections*, 675 F.3d

1277, 1293 (11th Cir. 2012)(alterations added)[70]. The state court's determination that the prosecutor's argument was not improper was neither contrary to nor an unreasonable application of clearly established Federal law, nor was it based upon an unreasonable determination of the facts in light of the evidence.

### c.   The prosecutor improperly encouraged the jury to vote for death to deter others

When he raised this claim on direct appeal, Jenkins argued that the prosecutor improperly urged the jury to return a death sentence, not based upon the characteristics of the crime or the aggravating circumstances, but based upon the idea that "future Mark Jenkins[es]" would "get the message" that juries in St. Clair County will not tolerate such crimes and thus be deterred from committing such crimes. (C.R. Vol. 13, Tab 30 at 62). He added that this "sort of argument" encourages the jury to base its decision on matters completely extraneous to the defendant and the crime. (*Id*. at 62-63).

In holding that the prosecutor's argument was not improper, the Alabama Court

---

[70] In *Reese*, the challenged comment was:

> "I ask you not to be swayed by pity or sympathy for the defendant. What pity or sympathy did he show to Charlene Austin?" The prosecutor continued, "[I]f you are to . . . show pity or mercy or sympathy to this defendant, I ask you to do this: I ask you to show that defendant the same sympathy, the same mercy, the same pity that he showed to Charlene Austin, and that was none."

*Reese*, 675 F.3d at 1284 (alterations in original).

310

of Criminal Appeals held:

> The appellant further argues that the following comment was prejudicial:

>> [Y]es, I will ask you to return a death penalty in this case, because the State of Alabama knows and feels that that's a deterrent in these kind of cases. And I feel good about asking you to send out deterrent messages, because the minute you come back and recommend the death penalty, it will be all over this County in short order, and the State, and this general area, that the juries in St. Clair County are not going to tolerate people being strangled to death and robbed in St. Clair County, Alabama. It will go out, and it will be a good message, and it will deter the future Mark Allen Jenkinses that might consider doing the same thing.

> This court stated in *Rutledge v. State*, 523 So.2d 1087 (Ala.Cr.App.1987), *rev'd on other grounds*, 523 So.2d 1118 (Ala.1988):

>> It is proper to argue deterrence in a sentencing phase closing argument. *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *Brooks v. Kemp*, 762 F.2d 1383 (11th Cir.1985), *cert. denied*, 478 U.S. 1022, 106 S.Ct. 3337, 92 L.Ed.2d 742 (1986); *Ex parte Waldrop*, 459 So.2d 959 (Ala.1984), *cert. denied*, 471 U.S. 1030, 105 S.Ct. 2050, 85 L.Ed.2d 323 (1985); *Varner v. State*, 418 So.2d 961 (Ala.Cr.App.1982); *Cook v. State*, 369 So.2d 1243 (Ala.Cr.App.1977), *aff'd in part, rev'd in part on other grounds*, 369 So.2d 1251 (Ala.1978). It is appropriate for a jury, in deciding whether to impose the death penalty, to consider whether or not the general deterrence purpose of the statute would be served thereby. *Brooks v. Kemp*.

523 So.2d at 1100.

> The comment made by the prosecutor in his closing argument in the

sentencing phase was not error.

*Jenkins v. State*, 627 So. 2d at 1051-52.

The Eleventh Circuit also has held that deterrence is a proper subject of prosecutorial arguments. *Brooks v. Kemp*, 762 F.2d 1383, 1407 (11th Cir. 1985)(en banc), *vacated on other grounds, Kemp v. Brooks*, 478 U.S. 1016 (1986), *reinstated on remand, Brooks v. Kemp*, 809 F.2d 700 (11th Cir. 1987). Thus, the state court's determination that the prosecutor's argument was not improper was neither contrary to, nor an unreasonable application of, clearly established Federal law, nor was it based upon an unreasonable determination of the facts in light of the evidence.

## G.   The Evidence of Capital Murder Was Insufficient To Convict Mr. Jenkins beyond a Reasonable Doubt

Jenkins claims that, although he was convicted of both intentional murder during the course of a kidnapping and intentional murder during the course of a robbery, the evidence was such that no rational trier of fact could have found him guilty beyond a reasonable doubt of either kidnapping or robbery. (Doc. 12 at 87-90). Specifically, he claims that the evidence was insufficient to find him guilty of kidnapping, because there was no evidence of a struggle, or that Jenkins had a premeditated plan to abduct the victim that night, and that there was no evidence of sexual or physical abuse of the victim, other than the murder itself. (*Id.* at 88-89). He claims that the evidence was

312

similarly insufficient to find him guilty of robbery, because there was no evidence that

Jenkins took the victim's jewelry, that he ever had possession of her jewelry, or that

he ever told anyone he took the jewelry. (*Id*. at 89-90).

When Jenkins raised this claim on direct appeal, the Alabama Court of Criminal

Appeals denied it on the merits:

> In evaluating the sufficiency of the evidence to convict the appellant, we view the evidence in "the light most favorable to the state," as the jury may have interpreted it. *McMillian v. State*, 594 So.2d 1253, 1263 (Ala.Cr.App.1991). Some of the evidence against the appellant was circumstantial. However, circumstantial evidence is not deficient evidence; it "is entitled to the same weight as direct evidence provided it points to the guilt of the accused." *Hinton v. State*, 548 So.2d 547, 558 (Ala.Cr.App.1988), *aff'd*, 548 So.2d 562 (Ala.), *cert. denied*, 493 U.S. 969, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989).

>> A defendant's guilt may be established by circumstantial evidence as well as by direct evidence. As long as the circumstantial evidence points to the guilt of the accused, it will support a conviction as strongly as direct evidence. In reviewing a conviction based on circumstantial evidence, "[t]he test to be applied is whether the jury might reasonably find that the evidence excluded every reasonable hypotheses except that of guilt; not whether such evidence excludes every reasonable hypothesis but guilt, but whether a jury might reasonably so conclude."

> *McMillian*, 594 So.2d at 1263 (citations omitted). *See also Potts v. State*, 426 So.2d 886 (Ala.Cr.App.1982), *aff'd*, 426 So.2d 896 (Ala.1983). This statement of the law refers to cases in which the evidence is entirely circumstantial.

>> "The rule is clearly established in this State that a

313

verdict of conviction should not be set aside on the ground of the insufficiency of the evidence to sustain the verdict, unless, after allowing all reasonable presumptions of its correctness, the preponderance of the evidence against the verdict is so decided as to clearly convince the court that it was wrong and unjust."

*White v. State*, 546 So.2d 1014, 1022–23 (Ala.Cr.App.1989), quoting *Bridges v. State*, 284 Ala. 412, 420, 225 So.2d 821 (1969).

The appellant maintains that there was insufficient evidence to find him guilty of robbery. "[T]he present Alabama robbery statutes[71] are

---

[71] Alabama Code § 13A-8-41, (1975) provides:

(a) A person commits the crime of robbery in the first degree if he violates Section 13A-8-43 and he:

   (1) Is armed with a deadly weapon or dangerous instrument; or

   (2) Causes serious physical injury to another.

(b) Possession then and there of an article used or fashioned in a manner to lead any person who is present reasonably to believe it to be a deadly weapon or dangerous instrument, or any verbal or other representation by the defendant that he is then and there so armed, is prima facie evidence under subsection (a) of this section that he was so armed.

(c) Robbery in the first degree is a Class A felony.

   Ala. Code § 13A-8-43 (1975) provides:

(a) A person commits the crime of robbery in the third degree if in the course of committing a theft he:

   (1) Uses force against the person of the owner or any person present with intent to overcome his physical resistance or physical power of resistance; or

   (2) Threatens the imminent use of force against the person of the owner or any person present with intent to compel acquiescence to the

314

broader than common-law robbery and embrace acts which, under former law, would have amounted to attempted robbery or to assault with intent to rob." *Luke v. State*, 444 So.2d 393, 395 (Ala.Cr.App.1983), *aff'd*, 444 So.2d 400 (Ala.1983), *cert. denied*, 466 U.S. 993, 104 S.Ct. 2374, 80 L.Ed.2d 846 (1984). Alabama's current capital offense statute related to robbery states that the murder must occur during the course of a robbery or an attempted robbery. Section 13A–5–40(a)(2), Code of Alabama 1975 (emphasis added); *Pierce v. State*, 576 So.2d 236, 247 (Ala.Cr.App.1990), *cert. denied*, 576 So.2d 258 (Ala.1991). In this case, there was testimony that the victim habitually wore several items of jewelry. When the body was found, the only item of jewelry recovered was a watch. These facts give rise to an inference that the other items of jewelry were taken by the murderer. There was also the direct evidence that the appellant admitted that "he did the crime." "Taking all the evidence and the manner in which the individual facts connect and mingle, and viewing it in the light most favorable to the prosecution, we find that the evidence excluded every reasonable hypothesis or explanation but that of guilt." *Jones v. State*, 450 So.2d 165 (Ala.Cr.App.1983), *aff'd*, 450 So.2d 171 (Ala.), *cert. denied*, 469 U.S. 873, 105 S.Ct. 232, 83 L.Ed.2d 160 (1984) (citation omitted).

The appellant also argues that there was insufficient evidence to find him guilty of kidnapping. "A person commits the crime of kidnapping in the first degree if he abducts another person with intent to . . . [i]nflict physical injury upon him, or to violate or abuse him sexually." Section 13A–6–43(a)(4), Code of Alabama 1975. The appellant maintains that there was no evidence that the victim was abducted. He contends that the same evidence could be viewed as showing that she voluntarily left the restaurant with the appellant. The great weight of the evidence, however, points to the opposite hypothesis.

"Abduct" is defined in § 13A–6–40(2) as "to restrain a person with intent to prevent his liberation by either: a. Secreting or holding him in a

---

taking of or escaping with the property.

(b) Robbery in the third degree is a Class C felony.

place where he is not likely to be found, or b. Using or threatening to use deadly physical force." To reiterate, the state's evidence tended to show that the victim was the only cook on duty at the Omelet Shoppe when the appellant came into the restaurant on the night of the victim's disappearance. She was wearing her apron and her work uniform. She left without taking her purse or her cigarettes, even though she was a heavy smoker. The victim was paid that evening and did not take her paycheck. She told no one where she was going. Her clothing and the articles she left behind tend to show that she did not leave voluntarily. Her body was found in a remote area on the side of I–59. "A reasonable juror may well have believed that she would not have voluntarily accompanied [the appellant] to such an area." *Neal v. State*, 451 So.2d 743, 758 (Miss.1984), *cert. denied*, 469 U.S. 1098, 105 S.Ct. 607, 83 L.Ed.2d 716 (1984), *post-conviction relief granted in part on other grounds*, 525 So.2d 1279 (Miss.1987). Furthermore, the position of the clothing around the victim's head and the fact that she was manually strangled tend to show that she was restrained prior to her death. "The physical condition of the body . . . the conduct and admission of the appellant were sufficient to establish . . . the underlying felony of kidnapping." *Mines v. State*, 390 So.2d 332, 335 (Fla.1980), *cert. denied*, 451 U.S. 916, 101 S.Ct. 1994, 68 L.Ed.2d 308 (1981). *See also State v. James*, 459 So.2d 1299 (La.App.1984), *writ denied*, 463 So.2d 600 (La.1985). Moreover, even if the victim initially left the restaurant with the appellant voluntarily, the offense of kidnapping is not mitigated. *Adams v. State*, 412 So.2d 850, 852 (Fla.1982), *cert. denied*, 459 U.S. 882, 103 S.Ct. 182, 74 L.Ed.2d 148 (1982).

A reasonable juror could conclude that the appellant's guilt was established beyond a "reasonable doubt." The evidence overwhelmingly pointed to the guilt of the appellant. The case was correctly submitted to the jury for its determination and there is no reason to disturb its verdict.

*Jenkins v. State*, 627 So. 2d at 1040-41 (alterations in original).[72] Jenkins claims that

---

[72] The Alabama Supreme Court affirmed, without specifically addressing the sufficiency of the evidence claim. *Ex parte Jenkins*, 627 So. 2d 1054, 1057 (1993).

because no rational trier of fact could have found him guilty beyond a reasonable doubt based upon the evidence, the state court's adjudication of this claim resulted in a decision that was contrary to and involved an unreasonable application of clearly established Federal law, and that it was based on an unreasonable determination of the facts.

Due process requires the state to prove each element of a criminal offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 315 (1979). The evidence is sufficient to support a conviction if, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319.

There are two layers of judicial deference in federal habeas proceedings. *Coleman*, 566 U.S. at 2062.

> First, on direct appeal, "it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." *Cavazos v. Smith*, 565 U.S. 1, – , 132 S.Ct. 2, 4, 181 L.Ed.2d 311 (2011) (per curiam). And second, on habeas review, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.'" *Ibid*. (quoting *Renico v. Lett*, 559 U.S. 766 – , 130 S.Ct. 1855, 1862, 176 L.Ed.2d 678 (2010)).

*Id.* "The only question for the reviewing state court under *Jackson* is 'whether the finding was so insupportable as to fall below the threshold of bare rationality.'" *Jones v. Secretary Dept. of Corrections*, 503 Fed. Appx. 749, 751 (11th Cir. 2013) (quoting *Coleman*, 132 S.Ct. at 2065). The state court's determination is, in turn, entitled to considerable deference under the AEDPA. *Coleman*, 132 S. Ct. at 2065.

Based upon the facts presented, the jury reasonably could have concluded that Jenkins intended to kidnap and rob the victim. Viewing the evidence in the light most favorable to the state, a rational trier of fact could have found the essential elements of kidnapping and robbery beyond a reasonable doubt. Thus, the denial of this claim by the state court was neither contrary to nor an unreasonable application of clearly established Federal law, nor was it based on an unreasonable determination of the facts in light of the evidence presented.

## H.    The Trial Court's Sentencing Errors

Jenkins claims that his "right to due process, a fair trial and to a reliable punishment determination, pursuant to the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution were violated by the trial court's failure to consider and give weight to several undisputed mitigating factors." (Doc. 12 at 90). Specifically, he contends that the trial court failed to consider "undisputed evidence" that he was severely intoxicated at the time of the crime; that he was trustworthy, non-

318

violent, and kind to his friend Lonnie Seal, and had helped Seal support his family; and

the information contained in the state's presentence investigation report indicating

Jenkins had a bleak and abusive childhood, lacked education, was addicted to drugs,

and lacked a significant history or prior criminal activity. (*Id*. at 90-92). When Jenkins

raised this claim on direct appeal, the Alabama Court of Criminal Appeals denied it on

the merits:

> The appellant also argues that the trial court erred in finding that
> several mitigating circumstances were not present. He maintains that the
> court should have found as statutory mitigating circumstances that . . . the
> appellant lacked the capacity to appreciate the criminality of his conduct
> (§ 13A–5–51(6)).

> . . . .

> The trial court . . . determined that §-13A-5-51(6) did not apply,
> given the facts of the case. The trial court stated in its order that:

>> The Court does find that there was evidence that the
>> defendant, at some time during the night of April 17th or
>> morning of April 18th had consumed alcoholic beverage
>> [sic], but the Court does not find that at the time of the
>> commission of the capital offense the capacity of the
>> defendant to appreciate the criminality of this conduct or to
>> conform his conduct to the requirements of law was
>> substantially impaired. The Defendant's conduct, at
>> approximately 5:00 a.m. on the 18th at the service station,
>> and his conversation with the two Coe witnesses and his
>> later recollection of the events that occurred surrounding the
>> commission of the offense, would indicate that the
>> defendant's capacity to appreciate the criminality of his
>> conduct or to conform his conduct to the requirements of

319

law was not substantially impaired to the extent as required in this mitigating circumstance.

"[V]oluntary intoxication will not constitute grounds for the mitigating circumstance in this case. The appellant simply did not show that he was so intoxicated as to have rendered himself incapable of appreciating his conduct." *Thompson v. State*, 503 So.2d 871, 881 (Ala.Cr.App.1986), *aff'd*, 503 So.2d 887 (Ala.1987), *cert. denied*, 484 U.S. 872, 108 S.Ct. 204, 98 L.Ed.2d 155 (1987). *See also Ex parte Jones*, 520 So.2d 553 (Ala.1988), *cert. denied*, 488 U.S. 871, 109 S.Ct. 182, 102 L.Ed.2d 151 (1988); Colquitt, Death Penalty Laws of Alabama, 33 Ala.L.Rev. 213 (1982). The trial court's findings in this regard are supported by the record and are correct.

The appellant also contends that the trial court erred in failing to find any nonstatutory mitigating factors. The trial court's findings show that the court considered all of the evidence that the appellant presented as possible nonstatutory mitigating evidence and found no nonstatutory mitigating circumstances.

"It is not required that the evidence submitted by the accused as a non-statutory mitigating circumstance be weighed as a mitigating circumstance by the sentencer, in this case, the trial court; although consideration of all mitigating circumstances is required, the decision of whether a particular mitigating circumstance is proven and the weight to be given it rests with the sentencer."

*McWilliams v. State*, [Ms. 6 Div. 190, Aug. 23, 1991], 1991 WL 184448, *3 (Ala.Cr.App.1991) (citation omitted). We have reviewed the evidence presented at the sentencing hearing and believe that the trial court committed no error in finding no nonstatutory mitigating circumstances in the present case.

*Jenkins*, 627 So. 2d at 1052-53. The Alabama Supreme Court affirmed the appellate court's findings without specifically addressing them. *Ex parte Jenkins*, 627 So. 2d at

1057. Jenkins contends that the "state court adjudication of this claim resulted in a decision that was contrary to and involved an unreasonable application of clearly established United States Federal law," and that it was "also based on an unreasonable determination of the facts." (Doc. 12 at 92).

"The Eighth and Fourteenth Amendments require that the sentencer in a capital case consider any evidence which mitigates against the imposition of the death penalty." *Glock v. Moore*, 195 F.3d 625, 637 n.20 (11th Cir. 1999)*(*citing *Lockett v. Ohio*, 438 U.S. 586, 608 (1978)). *See also Eddings v. Oklahoma*, 455 U.S. 104, 113-14 (1982) ("Just as the State may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, as a matter of law, any relevant mitigating evidence.").

> The operative word, however, is "consider." The Supreme Court has made clear that the sentencer need not accept or ascribe any specific weight to the evidence that it considers. "Acceptance of nonstatutory mitigating factors is not constitutionally required; the Constitution only requires that the sentencer consider the factors." *Atkins v. Singletary*, 965 F.2d 952, 962 (11th Cir.1992) (*citing Blystone v. Pennsylvania*, 494 U.S. 299, 308, 110 S.Ct. 1078, 108 L.Ed.2d 255 (1990)); *accord Harris v. Alabama*, 513 U.S. 504, 512, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995) ("[T]he Constitution does not require a State to ascribe any specific weight to particular factors, either in aggravation or mitigation, to be considered by the sentencer."). As the Supreme Court later stated in *Johnson v. Texas*, 509 U.S. 350, 113 S.Ct. 2658, 125 L.Ed.2d 290 (1993), " *Lockett* and its progeny stand only for the proposition that a State may not cut off in an absolute manner the presentation of mitigating evidence," *Id*. at 361, 113 S.Ct. 2658.

*Morris v. Secretary, Dept. of Corrections*, 677 F.3d 1117, 1131 (11th Cir. 2012).

"[A] federal habeas corpus court may review a state court factual finding concerning the existence of mitigating circumstances." *Magwood v. Smith*, 791 F.2d 1438, 1449 (11th Cir. 1986). "[O]nce we see that a full hearing has been held in which defense counsel is given a fair opportunity to present mitigating evidence, our review becomes highly deferential." *Atkins v. Singletary*, 965 F.2d 952, 962 (11th Cir. 1992)(citing *Palmes v. Wainwright*, 725 F.2d 1511, 1523 (11th Cir. 1984)). A trial court's findings on mitigating factors are presumed to be correct and will be upheld if they are supported by the record. *Id.* (citing *Magwood*, 791 F.2d at 1450; 28 U.S.C. § 2254(d)).

Jenkins was not prevented from presenting, as potential mitigating evidence, that he was intoxicated on the night of the murder; that his friend Lonnie Seal found him trustworthy, non-violent, helpful and kind; and that he had a bleak, abusive childhood, lacked education, battled drug addiction, and lacked a significant prior criminal history. In its sentencing order, the trial court stated that it had considered "all mitigating circumstances as set out in Title 13A-5-51 of the 1975 Code of Alabama, together with other mitigating circumstances not set out in the above Code Section." (C.R. Vol. 45, Tab 73 at 16). The court went on to state:

> This Court has further considered the pre-sentence report going into

322

> the background of the Defendant prior to the commission of the offense[73]
> and also all of the mitigating circumstances as set out in the Defendant's
> Attorney's pre-sentence memorandum[74] and all of the mitigating
> circumstances enumerated in Title 13A-5-51 of the Code of Alabama.

(C.R. Vol. 45, Tab 73 at 18). The Alabama Court of Criminal Appeals made factual

findings that the trial court had considered each of the potential mitigating factors put

forth by Jenkins. *Jenkins*, 627 So. 2d at 1052-53.

To be entitled to relief on this claim, Jenkins must provide clear and convincing

evidence to rebut the Alabama Court of Criminal Appeals' findings that the trial court's

findings that Jenkins was not so intoxicated as to have rendered himself incapable of

appreciating his conduct are supported by the record and are correct, that the trial court

considered all of the evidence Jenkins presented as possible nonstatutory mitigating

evidence, and that the "trial court committed no error in finding no nonstatutory

mitigating circumstances in the present case." *Id*. Jenkins has not met this burden.

When a trial court considers mitigating evidence presented during sentencing, as the

---

[73] The presentence report outlined Jenkins's personal and social history. (*See* Doc. 56-2 at 24-31).

[74] In the pre-sentence memorandum, Jenkins set out the bleak history of his childhood and argued as mitigating circumstances that he had no significant history of prior criminal activity; the victim was a participant in Jenkins's conduct or consented to it; his capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of the law was substantially impaired by his extreme intoxication; and he was twenty-one years old at the time of the crime. He also asked that lack of premeditation; the fact that the offense was not especially heinous, atrocious, or cruel when compared with other capital offenses; lack of use of a dangerous weapon; and Jenkins's background and lack of education be considered as mitigating circumstances. (Doc. 56-2 at 11-22).

trial court did in Jenkins's case, there is no constitutional error. Thus, the Alabama Court of Criminal Appeals' decision denying relief on this claim was not contrary to or an unreasonable application of Federal law, or based on an unreasonable determination of the facts.

## I.   Mr. Jenkins Was Deprived of a Fair Trial by the State's Racially Discriminatory Use of Peremptory Challenges

Jenkins claims that, during jury selection at his trial, the prosecutor "exercised peremptory challenges to remove all three of the qualified African-American members of the venire, and two-thirds of his peremptory challenges (14 of 21) to remove women." (Doc. 12 at 92).[75] He alleges that although the state's "pattern of strikes, manner or voir dire, disparate treatment of suspect groups and the disparate impact demonstrated a patter[n] of discrimination, no justification was ever offered for this wholly disproportionate pattern of strikes." (*Id.*).[76] Jenkins then leaps to the conclusion that the state "clearly used its peremptory strikes in a discriminatory and biased manner," which proves a prima facie case of discriminatory use of peremptory challenges that "was not and cannot be rebutted." (*Id.* at 93). He asserts that he was

---

[75] He adds that the prosecution "used seventeen (17) of its twenty-one (21) peremptory challenges, or 81% of its strikes, to remove people from protected classes." (*Id.*).

[76] Defense counsel made no objection to the state's strikes during the jury selection process. (R. Vol. 3 at 445-50).

prejudiced by "the racially discriminatory selection of jurors" at his trial and the state's failure "to rebut the inference of racial bias." (*Id.*).

On direct appeal, Jenkins raised the following claim:

Prior to trial, defendant Mark Allen Jenkins filed a Motion to Enjoin the Prosecution from utilizing its peremptory challenges to systematically exclude minorities from the jury panel. (Cr. 88) As grounds for said motion, defendant alleged that he was part Mexican blood and was charged with killing a white person. The motion also moved that the prosecutors use of peremptory challenges to systematically exclude minorities violated the defendant's Sixth and Fourteenth Amendment rights to trial by jury composed of a fair cross-section of the community and his Fourteenth Amendment rights to due process and equal protection of the law, as well as his right to trial by an impartial jury.[77] Prior to trial, defendant's motion, as stated, was denied.

---

[77] The motion read as follows:

Defendant, Mark Allen Jenkins, by the undersigned counsel, moves this Court for an order enjoining the prosecutor from using his peremptory challenges to systematically exclude minorities from the jury panel which will try the defendant.

As grounds therefore, defen[d]ant states the following:

1. The defen[d]ant is part Mexican-blood, and is charged with killing a white person.

2. The prosecutor's use of peremptory challenges to systematically exclude minorities violates the defendant's Sixth and Fourteenth Amendment rights to trial by a jury composed of a fair cross-section of the community and his Fourteenth Amendment rights to due process and equal protection of the law, as well as his right to trial by an impartial jury. *People v. Kagen*, 420 N.Y.S. 2d 987 (Sup. Ct. N.Y. Co. 1979); *Commonwealth v. Soares*, 387 N.E.2d 499 (Mass. 1979); *People v. Wheeler*, 22 Cal. 3d 258, 583 P.2d [748] (1978).

(C.R. Vol. 10, Tab 27 at 88) (alterations added).

In *Powers v. Ohio*, No. 89-5011, 499 U.S. __ (1991), 111 S.Ct. __, 113 L. Ed. 2d 411 (1991), the United States Supreme Court held that the Fourteenth Amendment which barred state prosecutors from using peremptory challenges against minorities in a racially biased manner could be utilized by defendants who are white or not members of the group of excluded venire persons. In this regard, the Court stated:

> We conclude that a defendant in a criminal case can raise the third-party equal protection claims of jurors excluded by the prosecution because of their race. In so doing, we once again decline "to reverse a course of decisions of long standing directed against racial discrimination in the administration of justice." *Cassell v. Texas*, *supra*, 339 U.S., at 290, 70 S.Ct., at 633 (Frankfurter, J., concurring in judgment). To bar petitioner's claim because his race differs from that of the excluded jurors would be to condone the arbitrary exclusion of citizens from the duty, honor, and privilege of jury service. In *Holland* and *Batson*, we spoke of the significant role peremptory challenges play in our trial procedures, but we noted also that the utility of the peremptory challenge system must be accommodated to the command of racial neutrality. *Holland*, 493 U.S., at 486-487, 110 S.Ct., at 810-811; *Batson*, *supra*, 476 U.S., at 98-99, 106 S.Ct., at 1723-1724.

113 L. Ed. 2d at 428.

The Court continued that the courts are under an affirmative duty to enforce the strong statutory and constitutional policies embodied in that prohibition. *Id*. at 15.

In fairness to the trial court, the *Powers* decision was rendered after defendant's trial. The Supreme Court did not address the retroactivity of *Powers* in its opinion, but it is certain that under *Griffith v. Kentucky*, 479 U.S. 314, 93 L. Ed. 2d 649 (1987), the *Powers*' decision should be retroactively applicable to cases that have not yet had certiorari denied on

original appeal in the United States Supreme Court.

It is clear that the court's denial of the motion to enjoin the systematic exclusion of minorities was a breach of the court's affirmative duty to enforce the strong and statutory constitutional policies embodied in the *Batson* decision. On the authority of *Powers*, defendant asks that this Honorable Court reverse and remand his conviction for a new trial or, in the alternative, to remand for further proceedings consistent with *Powers*.

(R. Vol. 12, Tab 28 at 70-72) (footnote added).

The Alabama Court of Criminal Appeals denied this claim on the merits:

The appellant next argues that the state prosecutor exercised his peremptory strikes to eliminate jurors from the jury solely on the basis of race, thereby violating the United States Supreme Court holding in *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). The appellant in this case is white. The ruling of *Batson* was extended, after the appellant was tried, to permit white defendants standing to complain of the purposeful exclusion of blacks from their jury. *Powers v. Ohio*, 499 U.S. 400, 111 S.Ct 1364, 113 L.Ed.2d 411 (1987).

Defense counsel in a pre-trial motion, which was filed prior to any jury selection, filed a motion entitled "Defendant's Motion to Enjoin the Prosecutor from Utilizing his Peremptory Challenges to Systematically Exclude Minorities from the Jury Panel." When the motion was filed, the court stated that it would consider the motion when it was made at the appropriate time after a jury had been struck. This is the last time in the record the motion was mentioned by anyone. The appellant did file a motion for new trial in which he alleged as one of the grounds that the trial court erred in denying his motion to enjoin the prosecutor. Because no objection was made to the composition of the jury after the jury was selected and before they were sworn, and because this is a case involving the death penalty, we must determine whether the alleged error is "plain error."

327

There is no evidence in the record that the prosecutor used his strikes in a racially discriminatory manner. There is no indication of the racial composition of the jury, though a jury strike list is contained in the record. Neither do we know whether any minorities in fact served on the jury. The record simply does not support an inference of plain error on the alleged *Batson* violation. Our Supreme Court in *Ex parte Watkins*, 509 So.2d 1074 (Ala.1987), *cert. denied*, 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987), refused to find plain error in a similar situation. It stated:

> The record as a whole simply does not raise an inference that the state engaged in the practice of purposeful discrimination. Under the plain error rule this Court will "notice any plain error or defect in the proceeding under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial rights of the petitioner." . . . The defendant cannot successfully argue that error is plain in the record when there is no indication in the record that the act upon which error is predicated ever occurred (i.e., the state's use of its peremptory challenges to exclude blacks).

509 So.2d at 1076–77. *See Kuenzel v. State*, 577 So.2d 474 (Ala.Cr.App.1990), *aff'd*, 577 So.2d 531 (Ala.1991), *cert. denied*, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991). (stating that there was no evidence in the record to support the contention that the State of Alabama used its peremptory strikes to exclude blacks from the jury). "Under the circumstances of this case, we cannot conclude that a prima facie case of purposeful discrimination has been established." *Pierce*, 576 So.2d at 242.

*Jenkins v. State*, 627 So. 2d at 1041-42.

In his petition for a writ of certiorari in the Alabama Supreme Court, Jenkins

made the following argument:

328

Before jury selection began, counsel for Mr. Jenkins moved the trial court to prohibit the State from systematically removing all black jurors from the jury on the basis of race. (CR 88-89, "Defendant's Motion to Enjoin the Prosecutor from Utilizing His Peremptory Strikes to Systematically Exclude Minorities from the Jury Panel;" R. 38-44). The trial court improperly denied this motion. During jury selection, the prosecution then peremptorily struck each and every qualified black juror from the venire. After being convicted and sentenced to death, Mr. Jenkins moved for a new trial on numerous grounds, including the racially discriminatory manner in which his jury was struck. (CR 188). The motion was denied. Mr. Jenkins then raised this issue before the Court of Criminal Appeals in his principal brief before that court; relief was denied, as was Mr. Jenkins' application for rehearing before that court.

The jury venire at Mr. Jenkins' trial included three qualified black potential jurors. During jury selection, the prosecution peremptorily struck each of these three qualified black potential jurors. As a result, no black person sat on Mark Jenkins' petit jury.

The State is expressly enjoined from discriminating against potential jurors on the basis of race, both by state and Federal law. *Batson v. Kentucky*, 479 U.S. 79 (1986); *Ex parte Branch*, 526 So. 2d 609 (Ala. 1987); § § 12-16-55 & 56, Code of Alabama (1975); Art. I Constitution of Alabama. Although Mr. Jenkins is not black, the United States Supreme Court and this Court have both held that regardless of his race, a criminal defendant has standing to object to the State's discriminatory use of peremptory challenges. *Powers v. Ohio*, 499 U.S. __, 111 S. Ct. 1364 (1991). This holding has been applied retroactively by the Alabama courts to cases pending on direct appeal, such as Mr. Jenkins'. *See Ex parte Mathis*, 594 So. 2d 692 (Ala. 1991); *Guthrie v. State*, __ So. 2d __, [7 Div. 287] (Ala. Crim. App. June 12, 1992); *Guthrie v. State*, __ So. 2d __, [Ms. 89-1078] (Ala. Crim. App. Nov. 27, 1991), *cert. denied*, __ So. 2d __, [Ms. 1910663] (Ala. April 17, 1992). The State's total exclusion of qualified black jurors from the petit jury and the resulting all-white jury creates a prima facie case of intentional discrimination on the part of the State. The burden is on the State to rebut the prima facie case created by the State's use of its peremptory challenges.

. . . .

Where, as here, the prosecution has used its peremptory strikes to exclude <u>all</u> the qualified black prospective jurors from sitting on the petit jury . . . the inference of discriminatory intent is strong. This case must be remanded back to the trial court in order for the State to rebut this inference.

The right to a jury chose without the unconstitutional intrusion of racial discrimination is essential to a fair and reliable trial.

(R. Vol. 14, Tab 36 at 1-4). The Alabama Supreme Court affirmed the appellate court's judgment on this claim, without specifically addressing it. *Ex parte Jenkins*, 627 So. 2d at 1057. Jenkins asserts that the state court's adjudication of this claim resulted in a decision that was contrary to and involved an unreasonable application of clearly established Federal law. (Doc. 12 at 93).

The court first notes that Jenkins never argued on direct appeal that the prosecutor removed women from the venire for an improper reason.[78] Thus, that portion of the claim is procedurally barred from review in this court. Jenkins has offered nothing to excuse the default of this claim. Further, to support his claim that females

---

[78] The court further notes that in his Amended Rule 32 petition, Jenkins again raised the claim the prosecution exercised its peremptory strikes in a discriminatory manner when it removed each of the black venire members from the panel. (Rule 32 C.R. Vol. 18, Tab 47 at 387-89; Rule 32 C.R. Vol. 18, Tab 46 at 55-57). The Rule 32 court held that the claim was procedurally barred because it was raised or addressed on direct appeal. (Rule 32 C.R. Vol. 45, Tab 77 at 277-80). Jenkins first mentioned women in this argument on appeal from the denial of his Rule 32 petition. (Rule 32 C.R. Vol. 37, Tab 52 at 12-24, 160-61). The Alabama Court of Criminal Appeals also found the claim to be procedurally barred. *Jenkins*, 972 So. 2d at 158.

were removed for improper reasons, he has offered nothing more than the fact that the prosecution used fourteen of its twenty-one peremptory strikes to remove females from the jury.[79] Jenkins has cited nothing to support his conclusion that the mere pattern of strikes used by the prosecution was sufficient to prove a prima facie case of discrimination at the time of his trial.

Further, the review of Jenkins's *Batson* claim in this court is "limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011).

> Section 2254(d)(1) refers, in the past tense, to a state-court adjudication that "resulted in" a decision that was contrary to, or "involved" an unreasonable application of, established law. This backward-looking language requires an examination of the state-court decision at the time it was made. It follows that the record under review is limited to the record in existence at that same time i.e., the record before the state court.

*Id*. When he raised the claim on direct appeal, the record contained nothing more than the final jury list, showing only the names of the jurors, and the strikes made by both sides. (R. Vol. 10, Tab 27 at 111). There was nothing in the record to indicate the race of anyone excluded from or selected to serve on the jury. Thus, there was no way for the state appellate courts to determine whether or not the prosecution used its peremptory challenges to eliminate black venire members from the jury in violation of

---

[79] Although the prosecution did in fact use fourteen strikes to remove females from the venire, eight females served on the jury.

*Batson*. Given the complete lack of evidence of purposeful discrimination, the Alabama Court of Criminal Appeals' determination that there was no evidence to support the claim that the prosecution used its strikes in a racially discriminatory manner was neither contrary to nor an unreasonable application of clearly established Federal law.

**J.      The Trial Court's Wholesale Adoption of the State's Proposed Findings of Fact Was Unreasonable**

Jenkins claims that the trial court's wholesale adoption of the state's proposed findings of fact in the order denying his Rule 32 petition was unreasonable. (Doc. 12 at 94-100). In raising this claim on appeal from the denial of his Rule 32 petition, he argued that it deprived him of his "rights to due process, his right to a full and fair hearing, his right to be free from cruel and unusual punishment, and other rights guaranteed under the Federal and State constitutions." (Rule 32 C.R., Vol. 37, Tab 52 at 164). In his brief on certiorari to the Alabama Supreme Court, he argued that the trial court's "wholesale adoption of the State's proposed order denied Mr. Jenkins his right to independent judicial findings of fact regarding the Rule 32 claims," and that the Alabama Court of Criminal Appeals' conclusion that the claim had no merit violated *Anderson v. City of Bessemer, N.C.*, 470 U.S. 564 (1985). (Rule 32 C.R. Vol. 40, Tab 61 at 108). In this court, Jenkins argues that, as a result of the wholesale adoption of the state's proposed order, the state court process was defective, and it "infected the

fact findings with respect to each and every claim for relief, entitling him to *de novo* review of all fact findings under § 2254(d)(2). (Doc. 35 at 18).[80]

When Jenkins presented this claim on appeal from the denial of his Rule 32 petition, the Alabama Court of Criminal Appeals denied it:

> Jenkins argues that the circuit court erred in its wholesale adoption of the State's proposed order denying relief. Jenkins's argument on this point consists of only three paragraphs in his brief to this Court.

> In *Bell v. State*, 593 So.2d 123 (Ala.Crim.App.1991), we stated:

>> The trial court did adopt verbatim the proposed order tendered by the state; however, from our review of the record, we are convinced that the findings and conclusions are those of the trial court. The record reflects that the trial court was thoroughly familiar with the case and gave the appellant considerable leeway in presenting evidence to support his claims. While the practice of adopting the state's proposed findings and conclusions is subject to criticism, the general rule is that even when the court adopts proposed findings verbatim, the findings are those of the court and may be reversed only if clearly erroneous. *Anderson v. City*

---

[80] Jenkins points out several examples from the trial court's opinion, claiming they exhibit the trial court's "unreasonableness." The court notes that these examples were not a part of this claim when Jenkins presented it in state court. In state court, Jenkins made only a general claim that the wholesale adoption of the state's proposed order violated his constitutional rights. In addition to adding several examples from the trial court's opinion that allegedly violated his constitutional rights, he has expanded the claim to include the allegation that, not only did the court fundamentally misconstrue the facts, but the court also misapplied the law. Thus, to the extent Jenkins has added specific allegations of unreasonable fact finding and allegations of misapplication of the law, those claims are procedurally barred and will not be addressed as part of this claim. The court will address this claim as it was presented in state court. To the extent Jenkins has alleged, as part of any other claim, that the trial court's findings of fact and/or law were unreasonable, and not due deference under the AEDPA, that argument will be addressed as part of that claim.

> *of Bessemer City, N.C.*, 470 U.S. 564, 105 S.Ct. 1504, 84
> L.Ed.2d 518 (1985); *Hubbard v. State*, 584 So.2d 895
> (Ala.Cr.App. 1991); *Weeks v. State*, 568 So.2d 864
> (Ala.Cr.App. 1989), *cert. denied*, [498] U.S. [882], 111
> S.Ct. 230, 112 L.Ed.2d 184 (1990); *Morrison v. State*, 551
> So.2d 435 (Ala.Cr.App.), *cert. denied*, 495 U.S. 911, 110
> S.Ct. 1938, 109 L.Ed.2d 301 (1990).
>
> 593 So.2d at 126. *See also DeBruce v. State*, *supra*; *Holladay v. State*,
> 629 So.2d 673 (Ala.Crim.App. 1992); *Wright v. State*, 593 So.2d 111,
> 117-18 (Ala.Crim.App. 1991).
>
> The circuit court's findings are supported by the testimony and the
> evidence that was presented at the Rule 32 proceedings. There is no
> indication that the circuit court's findings are "clearly erroneous." *See
> Bell, supra*.

*Jenkins v. State*, 972 So. 2d at 158-59.[81]

Jenkins maintains that in "adopting the State's proposed order, without

independently reviewing the evidence or researching the applicable law, the state court

employed an unreasonable fact-finding procedure; thus, its findings are not entitled to

deference." (Doc. 12 at 100). He reasons that since "the state court decision was based

upon an unreasonable fact-finding process, Mr. Jenkins is entitled to relief under a *de

novo* standard." (*Id*.).

Although, in *Anderson v. City of Bessemer*, 470 U.S. at 572, the Supreme Court

---

[81] The Alabama Supreme Court affirmed this finding without specifically addressing it. *Ex parte
Jenkins*, 972 So. 2d 159, 165 (Ala. 2005).

criticized the trial court's verbatim adoption of findings of fact prepared by prevailing parties, it ultimately held "that even when the trial judge adopts proposed findings verbatim, the findings are those of the court and may be reversed only if clearly erroneous." *Anderson*, 470 U.S. at 572. In reviewing Jenkins's claim on appeal from the denial of his Rule 32 petition, the Alabama Court of Criminal Appeals noted that "Jenkins's argument on this point consists of only three paragraphs in his brief to this Court." *Jenkins*, 972 So. 2d at 158. The court specifically found that the trial court's findings were supported by the testimony and evidence presented at the hearing on the Rule 32 petition, and that there was no indication that the Rule 32 court's findings were "clearly erroneous." *Id.* at 159. Jenkins has failed to demonstrate that the appellate court's holding on the claim, as it was presented in the state courts, that the Rule 32 court's findings of fact were not "clearly erroneous," is contrary to or an unreasonable determination of clearly established Federal law, or that it was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

In the brief filed alongside his June 20, 2013, amendment to his juror misconduct claim, Jenkins argues that the Supreme Court's ruling in *Jefferson v. Upton*, 560 U.S. 284 (2010), "provides considerable support" to his general claim that the Rule 32 court's findings are not entitled to deference since the court adopted the state's

proposed order verbatim[82]. (Doc. 35 at 16).

Moreover, even if *Jefferson* applied to this claim, Jenkins would not be entitled to relief. In *Jefferson*, the Court applied the pre-AEDPA version of § 2254, holding that the state court had denied the death-penalty petitioner a full, fair, and adequate hearing, because: (1) the state court had adopted factual findings drafted exclusively by the state's attorneys, pursuant to an *ex parte* request from the state court judge; (2) the state court did not notify the petitioner of the request made to opposing counsel; and (3) the findings proposed by the state recounted evidence from a non-existent witness. *See* 560 U.S. at 292. Jenkins's case is both legally and factually distinguishable from *Jefferson*.

In rejecting a similar claim in *Jones v. GDCP Warden*, the Eleventh Circuit held:

> First, *Jefferson* never could have held, nor did it presume to hold, that this kind of adopted order is not entitled to AEDPA deference. *Jefferson* addressed a claim arising under the pre-AEDPA version of § 2254; the *Jefferson* Court was therefore operating under a different statute than the one controlling this case. Moreover, even absent that legal distinction, the facts of this case are critically different from *Jefferson*. There, the state court adopted a proposed order that it had obtained *ex parte* from the State, without notice to Jefferson. Here, notably, the state court requested that both Jones and the State prepare proposed orders.

---

[82] In the brief, Jenkins also "submits that the circumstances surrounding the denial of his successive Rule 32 petition . . . further demonstrate that the process the state courts utilized to find facts in his case were consistently defective." (Doc. 35 at 17 n. 7). He suggests that "this Court should consider those circumstances and find that they underscore the Court's obligation to review the facts *de novo*." (*Id.*). However, the actions and findings of the second Rule 32 court are totally unrelated to the findings of the first Rule 32 court, and could not have had any impact on the findings of the first Rule 32 court.

> The court conducted an evidentiary hearing in August and September
> 2004, at which Jones was represented ably by his habeas counsel, who
> presented several witnesses and 125 exhibits spanning about 5,000 pages.
> The state court then took a year and a half to consider the party's
> submissions and only issued its order denying habeas relief in March
> 2006. In stark contrast to *Jefferson*, the circumstances here demonstrate
> that Jones received a full and fair hearing on all of his habeas claims.

*Jones*, 815 F.3d 689, 715 (11th Cir. 2016). Simply put, *Jones* held that the legal

analysis in *Jefferson* does not apply to the post-AEDPA version of § 2254.

This case is also factually distinct from *Jefferson*. The facts of this case are like

those in *Jones*, and the Eleventh Circuit found those facts to be "critically different".

*Jones*, 815 F. 3d at 715. Specifically, in this case, as in *Jones*, the Rule 32 court

requested that <u>both</u> Jenkins and the state submit briefs or proposed opinions after

receiving transcripts of the evidentiary hearing. (*See* Rule 32 C.R. Vol. 24 at 338; Rule

32 R. Vol. 22 at 699). Similarly, the Rule 32 court conducted an evidentiary hearing

on Jenkins's petition, on December 10, 1996, and January 20-21, 1997. At that hearing,

Jenkins was represented by counsel, who presented fourteen witnesses and a variety

of exhibits. (Rule 32 R. Vol. 19, Tab 48 at 1 - Rule 32 R. Vol. 22 at 700). Jenkins

submitted his memorandum of law to the court on April 4, 1997. (Rule 32 C.R. Vol.

24 at 354 - Rule 32 C.R. Vol. 25 at 411; Rule 32 Vol. 24 at 338). On April 18, 1997,

the state submitted its original proposed memorandum opinion. (Rule 32 C.R. Vol. 23

at 151 - Rule 32 C.R. Vol. 24 at 201-250). In May, 1997, Jenkins submitted an

"Opposition to State's 'Proposed Memorandum Opinion.'" (Rule 32 C.R. Vol. 25 at 422-452). Thereafter, on or about December 2, 1997, the state moved for leave to file a "revised and corrected proposed memorandum opinion," accompanied by the revised document.[83] (Rule 32 C.R. Vol. 24 at 251-335).

The Rule 32 court issued its order denying the petition on December 31, 1997, more than seven months after receiving the parties's initial submissions and several weeks after receiving the state's revised and corrected memorandum. (Rule 32 C.R. Vol. 45, Tab 77 at 267-346). The petition had been pending before the court since May 26, 1995, with the court actively involved in the proceedings throughout that time. Thus, like the petitioner in *Jones,* and in contrast to the petitioner in *Jefferson*, the circumstances here demonstrate that Jenkins received a full and fair hearing on his petition. *Jefferson* does not entitle Jenkins to relief.

## K.    The Manner of Execution Used by the State of Alabama Constitutes Cruel and Unusual Punishment

Jenkins's final claim is that Alabama's lethal injection protocol creates an unnecessary and unacceptable risk of pain and suffering, in violation of the Eighth Amendment's prohibition of cruel and unusual punishment. (Doc. 12 at 103). Specifically, he claims that:

---

[83] Jenkins indicates that the revised and corrected memorandum was submitted to correct an editing error. (Doc. 35 at 9).

Alabama utilizes the same three-drug protocol of sodium thiopental, pancuronium bromide, and potassium chloride, as all other death penalty jurisdictions that employ lethal injection. The first drug, sodium thiopental, is intended to anesthetize the inmate and render him unconscious. However, there is a reasonable likelihood that sodium thiopental, if ineffectively delivered, will not provide the necessary sedative effect for the duration of the execution process. Without adequate depth of anesthesia, Mr. Jenkins will experience conscious paralysis and suffocation as the result of the administration of pancuronium bromide, and excruciating agony from the searing burn and cardiac arrest caused by potassium chloride. Simple and readily available remedial measures are available to the state of Alabama to ensure that Mr. Jenkins has achieved a surgical plane of anesthesia before the second and third chemicals are administered.

(*Id*. at 102).

Alternatively, he argues that electrocution constitutes cruel and unusual punishment under evolving standards of decency, because:

Alabama's protocol fails to require sufficient training of execution personnel to enable to them to reliably induce an appropriate level of anesthesia, including training in the proper insertion and maintenance of intravenous access lines and/or catheters. Alabama's lethal injection protocol does not establish the minimum qualifications and expertise required of the personnel who insert IV lines and administer the lethal chemicals. Most fundamentally, Alabama fails to require any monitoring of anesthetic depth to ensure that the painful second and third chemicals are not administered to a conscious inmate. Alabama does not require execution personnel to be in the necessary "bedside" position to make such an assessment. Alabama fails to provide for appropriate review of the performance of execution personnel against objective criteria. Deficiencies in Alabama's record-keeping further corrode confidence in its lethal injection protocols and practices. Alabama's wholly unnecessary use of a neuromuscular blocking agent, pancuronium bromide, insidiously acts to mask any pain and suffering that the inmate is experiencing and to

prevent the inmate from communicating his distress to execution personnel.

(*Id.* at 103).

The respondent correctly argues that review of this claim is foreclosed under the authority of *Hill v. McDonough*, 547 U.S. 573, 580 (2006). In *Hill*, the Supreme Court held that claims challenging the execution process should be brought in a suit pursuant to 42 U.S.C. § 1983. *See Thompkins v. Secretary, Dept. of Corrections*, 557 F. 3d 1257, 1261 (11th Cir. 2009) (citing *Hill v. McDonough*, 547 U.S. 573, 579-83 (2006)). Accordingly, this court is without jurisdiction to entertain this claim in a habeas context. As such, this claim is due to be dismissed.

## VI. Conclusion

Based on the foregoing, the petition for writ of habeas corpus is due to be denied. A separate final judgment consistent with this memorandum of opinion will be entered simultaneously herewith.

As to the foregoing it is **SO ORDERED** this the 31st day of August, 2016.

**VIRGINIA EMERSON HOPKINS**
United States District Judge

340